Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re:<br><br>GOODMAN NETWORKS, INC.,<br><br>    Debtor. | § § § § § § | Case No. 22-31641-mvl-7<br><br>(Chapter 7) |
| SCOTT M. SEIDEL, TRUSTEE; and<br>GNET ATC, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>18920 NW 11th, LLC; JAMES GOODMAN;<br>JAMES FRINZI; STEVEN<br>ZAKHARYAYEV; EVELINA<br>PINKHASOVA; PEOPLE NQ INC.;<br>JJC & PEOPLE LLC; GDMN FAMILY<br>INVESTMENTS 2, LLC,<br><br>    Defendants. | § § § § § § § § § § § § § § § § § | ADVERSARY PROCEEDING<br>NO: 23-03072-mvl |

**TRUSTEE'S REPLY IN SUPPORT OF MOTION TO COMPEL**

COMES NOW Scott M. Seidel (the "Trustee"), the Chapter 7 trustee for Goodman Networks Inc. (the "Debtor") and for GNET ATC, LLC, the plaintiffs in this Adversary Proceeding, and files this *Reply* to the *Defendants' Response to Trustee's Motion to Compel* (the

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO COMPEL—Page 1

"Objection"), filed by 18920 NW 11th, LLC ("18920"), Steven Zakharyayev ("Zakharyayev"), and Evelina Pinkhasova ("Pinkhasova") (together, the "Defendants"), and in support of his *Trustee's Motion to Compel Written Discovery Responses and Production of Documents from 18920 NW 11th, LLC, Steven Zakharyayev, and Evelina Pinkhasova* (the "Motion"), respectfully stating as follows:

## I.    REPLY

### A.    ALLEGED AGREEMENT TO RESOLVE DISPUTE

1.    The Defendants seem to blame the Trustee for not just waiting around while they comply with their discovery obligations, alleging that they "informed the Trustee that they intended to produce documents and to supplement and amend their discovery responses." There is no *commitment* or *agreement*. There is no admission that at least *some* of the relief sought in the Motion is appropriate. There is no agreement to a proposed order resolving at least *some* of the Motion. The Court should see through this attempt to use the "meet and confer" requirements to stall and delay. The Trustee filed his Complaint on August 5, 2023. The Defendants took this case through not one, but *two*, motions to dismiss. The Trustee served his discovery on April 10, 2024. The Defendants responded on May 24, 2024. Now, almost one year after filing the Complaint, and almost four (4) months after serving discovery, the Defendants have yet to provide full and appropriate responses and have yet to provide the Trustee with a meaningful production of documents, all while the scheduling order ticks away and depositions have to be postponed pending written discovery. It is time for a coercive order with deadlines.

### B.    APPLICABILITY OF *HELLER*

2.    The Defendants argue that *Heller* is not binding with respect to their boilerplate objections. But they give this Court no reason why such objections *are* appropriate. Whether *Heller* is binding or not is not even necessarily the question. Whether it is good law is. Not only

has it been cited to favorably literally hundreds of times across the country, including by this Court, but it is a correct and wise summary of the law governing discovery. The fundamental problem with boilerplate objections is not *per se* that an objection, however silly, may be made. It is that a production "subject to" such objections hides what is and what is not produced, and what is and what has not been searched, since a party can always stand behind the objection if it is later caught having played discovery games. This makes a mockery of the very thing that discovery is supposed to provide: knowledge.

3. The truth is simple. Not too long ago, "Big Law" invented boilerplate objections and the "subject to" production in order to escape the requirements and the consequences of discovery obligations, primarily Rule 37. Basically, certain crafty lawyers figured out that if they could hide what was actually reviewed and produced in a sea of boilerplate objections, they could use that to not review certain sources of responsive documents and to not produce problematic responsive documents, under some general or boilerplate objection. They could then later argue that the serving party failed to move to compel, that it waived its rights, and that there was no misrepresentation in a discovery response: "we told you we were objecting and producing 'subject to' and you did nothing about it." Other lawyers caught on, believing that if this is how Big Law does it, then it is the right way to do it, and everyone wants to do it the right way of course. Thus the use of these objections became reflexive and, ultimately, ubiquitous, just as *Heller* explains. The Trustee urges this Court to put a stop to it. Perhaps using boilerplate objections is an inadvertent mistake, especially for counsel outside our District. But when *Heller* is brought to one's attention and corrective measures are still not taken, then the issue becomes more serious.

4. So with the objection to production "to the extent they [the requests] require 18920 to produce documents outside his possession, custody, or control, and go beyond the requirements provided for by Federal Rule of Civil Procedure 34." No request seeks documents outside of one's

possession, custody, or control, and no request does or can exceed Rule 34. If there is any such request, then a discrete and detailed objection may be made. Likewise that "18920 objects to the instructions and requests to the extent references to 18920 or any other party or entity include that entity's employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf." However, when dealing with artificial entities, these can only act through their vice principals, employees, and agents. To say that, "[t]o the extent a request references a particular entity, 18920 intends to respond based solely on the entity itself," is simply incomplete. And, the objection that "18920 objects to the definition of the term "Document(s)" to the extent it exceeds the ordinary use of the term and that which is contemplated by Federal Rule of Civil Procedure 34 and in that it is overbroad as defined," is meaningless because the Defendants fail to state what portion of the Trustee's definition is objected to. To then state that "18920 will therefore respond to these requests which reference or seek "Document(s)" in accordance with the ordinary use of the term and the Federal Rules of Civil Procedure" is likewise meaningless without explaining how the Defendants understand the ordinary use of the term. The Court knows, for example, that Frinzi took screenshots of Signal messages that were supposed to be instantly deleted. If Zakharyayev did the same, would he subjectively consider that to be a "communication" or a "document?"

5. The foregoing are the more general of the boilerplate objections, but additional boilerplate objections are made to most of the requests for production in the nature of "overbroad, unduly burdensome, and harassing. 18920 also objects to this request to the extent it seeks documents not relevant nor reasonably anticipated to lead to the discovery of admissible evidence," and in the nature of "lacking specificity." These are asserted to discrete requests but are not themselves explained or supported. For most of the requests, the response then includes the "subject to" language. The result of all of these general and boilerplate objections is, as argued

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO COMPEL—Page 4

in the Motion and explained in *Heller*, an almost complete inability to determine what has been reviewed, what has been produced, and what has been withheld.

C.     **DOCUMENTS FROM THE INDIVIDUAL DEFENDANTS**

6.     The Defendants complain that the Trustee seeks the "Individual Defendants" to produce documents that are properly producible by 18920.  They argue that these requests are duplicative because any responsive documents would be in the possession, custody, or control of 18920.  They also argue that they have no responsive documents in their personal possession, custody, or control.  This is much to do about nothing.  If 18920 has all responsive documents in its possession, custody, or control, then the Individual Defendant's response to a Request for Production should be precisely that, and that 18920 will be producing such documents.  And, if the Individual Defendants have no responsive documents in their possession, custody, or control then the response is likewise simple: "after diligent and thorough review, the Individual Defendant has not located any responsive document that is within his/her possession, custody, or control."  One might ask why the Individual Defendants did not state that in their responses, if it is in fact true.

7.     The Trustee is simply covering his bases here.  He has sued individuals who may or may not have transacted all business related to the Transaction Shares through 18920 or through 18920's communications mechanisms, and it is not likely that an artificial entity would have possession, custody, or control of its control person's personal communications done through non-corporate means.  The Trustee therefore wants to ensure that he has the universe of responsive and relevant documents.  Zakharyayev, for example, is friends with Shalom Auerbach, with whom he also transacts business, and it is known from other defendants' discovery responses that Mr. Auerbach put the transaction together.  It is very likely that Zakharyayev would have initially discussed the matter with Mr. Auerbach through a non-18920 communication, which would not

be within the possession, custody, or control of 18920, and the Trustee needs to have confidence that Zakharyayev has or will search all potential means of communication with Mr. Auerbach. This is not duplication but is thoroughness. If the Defendants are right that 18920 has everything and will produce everything, and that they personally have nothing, then their responses and their obligations are easily and efficiently met—except of course that if they lie in their responses, the Trustee would then have a remedy that he currently lacks.

D. **ALLEGED PRIVILEGES**

8. That Zakharyayev is an attorney is not deniable, but that does not mean, as the Defendants say, that Zakharyayev "was not only 18920's manager, but also its lawyer." There is no evidence of that, no engagement letter, no invoice, no payment, no document or affidavit demonstrating any attorney-client relationship. That is the Trustee's first point: it is the Defendants' burden to prove the existence and application of a privilege, which they have not done. *See, e.g., U.S. v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002).

9. The Trustee's second point is an obvious one: that one may be an attorney does not convert everything that one does or everything that one says into work product or privileged communications. And, that Zakharyayev chose to own and to manage a business does not permit him to clothe everything he did as owner or manager under the mantle of legal services. That is a risk that he assumed when he agreed to wear two hats, and it is for him and his clients to impose proper procedures to differentiate between what is legal advice and what are business issues.

10. Third, no privilege log has been provided. Surely the Defendants do not assert that each and every communication that Zakharyayev had with anyone regarding the transaction is privileged? Without a privilege log, the Trustee cannot assess these issues and the Court cannot decide them. Perhaps an *in camera* review may become appropriate, but the minimum is that a privilege log first be provided.

11. Fourth, there is the ability to compel production and answers notwithstanding an asserted privilege. The Trustee has sued Pinkhasova for fraud. She actually signed (even if her husband drafted) a letter claiming that 18920 owned shares (which it did not) that had tens of millions of dollars of mandatory redemption rights (which they did not), demanding payment of tens of millions of dollars. "Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome where communication or work product is intended to further continuing or future criminal or fraudulent activity." *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005). And, Rule 26 provides a mechanism where work product may be obtained where "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3)(A). The Defendants need to properly comply with their discovery obligations in order that the Trustee can determine whether sufficient grounds to seek any of the foregoing relief exist.

12. Fifth, and most importantly, is the substance of the objections based on privilege. Even giving the Defendants the benefit of the doubt on every allegation concerning Zakharyayev and the privilege, it is clear that no privilege applies to the Trustee's carefully crafted requests and interrogatories. "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. U.S.*, 449 U.S. 383, 395 (1981). "Thus, in the corporate setting, the attorney-client privilege attaches only to communications made for the purpose of giving or obtaining legal advice or services, not business or technical advice or management decisions." *Baptist Health v. BancorpSouth Ins. Servs. Inc.*, 270 F.R.D. 268, 276 (N.D. Miss. 2010). *Accord Stoffels v. SBC Communications Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009). This may be a highly "fact-specific" inquiry, but without the Defendants presenting any evidence—and on what is their burden of proof at that—the Court simply cannot find any communications to be privileged.

13. The following Interrogatories, objected to on the basis of privilege, are particularly relevant:

- At the time of the Redemption Notice, what was the <u>factual</u> basis for the statement in the Redemption Notice that "18920 NW 11th LLC, (the "Shareholder") is owner of 4,032,918 Series A-1 Preferred Shares" as of the date of the Redemption Notice?

- At the time of the execution of the Purchase Agreements, how did You believe or understand that 18920 paid, or would pay, for the Transaction Shares, and when it would do so or when it had done so?

- At the time of the Redemption Notice, what was the <u>factual</u> basis for the statement in the Redemption Notice that the "Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis?"

- Explain what steps You took, including any due diligence You undertook, to review whether the "Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis," as stated in the Redemption Notice.[1]

- At the time of the Redemption Notice, did You believe or understand that the "Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis," as stated therein, and, if You so believed, why did You so believe?

- At the time of the Redemption Notice, what did You believe or understand was the "liquidation value [of Preferred Shares] on a quarterly basis" as stated in the Redemption Notice, and why?

- At the time of the Redemption Notice, did You believe or understand that the Debtor had the funds necessary to pay the "mandatory redemptions" as stated in the Redemption Notice and if so, why?

- At the time of the execution of the Purchase Agreements, where and how did you believe that the funds that would be used by 18920 to pay for the Transaction Shares would ultimate [sic] come or originate from.

- At the time of the Redemption Notice, did You have a belief or understanding as to the Debtor's solvency and, if so, state the factual basis for any such belief or understanding.

---

[1] This one *may* be privileged in part with respect to Zakharyayev, if he undertook any such due diligence, but in no event would be privileged with respect to Pinkhasova. She can respond with facts, with "no due diligence," or with full reliance on her husband.

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO COMPEL—Page 8

- As of the date of the Settlement Agreement, what value did You believe or understand that 18920 gave to the Debtor for the Settlement Agreement or what the "value received" stated in the Promissory Note was?

- Do You agree that. at the time of the execution of the Purchase Agreements, You already had an understanding or agreement, whether oral or written, with the Debtor, GNET. Frinzi, Goodman, or anyone else, that, in lieu of the Debtor paying the redemption demand the subject of the Redemption Notice, the Debtor would instead execute the Promissory Note and the Settlement Agreement and deliver to 18920 the consideration provided for in the Settlement Agreement?

14. None of this is privileged: the factual basis, *i.e.* document, providing for the redemption rights; whether 18920 owned the shares on the date of the demand; how 18920 would pay for the shares it was purchasing; where that money came from; what the liquidated value of the redemption shares was; whether the Debtor had the funds to pay; what consideration 18920 gave for the promissory note; and whether there was an agreement by which the Debtor would pay consideration other than cash—all of these are factual and business issues. None of this is the "giving or obtaining legal advice or services."

E. GENERAL EVASIVENESS

1. **Right to Redemption**

15. The critical issue in this Adversary Proceeding is whether the Transaction Shares had a redemption right. In this respect:

> [18920] INTERROGATORY NO. 6. Identify each document or instrument, including any articles of incorporation, bylaws, shareholder agreement, resolution, or other governance document of the Debtor, which You assert or contend gave You any right or option of redemption with respect to the Transaction Shares or any securities of the Debtor as demanded in the Redemption Notice, including any of the Debtor's Series A-1 Preferred Stock, including by identifying the same in Your production to the Trustee in response to his Requests for Production served concurrently herewith.
>
> RESPONSE: 18920 objects to this request as overbroad and that this request seeks information not relevant nor reasonably anticipated to lead to the discovery of admissible evidence. Subject to the foregoing, 18920 would refer the Trustee to documents produced with 18920's responses to Trustee's requests for production.

16. The objection to this Interrogatory can only have been made in bad faith: the key issue in this Adversary Proceeding was whether there was a redemption right—indeed, Pinkhasova demanded tens of millions of dollars in payment on an alleged redemption right. To suggest that this is not relevant or is overly broad is absurd. These objections should be overruled.

17. Next, the reference to "documents produced with 18920's responses to Trustee's requests for production" is insufficient. For one, very few documents have been produced, and none seemingly on point, and the supplemental production that is alleged in the Objection still has not been made. More to the point, however, Rule 33 provides as follows:

> (d) Option to Produce Business Records. If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:
>
> > (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and
> >
> > (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

FED. R. CIV. P. 33(d).

18. The predicate of this option is not met, because the burden is not the same on both parties. The Interrogatory asks 18920 for *its* assertion and contention; the Trustee has no way to divine that even if he reviews all documents. And, 18920 has not specified "in sufficient detail to enable the [Trustee] to locate and identify them as readily as the responding party could." Thus, this answer is deficient and the Court should compel 18920 to answer, with specificity, precisely which document it is that gave it the redemption right it alleged and it used to make millions of dollars from the Debtor. And, in response to Interrogatory No. 7, which asks what due diligence 18920 undertook with respect to the redemption right, 18920 answers "[c]ounsel for 18920 had

several conversations with James Goodman, Goodman Network's former attorney and in-house counsel, and Frinzi. 18920 also reviewed shareholder agreements produced by Goodman and his attorneys with respect to ownership in the shares." Surely, therefore, 18920 (and Pinkhasova) knows what document gave it the right to demand tens of millions of dollars from the Debtor?

19. The truth is simple and everyone knows it: there was not a redemption right. Perhaps people thought that there was one, and perhaps they even thought that in good faith. But there was none. The Defendants know that the Trustee will move for summary judgment on this issue. So, instead of simply answering the discovery, they hedge in order to attempt to defeat summary judgment in the future. Yet a main purpose of interrogatories is to see whether certain issues are capable of summary adjudication as a means of streamlining and advancing the litigation. This is certainly one of those situations: let everyone identify the document or right, and let the Court decide the issue in light of that identification. It is no different than asking a breach of contract plaintiff to identify the contract on which it sues. It is unimaginable that the plaintiff would be permitted to avoid a direct and binding answer.

### 2. Receipt of Transfers

20. Incredibly, 18920 *denies* receipt of funds from the Debtor and GNET. *Compare* docket no. 23 (amended complaint) at ¶¶ 55-58, *with* docket no. 27 at ¶¶ 55-58. Then, 18920 objected to providing its own bank records.

> [18920] REQUEST FOR PRODUCTION NO. 1. Any and all bank statements for any bank accounts held in Your name or for Your benefit since January 1, 2021 through the present.
>
> RESPONSE: 18920 objects to this request as overbroad, unduly burdensome, and harassing. 18920 also objects to this request to the extent it seeks documents not relevant nor reasonably anticipated to lead to the discovery of admissible evidence. Subject to the foregoing, none.
>
> [18920] INTERROGATORY NO. 1. Identify all of the bank accounts currently held in Your name or for Your benefit and any such bank accounts held at any time

since October 1, 2021. The foregoing includes the name of the bank, the account number, and the holder of the account.

RESPONSE: 18920 objects to this request as overbroad, unduly burdensome, and harassing. 18920 also objects to this request to the extent it seeks documents not relevant nor reasonably anticipated to lead to the discovery of admissible evidence. Subject to the foregoing, 18920 had a single Bank of America account, which was ultimately closed by Bank of America and for which there is no longer access.

[18920] INTERROGATORY NO. 2. Identify each and every Transfer made by the Debtor and GNET to You, including the transfer of any funds, including into any bank account held in Your name or held for Your benefit or to which You had access. For each such Transfer that is a transfer of funds, state the transferor, the transferor's bank, the transferor's bank account, the date of the transfer, the method of the transfer, the name of the transferee's bank, the transferee's bank account, and the amount of such transfer.

RESPONSE: 18920 received some of, or partial payment relating to, the items provided for in the Settlement Agreement. See the Settlement Agreement produced by 18920; the February 10, 2023 deposition testimony of its corporate representative, Steven Zakharyayev, at 59:1–60:2, 62:8–64:5.

21.     These requests and interrogatories are very relevant to demonstrate that 18920 had no funds of its own, to confirm receipt of Debtor funds, to evidence any payments to the sellers who are other defendants in this Adversary Proceeding, and to "follow" the money. The notion that there were no paper or electronic bank statements or other documents is simply not credible [in response to Interrogatory No. 1, 18920 answers that it no longer has access to bank statements]. The Trustee believes that 18920 has a right to contact its bank and obtain the records, to the extent that it did not receive paper copies or save electronic ones. Or, if the Trustee has to subpoena the bank, then 18920 should provide additional information to help in identifying the branch and accounts. It is simply not credible that a business that transacted over ten million dollars and is managed by a licensed attorney does not have bank statements, does not have access to bank statements, and does not know how to get them. At a minimum, the Rules require an explanation as to what was attempted to be done before the Defendants provide their cursory conclusion that they do not have the records and cannot get them.

### 3. Acquisition of Transaction Shares

22. An important issue in this Adversary Proceeding, especially given the fraud allegations against Pinkhasova, concerns whether 18920 even owned the Transaction Shares when it sent its demand, and how it expected to pay for them. In this respect:

> [18920] INTERROGATORY NO. 4. Explain what the intended source of funds was that would be used by You or transferred on Your behalf to make any payments on the Purchase Agreements or otherwise used to acquire the Transaction Shares, including the amounts of any such payment(s) and who any such payment(s) would came from. In other words, how did You intend and expect to pay for the Transaction Shares and when?
>
> RESPONSE: 18920 objects to this request as overbroad and that this request seeks information not relevant nor reasonably anticipated to lead to the discovery of admissible evidence. Subject to the foregoing, 18920 intended to fund the purchase through private capital from investors.
>
> [18920] INTERROGATORY NO. 5. Did You ever acquire the Transaction Shares and, if so, when and how? Your answer should identify all documents and agreements pursuant to which You acquired the same, all transactions and transfers pursuant to which You paid for the same, and all documents and actions executed or taken to evidence Your acquisition of the Transaction Shares and the date of all of the foregoing, including the transfer of any funds to any of Goodman, GDMN, JJC, and People, and including the amounts, dates, and transferees of such transfers.
>
> RESPONSE: 18920 had acquired the Transaction Shares via the purchase agreements, and had a right to them, since it had made payment. However, 18290 never actually received the Transaction Shares, because James Goodman would not sign some of the necessary transfer documents.
>
> [18920] INTERROGATORY NO. 8. At the time of the Redemption Notice, what was the factual basis for the statement in the Redemption Notice that "18920 NW 11th LLC, (the "Shareholder") is owner of 4,032,918 Series A-1 Preferred Shares"? Your answer should address whether, by that date, 18920 had paid for the Transaction Shares, whether You believed that it needed to pay for the same in order to then own the same, why You may have believed that it need not have paid for the same in order to then own the same, and whether any steps had then been taken for 18920 to take any action to evidence its ownership of the Transaction Shares and what any such action would have been and whether and when it was taken.
>
> RESPONSE: The Share Purchase Agreements with the various Goodman entities entitled 18920 to the preferred shares which carried mandatory redemption rights.

Document    Page 14 of 19

18290 initiated payment of $10 million to Goodman Networks around March 9 or 10, 2022.

[18920] INTERROGATORY NO. 20. Admit that, at the time you entered into the Purchase Agreements, You knew that the Debtor and GNET would be unable to pay any redemption demand or option for the Transaction Shares, and that You had already reached an understanding or oral agreement with Frinzi that the Promissory Note and Settlement Agreement would be given by the Debtor in satisfaction of such redemption demand or option, such that all of the Purchase Agreements, Demand Notice, Promissory Note, and Settlement Agreement were part of the same overall transaction in Your mind. If you deny this Interrogatory, then explain how it was that the Purchase Agreements, Demand Notice, Promissory Note, and Settlement Agreement were all done within forty-eight hours of each other or, if the dates of such documents are incorrect, then state the dates on which such documents were executed.

RESPONSE: 18920 objects to this request as an improper interrogatory, as it is actually a request for admission to be propounded pursuant to Federal Rule of Civil Procedure 36.

23.  These objections should be stricken and the Defendants should be ordered to give full and non-evasive answers. The answer that "18920 intended to fund the purchase through private capital from investors" is woefully deficient. Who? When? Why? The answer that, at the time of the Redemption Demand, 18920 owned the Transaction Shares because "Share Purchase Agreements with the various Goodman entities entitled 18920 to the preferred shares which carried mandatory redemption rights. 18290 initiated payment of $10 million to Goodman Networks around March 9 or 10, 2022,"[2] is likewise evasive because it does not explain how 18920 could have believed that it owned something it had not paid for, especially when payment was a condition precedent in the sale agreements to transfer of title. And, the objection to Interrogatory No. 20 that it is properly a Request for Admission is nonsensical: nothing prevents a party from using an interrogatory to ask an admission.

---

[2]   Of course, the Trustee cannot test this as no bank records are produced. But is known for a fact that 18920 did not pay for the Transaction Shares on March 9 or 10, because the Debtor transferred the funds to 18920 on March 11—which, incidentally, 18920 admitted in response to the Trustee's original complaint, only denying it later with the amended complaint. But then again, since no one has verified the Interrogatory responses, no one can be held accountable for this obvious lie.

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO COMPEL—Page 14

### 4. Return Consideration

24. Given the fraudulent transfer issues involved, the issue of return consideration and reasonably equivalent value is of obvious importance. In this respect, 18920 has evaded the critical interrogatories.

> [18920] INTERROGATORY NO. 15. What value or return consideration did You provide to the Debtor or GNET for the Redemption Notice, Promissory Note, Settlement Agreement, and any of the transfers or payments the subject of Interrogatory No. 2? Your answer should explain both the nature and the amount of such value, and the date(s) on which it was given.
>
> RESPONSE: 18920 paid $10 million for the preferred shares pursuant to the Share Purchase Agreements with the three Goodman entities.
>
> [18920] INTERROGATORY NO. 23. What did You do to earn the gain of profit the subject of Interrogatory No. 22? Explain what capital You used, what risk You had. what transactional fees and expenses You had, what value You added to anyone, and everything else that should be taken into account as a cost or expense of said gain or profit.
>
> RESPONSE: 18920 objects to this request as overly broad. Subject to the foregoing, 18920 negotiated the Share Purchase Agreements and had to redeem those shares.

25. This is clear evasiveness. Interrogatory 15 asks for consideration given to the Debtor, yet the answer is what was paid to the James Goodman entities. Interrogatory 23 is likewise ignored.

### F. COMMUNICATIONS

26. The Trustee has generally requested all communications related to the underlying transaction, including the sale of the stock, the demand for the redemption payment, and the subsequent alleged settlement of that. The Defendants have generally objected based on privilege, and then have responded that "18920 will produce responsive documents." First, there needs to be a privilege log, as discussed above. Second, it does not appear that responsive communications have been produced. Most important, especially as it goes to the fraud and other causes of action against the individuals, is the March 9, 2022 redemption demand. It is very likely that this was

sent by e-mail to Frinzi, as it was not possible to send it even overnight and yet do everything else that was done on that day and the day after. It is simply not likely that there would be no communication from 18920, Zakharyayev or Pinkhasova attaching at least that demand letter to an e-mail.[3]

**G   SUBSEQUENT TRANSFEREE DISCOVERY**

27. The Trustee seeks discovery related to subsequent transfers and 18920's financial condition, including tax returns, bank statements, capitalization, and information related to subsequent transfers. The Defendants object based on relevance grounds (or that the information the Trustee seeks predates the facts at issue here). Normally, the financial condition of a defendant may not be relevant to a complaint unless and until there is a judgment. Here, under both the Bankruptcy Code and TUFTA, issues involving subsequent transferees *and* prejudgment rights—which, given the ever-growing pattern of consecutive fraudulent transfers is something that the Trustee is certainly exploring—are highly relevant and may lead to additional claims and defendants. This is all the more so given certain case law treating UFTA limitations periods as statutes of repose. To be blunt, the law is not so foolish or naive as to permit a defendant to keep transferring away assets while statutes of repose run, at least not for a vigilant plaintiff.

28. That the Trustee may sue subsequent transferees under TUFTA and the Bankruptcy Code without first obtaining a judgment against the original transferee is clear. *See, e.g.,* 11 U.S.C. § 550; *In re Leff*, 631 B.R. 106, 124-25 (Bankr. E.D.N.Y. 2021). More to the point, TUFTA provides for extensive prejudgment remedies, including "an attachment or other provisional remedy against the asset transferred or other property of the transferee," and "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other

---

[3] The Trustee has imaged Frinzi's corporate e-mail file, but he is known to have frequently communicated from his personal e-mail address from through his other e-mail addresses at his other businesses.

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO COMPEL—Page 16

property; (B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or (C) any other relief the circumstances may require." TEX. BUS. & COMM. CODE § 24.008(2)-(3). Indeed, our District Court has stated that "TUFTA provides unsecured creditors with a <u>substantive right</u> to the prejudgment appointment of a receiver." *Biliouris v. Sundance Resources Inc.*, 559 F. Supp. 2d 733, 737 (N.D. Tex. 2008) (emphasis added). And, this right and all other prejudgment remedies available under the TUFTA and the Bankruptcy Code are clearly available to the Trustee. *See* FED. R. CIV. P. 64 *et. al.*

29. In this respect, the financial condition of 18920 *before* the redemption transaction is also very relevant. First, as the Trustee is certain the evidence will show, 18920 did not have the funds, credit, capitalization, or wherewithal to pay the $12.4 million it needed to. This goes to the heart of the Trustee's case: that 18920 was not just an opportunistic entity used to make a lawful buck, but rather an instrumentality to funnel Debtor funds out for no consideration. It is one thing for 18920 to use its own funds to make a risky investment and to turn a profit, and another entirely to use the Debtor's funds and to keep a profit. Second, the capitalization and solvency of 18920 are relevant to constructive fraudulent transfer claims and to subsequent transferee defenses.

30. The Trustee will be direct. It has been two and one-half years since the defendants fraudulently received some $12.4 million. No one knows what they did with that money, but it must have gone somewhere, and they have had plenty of time—and continue to buy time for themselves—to further transfer or metamorphosize the fruits of their torts. The Trustee has seen how Frinzi spent millions and millions living the good life, which money is gone. One Genesis entity and John Goodman have already filed Chapter 7 cases. The various estate defendants appear to be masters at orchestrating and then hiding fraudulent transfers, including through the use of "shills" like 18920 and their friends in another lawsuit, the Hudson entities.

31. In sum, the Trustee intends to seek all available prejudgment remedies, if the facts warrant it, and discovery exists for any matter that is relevant, which this certainly is given the law of fraudulent transfer and subsequent transferees.

## II.     SANCTIONS

32. The Trustee's Motion is not about sanctions. What he wants is the discovery that he is entitled to in order to advance this Adversary Proceeding. On the other hand, the Defendants have forced motion practice over what are fairly simple issues, which the Trustee raised informally, and then spent weeks trying to work out informally. Even now, despite their vague statements of promising cooperation, the Defendants continue to resist each and every request made by the Trustee in his Motion. What possible reason can the Defendants have, for example, for not verifying interrogatory responses, or that they have not have a chance in the past 3 months to visit a notary public? How can they possibly argue with a straight face that bank records are not relevant, when they deny the allegation of receipt of the transfers from the Debtor? How can they possibly object to identifying the very document they said entitled them to tens of millions of dollars as "overbroad and that this request seeks information not relevant nor reasonably anticipated to lead to the discovery of admissible evidence."

33. It is for the Court to determine whether sanctions are warranted and, if so, in what amount. That grounds and facts exist to issue sanctions is clear. So is one more thing: many of the estate defendants and their counsel are related and affiliated, and there are many other present and future defendants that will all participate in discovery served and to be served by the Trustee. This may be the appropriate and timely opportunity for the Court to show all parties that it will not tolerate games of the type played by these Defendants, which only serve to hide the truth, increase everyone's fees and costs, delay litigation, and take from the Court its precious resources.

RESPECTFULLY SUBMITTED this 19th day of July, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
tberghman@munsch.com
jvasek@munsch.com
cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 19th day of July, 2024, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Defendants.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.