Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 23-03072 |
| | § | |
| 18920 NW 11th LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 23-03090 |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF TRUSTEE'S MOTION TO
COMPEL WRITTEN DISCOVERY RESPONSES
AND PRODUCTION OF DOCUMENTS FROM JAMES
GOODMAN, GOODMAN INVESTMENT HOLDINGS, LLC, GENESIS
NETWORKS GLOBAL SERVICES, LLC, PEOPLE NQ, INC., JJC
& PEOPLE, LLC AND GDMN FAMILY INVESTMENTS 2, LLC**

Scott M. Seidel, the duly-appointed chapter 7 trustee (the "Trustee") for Goodman

Networks, Inc. (the "Debtor"), files this appendix in support of his *Trustee's Motion to Compel*

*Written Discovery Responses and Production of Documents from James Goodman, Goodman*

*Investment Holdings, LLC, Genesis Networks Global Services, LLC, People NQ, LLC, JJC &*

*People, LLC, and GDMN Family Investments 2, LLC* (the "Motion").  This appendix includes the

following documents to aid the Court in evaluating the Motion:

| Tab | Description | Appx. |
|-----|-------------|-------|
| 1 | Trustee's Amended Complaint [Case No. 23-03072] | 1 |
| 2 | Trustee's Original Complaint [Case No. 23-03090] | 32 |
| 3 | Trustee's First Set of Requests for Production to Defendant James Goodman | 59 |
| 4 | Trustee's First Set of Interrogatories to Defendant James Goodman | 93 |
| 5 | Trustee's First Set of Requests for Production to Defendant Goodman Investment Holdings, LLC | 122 |
| 6 | Trustee's First Set of Interrogatories to Defendant Goodman Investment Holdings, LLC | 156 |
| 7 | Trustee's First Set of Requests for Production to Defendant Genesis Networks Global Services, LLC | 186 |
| 8 | Trustee's First Set of Interrogatories to Defendant Genesis Networks Global Services, LLC | 220 |
| 9 | James Goodman's Objections and Responses to Trustee's First Set of Requests for Production to Defendant James Goodman | 250 |
| 10 | James Goodman's Objections and Responses to Trustee's First Set of Interrogatories to Defendant James Goodman | 260 |
| 11 | Goodman Investment Holdings, LLC's Objections and Responses to Trustee's First Set of Requests for Production to Defendant Goodman Investment Holdings, LLC | 269 |

| Tab | Description | Appx. |
|-----|-------------|-------|
| 12 | Goodman Investment Holdings, LLC's Objections and Responses to Trustee's First Set of Interrogatories to Defendant Goodman Investment Holdings, LLC | 278 |
| 13 | Genesis Networks Global Services, LLC's Objections and Responses to Trustee's First Set of Requests for Production to Defendant Genesis Networks Global Services, LLC | 287 |
| 14 | Genesis Networks Global Services, LLC's Objections and Responses to Trustee's First Set of Interrogatories to Defendant Genesis Networks Global Services, LLC | 296 |
| 15 | November 8, 2024 letter from Conor White to Randy Pulman regarding discovery | 305 |
| 16 | Trustee's Second Set of Requests for Production to Defendant James Goodman | 312 |
| 17 | Trustee's Second Set of Requests for Production to Defendant People NQ, Inc. | 323 |
| 18 | Trustee's First Second Set of Requests for Production to Defendant JJC & People, LLC | 333 |
| 19 | Trustee's First Second Set of Requests for Production to Defendant GDMN Family Investments 2, LLC | 343 |
| 20 | James Goodman's Responses to Trustee's Second Set of Requests for Production to Defendant James Goodman | 353 |
| 21 | People NQ, Inc's Responses to Trustee's Second Set of Requests for Production to Defendant People NQ, Inc. | 359 |
| 22 | JJC & People, LLC's Responses to Trustee's First Second Set of Requests for Production to Defendant JJC & People, LLC | 364 |
| 23 | GDMN Family Investments 2, LLC's Responses to Trustee's First Second Set of Requests for Production to Defendant GDMN Family Investments 2, LLC | 369 |
| 24 | December 18, 2024 email from Conor White to Anna MacFarlane regarding discovery deficiencies | 374 |
| 25 | Document Production GOODMAN_A-1-00000869-00000918 | 375 |

RESPECTFULLY SUBMITTED this 16th day of January, 2025.

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ *Conor P. White*
_____
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White
Texas Bar No.
500 N. Akard St., Ste. 4000
Dallas, Texas 75201
214-855-7500
drukavina@munsch.com
jvasek@munsch.com
cwhite@munsch.com

**COUNSEL FOR SCOTT M. SEIDEL,
CHAPTER 7 TRUSTEE**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 16th day of January, 2025, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on James Goodman, GDMN Family Investments 2, LLC, People NQ, LLC, and JJC & People, LLC through Randy Pulman, their counsel of record.

/s/ *Conor P. White*
_____
Conor P. White

# EXHIBIT 1

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | ADVERSARY PROCEEDING |
| Plaintiffs, | § | NO: 23-03072-mvl |
| | § | |
| v. | § | |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

<div align="center">

**TRUSTEE'S AMENDED COMPLAINT**

</div>

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel, Trustee (the "Trustee"), the trustee of Goodman Networks,

Inc. (the "Debtor"), the debtor in the above styled and numbered chapter 7 bankruptcy case (the

"Bankruptcy Case"), and GNET ATC, LLC ("GNET," with the Trustee, the "Plaintiffs"), and file

TRUSTEE'S AMENDED COMPLAINT—Page 1

this *Amended Complaint* (the "Complaint"), complaining of 18920 NW 11th, LLC ("18920"), James Goodman ("Goodman"), James Frinzi ("Frinzi"), Steven Zakharyayev ("Zakharyayev"), Evelina Pinkhasova ("Pinkhasova"), People NQ Inc. ("People NQ"), JJC & People LLC ("JJC"), and GDMN Family Investments 2, LLC ("GDMN," with People and JJC, the "Goodman Entities," and the Goodman Entities, with 18920, Goodman, Frinzi, Zakharyayev, and Pinkhasova, collectively, the "Defendants"), and, for cause and action, would respectfully show as follows:

## I.     INTRODUCTION

1.     By March 2022, the Debtor was insolvent – owing tens of millions of dollars to secured and unsecured creditors.  Employing misrepresentation, concealment, fraud, and other tortious conduct, and in breach of various duties to the Plaintiffs, the Defendants participated in a convoluted transaction that stripped the Plaintiffs of at least $13.5 million and other valuable assets in March 2022.  The Plaintiffs received nothing of value, and the Defendants executed the dual purpose of removing Plaintiffs' valuable assets from the reach of creditors and enriching certain of the Defendants.

2.     Specifically, Goodman, through the Goodman Entities, owned a large number of the Debtor's then worthless preferred shares.  Looking for an opportunity to monetize those shares, Goodman, Zakharyayev and Frinzi concocted a plan to have the preferred shares transferred to 18920, have 18920 demand redemption of the preferred shares by the Debtor, and then settle that demand for the transfer of cash and valuable assets.  To make everything appear legitimate, the plan was based on a purported obligation of the Debtor to mandatorily redeem or liquidate the preferred shares.  But, under the Debtor's operative corporate documents in 2022, such an obligation did not exist.  Indeed, if such a mandatory redemption right had existed, Goodman and the Goodman Entities could have capitalized on it without the need for a middle-man.  Thus, 18920 agreed to purchase the shares—not with its money or at its risk, but rather with the Debtor's

TRUSTEE'S AMENDED COMPLAINT—Page 2

Appx.0002

money—then made a fraudulent redemption demand on shares it did not own, which Frinzi then honored by transferring cash and other assets pursuant to a "settlement" with 18920.

3.     Following the transaction, the Plaintiffs had received no value, Goodman and the Goodman Entities had received $10 million for worthless preferred shares, and 18920 (controlled by Zakharyayev and Pinkhasova) held onto cash of approximately $3.5 million and other valuable assets in consideration for its role as a conduit to perpetuate the fraud and torts further detailed in this Complaint.  Goodman, Zakharyayev, and Pinkhasova tortuously convinced Frinzi that there was this (non-existing) redemption right, and Frinzi, blindly believing this in order to benefit Goodman at the expense of the Debtor, breached his duties of care and loyalty by facilitating and permitting the transaction.

4.     The Trustee therefore files this Complaint to avoid these transactions, obtain monetary and other relief, and hold the Defendants accountable.

## II.     PROCEDURAL BACKGROUND

5.     On September 6, 2022 (the "Petition Date"), various petitioning creditors filed an involuntary petition against the Debtor, thereby initiating the Bankruptcy Case and creating the Debtor's bankruptcy estate (the "Estate").

6.     The Court entered an order for relief against the Debtor on December 12, 2022.

7.     The Trustee is the duly appointed trustee of the Debtor and the Estate.

8.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.  Such jurisdiction is core under 28 U.S.C. § 157(b)(2).  To the extent that any matter in this Adversary Proceeding is not core, the Trustee consents to this Court's entry of a final judgment over any and all such matters.

9.     Venue of this Adversary Proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

TRUSTEE'S AMENDED COMPLAINT—Page 3

## II.     PARTIES

10.     The Trustee is the Chapter 7 trustee of the Debtor and the Estate and files this Complaint in such capacity only.

11.     GNET is a Texas limited liability company, the sole member and owner of which is the Debtor.  In that the Trustee controls the Debtor, and the Debtor is the sole member of GNET, the Trustee has all necessary authority to cause GNET to file this Complaint and to direct its actions in this matter as the sole member.

12.     18920 is a limited liability company organized and existing under the laws of the State of Florida.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), 18920 may be served with process in this Adversary Proceeding by and through its registered agent, Evelina Pinkhasova, as follows: 18920 NW 11th LLC, c/o Evelina Pinkhasova, Registered Agent, 2719 Hollywood Blvd., Hollywood, FL 33020.

13.     Goodman is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Goodman may be served with process in this Adversary Proceeding anywhere he may be found, including his home at: James Goodman, 103 Tomahawk Trail, San Antonio, TX 78232, or where he regularly transacts business: James E. Goodman, Genesis Networks, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

14.     Frinzi is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Frinzi may be served with process in this Adversary Proceeding anywhere he may be found, including his home, as follows: James Frinzi, 9204 Eddy Cv., Austin, TX 78735.

15.     Zakharyayev is an individual and a resident of the State of New Jersey.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Zakharyayev may be served with process in

Appx.0004

this Adversary Proceeding anywhere he may be found, including his home, as follows: Steven Zakharyayev, 43 West Canadian Woods Road, Marlboro, NJ, 07746.

16. Pinkhasova is an individual and the wife of Zakharyayev. Upon information and belief, and pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Pinkhasova may be served with process in this Adversary Proceeding anywhere she may be found, including her home, as follows: Evelina Pinkhasova, 43 West Canadian Woods Road, Marlboro, NJ, 07746.

17. People NQ is a corporation organized and existing under the laws of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), People NQ may be served with process in this Adversary Proceeding by and through its registered agent, Capital Corporate Services, Inc., as follows: People NQ Inc., c/o Capital Corporate Services, Inc., Registered Agent, 1501 S Mopac Expy Suite 220, Austin, TX 78746.

18. JJC is a limited liability company organized and existing under the laws of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), JJC may be served with process in this Adversary Proceeding by and through its registered agent, James Goodman, as follows: JJC & People, LLC, c/o James Goodman, Registered Agent, 205 Crest Trl, San Antonio, TX 78232.

19. GDMN is a limited liability company organized and existing under the laws of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), GDMN may be served with process in this Adversary Proceeding by and through its registered agent, John Goodman, as follows: GDMN Family Investments 2, LLC, c/o John Goodman, Registered Agent, 2801 Network Blvd, Suite 300, Frisco, TX 75034.

# III.   FACTS

## A.   THE PLAYERS

20.     At all times material to this Complaint, Frinzi was the Chief Executive Officer of the Debtor, owing fiduciary duties to the Debtor.

21.     At all times material to this Complaint, Frinzi was the Chief Executive Officer of GNET, owing fiduciary duties to GNET.

22.     Goodman was a director of the Debtor prior to his resignation as such on February 1, 2022.  Upon information and belief, Goodman controlled the majority shareholder group of the Debtor.  Furthermore, Goodman continued to communicate with Frinzi as though Goodman was in charge, and Frinzi continued to act as though Goodman was in charge.

23.     At all times material to this Complaint, Goodman was an insider of the Debtor: as the person who controlled the majority of the Debtor's stock, and as the person who controlled Frinzi even after the time that he may have resigned as a director, and whose instructions Frinzi followed regardless of whether Goodman was a director or not.

24.     People NQ is, upon information and belief, owned and controlled by Goodman.

25.     At all times material hereto, People was an insider of the Debtor, through its common ownership and control by Goodman.

26.     JJC is, upon information and belief, owned and controlled by Goodman.

27.     At all times material hereto, JJC was an insider of the Debtor, through its common ownership and control by Goodman.

28.     GDMN is controlled, and at all times material hereto was controlled, by John Goodman.  Upon information and belief, Goodman owns an interest in GDMN.  John Goodman and Goodman are brothers.  Thus, because Goodman was an insider of the Debtor, and John

Appx.0006

Goodman was an insider of Goodman, and John Goodman was an insider of GDMN, GDMN was

an insider of the Debtor.

29.     Zakharyayev is an attorney, upon information and belief licensed to practice law in

the State of New York and the State of Florida.

30.     Upon information and belief, Zakharyayev and Pinkhasova own and control 18920.

**B.     THE DEBTOR**

31.     As of March 1, 2022, and at all times material hereto, the Debtor was insolvent.

32.     Among other things, the Debtor lost its largest customer in October 2021, had

stopped paying FedEx Supply Chain Logistics & Electronics, Inc. ("FedEx") (a major creditor

which was owed tens of millions of dollars), had stopped paying other large creditors and vendors,

faced numerous lawsuits, and knew that it would soon be unable to make the final principal

payment on its Bonds (defined below) due in May 2022.

33.     As of March 1, 2022, the Debtor owed at least $47 million on its 8% Senior Secured

Notes (the "Bonds"), though it was in the process of attempting to retire approximately $30 million

of Bonds in advance of an interest payment due in April 2022.  GNET was a guarantor of the

Bonds.

34.     As of March, 2022, the Debtor had few remaining assets.  The Debtor and/or GNET

held, as payee, a secured promissory note in the amount of $44 million (the "AMRR Note")[1]

payable by American Metals Recovery and Recycling, Inc. n/k/a MBG Holdings, Inc. ("AMRR"),

an entity indirectly owned, and directly controlled, by Frinzi.[2]  The Debtor also held a License

---

[1] The AMRR Note is nominally payable to GNET.  However, because the $44 million of funds transferred
to AMRR came from the Debtor, and because the parties repeatedly referenced the note as the property of the Debtor,
and not GNET, the Trustee and GNET maintain that the identification of GNET as the payee was a mistake and that
the correct payee under the AMRR Note was always intended to be, and always was, the Debtor.

[2] The Trustee has large claims and causes of action against AMRR, Frinzi, and others related to the AMRR
Note and other transactions, none of which are asserted in this Complaint and all of which are preserved.  Furthermore,
the Trustee reserves the right to question the legitimacy of the AMRR Note.

granted by Tiger Athletic Foundation to use and access certain property at LSU Tiger Stadium (the

"LSU License"). Further, the Debtor owned certain trademarks that it and its subsidiaries had used

in conducting business (the "Trademarks").

35.     By March 1, 2022, the Debtor had insufficient assets to satisfy obligations to its

creditors.

36.     The Debtor issued shares of Series A-1 Preferred Stock in connection with its

emergence from a prior chapter 11 case in 2017. The Debtor's Series A-1 Preferred Stock had no

mandatory redemption right in 2022. The Debtor's *Third Amended and Restated Certificate of

Formation* filed with the Texas Secretary of State on May 26, 2017 (the "Third Amendment")

contained an optional redemption right and a mandatory redemption obligation with respect to the

Series A-1 Preferred Stock. The mandatory redemption obligation was subject to multiple

contingencies, including that it was subject to any limitation in the Debtor's Bond documents, that

it could be done "to the extent it [the Debtor] may lawfully do so," and only the amount of "Excess

Net Cash" as of the end of the calendar quarter preceding any redemption demand.

37.     On September 17, 2020, the Debtor filed with the Texas Secretary of State its *Sixth

Amended and Restated Certificate of Formation* (the "Sixth Amendment"). The Sixth Amendment

replaced and superseded the Third Amendment's (and other prior amendments') provisions

regarding redemption rights. The Sixth Amendment removed the mandatory redemption provision

for Series A-1 Preferred Stock, and retained only an optional redemption right to be exercised in

the Debtor's discretion, pursuant to certain requirements and metrics. The Debtor's audited

financial statements for the year ending December 31, 2020, the year in which the mandatory

redemption obligation was removed, do not reflect a liability for accrued and unpaid mandatory

redemption of preferred stock.

---

TRUSTEE'S AMENDED COMPLAINT—Page 8

38.     The Goodman Entities cumulatively owned more than 4.5 million shares of Series A-1 Preferred Stock as of December 31, 2019.

## C.     THE PLAN AND THE 18920 TRANSACTION

39.     From late 2021 through early 2022, the Debtor had amassed tens of millions of dollars in cash, mainly because it stopped paying its largest creditors, including FedEx. Over $65 million in cash had already been removed from the Debtor between December 2021 and February 2022 via various insider transactions that are not the subject of this Complaint. One question for Goodman was how to exploit the remaining cash and other assets. Another question for Goodman was how to monetize his, and the Goodman Entities', equity in the Debtor.

40.     Goodman sought Frinzi's advice and assistance on these questions, informing Frinzi that the A-1 Preferred Stock held a mandatory redemption right that he wished to exercise in order to monetize the stock before the Debtor ran out of all money and would be unable to pay him anything towards any such redemption right. Frinzi, without any due diligence, such as by reviewing the corporate governance documents or conferring with legal counsel, blindly believed Goodman regarding the alleged mandatory redemption right, in part because he wanted to enrich Goodman at the expense of all other creditors and claimants of the Debtor and GNET in order to stay in Goodman's good graces, as Goodman still held the effective power to fire Frinzi, and in part because he was utterly unqualified to serve as the Debtor's and GNET's chief executive officer or to know how to properly exercise his duty of care to the Debtor or to GNET.

41.     Frinzi proposed to Goodman that he seek to sell some or all of the Series A-1 Preferred Stock held by the Goodman Entities. Frinzi identified Zakharyayev to be the third party to purchase a negotiated amount of the Series A-1 Preferred Stock (the "Transaction Shares") and introduced Zakharyayev to Goodman. 18920 was identified by Zakharyayev as the entity that would purchase the Transaction Shares.

42. Various of the Defendants implemented the plan in a nefarious manner, employing concealment and misleading documents in an attempt to "paper up" something they knew to be nefarious and tortious. In broad strokes, with further detail below, the plan was as follows: (i) the Goodman Entities would transfer the Transaction Shares to 18920; (ii) 18920 would demand redemption of the Transaction Shares from the Debtor; and (iii) the Debtor would use cash and other assets to satisfy the (in fact non-existent) redemption demand.

43. On March 9, 2022, Goodman and Zakharyayev agreed to the number of Transaction Shares that would be sold from the Goodman Entities to 18920 and the price per share to be paid by 18920 for the Transaction Shares.

44. On or about March 9, 2022, JJC, as seller, and 18920, as buyer, entered into that certain *Share Purchase Agreement* (the "JJC Purchase Agreement"), pursuant to which JJC agreed to sell 750,837 of the Debtor's Series A-1 Preferred Stock to 18920 for $1.65 per share, or $1,238,881.05.

45. On or about March 9, 2022, GDMN, as seller, and 18920, as buyer, entered in that certain *Share Purchase Agreement* (the "GDMN Purchase Agreement"), pursuant to which GDMN agreed to sell 2,574,326 of the Debtor's Series A-1 Preferred Stock to 18920 for $4.05 per share, or $10,426,020.30.

46. On or about March 9, 2022, People, as seller, and 18920, as buyer, entered in that certain *Share Purchase Agreement* (the "People Purchase Agreement," together with the JJC Purchase Agreement and the GDMN Purchase Agreement, the "Purchase Agreements"), pursuant to which People agreed to sell 707,755 of the Debtor's Series A-1 Preferred Stock to 18920 for $1.00 per share, or $707,755.00.

47. In each of the Purchase Agreements, 18920 represents that "it is aware of, and Seller has fully disclosed to Buyer, the current financial and operational condition of the Company,

Appx.0010

including that the Company's liabilities exceed the Company's assets, and that the Company may be considered insolvent." The "Company" referenced in the foregoing sentence is the Debtor.

48.    Furthermore, in each of the three Purchase Agreements, 18920 affirmatively represents that it will have on the "Closing Date" immediately available funds to pay the purchase price under each agreement to the seller under each agreement. The "Closing Date" was the date of execution of the Purchase Agreements; *i.e.* March 9, 2022. This representation was false. Upon information and belief, 18920 did not have the funds that it represented that it had and, instead, was counting on the Debtor making a future payment to it, which it would then use to pay. Upon further information and belief, Goodman and the Goodman Entities knew this representation to be false.

49.    On March 9, 2022, the total purchase price agreed by 18920 as reflected in the Purchase Agreements was $12,372,656.35. The total number of Transaction Shares reflected in the Purchase Agreements was 4,032,918. 18920 did not deliver the purchase price for the Transaction Shares on March 9, 2022. The transfer of the Transaction Shares to 18920 did not occur on March 9, 2022. As of March 14, 2022, 18920 had not submitted the documentation to the Debtor's transfer agent, American Stock Transfer, to effect the transfer of the Transaction Shares to 18920. As of March 14, 2022, 18920 had not remitted payment for the Transaction Shares to the Goodman Entities.

50.    On March 9, 2022, Pinkhasova, on behalf of 18920 as the "owner of 4,032,918 Series A-1 Preferred Shares", demanded redemption of the Transaction Shares. Such demand states that, "[a]s you know, the Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis." At the time this demand was made, 18920 had not paid for or received the Transaction Shares. At the time this demand was made, 18920 did not own the

---

Transaction Shares. At the time the demand was made, no mandatory redemption obligation was included in the Debtor's then current certificate of formation.

51. On March 9, 2022—the same day as the redemption demand—Frinzi, on behalf of the Debtor, and Zakharyayev, on behalf of 18920, agreed to settle 18920's redemption demand in exchange for a $50 million promissory note issued by the Debtor to 18920 (the "$50 Million Note"). The Trustee has been provided an unsigned copy of the $50 Million Note. The Trustee is not aware if the $50 Million Note was executed. Frinzi did not have the corporate authority to bind the Debtor to the $50 Million Note.

52. The next day, March 10, 2022, 18920, through Pinkhasova, and the Debtor, through Frinzi, executed that certain *Settlement Agreement* (the "Settlement Agreement"). Frinzi did not have the corporate authority to bind the Debtor to the Settlement Agreement.

53. Under the Settlement Agreement, 18920 and the Debtor state that 18920 holds the $50 Million Note which, upon information and belief, had not been signed.

54. Under the Settlement Agreement, and in satisfaction of the $50 Million Note, the Debtor and 18920 agreed as follows:

(i)     the Debtor would pay 18920 $14,500,000;

(ii)    the Debtor would assign to 18920 one-half of the AMRR Note (such half representing $22 million) (the "Half AMRR Note"),

(iii)   the Debtor would assign to 18920 the LSU License; and

(iv)    the Debtor would assign to 18920 the Trademarks (the Trademarks, the LSU License and the Half AMRR Note, collectively, the "Transferred Assets").

55. On March 11, 2022, GNET, from its funds held at East West Bank in account number ending in 0690, held in the name of GNET, transferred $3,976,000.00 to 18920 (the "GNET Transfer").

Appx.0012

56.     On March 11, 2022, the Debtor, from its funds held at Prosperity Bank in account number ending in 1838, held in the Debtor's name, transferred $7,498,075.00 to 18920.[3]

57.     On March 15, 2022, the Debtor, from funds it held at RBC Capital Markets, LLC, or its affiliates or subsidiaries in account number ending 1568, transferred $2,000,000.00 to 18920 (together with the $7,498,075.00 transfer, the "Debtor Transfers").

58.     Thus, in total, the Debtor and GNET transferred at least $13,474,075 to 18920 (the "Cash Transfers").

59.     Frinzi caused each of the Cash Transfers and the transfers of the Transferred Assets to be made.

60.     The Settlement Agreement suggests that $14,500,000.00 was transferred by the Debtor to 18920.  To the extent that is the amount of the Transfer, the Trustee reserves all of his rights with respect to the same.

61.     The timing of the above transactions further evidences the fraudulent scheme between Goodman, the Goodman Entities, 18920, Zakharyayev, and Pinkhasova: on March 9, when 18920 does not even own the Transaction Shares, it makes its fraudulent redemption demand knowing that the Debtor cannot possibly pay it; on the same day the $50 Million Note is prepared; on the next day the parties execute the Settlement Agreement; and the day after the Debtor and GNET commence transferring millions of dollars to 18920.  Clearly, it was always the intent of the conspirators that this would be the course and sequence of events.  No reasonable buyer of the Transaction Shares would pay millions of dollars (not that 18920 paid anything) to buy a

---

[3] The Trustee understands that FedEx takes the position that the funds in question constituted its property or property in held in trust for it, and that the proceeds of such funds are or should be held in constructive trust for its benefit.  Nothing in this Complaint is intended to prejudice any such claims, arguments, or rights, or the Trustee's objections to the same.  The funds subject of this Complaint originated from a bank account held in the Debtor's name, and in which the Debtor unquestionably held an interest.  That is all that is necessary for the Court to adjudicate the Trustee's claims, and it is not necessary to consider, or adjudicate, at this time, whether such funds or any proceeds were held in any kind of trust for FedEx.

redemption right that it knew (as 18920 acknowledged it did in the Purchase Agreements) the
Debtor could not honor, unless the plan all along was to use these fictitious transactions and
documents as a pretense to strip the Debtor of its assets. In other words, it is one thing to just take
money and assets out of the Debtor, which would certainly raise multiple red flags and likely lead
to prompt litigation, but it is another to clothe the true transaction with the appearance of
consideration, all papered up through fraudulent documents, which was the true intent of the
conspirators and the reason why a middle-man in the form of 18920 was used.

62.     In April, 2022, Zakharyayev and Frinzi exchanged a revised version of the
Settlement Agreement which included the transfer of a $4.5 million note payable by Multiband
Global Resources, LLC, a company owned by Frinzi, to Multiband Field Services, Inc., a wholly-
owned subsidiary of the Debtor. The Trustee does not believe this revised Settlement Agreement
was fully executed. To the extent it was, the Trustee reserves all of his rights, on behalf of the
Debtor and Multiband Field Services with respect to the transfer of the note payable by Multiband
Global Resources, LLC as one of the Transferred Assets.

63.     18920 only paid the Goodman Entities $10 million as opposed to the
$12,372,656.35 provided for in the Purchase Agreements, thus further demonstrating the
fraudulent nature of the true transaction, for 18920 could count on Goodman not seeking legal
redress against it when the whole transaction was a sham and was fraudulent. On June 8, 2022,
after consulting with Goodman's counsel, Zakharyayev revised the GDMN Purchase Agreement
to lower the number of Transaction Shares sold by GDMN to 18920 from 2,574,326 to 1,988,484
to match the $10 million. 18920 did not reduce the amount of the $50 Million Note. 18920 did
not reduce the consideration to be paid by the Debtor under the Settlement Agreement. 18920 did
not refund any of the Cash Transfers or return any of the Transferred Assets.

Appx.0014

64.     Upon information and belief, only after 18920 received at least $10 million from the Plaintiffs, combined, did it transfer $10 million to the Goodman Entities.

65.     Thus, 18920, without putting in a penny of its own funds, not having any funds to put in, not even owning the Transaction Shares, and using only the Cash Transfers, pocketed at least $3,474,075 and the Transferred Assets.  In other words, based on a non-existent redemption obligation for the Transaction Shares, which themselves had no value and which 18920 paid nothing for, various of the Defendants conspired to create a non-existent $50 Million Note, and then "settled" such non-existent redemption obligation and note with the transfer, to 18920, of actual and valuable property of the Plaintiffs.

66.     Upon information and belief, 18920 and/or Zakharyayev received subsequent payment and consideration on account of using the Transferred Assets, the value of which the Trustee does not know but intends to discover.

**D.    MOTIVES**

**1.    FRINZI**

67.     Upon information and belief, Goodman informed Frinzi that the Transaction Shares had a redemption right.  Upon further information and belief, Frinzi believed Goodman.  Frinzi had only recently been made CEO (in October 2021) and Goodman, unlike Frinzi, had historical and institutional knowledge regarding the Plaintiffs.  Upon further information and belief, Frinzi undertook no investigation or analysis as to whether there was an obligation for the Debtor to redeem the Transaction Shares.  Upon information and belief, Frinzi did not seek legal counsel regarding the redemption demand by 18920 or review the operative corporate documents that would have addressed any potential redemption obligation of the Debtor.  Rather, Frinzi simply took Goodman at his word, motivated by his desire to get his boss and majority shareholder money, even if it came at the expense of the Debtor and GNET.

Appx.0015

68.     By March 1, 2022, Frinzi knew of the Debtor's insolvency and its inability to pay its debts as they came due.  Frinzi should have known, as any reasonably prudent CEO should have known, that the financial or other metrics required for a Texas corporation to redeem the Transaction Shares could not be satisfied by the Debtor at the time, if they even existed in the first place.  At a minimum, a reasonably prudent CEO would have sought legal and/or financial counsel regarding the alleged redemption rights, certainly before causing tens of millions of dollars of Debtor and GNET property to be transferred.

69.     And, with respect to GNET, under no theory was GNET liable for any redemption right and under no theory could GNET benefit by Frinzi transferring its cash to 18920.

## 2.     GOODMAN

70.     Upon information and belief, Goodman knew that the Transaction Shares had no redemption right.  Otherwise, he would have caused the Goodman Entities to make the redemption demand and be paid directly by the Debtor.  Goodman was a shareholder, director, and officer of the Debtor at the time the Debtor filed the Sixth Amendment with the Texas Secretary of State. Upon information and belief, Goodman would have known about and would have been required to approve the adoption of the Sixth Amendment.  The Goodman Entities were also shareholders of the Debtor at the time of the filing of the Sixth Amendment.  Furthermore, a reasonably prudent businessman like Goodman, who has been, and is, a director and officer of multiple business organizations, would have known that no reasonable redemption right could have been exercised when a company was insolvent.  Goodman knew that the Debtor was insolvent.

## 3.     18920, ZAKHARYAYEV AND PINKHASOVA

71.     Upon information and belief, Zakharyayev, Pinkhasova, and 18920 undertook no due diligence of whether a mandatory or other redemption right existed.  Upon information and belief Zakharyayev, Pinkhasova, and 18920 relied on an old summary of the Third Amendment

Appx.0016

provided by Goodman. This is evident from the text of the redemption demand which states that "the Preferred Shares are subject to mandatory redemption rights at their liquidation value on a quarterly basis," which tracks the language in the Third Amendment. There is no such or equivalent language in the Sixth Amendment.

72.     Any reasonable investor or other person in the shoes of Zakharyayev (a transactional attorney), Pinkhasova, and 18920 would have undertaken basic due diligence to confirm the existence of the mandatory redemption obligation were they to use their own $10 million to purchase the stock and prior to making a written demand on the Debtor to pay tens of millions of dollars. Such diligence, however, was not performed because they were not putting their own money at risk in the transaction. They knew that the Debtor would be transferring, through them, the money to the Goodman Entities to pay for the Transaction Shares. That is further evidence of their knowledge of the nefarious and tortious nature of the transaction because they were not acting as a reasonable, innocent investor would have.

73.     In each Purchase Agreement, 18920 represents that "it is aware of, and Seller has fully disclosed to Buyer, the current financial and operational condition of the Company, including that the Company's liabilities exceed the Company's assets, and that the Company may be considered insolvent."

74.     Nor was the above representation a mistake or misunderstanding. By e-mail dated March 2, 2022, concerning the negotiation of the Purchase Agreements, Zakharyayev accepted the insolvency language but struck the following language: "[including] without limitation, that the Company has no material assets, employees or operations." Whether Zakharyayev accepted this language or not, he was certainly made aware of these facts.

75.     Zakharyayev, a transactional attorney, should not have believed that there was any value to the Transaction Shares, much less the value of the Cash Transfers and Transferred Assets,

Appx.0017

when he represented that he knew, on behalf of 18920, that the liabilities of the Debtor exceeded its assets. Hence the reason why neither he nor 18290 put even a penny of their own funds into the purchase.

76. It is inconceivable that Zakharyayev, an attorney, would reasonably believe or rely on any representation that such worthless Transaction Shares could conceivably have a redemption right. When a company cannot even pay its debts, any return on an equity security, whether preferential or not, is *per se* a fraudulent transfer. Furthermore, that Zakharyayev undertook no due diligence and instead relied on Frinzi and/or Goodman for the existence of the redemption right, demonstrates that he willfully did not investigate or want to know, further evidencing his nefarious intent and participation in a transaction that he knew or should have known, as should any reasonably prudent investor or attorney, to be tortious.

77. Furthermore, in each Purchase Agreement, 18920 purchases the Shares on a "where is, as is" basis, and acknowledges that its purchase is "based solely upon its working knowledge of Company's business . . . and not in reliance upon any representations or warranties of Seller other than those contained in this Agreement." Zakharyayev cannot in good faith claim to have relied on any representations made by Goodman and/or Frinzi, again demonstrating that he knew or should have known that he was participating in something fraudulent, nefarious, or tortious.

78. Furthermore, as noted above, in each of the three Purchase Agreements, 18920 affirmatively represents that it will have on the "Closing Date" immediately available funds to pay the purchase price under each agreement to the seller under each agreement. The "Closing Date" was the date of execution of the Purchase Agreements; *i.e.* March 9, 2022. This representation was false. Upon information and belief, 18920 did not have the funds that it represented that it had and, instead, was counting on the Debtor making a future payment to it, which it would then use to pay. Upon further information and belief, Goodman and the Goodman Entities knew this

Appx.0018

representation to be false, since they were not paid at any "closing" yet permitted 18920 to pretend that it owned the Transaction Shares.

79.     That 18920 made these false representations and that Goodman and the Goodman Entities knew they were false yet proceeded is further evidence of a nefarious intent, and that false and misleading documents were prepared and signed with the knowledge of Goodman, Zakharyayev, Pinkhasova, 18920, and the Goodman Entities, that they were participating in a nefarious, misleading, and tortious transaction, the truth of which needed to be concealed.

80.     Upon further information and belief, the intent was always that 18920 not pay a penny of any purchase price, knowing that 18920 did not have those funds, but rather to cause the Debtor to fund the purchase price while hiding this fact in the documents and then using subsequent documents to further conceal the truth and perpetuate the fraud.

81.     Namely, on March 9, 2022, 18920, through a written document signed by Pinkhasova, transmitted to the Debtor a demand to redeem 4,032,918 Series A-1 Preferred Shares now purportedly owned by 18920.  Such demand states that, "[a]s you know, the Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis."

82.     This is further proof of Zakharyayev's, Pinkhasova's, and 18920's knowledge of the nefarious and tortious nature of the transaction: if the Transaction Shares are subject to a liquidation value on a quarterly basis, as opposed to some outright, stated amount, and Zakharyayev, Pinkhasova, and 18920 knew that the liabilities of the Debtor exceeded its assets, then no reasonable person, especially one of Zakharyayev's sophistication, could have believed that there was any redemption right or any value to that.

83.     Upon information and belief, the $50 Million Note was fraudulently agreed to in order to justify transfers in satisfaction of this "debt," to attempt to engineer and paper-up a fraud, and to conceal the truth.  It is inconceivable that Zakharyayev and/or 18920 could possibly have

Appx.0019

expected to make a profit of $40 million from the Transaction Shares *in one day* without having

put in a penny of their own funds or having undertaken any risk to purchase the Transaction Shares.

84.     As final evidence of the nefarious and tortious nature of the transactions, and the

parties' knowledge of their complicity in the same, because 18920 only paid the Goodman Entities

$10 million as opposed to the $12,372,656.35 provided for in the Purchase Agreements, on June

8, 2022—well after the transactions and the documents—and "[t]o keep it simple," Zakharyayev

revised the GDMN Purchase Agreement to lower the number of Shares sold by GDMN to 18920

from 2,574,326 to 1,988,484.  Yet 18920 did not inform the Debtor to lower the consideration the

Debtor had paid under the Settlement Agreement.  And GDMN did not demand its bargained-for

consideration.  Instead, Zakharyayev and Pinkhasova simply decided to keep more of the "loot"

for themselves and their coconspirator, Goodman, could do nothing about it because any resort to

judicial remedies would have exposed the whole illegitimate scheme.

## IV.     CAUSES OF ACTION

<u>**COUNT 1 :**</u>     **BANKRUPTCY CODE FRAUDULENT TRANSFER (18920 AND GOODMAN ENTITIES)**

85.     The Trustee incorporates his allegations above.

86.     The Debtor was insolvent when it entered into the $50 Million Note and the

Settlement Agreement, and when it made the Debtor Transfers and transfers of the Transferred

Assets.

87.     There was no mandatory redemption obligation owed by the Debtor in respect of

the Transaction Shares.

88.     The Debtor received no value, much less reasonably equivalent value, for honoring

a non-existent mandatory redemption obligation and, therefore, in turn for the $50 Million Note,

and, in turn, for the Settlement Agreement, and, in turn, for the Debtor Transfers and the

Transferred Assets.  Among other things, the Debtor was not relieved of any liability and the

Appx.0020

Debtor received no other consideration, since there was no mandatory redemption obligation with respect to the Transaction Shares for the Debtor to pay. Even if there was an optional redemption, which was not the parties' understanding, the Debtor would have received no return consideration.

89.     18920 is the initial transferee of each of the above transfers while, additionally, the Goodman Entities are the entities for whose benefit a portion of such transfers was made.

90.     The Goodman Entities were the immediate transferees of such transfers to the extent of $10 million. Because the knowledge of Goodman is imputed to the Goodman Entities, in addition to their independent knowledge, the Goodman Entities did not take such transfers in good faith, they did not take for value, and they did not take without knowledge of the voidability of the transfers.

91.     Accordingly, pursuant to section 548 of the Bankruptcy Code, the Trustee requests the avoidance of any obligation of the Debtor for the mandatory redemption, the $50 Million Note, and the Settlement Agreement, and the avoidance of the Debtor Transfers and the transfers of the Transferred Assets.

**COUNT 2:**      **TUFTA[4] FRAUDULENT TRANSFER (18920 AND GOODMAN ENTITIES)**

92.     The Trustee incorporates his allegations above.

93.     Pursuant to section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a prepetition transfer by the Debtor that an unsecured creditor could avoid.

94.     As of March 1, 2022, the Debtor had multiple unsecured creditors who remain unpaid.

95.     The Debtor was insolvent when it entered into the $50 Million Note and the Settlement Agreement, and when it made the Debtor Transfers and transfers of the Transferred Assets.

---

[4] The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§ 24.001 et. seq.

Appx.0021

96.     There was no mandatory redemption obligation owed by the Debtor in respect of the Transaction Shares.

97.     The Debtor received no value, much less reasonably equivalent value, for honoring a non-existent mandatory redemption obligation and, therefore, in turn for the $50 Million Note, and, in turn, for the Settlement Agreement, and, in turn, for the Debtor Transfers, and the Transferred Assets.  Among other things, the Debtor was not relieved of any liability and the Debtor received no other consideration, since there was no mandatory redemption obligation with respect to the Transaction Shares for the Debtor to pay.  Even if there was an optional redemption, which was not the parties' understanding, the Debtor would have received no return consideration.

98.     18920 is the initial transferee of each of the above transfers.

99.     The Goodman Entities were the immediate transferees of such transfers to the extent of $10 million.  Because the knowledge of Goodman is imputed to the Goodman Entities, in addition to their independent knowledge, the Goodman Entities did not take such transfers in good faith, they did not take for value, and they did not take without knowledge of the voidability of the transfers.

100.    Accordingly, pursuant to section 24.006 of TUFTA, the Trustee requests the avoidance of any obligation of the Debtor for the mandatory redemption, the $50 Million Note, and the Settlement Agreement, and the avoidance of the Debtor Transfers and the transfers of the Transferred Assets.

101.    The Trustee further requests his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 3:**    **TUFTA FRAUDULENT TRANSFER (GNET V. 18920 AND GOODMAN ENTITIES)**

102.    The Trustee incorporates his allegations above.

Appx.0022

103. Prior to and after the transactions alleged in this Complaint, the Debtor was a creditor of GNET, whose claims remain unsatisfied. The Trustee asserts Count 3 of this Complaint as such.

104. GNET was insolvent when it made the GNET Transfer, or the making of such transfer rendered it insolvent.

105. GNET received no value, much less reasonably equivalent value, for making the GNET Transfer. Not only was there no mandatory redemption right in the Transaction Shares, but in no event could or would GNET have been liable to pay any such mandatory redemption right or optional redemption because it was not the issuer of the Transaction Shares.

106. 18920 is the initial transferee of the GNET Transfer.

107. The Goodman Entities were the immediate transferees of the GNET Transfer. Because the knowledge of Goodman is imputed to the Goodman Entities, in addition to their independent knowledge, the Goodman Entities did not take such transfer in good faith, they did not take for value, and they did not take without knowledge of the voidability of the transfer.

108. Accordingly, pursuant to section 24.006 of TUFTA, the Trustee requests the avoidance of the GNET Transfer.

109. The Trustee further requests his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 4:** **RECOVERY OF AVOIDED TRANSFERS**

110. The Trustee incorporates his allegations above.

111. Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee, to recover on certain of the avoided transfers above, requests a money judgment against 18920 in the amount of the Debtor Transfers ($9,498,075.00), jointly and severally with the Goodman Entities (as such amount is less than $10 million).

Appx.0023

112.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee requests the turnover of the Half AMRR Note and any benefits or proceeds on account of the same, and any security instruments or liens on account of the same.

113.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee requests a money judgment against 18920 for the value of the LSU License and for any proceeds, payments, or benefits that 18920 may have obtained on account of the same.

114.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee requests a money judgment against 18920 for the value of the Trademarks and for any proceeds, payments, or benefits that 18920 may have obtained on account of the same.

115.    Pursuant to TUFTA, the Trustee seeks the recovery of the GNET Transfer, by money judgment against 18920 and the Goodman Entities, jointly and severally (but the Goodman Entities overall joint and several liability capped at $10 million), in the amount of $3,976,000.00.

**COUNT 5:**    **BREACH OF FIDUCIARY DUTY (TRUSTEE V. FRINZI)[5]**

116.    The Trustee incorporates his allegations above.

117.    Frinzi owed fiduciary duties to the Debtor, including the duty of loyalty and the duty of care.

118.    In agreeing to the foregoing transactions, including honoring the mandatory redemption demand, entering into the $50 Million Note, entering into the Settlement Agreement, and making the transfers provided for in the Settlement Agreement, Frinzi was not looking to the best interests of the Debtor but instead to enrich Goodman, through the Goodman Entities, at the expense of the Debtor, which lost assets worth tens of millions of dollars that it needed to pay its legitimate creditors.  In so doing, he breached his duty of loyalty.

---

[5] The Trustee and Estate and GNET hold other claims and causes of action against Frinzi, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

Appx.0024

119.     In agreeing to honor an otherwise non-existent mandatory redemption obligation, without any due diligence, review of documents, advice or counsel, or common sense, Frinzi acted recklessly and committed gross negligence.  No reasonably prudent officer would transfer tens of millions of dollars of desperately needed assets without significant due diligence, and only one acting recklessly to benefit Goodman would have done so.  In so doing, Frinzi breached his duty of care.  The documents and transfers he executed and orchestrated are the direct result of such breaches and constitute additional breaches of the duty of care: entering into the $50 Million Note to satisfy a liability that did not exist, entering into the Settlement Agreement to satisfy a liability and $50 Million Note that did not exist, and compromising and settling nothing, and making the Debtor Transfers, and the transfers of the Transferred Assets, to satisfy such non-existent settlement of such non-existent note, of such non-existent redemption obligation.

120.     The Debtor was damaged by the foregoing breaches of fiduciary duty through the loss of tens of millions of dollars in cash and property.

121.     Accordingly, the Trustee seeks a money judgment for breach of fiduciary duty against Frinzi in the amount of the Debtor Transfers ($9,498,075.00), the value of the LSU License and Trademarks in an amount to be proven at trial, and the attorney's fees incurred herein to avoid and recover the Half AMRR Note.[6]

**COUNT 6:**     **BREACH OF FIDUCIARY DUTY (GNET V. FRINZI)**

122.     The Trustee incorporates his allegations above.

123.     Frinzi owed fiduciary duties to GNET, including the duty of loyalty and the duty of care.

---

[6] While attorney's fees may not usually be direct damages under Texas law, they are when incurred to fix or address or mitigate the results of someone's tort.

Appx.0025

124.     For similar reasons as stated in Count 5, Frinzi breached his fiduciary duties to GNET: causing to be made the GNET Transfer to benefit someone other than GNET and at the expense of GNET, and causing GNET to make a payment for which it had absolutely no liability and for which it received absolutely no benefit.

125.     GNET was damaged by Frinzi's breaches of duty in that GNET transferred and lost $3,976,000.00 of its funds for no return benefit whatsoever.

126.     Accordingly, the Trustee seeks a money judgment for breach of fiduciary duty against Frinzi in the amount of the GNET Transfer ($3,976,000.00).

### COUNT 7: KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY (GOODMAN, ZAKHARYAYEV AND PINKHASOVA)

127.     The Trustee incorporates his allegations above.

128.     Under Texas law, where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such. Instigating, aiding, or abetting the wrongdoing constitutes participation.

129.     Goodman knowingly participated in Frinzi's breaches of fiduciary duty whether or not Goodman was an officer or director of Goodman and/or GNET.   Among other things, Goodman knew that there was no mandatory redemption right and that Frinzi, in blindly believing Goodman, was not exercising due care and was acting out of a desire to enrich Goodman at the expense of the Debtor and GNET, and their creditors.   Goodman instigated Frinzi's breaches of fiduciary duty.

130.     Zakharyayev knowingly participated in Frinzi's breaches of fiduciary duty. Zakharyayev, even if he believed that there was a mandatory redemption right, knew that Frinzi was breaching his fiduciary duties, both of care and of loyalty, especially given his knowledge as a licensed attorney.   Among other things, Zakharyayev knew that the Debtor was insolvent and

Appx.0026

that Frinzi and Goodman were seeking a way to transfer large assets to Goodman on account of his otherwise worthless stock, at the expense of the Debtor, GNET, and their creditors. This violated both the duty of loyalty, since Frinzi was favoring Goodman at the expense of his companies, and also the duty of care even if Zakharyayev believed there was a mandatory right of redemption, because Zakharyayev knew that the metrics could not possibly be met to exercise the same and because Zakharyayev knew that Frinzi was engaging in a fraudulent transfer, itself tortious. Zakharyayev instigated, aided, and abetted these breaches of fiduciary duty by negotiating and papering the transaction with Frinzi.

131. Zakharyayev and Pinkhasova knowingly participated in Frinzi's breaches of fiduciary duty. In addition to the above with respect to Zakharyayev, both Zakharyayev and Pinkhasova: (i) knew that 18920 did not own, because it had not paid for, the Transaction Shares when they demanded, on behalf of 18920, payment on the alleged redemption right; (ii) knew that there was no basis in law or in fact for the $50 Million Note, as 18920 did not own the Transaction Shares even if they could have believed that there was a redemption right; (iii) knew that there was no basis for the Settlement Agreement and the transactions contemplated thereby, as 18920 did not own the Transaction Shares even if they could have believed that there was a redemption right; and (iv) knew that Frinzi was causing the Debtor and GNET to execute the foregoing and transfer the Half AMRR Note, the Transferred Assets, and the Cash Transfers when no obligation at all was owing from the Debtor or GNET to 18920.

132. Both Zakharyayev and Pinkhasova knew that, in authorizing all of the foregoing, Frinzi had undertaken no due diligence into whether 18920 even owned the Transaction Shares (such as by consulting with counsel, or consulting with American Stock Transfer, or even asking for any proof from Zakharyayev and Pinkhasova), much less whether there was a redemption right, and was acting to benefit Goodman, thus breaching his duties of care and loyalty. In other words,

Appx.0027

Zakharyayev and Pinkhasova knew that the whole purpose of the transaction was to benefit Goodman and themselves, using 18920 as an intermediary, by sucking cash and assets out of the Debtor and GNET, when 18920 had not even paid for the Transaction Shares or owned them, and that Frinzi was breaching his fiduciary duties by agreeing and by engaging in the transactions.

133.    Zakharyayev and Pinkhasova instigated, aided, and/or abetted—and thereby knowingly participated in—these breaches of fiduciary duty by, among other things, making the fraudulent redemption demand, insisting on the subsequent settlement documents, and insisting on, and aiding in the transfer of, the Half AMRR Note, the Transferred Assets, and the Cash Transfers.

134.    Accordingly, the Trustee and GNET request a money judgment holding each of Goodman, Zakharyayev, and Pinkhasova jointly and severally liable with Frinzi for all damages awarded to the Trustee and GNET herein for Frinzi's breaches of fiduciary duty.

## COUNT 8:    FRAUD (PINKHASOVA)

135.    The Trustee incorporates his allegations above.

136.    The elements of fraud are (1) a material false representation, (2) that was made with knowledge or recklessness as to its falsity, (3) with the intent to induce reliance, and (4) that the other party actually and justifiably relied upon, causing him injury.

137.    In making her demand for the Debtor to pay the mandatory redemption demand, Pinkhasova made two false representations; *i.e.* that there was a mandatory redemption obligation and that 18920 owned the Transaction Shares which, according to the Purchase Agreements and other contemporaneous evidence, it did not because it had not paid for them.

138.    She made these false representations with knowledge of their falsity or recklessness as to their falsity, for the reasons discussed above (including the lack of any due diligence and the rational impossibility for an equity redemption when the Debtor was known and

Appx.0028

admitted to be insolvent), the knowledge of her husband and of 18920 being imputed to her to the extent she lacked personal knowledge, and her own knowledge that 18920 had not paid for, and therefore did not own, the Transaction Shares.

139.     She made these false representations intending to induce reliance on the part of Frinzi; *i.e.* to cause him to pay tens of millions of dollars in consideration on account of the non-existing redemption right under the Transaction Shares that 18920 did not own.

140.     Frinzi actually relied on these representations because he caused the resulting transfers to be made by the Debtor and GNET.

141.     Notwithstanding Frinzi's own recklessness and breaches of duty, or in the alternative thereto, Frinzi's reliance on these representations was justified under the circumstances. While Frinzi did no due diligence of his own, Goodman had told him that there was a mandatory redemption right, and Zakharyayev, who Frinzi knew to be a lawyer, and who he knew to represent 18920, as well as Zakharyayev's wife, would not be making a fraudulent demand.

142.     As a result of the fraud, the Debtor was damaged by the Debtor Transfers and other documents and transfers that Frinzi executed and delivered as a result of the fraudulent mandatory redemption demand, and GNET was damaged by the GNET Transfer.

143.     18920, meaning Zakharyayev and Pinkhasova, received $3.5 million cash and other valuable assets for acting as a conduit for only a few days, without putting in any of their own money or taking any risk. Any reasonable person would or should know that making such a large profit, for no capital and no risk, and in only a few days, is not legitimate and that the money is the payoff for facilitating the fraud.

144.     Accordingly, the Trustee and GNET request a money judgment against Pinkhasova in an amount to be proven at trial.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trustee and GNET request that the

Defendants be cited to appear and to answer this Complaint and that they have judgment as

follows:

(i)      avoidance of all transfers requested herein;

(ii)     recovery of all transfers requested herein;

(iii)    money judgment against Frinzi for his breaches of fiduciary duty;

(iv)    money judgment against Goodman, Zakharyayev, and Pinkhasova for their
knowing participation in Frinzi's breaches of fiduciary duty;

(v)     money judgment against Pinkhasova for fraud;

(vi)    reasonable attorney's fees to the extent provided for by applicable law;

(vii)   prejudgment and postjudgment interest to the extent provided by applicable law;
and

(viii)  such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this 20th day of February, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Thomas D. Berghman, Esq.
     Texas Bar No. 24082683
     Julian P. Vasek, Esq.
     Texas Bar No. 24070790
     500 N. Akard Street, Ste. 4000
     Dallas, Texas  75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584
     Email: drukavina@munsch.com
             tberghman@munsch.com
             jvasek@munsch.com

**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7
TRUSTEE**

Appx.0030

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on February 20, 2024, true and correct copies of this document were served via the Court's CM/ECF system on the following counsel for the defendants, all of whom were already served with the original complaint an summons:

Michael A Cancienne on behalf of Defendants 18920 NW 11th, LLC, Evelina Pinkhasova, and Steven Zakharyayev
mcancienne@jlcfirm.com

Joseph Webster Golinkin, II on behalf of Defendants 18920 NW 11th, LLC, Evelina Pinkhasova, and Steven Zakharyayev
jgolinkin@jlcfirm.com

Leslie Sara Hyman on behalf of Defendants GDMN Family Investments 2, LLC, JJC & People LLC, People NQ Inc., and James Goodman
lhyman@pulmanlaw.com, dvanoutryve@pulmanlaw.com;mvilla@pulmanlaw.com

Anna Kochut MacFarlane on behalf of Defendants GDMN Family Investments 2, LLC, JJC & People LLC, People NQ Inc., and James Goodman
amacfarlane@pulmanlaw.com

Randall A. Pulman on behalf of Defendants GDMN Family Investments 2, LLC, JJC & People LLC, People NQ Inc., and James Goodman
rpulman@pulmanlaw.com, jgonzales@pulmanlaw.com;mvilla@pulmanlaw.com

Jason M. Rudd on behalf of Defendant James Frinzi
jason.rudd@wickphillips.com, brenda.ramirez@wickphillips.com

By: /s/ Davor Rukavina
Davor Rukavina, Esq.

# EXHIBIT 2

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22-31641-mvl-7 |
| | § | |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC; ALLIANCE TEXAS | § | |
| HOLDINGS, LLC; NEIL Z. AUERBACH; | § | |
| JUDITH AUERBACH; AUERBACH | § | |
| PARTNERS, L.P.; JAMES GOODMAN; | § | |
| JAMES FRINZI; GOODMAN | § | |
| INVESTMENT HOLDINGS, LLC; | § | |
| GENESIS NETWORKS, INC.; GENESIS | § | |
| NETWORKS GLOBAL SERVICES, LLC; | § | |
| AUERBACH CHILDREN'S DYNASTY | § | |
| TRUST U/A/D OCTOBER 9, 2012; and | § | |
| AUERBACH FAMILY DYNASTY TRUST | § | |
| U/A/D OCTOBER 9, 2012, | § | |
| | | |
| Defendants. | | |

## **ORIGINAL COMPLAINT**

ORIGINAL COMPLAINT—Page 1

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel, Trustee (the "Trustee"), the trustee of Goodman Networks, Inc. (the "Debtor"), the debtor in the above styled and numbered chapter 7 bankruptcy case (the "Bankruptcy Case"), and files this *Original Complaint* (the "Complaint"), complaining of Hudson Clean Energy Enterprises, LLC ("Hudson"), Alliance Texas Holdings, LLC ("Alliance"), Neil Z. Auerbach ("Auerbach"), Judith Auerbach ("J. Auerbach"), Auerbach Partners, L.P. ("Auerbach Partners"), James Goodman ("Goodman"), James Frinzi ("Frinzi"), Goodman Investment Holdings, LLC ("GIH"), Genesis Networks, Inc. ("Genesis Inc."), Genesis Networks Global Services, LLC ("Genesis LLC"), Auerbach Children's Dynasty Trust u/a/d October 9, 2012 (the "Auerbach Trust 1"), and Auerbach Family Dynasty Trust u/a/d October 9, 2012 (the "Auerbach Trust 2"), and, for cause and action, would respectfully show as follows:

## I.    INTRODUCTION

1.      This Complaint concerns the transfer by the Debtor of $17 million designed to benefit and enrich Goodman and Auerbach at the expense of the Debtor and its creditors.  Namely, Goodman, through his entities, owned more than $30 million of the Debtor's bonds, which he knew could not and would not be repaid.  Knowing that the Debtor was insolvent and about to be in default on its bonds, Goodman sought a mechanism to cash out his bonds in secret.  Goodman entered into an agreement with Auerbach whereby Auerbach, through his entities, would purchase the bonds with the Debtor's funds—not his own funds—and would keep $5.9 million for himself with no benefit whatsoever to the Debtor.  Frinzi, the Debtor's CEO, executed the transaction for Goodman's personal benefit and to enrich Auerbach.  Auerbach knew of the Debtor's insolvency and of Goodman's and Frinzi's breaches of fiduciary duty, and conspired to help them breach that duty.  In the end, Goodman recovered $11 million he otherwise would not have, and Auerbach obtained almost $6 million to which he was not entitled and which provided no benefit to the

Appx.0033

Debtor at all. The Trustee therefore files this Complaint to avoid these transactions, obtain monetary relief, and hold the conspirators accountable.

## II.     PROCEDURAL BACKGROUND

2.     On September 6, 2022 (the "Petition Date"), various petitioning creditors filed an involuntary petition against the Debtor, thereby initiating the Bankruptcy Case and creating the Debtor's bankruptcy estate (the "Estate").

3.     The Court entered an order for relief against the Debtor on December 12, 2022.

4.     The Trustee is the duly appointed trustee of the Debtor and the Estate.

5.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334. Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent that any matter in this Adversary Proceeding is not core, the Trustee consents to this Court's entry of a final judgment over any and all such matters.

6.     Venue of this Adversary Proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## II.     PARTIES

7.     The Trustee is the Chapter 7 trustee of the Debtor and the Estate and files this Complaint in such capacity only.

8.     Hudson is a limited liability company organized and existing under the laws of the State of Delaware. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Hudson may be served with process in this Adversary Proceeding by and through its registered agent, Cogency Global Inc., as follows: Hudson Clean Energy Enterprises, LLC, c/o Cogency Global Inc., Registered Agent, 850 New Burton Road, Suite 201, Dover, DE 19904.

9.     Alliance is a limited liability company organized and existing under the laws of the State of Florida. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Alliance may be

served with process in this Adversary Proceeding by and through its registered agent, Steven Zakharyayev, as follows: Alliance Texas Holdings, LLC, c/o Steven Zakharyayev, Registered Agent, 2719 Hollywood Blvd., Hollywood, FL 33020, and by and though its manager, Steven Zakharyayev, as follows: Alliance Texas Holdings, LLC, c/o Steven Zakharyayev, Manager, 8 South Main Street, P.O. Box 342, Marlboro, NJ, 07746.

10.     Auerbach is an individual and a resident of either the State of New York or of Florida.  He is sued herein both in his personal capacity and as a trustee of the Auerbach Trust. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach may be served with process in this Adversary Proceeding anywhere he may be found, including his home at: Neil Z. Auerbach, 50 Lawrence Ave., Lawrence, NY 11559, or where he regularly transacts business: Neil Z. Auerbach, CEO, Hudson Clean Energy Partners, 333 SE 2d Ave. #3410, Miami, FL 33131.

11.     Auerbach Partners is a limited partnership organized and existing under the laws of the State of Delaware.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach Partners may be served with process in this Adversary Proceeding by and through one or both of its general partners as follows: (i) Auerbach Partners, L.P., c/o Auerbach Children's Dynasty Trust u/a/d October 9, 2012, General Partner, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559; and/or (ii) Auerbach Partners, L.P., c/o Auerbach Family Dynasty Trust u/a/d October 9, 2012, General Partner, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559.

12.     Auerbach Trust 1 is a general partner of Auerbach Partners.  Auerbach Trust 1's trustees are Neil Z. Auerbach and Judith Auerbach.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach Trust 1 may be served with process in this Adversary Proceeding through its trustees as follows: Auerbach Children's Dynasty Trust u/a/d October 9, 2012, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559.

Appx.0035

13.     Auerbach Trust 2 is a general partner of Auerbach Partners.  Auerbach Trust 2's trustees are Neil Z. Auerbach and Judith Auerbach.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach Trust 2 may be served with process in this Adversary Proceeding through its trustees as follows: Auerbach Family Dynasty Trust u/a/d October 9, 2012, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559.

14.     J. Auerbach is a trustee of the Auerbach Trust and she is sued herein in said capacity only.[1]  J. Auerbach is an individual and a resident of either the State of New York or of Florida. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), J. Auerbach may be served with process in this Adversary Proceeding anywhere she may be found, including her home at: Judith Auerbach, 50 Lawrence Ave., Lawrence, NY 11559.

15.     Goodman is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Goodman may be served with process in this Adversary Proceeding anywhere he may be found, including his home at: James Goodman, 103 Tomahawk Trail, San Antonio, TX 78232, or where he regularly transacts business: James E. Goodman, Genesis Networks, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

16.     Frinzi is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Frinzi may be served with process in this Adversary Proceeding anywhere he may be found, including his home, as follows: James Frinzi, 9204 Eddy Cv., Austin, TX 78735.

17.     GIH is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), GIH may be served

---

[1]     As the Trustee does not know what type of trust this trust is, or what jurisdiction it is organized under, he does not know whether he is required to sue the trustee in order to sue the trust, or whether he may sue the trust directly.  The trustee is prepared to dismiss J. Auerbach from this Complaint, without prejudice, provided that Auerbach Trust 1 and Auerbach Trust 2 agree that the Trustee does not need to sue her in order to sue and to obtain a judgment against these trusts.

ORIGINAL COMPLAINT—Page 5

with process in this Adversary Proceeding by and through its registered agent, Blakely L. Fernandez, as follows: Goodman Investment Holdings, LLC, c/o Blakely L. Fernandez, Registered Agent, 300 Convent Street, Suite 2, San Antonio, TX 78205.

18.     Genesis Inc. appears to no longer be an entity, having been a Texas corporation merged into Genesis LLC.  However, because the documents described below reference Genesis Inc., it may be that Genesis Inc. is a d/b/a of Genesis LLC or is a fictional entity used by James Goodman.  Either way, Genesis Inc. may, pursuant to Federal Rule of Bankruptcy Procedure 7004(b), be served with process in this Adversary Proceeding by and through James Goodman, its manager, director, officer, or control person, at 103 Tomahawk Trail, San Antonio, TX 78232, or where he regularly transacts business: James E. Goodman, Genesis Networks, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

19.     Genesis LLC is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Genesis LLC may be served with process in this Adversary Proceeding by and through its registered agent, Wilburn R. Deahl, as follows: Genesis Networks Global Services, LLC, c/o Wilburn R. Deahl, Registered Agent, 309 Hilton Drive, Cibolo, TX 78108.

20.     As used hereinafter, "Genesis" refers to either or both Genesis Inc. and Genesis LLC, pending a determination of whether Genesis Inc. exists, whether it is a d/b/a of Genesis LLC, whether it is anything else, or which of the Genesis entities is the actual entity involved in the transactions and transfers discussed below.

### III.     FACTS

#### A.     THE PLAYERS

21.     As of January 31, 2022, Goodman was the sole director of the Debtor, owing fiduciary duties to the Debtor.  Goodman purported to resign as the director of the Debtor on

February 1, 2022 (which the Trustee does not admit). However, he formed the strategy and entered into the conspiracy that is the subject of this Complaint while he was a director of the Debtor.

22. Alternatively, his resignation was a sham, done on paper to make it seem like he was no longer a director at the time of the transactions described herein. Even after such sham resignation, he continued to control Frinzi and to give him instructions, which Frinzi implemented as though Goodman were still a director.

23. Alternatively, due to his special relationship with the Debtor, including managing the majority shareholder of the Debtor and making decisions for the Debtor as such, and his *de facto* control of Frinzi, and his knowledge of confidential books and records and financial transactions of the Debtor, and the trust that Frinzi and others at the Debtor placed in him, and his ability to orchestrate the transactions complained of herein and other transactions, Goodman is charged by law with fiduciary duties to the Debtor as though he were a *de jure* director of the Debtor.

24. At all times material to this Complaint, Goodman was an insider of the Debtor: as a director, as the person who controlled the majority of the Debtor's stock, and as the person who controlled Frinzi even after the time that he may have resigned as a director, and whose instructions Frinzi followed regardless of whether Goodman was a director or not.

25. At all times material to this Complaint, Goodman directly or indirectly owned GIH and controlled GIH.

26. At all times material to this Complaint, GIH was an insider of the Debtor as an affiliate and through the common control of both GIH and the Debtor by Goodman.

27. At all times material to this Complaint, Goodman directly or indirectly owned Genesis and controlled Genesis.

ORIGINAL COMPLAINT—Page 7

28. At all times material to this Complaint, Genesis was an insider of the Debtor as an affiliate and through the common control of both Genesis and the Debtor by Goodman.

29. At all times material to this Complaint, Frinzi was the Chief Executive Officer of the Debtor, owing fiduciary duties to the Debtor.

30. Auerbach is a wealthy and successful investor and funds manager in New York.

31. Hudson is an entity directly or indirectly owned by Auerbach and controlled by Auerbach.

32. Alliance is an entity which Auerbach controls and, upon information and belief, directly or indirectly owns. The registered agent for Alliance is Steven Zakharyayev ("Zakharyayev").

33. Auerbach, Goodman, and Frinzi, directly and through their respective families, have been friends for a long period of time and, upon information and belief, have engaged in business together. Furthermore, upon information and belief, Zakharyayev is friends with Auerbach's son, Shalom Auerbach ("Shalom"), and has done business with him. Thus, all of the individuals involved in this matter have personal, familial, and/or business relationships predating the Debtor.

**B.** **THE PLAN**

34. As of February 1, 2022, and at all times material hereto, the Debtor was insolvent.

35. Among other things, the Debtor lost its largest customer in October 2021, had stopped paying Federal Express Logistics (a major creditor) tens of millions of dollars and knew that FedEx would soon begin to exercise its remedies, had stopped paying other large creditors and vendors, and knew that it would soon be unable to make payment on the Bonds (defined below). In short, the Debtor would soon cease all business operations, even as most of its business operations had already ceased due to the loss of its customers. Goodman and Frinzi knew all of

this. Upon information and belief, Auerbach too was made aware of this, either through Goodman and/or Frinzi, or through his son, Shalom.

36. Commencing in late 2021, and through early 2022, however, the Debtor had amassed tens of millions of dollars in cash on hand, mainly because it stopped paying its largest creditors, including FedEx. The question for Goodman was how to exploit this cash for his or his other companies' and friends' benefit, before creditors would exercise their remedies and the cash would be seized.

37. As of February 1, 2022, the Debtor had issued and had outstanding certain 8.00% Senior Secured Notes due 2022 (the "Bonds"), with respect to which UMB National Bank (the "Indenture Trustee") served as the indenture trustee.

38. The maturity of the Bonds was May 11, 2022. The Debtor, Goodman, and Frinzi knew that the Debtor would not be able to repay the Bonds on that date and that the Bonds would be in default as of that date.

39. Prior to and at that time, Goodman was attempting to have the Debtor cancel as much of the Bonds as it could for less than face value, in order to relieve the Debtor of its debt burden at a discount. As part of this, Goodman, directly or indirectly, purchased or otherwise acquired a certain amount of the Bonds at a discount. Employees of the Debtor and various creditors knew that Goodman had, and was attempting to, purchase Bonds at a discount, partially to aid the Debtor's financial issues.

40. As of February 3, 2022, GIH held and owned $30,146,617.00 of the Bonds (the "GIH Bonds").

41. As of February 3, 2022, Genesis held and owned $1,600,000 of the Bonds (the "Genesis Bonds").

42.     Thus, by February 1, 2022, Goodman knew that the Debtor was insolvent, would not be able to repay the Bonds and would shortly default on the Bonds.  Goodman therefore knew that his ability to recover on the GIH Bonds and the Genesis Bonds would soon expire, and that a bankruptcy proceeding was instead highly likely, especially because the Debtor had been through a Chapter 11 proceeding before, existing only a few years earlier.  Goodman did not want the Debtor to simply pay on the Bonds, because he would then have to share in the proceeds of such payment with other holders of the Bonds.

43.     Furthermore, on or about June 4, 2021, Unified Field Services, Inc. ("UFS"), a company owned and controlled by Goodman, entered into an *Asset Purchase Agreement* with the Debtor, pursuant to which it purchased certain assets from the Debtor.  As part of said agreement, GIH, UFS, and Goodman agreed to waive any interest payable on the Bonds through 2024, and to extend the maturity under the Bonds from May 11, 2022 to May 11, 2024.  Thus, Goodman knew that he could not direct payments by the Debtor on the GIH Bonds and the Genesis Bonds and that he, GIH, and UFS would face potential liability for breach of contract if he did so.

44.     In January, 2022, Goodman and Frinzi were considering how to use the tens of millions of dollars of cash that the Debtor had left (after approximately $50 million that Frinzi had separately transferred to himself and his other entities).  Instead of weighing options on using those funds to pay creditors, the topic of discussion was how Goodman could monetize the GIH Bonds and Genesis Bonds before he would lose the ability to do so.  Frinzi encouraged Goodman to make some money on these Bonds, and advised that a third party be used for the transaction.

45.     Upon information and belief, the intent in using a third party was to hide the true nature of the transaction from the Debtor's creditors, make it more difficult to claw-back any payments through the use of intermediaries and conduits, and for Goodman to avoid potential breach of contract claims related to the UFS agreement.  Thus, in response, Goodman proposed

Appx.0041

that he sell these Bonds to Shalom for 35 cents on the dollar. Frinzi agreed and encouraged Goodman to proceed.

46.     Thereafter, upon information and belief, Goodman and Auerbach (directly or through agents) entered into an agreement whereby each would enrich himself at the expense of the Debtor: the Debtor would fund a purchase of the GIH Bonds and Genesis Bonds for 35 cents on the dollar, and Auerbach would make a large premium for acting as some kind of intermediary to conceal the transaction and to participate as a Straw Man, to hide the fact of actual payment or repayment of the Bonds to Goodman and his entities. In other words, rather than Auerbach buying the Bonds with his funds, or rather than the Debtor redeeming or paying the Bonds directly, Goodman, Frinzi, and Auerbach agreed to hide the true nature of the persons involved and the payments and transactions involved.

47.     Auerbach is a successful businessman and director, officer, and manager of billions of dollars in funds and investments. He knows of fiduciary duties and business ethics. As such, Auerbach knew or should have known that his role in the proposed transaction was to facilitate something nefarious and to conceal and hide the true nature of the transactions. As such, Auerbach knew or should have known that he would not be offered millions of dollars in profit, without putting in any money or assuming any risk, except as a payment to participate in the fraudulent and concealed nature of the transaction. And, as Auerbach knew or should have known that the Debtor was insolvent, and was not using his own funds to purchase the Bonds, he knew or should have known that Goodman and Frinzi were breaching their fiduciary duties by orchestrating the transaction; hence the reason he was offered a multi-million dollar immediate profit for putting in no money and assuming no risk.

48.     Simply put, in a transaction such as this, a reasonably prudent person, especially one with the sophistication of Auerbach, knows or should know that he is being paid millions of

Appx.0042

dollars for a purpose, and that that purpose is not legitimate but is instead to effectuate and conceal a tort.  That Auerbach knew of the torts and willingly participated in them, and the concealment, is further evidenced by the two "fund flow memorandums" and the concealment of the true nature of the flow of funds below.

## C.    IMPLEMENTATION OF THE PLAN

49.    On or about February 3, 2022, GIH and Genesis, as sellers, and Alliance, as the buyer, entered into that certain *Bond Purchase Agreement* (the "Purchase Agreement").

50.    Pursuant to the Purchase Agreement, GIH would sell the GIH Bonds to Alliance for a payment of $10,570,912.00 (the "GIH Purchase Price").  This is 35% of face value.

51.    Pursuant to the Purchase Agreement, Genesis would sell the Genesis Bonds to Alliance for a payment of $561,041.00 (the "Genesis Purchase Price").  This is 35% of face value.

52.    However, Alliance did not have the money to pay for the foregoing purchases. Rather, the plan, as envisioned by Goodman and Auerbach, was to have the Debtor fund both the GIH Purchase Price and the Genesis Purchase Price.

53.    As part of the plan by Goodman and Auerbach to hide the identity of the parties and the nature of the transactions, Auerbach decided to use Hudson as an alleged intermediary; Hudson otherwise being a respected business entity.

54.    Thus, on February 3, 2022, Alliance, as principal, and Hudson, as agent, entered into that certain *Agency Agreement* (the "Agency Agreement").

55.    Pursuant to the Agency Agreement, Hudson agreed to act as the agent for Alliance to effectuate the Purchase Agreement, in consideration of $1,000.00.

56.    Upon information and belief, the purpose of the Agency Agreement was to hide the fact that it would be the Debtor which would pay the GIH Purchase Price, the Genesis Purchase Price, and more.

---

ORIGINAL COMPLAINT—Page 12

57.     On February 3, 2022, the Debtor caused to be transferred $17,032,060.00 to Hudson, from the Debtor's bank account at Prosperity Bank ending in 4352 (the "Main Transfer"). The Debtor had an interest in the funds used to make the Main Transfer.

58.     The sum of $17,032,060.00 is more than the GIH Purchase Price and the Genesis Purchase Price.  Upon information and belief, the difference of $5,900,107.00 (the "$5.9 Million Transfer") was intended to benefit and enrich Auerbach for acting as the intermediary to hide the true nature of the transaction.

59.     What follows are two different versions of the flow of funds, believed to be done intentionally to hide the fact of the $5.9 Million Transfer and to deceive the lawyers involved, as well as the Debtor's employees.   And, although unclear, there appear to be two "execution" versions of the Purchase Agreement.  Alternatively, the two sets of documents were designed to be "back-to-back" agreements, intended to close simultaneously, where Hudson, Auerbach, and Auerbach Partners would make a large profit for acting as a middle-man, with no funds or risk of their own at all in the transaction.

60.     The signed Purchase Agreement references a purchase price of $10,570,912.00, to be transferred "as set forth in the attached Funds Flow Memorandum."  Namely, on February 3, 2022, GIH, Genesis, and Alliance entered into that certain *Funds Flow Memorandum*, referenced in the Purchase Agreement, pursuant to which $10,570,912.00 of the Main Transfer would be transferred from Hudson to GIH, and pursuant to which $561,041.00 of the Main Transfer would be transferred from Hudson to Genesis, and which otherwise does not account for the balance of the Main Transfer ($5,900,107.00).  The same also references that the subject Bonds would be transferred from Pershing Square Capital to Hudson, as agent.  Thus, anyone reviewing the Purchase Agreement would therefore not know that an additional $5.9 million was involved, and

it would seem like the Debtor was using its funds to effectively retire more than $30 million in Bonds—a seemingly positive and beneficial arrangement.

61.     Both of the above, the signed Purchase Agreement and the signed funds flow memorandum, appear to have been executed the morning of February 3, 2022.  Both are signed by Auerbach on behalf of Alliance.  These were the versions of the documents shared with the respective lawyers involved papering the transaction.

62.     However, there is a different version of the Purchase Agreement, also styled as "Execution Version," but which has not been signed, at least not in the form produced to the Trustee.  In this version, which is a red-line from the afternoon of February 3, 2022, the purchase price—which is not redlined or track-changed, as though it has always remained the same—is $17,032,060.00.  This matches to the penny the amount of the Main Transfer.  Additionally, this version states that the transfers will be made "as directed by Purchaser."  Under this document, the "Purchaser" is defined as the Debtor, and the "Seller" is defined as Alliance.

63.     There is also a different version, unsigned, of the funds flow memorandum to go with this document, under which: (i) Hudson pays $10,570,912.00 of the Main Transfer to GIH; (ii) Hudson pays $561,041.00 of the Main Transfer to Genesis; and (iii) Hudson pays $5,900,107.00 of the Main Transfer to "Auerbach Partners LP."  This is the first mention of an Auerbach Partners.

64.     The communications involving this second funds flow memorandum exclude the attorneys involved and include only Max Klein, an employee of Hudson, John Mcmullan, also an employee of Hudson, Shalom, and Auerbach.  Max Klein writes that this flow of funds is what Shalom approved, and Auerbach also writes "approved."  Max Klein also writes to Auerbach that "Auerbach Partners should also have received the fees."  Thus, it is known that this, unsigned and

Appx.0045

concealed funds flow memorandum, shows the true flow of funds and demonstrates the true intent
of the persons involved.

65.     The Trustee is unaware of any alleged fees, other than the $1,000 agency fee to
Hudson, and is certainly not aware of any fees payable to Auerbach Partners.

66.     Auerbach and Auerbach Partners are the intended beneficiaries of the $5.9 Million
Transfer.  Auerbach Trust 1 and Auerbach Trust 2 are the general partners of Auerbach Partners
and, as such, are jointly and severally liable with Auerbach Partners.

67.     It therefore appears that Auerbach charged a premium or a fee in the amount of the
$5.9 Million Transfer for buying the GIH Bonds and Genesis Bonds from Goodman and then
selling (if that is even what happened) the same GIH Bonds and Genesis Bonds to the Debtor, on
the same day.  The problem is that Auerbach and Auerbach Partners did not use their own money
to do this which, if they had, the premium or fee may have been unconscionable (and a
constructively fraudulent transfer), but it may have represented a shrewd investor's profit.  Instead,
for no money of their own and for no risk of their own, they had the Debtor fund the purchase and
then make an immediate $5.9 million profit.  And, in no event did Auerbach Partners play any
legitimate role in this to receive the $5.9 Million Transfer, as it would have been Alliance, as the
purchaser of the GIH Bonds and Genesis Bonds, that would have sought to make some profit,
illegitimate as it may have been.

68.     Frinzi authorized the wire representing the Main Transfer.  Frinzi knew the
purchase price for the GIH Bonds and Genesis Bonds to be 35%.  Simple math would have shown
him that the Debtor was overpaying that amount by $5.9 million, or he voluntarily caused the
Debtor to pay that extra amount as a "fee" to benefit his friends, knowing of the purpose of the
$5.9 Million Transfer.

---

ORIGINAL COMPLAINT—Page 15

69.     The Trustee has conferred with the Indenture Trustee and understands that the GIH Bonds have been cancelled.

70.     The Trustee has conferred with the Indenture Trustee and understands that the Genesis Bonds have not been cancelled and remain outstanding.

## IV.    CAUSES OF ACTION

**COUNT 1 :    BANKRUPTCY CODE $5.9 MILLION FRAUDULENT TRANSFER (HUDSON, AUERBACH, AUERBACH PARTNERS)**

71.     The Trustee incorporates his allegations above.

72.     The Debtor was insolvent when it made the Main Transfer and/or the $5.9 Million Transfer.

73.     One or more of Hudson, Auerbach, and Auerbach Partners are the initial transferees of the $5.9 Million Transfer or the persons for whose benefit the transfer was made.

74.     To the extent that Auerbach or Auerbach Partners was a subsequent transferee of the $5.9 Million, they took the same in bad faith knowing of the avoidance and fraudulent nature of the $5.9 Million Transfer.

75.     Even if the Debtor received some value for the cancellation of the GIH Bonds resulting from the Main Transfer, the Debtor received no value whatsoever for the $5.9 Million Transfer.  The price for the GIH Bonds and Genesis Bonds was known and was set at 35%, and Hudson was entitled to a payment of only $1,000 for acting as agent.  Accordingly, the $5.9 Million Transfer was a constructively fraudulent transfer.

76.     Additionally, the $5.9 Million Transfer was an actually fraudulent transfer intended to delay, hinder, and defraud the Debtor's creditors while enriching Hudson, Auerbach, and/or Auerbach Partners, and made by the Debtor through Goodman with the foregoing intent.

77.     Among other things: (i) the Debtor was insolvent; (ii) the Debtor had been threatened with suit and knew that it would soon default on the Bonds; (iii) the transfer was concealed, including from the attorneys involved through the use of two flow of funds memorandums; (iv) the fact of a fraudulent flow of funds memorandum demonstrates actual fraud; (v) and the transfer was necessary for Goodman, an insider, to obtain his own transfers, which he could not otherwise have obtained.

78.     To the extent that the $5.9 Million Transfer was some sort of "fee," it is unconscionable and something that the Debtor received no reasonably equivalent benefit for, as it was Goodman, GIH, and/or Genesis that receiver any resulting benefit by obtaining a recovery on the GIH Bonds and Genesis Bonds.

79.     Accordingly, pursuant to sections 548(a)(1)(A) and 548(a)(1)(B), the Trustee seeks the avoidance of the $5.9 Million Transfer.

## **COUNT 2: TUFTA[2] $5.9 MILLION FRAUDULENT TRANSFER (HUDSON, AUERBACH, AUERBACH PARTNERS)**

80.     The Trustee incorporates his allegations above.

81.     Pursuant to section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a prepetition transfer by the Debtor that an unsecured creditor could avoid.

82.     As of February 1, 2022, the Debtor had multiple unsecured creditors who remain unpaid.

83.     The Debtor was insolvent when it made the Main Transfer and/or the $5.9 Million Transfer.

84.     One or more of Hudson, Auerbach, and Auerbach Partners are the initial transferees of the $5.9 Million Transfer or the persons for whose benefit the transfer was made.

---

[2] The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§ 24.001 *et. seq*.

85. To the extent that Auerbach or Auerbach Partners was a subsequent transferee of the $5.9 Million, they took the same in bad faith knowing of the avoidance and fraudulent nature of the $5.9 Million Transfer.

86. Under sections 24.005(2) and 24.006(a) of TUFTA, the Trustee may avoid a constructively fraudulent transfer.

87. Even if the Debtor received some value for the cancellation of the GIH Bonds resulting from the Main Transfer, the Debtor received no value whatsoever for the $5.9 Million Transfer. The price for the GIH Bonds and Genesis Bonds was known and was set at 35%, and Hudson was entitled to a payment of only $1,000 for acting as agent. Accordingly, the $5.9 Million Transfer was a constructively fraudulent transfer.

88. Under section 24.005(1), the Trustee may avoid an actually fraudulent transfer.

89. The $5.9 Million Transfer was an actually fraudulent transfer intended to delay, hinder, and defraud the Debtor's creditors while enriching Hudson, Auerbach, and/or Auerbach Partners, and made by the Debtor through Goodman with the foregoing intent.

90. Among other things: (i) the Debtor was insolvent; (ii) the Debtor had been threatened with suit and knew that it would soon default on the Bonds; (iii) the transfer was concealed, including from the Debtor's counsel and potentially Frinzi through the use of two flow of funds memorandums; (iv) the fact of a fraudulent flow of funds memorandum demonstrates actual fraud; (v) and the transfer was necessary for Goodman, an insider, to obtain his own transfers, which he could not have otherwise obtained.

91. To the extent that the $5.9 Million Transfer was some sort of "fee," it is unconscionable and something that the Debtor received no reasonably equivalent benefit for, as it was Goodman, GIH, and/or Genesis that receiver any resulting benefit by obtaining a recovery on the GIH Bonds and Genesis Bonds.

Appx.0049

92.     Accordingly, pursuant to sections 24.005 and 24.006 of TUFTA, and section 548 of the Bankruptcy Code, the Trustee seeks the avoidance of the $5.9 Million Transfer.

93.     The Trustee further seeks his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 3:**     **TUFTA FRAUDULENT TRANSFER/INSIDER PREFERENCE (GIH AND GENESIS)**[3]

94.     The Trustee incorporates his allegations above.

95.     Pursuant to section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a prepetition transfer by the Debtor that an unsecured creditor could avoid.

96.     As of February 1, 2022, the Debtor had multiple unsecured creditors who remain unpaid.

97.     The Debtor was insolvent as of February 1, 2022 and at all times thereafter,

98.     At the time that GIH and Genesis received the GIH Purchase Price and the Genesis Purchase Price, each of GIH and Genesis were insiders of the Debtor.  Each was the initial transferee of such transfers or the entity for whose benefit such transfers were made.

99.     The purpose and intent of the GIH Purchase Price and Genesis Purchase Price transfers was to repay GIH and Genesis for the GIH Bonds and the Genesis Bonds, even if the transaction was structured as a sale to Alliance, which sale was a sham, since the Debtor used its funds to make the payments as opposed to Alliance investing any of its own funds or risk.  In truth and in substance, the transaction was designed and intended to pay HIG and Genesis on the Bonds that they held, since Goodman knew that the Debtor would not otherwise be able to pay the same.

100.     Under TUFTA, an unsecured creditor, and therefore now the Trustee, may avoid a transfer to a creditor who was an insider for an antecedent debt.  The HIG Purchase Price and the

---

[3] The Trustee and Estate hold other claims and causes of action against GIH and Genesis, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

Appx.0050

Genesis Purchase Price represented such transfers. Moreover, through the common control of the Debtor, HIG, and Genesis by Goodman, HIG and Genesis knew that the Debtor was insolvent at the time that it made the transfers.

101.    Accordingly, pursuant to section 544 of the Bankruptcy Code and section 24.006(b) of TUFTA, the Trustee seeks the avoidance of the HIH Purchase Price and the Genesis Purchase Price transfers.

102.    The Trustee further seeks his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 4:    MAIN TRANSFER AS FRAUDULENT TRANSFER**

103.    The Trustee incorporates his allegations above.

104.    In the alternative, if the intention behind the Main Transfer was not for the Debtor to be relieved of certain Bonds at discounted prices, then the Main Transfer itself is both a constructively fraudulent transfer and an actually fraudulent transfer.

105.    As such, Hudson, Alliance, Auerbach, and Auerbach Partners are the initial transferees of the Main Transfer, as are GIH, Genesis, Auerbach, and Auerbach Partners, as the parties for whose benefit the Main Transfer was made. To the extent any is a subsequent transferee, it did not take the transfer in good faith and without knowledge of its avoidance.

106.    The Debtor was insolvent when it made the Main Transfer.

107.    The Main Transfer is a constructively fraudulent transfer because the Debtor received less than reasonably equivalent value for the retirement of one or both of the GIH Bonds and Genesis Bonds, as the same were worth far less than the amounts paid (even excluding the $5.9 Million Transfer), since the Debtor was insolvent, had no ability to repay the bonds near their face amounts or the amounts they traded at, and was about to default on the bonds.

Appx.0051

108.     Additionally, the Debtor, through Goodman, made the Main Transfer with the intention of hindering, delaying, and defrauding its creditors, specifically by removing funds that could be used to pay creditors in order that insiders and their friends could benefit.  Among other things: (i) the Debtor was insolvent; (ii) the Debtor had been threatened with suit and knew that it would soon default on the Bonds; (iii) the transfer was concealed, including from the Debtor's counsel and potentially Frinzi through the use of two flow of funds memorandums; (iv) the fact of a fraudulent flow of funds memorandum demonstrates actual fraud; (v) and the purpose of the transfer was to cause the Debtor to dispose of liquid funds before the same could be seized or attached by one or more of the Debtor's creditors.

109.     The mere fact that an intermediary was used in the form of Hudson evidences the intention to conceal and hide the transaction, as does the additional concealment of Auerbach and Auerbach Partners as being the actual persons behind the transaction who received much of the Main Transer.

110.     Accordingly, pursuant to sections 24.005 and 24.006 of TUFTA, and section 548 of the Bankruptcy Code, the Trustee seeks the avoidance of the Main Transfer as a constructively fraudulent transfer and an actually fraudulent transfer.

111.     The Trustee further seeks his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

### COUNT 5:    FRAUDULENT TRANSFER—GENESIS BONDS (ALLIANCE)

112.     The Trustee incorporates his allegations above.

113.     Upon information and belief, Alliance has not cancelled the Genesis Bonds sold to it, whether that was the intent or not.

114.     The funds used to enable Alliance to acquire the Genesis Bonds came from the Debtor, for which the Debtor received no reasonably equivalent value.

Appx.0052

115. Accordingly, pursuant to section 548 of the Bankruptcy Code, the Trustee seeks the avoidance, as a constructively fraudulent transfer, of the transfer of the Genesis Purchase Price, and a recovery, under section 550 of the Bankruptcy Code, of the Genesis Bonds for the Estate.

**COUNT 6:** **RECOVERY OF AVOIDED TRANSFERS**

116. The Trustee incorporates his allegations above.

117. Pursuant to section 550 of the Bankruptcy Code, upon the avoidance of each transfer requested above, the Trustee seeks a recovery of such transfer by way of money judgment against each transferee or subsequent transferee named herein, except with respect to the Genesis Bonds which, if still held by Alliance, the Trustee seeks the turnover of to the Estate.

**COUNT 7:** **BREACH OF FIDUCIARY DUTY (GOODMAN)**[4]

118. The Trustee incorporates his allegations above.

119. Goodman, while still a director of the Debtor, planned the strategy that led to the transfers described above to GIH, Genesis, and Auerbach/Hudson. That he nominally resigned days prior to the date of such transfers is not determinative, because Frinzi, as the Debtor's CEO, merely implemented the strategy that his director had ordered him to.

120. Alternatively, or additionally, Goodman's purported resignation as director on February 1, 2022 was a sham. Upon information and belief, Goodman remained in control of the Debtor and of Frinzi, continuing to instruct Frinzi with respect to multiple subsequent transactions. Thus, upon information and belief, Goodman remained as a director at all times material hereto.

121. As a director of the Debtor, Goodman owed a duty of, among other things, loyalty and of care to the Debtor.

---

[4] The Trustee and Estate hold other claims and causes of action against Goodman, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action. Nothing herein shall prejudice the same.

Appx.0053

122.     Goodman breached the duty of loyalty by self-dealing and looking to his personal interests ahead of the interests of the Debtor, in having the Debtor pay the GIH Purchase Price and the Genesis Purchase Price, both of which benefited him and his other companies, at the expense of the Debtor, its ongoing business, and its ability to service its debt and pay its creditors.

123.     Goodman breached the duty of loyalty by orchestrating the $5.9 Million Transfer, which enriched his friend, Auerbach, at the expense of the Debtor, and for which the Debtor received no value.

124.     Goodman breached the duty of care by orchestrating the $5.9 Million Transfer, because he knew that the price for the GIH Bonds and Genesis Bonds was 35%, yet he had the Debtor pay $5.9 million more than this purchase price for no return consideration to the Debtor, in what amounts to gross negligence.

125.     Accordingly, the Trustee seeks a money judgment against Goodman for the foregoing breaches of fiduciary duty.

**COUNT 8:**     **BREACH OF FIDUCIARY DUTY (FRINZI)[5]**

126.     The Trustee incorporates his allegations above.

127.     At all times material hereto, Frinzi was the Chief Executive Officer of the Debtor. As such, he owed fiduciary duties to the Debtor, including the duty of loyalty and the duty of care.

128.     Frinzi participated in and approved of the Main Transfer, and personally authorized and instructed the Main Transfer.  To the extent that the same was instructed by Goodman, Frinzi nevertheless had an independent fiduciary duty to the Debtor with respect to the same.

129.     In participating in, orchestrating, and instructing the foregoing, Frinzi breached his duty of loyalty to the Debtor.  Namely, in order to enrich Goodman and provide a preferential

---

[5] The Trustee and Estate hold other claims and causes of action against Frinzi, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

return to Goodman on the GIH Bonds and Genesis Bonds, which Frinzi knew would otherwise not

be paid, and in order to please his boss in order to retain his own job and benefits, Frinzi placed

the interests of Goodman ahead of those of the Debtor, thereby benefiting Goodman at the expense

of the Debtor, which lost the funds it needed to continue operations and pay debts.

130.     In participating in, orchestrating, and instructing the foregoing, Frinzi also breached

his duty of care to the Debtor.  To the extent that Frinzi believed the Debtor would be benefited

from the cancellation of the GIH Bonds and Genesis Bonds, Frinzi also knew that the price for the

same was 35%, or precisely the amount of the GIH Purchase Price and the Genesis Purchase Price.

Yet Frinzi caused the Debtor to pay $5.9 million more, in what is either gross negligence because

a $2 calculator could have told him what the correct price was or, if done intentionally, a breach

of the duty of loyalty, by causing the Debtor to enrich another—Frinzi's friend Auerbach—for no

return consideration to the Debtor.

131.     Accordingly, the Trustee seeks a money judgment against Frinzi for the foregoing

breaches of fiduciary duty.

### COUNT 9:     CONSPIRACY (AUERBACH AND AUERBACH PARTNERS)

132.     The Trustee incorporates his allegations above.

133.     A civil conspiracy consists of a combination of two or more persons, seeking to

accomplish a shared object or course of action, a meeting of the minds on such object or course of

action, one or more unlawful, over acts in pursuance thereof, and resulting damages.

134.     At all times material hereto, Auerbach and Auerbach Partners, through Auerbach,

knew that the Debtor was insolvent and would not be able to repay the Bonds or its other debts.

Auerbach knew that Goodman sought to exploit this situation for his personal benefit, by getting

paid on the GIH Bonds and Genesis Bonds before the Debtor lost any ability to repay the same.

Auerbach used this situation to also enrich himself at the expense of the Debtor.  Auerbach and

Appx.0055

Goodman had a meeting of the minds that both would exploit this situation for their personal benefits, with each agreeing to the enrichment of the other, at the expense of the Debtor. Auerbach, a successful and sophisticated businessman and funds manager, knew that Goodman and Frinzi owed fiduciary duties to the Debtor, which they would breach by entering into the transactions described above, particularly with respect to the $5.9 Million Transfer. Both Goodman and Frinzi breached their fiduciary duties in agreeing to, orchestrating, and effectuating the Main Transfer and, in particular, the $5.9 Million Transfer. The Debtor was damaged as a result.

135.    Accordingly, the Trustee seeks a money judgment against Auerbach, jointly and severally with Goodman and Frinzi, for the damages caused to the Debtor by Goodman's and Frinzi's breaches of fiduciary duty as otherwise described above, in an amount to be proven at trial.

**COUNT 10:    UNJUST ENRICHMENT (HUDSON, AUERBACH, AUERBACH PARTNERS)**

136.    The Trustee incorporates his allegations above.

137.    Hudson, Auerbach, and/or Auerbach Partners, to extent the recipients of the $5.9 Million Transfer, were unjustly enriched by the Debtor insofar as they obtained large sums from the Debtor without providing any value to the Debtor.

138.    Accordingly, the Trustee seeks a money judgment against Hudson, Auerbach, and Auerbach Partners, jointly and severally, for $5.9 million, or against each to the extent of any benefit provided from the $5.9 Million Transfer.

**COUNT 11:    PARTNER LIABILITY (AUERBACH TRUST 1 AND AUERBACH TRUST 2)**

139.    The Trustee incorporates his allegations above.

140.    Auerbach Partners is a limited partnership, the general partners of which are Auerbach Trust 1 and Auerbach Trust 2.

---

ORIGINAL COMPLAINT—Page 25

141.     Under applicable law, a general partner is jointly and severally liable with the limited partnership for the limited partnership's debts.

142.     Accordingly, the Trustee requests a judgment against Auerbach Trust 1 and Auerbach Trust 2 holding them jointly and severally liable for all awards otherwise awarded the Trustee herein against Auerbach Partners.

## V.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee requests that the defendants be cited to appear and to answer this Complaint and that he have judgment as follows:

(i)      avoidance of all transfers requested herein;

(ii)     recovery of all transfers requested herein by way of money judgment;

(iii)    money judgment against Goodman and Frinzi for their breaches of fiduciary duty;

(iv)     money judgment against Auerbach and Auerbach Partners, jointly and severally with Goodman and Frinzi, for their breaches of fiduciary duty;

(v)      money judgment against Auerbach and Auerbach Partners for unjust enrichment;

(vi)     reasonable attorney's fees to the extent provided for by applicable law;

(vii)    cancelation or return of any bonds held by Alliance or any other defendant not previously retired;

(viii)   judgment holding Auerbach Trust 1 and Auerbach Trust 2 jointly and severally liable for all awards against Auerbach Partners awarded herein;

(ix)     prejudgment and postjudgment interest to the extent provided by applicable law; and

(x)      such other and further relief as may be appropriate.

Appx.0057

RESPECTFULLY SUBMITTED this 7th day of July, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE**

Appx.0058

# EXHIBIT 3

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC; ALLIANCE TEXAS | § | |
| HOLDINGS, LLC; NEIL Z. AUERBACH; | § | |
| JUDITH AUERBACH; AUERBACH | § | |
| PARTNERS, L.P.; JAMES GOODMAN; | § | |
| JAMES FRINZI; GOODMAN | § | |
| INVESTMENT HOLDINGS, LLC; | § | |
| GENESIS NETWORKS, INC.; GENESIS | § | |
| NETWORKS GLOBAL SERVICES, LLC; | § | |
| AUERBACH CHILDREN'S DYNASTY | § | |
| TRUST U/A/D OCTOBER 9, 2012; and | § | |
| AUERBACH FAMILY DYNASTY TRUST | § | |
| U/A/D OCTOBER 9, 2012, | § | |
| | | |
| Defendants. | | |

## TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO
## DEFENDANT JAMES GOODMAN

To:    Defendant, James Goodman, by and through his counsel of record, Randall A. Pulman, Esq., Pulman Cappuccio & Pullen, LLP, 2161 NW Military Hwy, Suite 400, San Antonio, Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon James Goodman ("Goodman"), a defendant in this Adversary Proceeding, this his *Trustee's First Set of Requests for Production to Defendant James Goodman* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I.    **INSTRUCTIONS**

1.    These Requests are intended to cover all information, documents, and things in Your possession, custody, or control. A document or thing is deemed to be in Your possession, custody, or control, if:

a.    It is in Your physical control or possession; or

b.    It is in the physical control or possession of any other person or entity, and You, individually or otherwise

i.    Own the document or thing in whole or in part;

ii.    Have a right by contract, statute, or otherwise, to use, inspect, examine, or copy that document or thing on any terms; or

iii.    Have, as a practical matter, been able to use, inspect, examine, or copy that document or thing when You have sought to do so.

2.    Unless otherwise indicated, references in these requests to You or any party, business organization, or other legal entity specifically includes all of that entity's present or former employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

3.    If any portion of any document, electronically stored information, or tangible thing is responsive to any Request, then the entire document, electronically stored information, or

tangible thing must be produced. Documents and electronically stored information shall be produced in the order in which they are found in your files. Documents that are found stapled, clipped, or otherwise fastened shall be produced in such form.

4.      These requests cover and include all electronically stored information, as that term is used in the Federal Rules of Civil Procedure, including all means of communication such as Signal, Snapchat, e-mail, text messaging, and all other electronic means of communication or recording of information (collectively, "ESI"). ESI must be produced as follows:

a.   ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

i.   E-mail: E-mail and other and other electronic messages (*e.g.,* instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container. Other email files should be produced as .eml or in .mbox format.

ii.   Electronic documents. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business. All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii) spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.,* non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

iii.   Electronic audio recordings, photographs or images: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

b.   Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic

Appx.0061

document including family relationship data. Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format. Other documents may be requested to be produced in their native format if necessary

5.      In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

6.      If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

7.      You must serve your responses to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

<div align="center">

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
drukavina@munsch.com

</div>

## II.     **DEFINITIONS**

"Alliance" means Alliance Texas Holdings, LLC, and includes any agent thereof when acting on its behalf.

"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

"Bond Purchase Agreement 1" means the *Bond Purchase Agreement* attached hereto as Exhibit "A."

"Bond Purchase Agreement 2" means the *Bond Purchase Agreement* attached hereto as Exhibit "B."

"Bonds" means the 8% Senior Secured Notes due 2022 of Goodman Networks, Inc. (and issued by Goodman Networks, Inc.).

"Communication" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

"Computer data" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

"Debtor" means Goodman Networks, Inc., and includes any agent thereof when acting on its behalf.

"Document(s)" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated. "Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

"Electronic information system" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

"Electronic storage device" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

"ESI" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

"File" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

"Frinzi" means James Frinzi.

"Genesis" means either/or Genesis Networks, Inc. and/or Genesis Networks Global Services, LLC, and includes any agent of either when acting on either's behalf.

"Genesis Bonds" means any or all of the Bonds held by Genesis as of February 1, 2022.

"GIH" means Goodman Investment Holdings, LLC, and includes any agent thereof when acting on its behalf.

"GIH Bonds" means any or all of the Bonds held by GIH as of February 1, 2022.

"GNET" means GNET ATC, LLC.

"Goodman" means James Goodman.

"Hudson" means Hudson Clean Energy Enterprises, LLC, and includes any agent thereof when acting on its behalf.

"Including" means 'including but not limited to', and is not restrictive or limiting.

"Indenture Trustee" means UMB Bank, N.A., as indenture trustee regarding the Bonds.

"N. Auerbach" means Neil Auerbach.

"Person" or "persons" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

"S. Auerbach" means Shalom Auerbach.

"Transfer" shall have the same meaning as defined by 11 U.S.C. § 101(54).

"You" and "your" shall mean Goodman.

### III.   FIRST SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 1:**

All Documents and Communications between You and Frinzi regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 2:**

All Documents and Communications between You and S. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 3:**

All Documents and Communications between You and N. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 4:**

All Documents and Communications between You and any person (not already the subject of Requests No. 1, 2, and 3) regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

Appx.0067

**REQUEST NO. 5:**

Any Document and Communication regarding, related to, or referring to any approval by any director, shareholder, officer, manager, or other person at the Debtor, including any attorney of the Debtor and including any financial advisor of the Debtor (such as Sierra Constellation Partners or CFGI), of the Bond Purchase Agreement 1 or the transactions and Transfers contemplated thereby.

RESPONSE:

**REQUEST NO. 6:**

Any Document and Communication regarding, related to, or referring to any due diligence You undertook, or had undertaken for You, regarding the Bond Purchase Agreement 2 or the transactions contemplated thereby.

RESPONSE:

**REQUEST NO. 7:**

Any Document and Communication regarding, related to, or referring to any approval by any director, shareholder, officer, manager, or other person at GIH and Genesis of the Bond Purchase Agreement 2 or the transactions and Transfers contemplated thereby.

RESPONSE:

**REQUEST NO. 8:**

Any Document and Communication related to the price at which the Bonds were trading as of February 3, 2022.

RESPONSE:

**REQUEST NO. 9:**

Any Document and Communication regarding, related to, or referring to transfer of the GIH Bonds to Alliance, the Debtor, or any other person.

RESPONSE:

**REQUEST NO. 10:**

Any Document and Communication regarding, related to, or referring to transfer of the Genesis Bonds to Alliance, the Debtor, or any other person.

RESPONSE:

**REQUEST NO. 11:**

All Communications between You and any person, at any time during 2021 or 2022, regarding, related to, or referring to any potential sale by GIH or Genesis of any of their Bonds, or any potential purchase by any person of the same, directly or indirectly.

RESPONSE:

**REQUEST NO. 12:**

All Communications between You and any person, at any time during 2021 or 2022, regarding, related to, or referring to the Bonds, the Debtor's performance under the Bonds, and the Debtor's payment or non-payment of the Bonds at their maturity.

RESPONSE:

**REQUEST NO. 13:**

All Documents and Communications between You and Bobby Forshey or any other attorney or person at Forshey Prostok, LLP regarding the Debtor. You are reminded that the Trustee has waived the privilege for this.

RESPONSE:

---

**REQUEST NO. 14:**

All Documents and Communications between You and Sierra Constellation Partners, LLC regarding the Debtor.

RESPONSE:

**REQUEST NO. 15:**

All Documents and Communications between You and Joseph Baum or CFGI, LLC regarding the Debtor.

RESPONSE:

**REQUEST NO. 16:**

All Documents and Communications between You and Winstead, PC regarding the Debtor.

RESPONSE:

**REQUEST NO. 17:**

All Documents and Communications between You and any sibling of Yours, including John Goodman, from December 1, 2021 through June 1, 2022, regarding the Debtor, the Bonds, GIH, or Genesis.

RESPONSE:

**REQUEST NO. 18:**

All Documents and Communications between You and any shareholder, member, owner, or investor in GIH or Genesis, from December 1, 2021 through June 1, 2022, regarding the Debtor or the Bonds.

RESPONSE:

**REQUEST NO. 19:**

All Documents and Communications between You and T. Denny Sanford regarding the Debtor, the Bonds, GIH, or Genesis, prior to June 1, 2022.

RESPONSE:

**REQUEST NO. 20:**

Any guarantee by You of any debt of GIH or Genesis in place at any time between January 1, 2022 and June 1, 2022 and, for each such guarantee, each related promissory note, security instrument, pledge of collateral, deed of trust, financing statement, and each other related agreement or instrument.

RESPONSE:

**REQUEST NO. 21:**

All Communications between You and any person regarding any guarantee within Request No. 20, between January 1, 2022 and June 1, 2022.

RESPONSE:

**REQUEST NO. 22:**

All Documents and Communications from or with GIH or Genesis at any time during 2021 and 2022 regarding, related to, or referring to any distribution, dividend, or loan payment to You or to any entity affiliated with You.

RESPONSE:

**REQUEST NO. 23:**

Your federal income tax return for 2022.

RESPONSE:

DATED at Dallas Texas this 10th day of June, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: _____

    David Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    Conor P. White, Esq.
    Texas Bar No. 24125722
    500 N. Akard Street, Suite 4000
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com
           tberghman@munsch.com
           jvasek@munsch.com
           cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 10th day of June, 2024, he caused a true and correct copy of this document to be served via email on James Goodman by and though his counsel of record, Randy Pullman Esq. at RPulman@pulmanlaw.com, and by U.S. mail first-class, postage prepaid, on the following:

James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

Micahel Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
2161 NW Military Hwy.
Suite 400
San Antonio, Texas 7821

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

By: _____
Davor Rukavina, Esq.

*Execution Version*

### BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Alliance Texas Holdings, LLC a Florida limited liability company ("Seller") and Goodman Networks Incorporated, a Texas corporation ("Purchaser").

WHEREAS, Purchaser intends to purchase $31,746,617 million in face amount outstanding aggregate principal amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") which Purchaser issued on May 31, 2017, held by Seller for a purchase price of $17,032,060.00 (the "Purchased GNI Bonds");

WHEREAS, Seller desires to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. Purchase and Sale:

   a. Purchaser shall acquire the Purchased GNI Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"). Purchaser shall purchase the Purchased GNI Bonds owned by Seller at an aggregate purchase price for $17,032,060.00 (the "Purchase Price") by wiring same-day funds to the account as instructed by seller. Purchaser shall pay the Purchase Price to Seller upon execution of this Agreement, and thereafter Seller shall instruct its prime broker to transfer within 15 days the Purchased GNI Bonds to Purchaser's brokerage account as directed by Purchaser.

   b. Purchaser's obligation to pay the Purchase Price and Seller's obligation to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically this Agreement. Purchaser and Seller further acknowledge and agree that the obligations of the Seller under this Agreement may be settled only with the Purchased GNI Bonds.

2. Indemnification:

   a. Seller agrees to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "Purchaser Indemnitee") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("Losses"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Seller's agreements,



covenants or representations or warranties under this Agreement. The Seller shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

b. Purchaser agrees to indemnify Seller, its affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "Seller Indemnitee") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement. Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3. Tender Offer; Offers to other holders:   Purchaser covenants to offer all or substantially all of the other holders of the GNI Bonds to purchase any outstanding GNI Bonds at the Purchase Price.

4. No Legal Obligation; Confidentiality. Each party hereto agrees that neither the Seller, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a Purchaser's intent to acquire the remaining GNI Bonds at a price per note equal or greater than the Purchase Price pursuant to a tender offer, series of tender offers or other offer to purchase such GNI Bonds or (B) the termination of this Agreement.

5. Termination; Right of First Refusal. This Agreement shall terminate upon the mutual written agreement of the parties.

6. Miscellaneous:

a. Seller and Purchaser each acknowledge and agree that:

(i) it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement. No communication (written or oral)

2

received from the other party shall be deemed to be an assurance or guarantee as to the expected results of entering into this Agreement;

(ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Agreement. It is also capable of assuming, and assumes, the risks of this Agreement;

(iii) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it in respect of the transactions contemplated by this Agreement and each party is acting for its own account and it has made its own independent decision to enter into this Agreement;

(iv) Neither party is receiving any compensation or fees in respect of the specific transactions contemplated in this Agreement; and

(v) All Purchased GNI Bonds subject to this Agreement shall be acquired in compliance with applicable law, including the Securities Act.

b.  Purchaser represents to Seller:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited to deal under the laws of the United States, and (C) is not a Person identified as a terrorist organization on any other relevant lists maintained by governmental authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived from or related to any illegal activities, including, without limitation, money laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (B) employs one or more individuals on a full-time basis; (C) maintains operating records related to its banking activities; (D) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (E) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate;

(iv) it will provide to Seller at any time such information as Seller determines to be necessary or appropriate (A) to comply with the anti-money laundering laws, rules and regulations of any applicable jurisdiction and (B) to respond to requests for information concerning its identity from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information;

(v) as of the date hereof, Purchaser had Purchaser had $32 million of cash available to fund purchases of GNI bonds or for other general corporate purchases;

3

    (vi) there are $48,195,171 million in aggregate face amount of GNI Bonds outstanding as of the date of this Agreement;

    (vii) the GNI Bonds have a maturity date of May 31, 2022;

    (viii)    no insolvency proceeding of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the GNI or any of its assets or properties, is pending or, to the knowledge of the Purchaser, threatened. GNI has not taken any action in contemplation of, or that would constitute the basis for, the institution of any such insolvency proceedings; and

    (ix) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Seller. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Seller in writing.

c.    Seller hereby represents to Purchaser:

    (i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

    (ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d.    Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e.    This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f.    All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to

<div align="center">4</div>

Appx.0077

be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g.   Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h.   The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i.   This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j.   All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:                     Goodman Networks Incorporated
                                     2831 Eldorado Parkway, Suite 103
                                     Frisco, TX 75033
                                     Attn: James Frinzi
                                     James.Frinzi@gnetatc.com

If to Seller:                        Alliance Texas Holdings, LLC
                                     333 S.E. 2nd Avenue, Suite 3410
                                     Miami, FL 33131
                                     Attn: Neil Auerbach
                                     Neil.Auerbach@hudsonsustainable.com

                                     With a copy to:
                                     Baker Botts L.L.P
                                     910 Louisiana Street

Appx.0078

Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

k.  This Agreement shall be construed in accordance with and be governed by the laws of
the State of Texas (without reference to choice of law doctrine). Any action brought in
connection with this Agreement shall be brought in the federal or state courts located
in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such
courts and waive any objections as to venue or inconvenient forum. THE PARTIES
HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY
IN   ANY   LEGAL   ACTION   OR   PROCEEDING   RELATING   TO   THIS
AGREEMENT,   OR   ANY   INTERPRETATION   THEREOF,   AND   FOR   ANY
COUNTERCLAIM RELATED THERETO.

*[Signature Pages Follow]*

6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**GOODMAN NETWORKS INCORPORATED**

By: _____

Name:  James Frinzi

Title:  CEO

*Signature Page to Bond Purchase Agreement*

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____
Name: Neil Auerbach
Title:   Managing Member

*Signature Page to Bond Purchase Agreement*

*Execution Version*

**BOND PURCHASE AGREEMENT**



71672585_2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0067

EXHIBIT
B



2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0083

HUDSON_0068



3

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0069



4

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER



5

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0071



6

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0087

HUDSON_0072



7

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0073



8

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0074



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0090



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0091



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0077

# EXHIBIT 4

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | | (Chapter 7) |
| Debtor. | | |
| SCOTT M. SEIDEL, TRUSTEE, | § § § § § § | |
| Plaintiff, | | ADVERSARY PROCEEDING NO: 23-03090-mvl |
| v. | § § | |
| HUDSON CLEAN ENERGY ENTERPRISES, LLC; ALLIANCE TEXAS HOLDINGS, LLC; NEIL Z. AUERBACH; JUDITH AUERBACH; AUERBACH PARTNERS, L.P.; JAMES GOODMAN; JAMES FRINZI; GOODMAN INVESTMENT HOLDINGS, LLC; GENESIS NETWORKS, INC.; GENESIS NETWORKS GLOBAL SERVICES, LLC; AUERBACH CHILDREN'S DYNASTY TRUST U/A/D OCTOBER 9, 2012; and AUERBACH FAMILY DYNASTY TRUST U/A/D OCTOBER 9, 2012, | § § § § § § § § § § § § § § | |
| Defendants. | | |

## TRUSTEE'S FIRST SET OF INTERROGATORIES TO
## DEFENDANT JAMES GOODMAN

Appx.0093

To:  Defendant, James Goodman, by and through his counsel of record, Randall A. Pulman, Esq., Pulman Cappuccio & Pullen, LLP, 2161 NW Military Hwy, Suite 400, San Antonio, Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon James Goodman ("Goodman"), a defendant in this Adversary Proceeding, this his *Trustee's First Set of Interrogatories to James Goodman* (the "Interrogatories") pursuant to Rule 33 of the Federal Rules of Civil Procedure as follows.

## I.    INSTRUCTIONS

Goodman must serve his responses to the Interrogatories, no later than thirty (30) days following service of these Interrogatories, at the following address or email:

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
drukavina@munsch.com

## II.    DEFINITIONS

"Alliance" means Alliance Texas Holdings, LLC, and includes any agent thereof when acting on its behalf.

"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

"Bond Purchase Agreement 1" means the *Bond Purchase Agreement* attached hereto as Exhibit "A."

"Bond Purchase Agreement 2" means the *Bond Purchase Agreement* attached hereto as Exhibit "B."

---

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT JAMES GOODMAN—Page 2

"<u>Bonds</u>" means the 8% Senior Secured Notes due 2022 of Goodman Networks, Inc. (and issued by Goodman Networks, Inc.).

"<u>Debtor</u>" means Goodman Networks, Inc.

"<u>Frinzi</u>" means James Frinzi.

"<u>Genesis</u>" means either/or Genesis Networks, Inc. and/or Genesis Networks Global Services, LLC, and includes any agent of either when acting on either's behalf.

"<u>Genesis Bonds</u>" means any or all of the Bonds held by Genesis as of February 1, 2022.

"<u>GIH</u>" means Goodman Investment Holdings, LLC, and includes any agent thereof when acting on its behalf.

"<u>GIH Bonds</u>" means any or all of the Bonds held by GIH as of February 1, 2022.

"<u>Goodman</u>" means James Goodman.

"<u>Including</u>" means 'including but not limited to', and is not restrictive or limiting.

"<u>Indenture Trustee</u>" means UMB Bank, N.A., as indenture trustee regarding the Bonds.

"<u>N. Auerbach</u>" means Neil Auerbach.

"<u>Person</u>" or "<u>persons</u>" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

"<u>S. Auerbach</u>" means Shalom Auerbach.

"<u>Transfer</u>" shall have the same meaning as defined by 11 U.S.C. § 101(54).

"<u>You</u>" and "<u>your</u>" shall mean Goodman.

## III.    **FIRST SET OF INTERROGATORIES**

### INTERROGATORY NO. 1:

Explain why You decided to cause GIH and Genesis to sell their Bonds at the time that they did and for the discount that they did, including whether there were any liquidity issues at these entities, whether they needed to pay down any debt, whether You were concerned that the Debtor would soon default on the Bonds, and any other fact or belief You had or considered in so deciding as of February 3, 2022.

RESPONSE:

### INTERROGATORY NO. 2:

Explain why, in causing GIH and Genesis to sell their Bonds, You did not simply ask the Debtor or cause the Debtor to purchase or redeem the Bonds directly, as opposed to selling them to Alliance for the subsequent transfer to the Debtor.

RESPONSE:

### INTERROGATORY NO. 3:

Explain in detail and with specificity the course of events that led from the initial decision or desire to cause GIH and Genesis to sell their Bonds to the execution of Bond Purchase Agreement 2, including whose idea it originally was to sell the Bonds, whose idea it was to sell them to a third party as opposed to the Debtor, who first located Alliance (or S. Shalom, N. Shalom, or any other person affiliated with Alliance) as the buyer, and each person who participated in the negotiation, drafting, or execution of Bond Purchase Agreement 2.

RESPONSE:

### INTERROGATORY NO. 4:

Did You know or believe, or had anyone informed You of any intent, that Alliance would, after purchasing the Bonds from GIH and Genesis, then sell, transfer, or redeem the purchased Bonds to the Debtor, and state and explain all You may have known or believed regarding the same, including from whom, and including for what price Alliance would do so with the Debtor, including whether You knew of the fact, existence, or substance of Bond Purchase Agreement 1.

RESPONSE:

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT JAMES GOODMAN—Page 4

Appx.0096

**INTERROGATORY NO. 5:**

Where did You believe or understand that Alliance was obtaining the funds to pay GIH and Genesis for the Bonds under the Bond Purchase Agreement 2, and did You know or believe, or had anyone informed You, that any portion of such funds would be coming from the Debtor, whether pursuant to Bond Purchase Agreement 1 or otherwise.

RESPONSE:

**INTERROGATORY NO. 6:**

Did You believe that the Debtor was insolvent on February 3, 2022 (meaning did You believe it at that time), as "insolvent" is defined in section 101 of the Bankruptcy Code, and explain the basis for such belief as of such date.

RESPONSE:

**INTERROGATORY NO. 7:**

On February 3, 2022, did You expect that the Debtor would default on the Bonds when they matured later that year, and explain the basis for such belief as of such date.

RESPONSE:

**INTERROGATORY NO. 8:**

At any time prior to February 3, 2022, did You discuss the Debtor's solvency, insolvency, or potential default on the Bonds when they matured later that year, with any of Frinzi, N. Auerbach, S. Auerbach, or any agent of any of the foregoing and, if so, what did You discuss or say, with whom, how, and when.

RESPONSE:

---

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT JAMES GOODMAN—Page 5

**INTERROGATORY NO. 9:**

Did You have anything to do with Bond Purchase Agreement 1, or the agreement evidenced thereby, prior to its execution, including anything to do with the negotiation of the terms thereof or the drafting thereof, and including whether You saw any draft thereof, and whether You discussed the form or substance thereof or of any draft thereof with Frinzi prior to its execution, and, if not, state when and how You first learned of the fact or substance of Bond Purchase Agreement 1.

RESPONSE:

**INTERROGATORY NO. 10:**

As of February 3, 2022, what did You understand or believe to be the reason that Alliance was entering into Bond Purchase Agreement 2, including whether You had any understanding or belief that it would subsequently transfer the Bonds or hold the Bonds for maturity, and including any understanding or belief of any profit, gain, margin, or arbitrage that Alliance may make from the transaction and, if You had any such understanding or belief, state where it came from.

RESPONSE:

**INTERROGATORY NO. 11:**

Do You have any information, fact, document, or evidence to the effect that Frinzi personally benefited, monetarily or otherwise, from causing the Debtor to execute Bond Purchase Agreement 1 or from the overall transactions the subject of Bond Purchase Agreement 1 and Bond Purchase Agreement 2, and, if so, what is it.

RESPONSE:

**INTERROGATORY NO. 12:**

State and explain in detail Frinzi's role with respect to the Bond Purchase Agreement 1, Bond Purchase Agreement 2, and the transactions the subject thereof, including any such role in introducing Alliance, N. Auerbach, or S. Auerbach to You for such purpose, and including any such role in negotiating or drafting the deal terms, including the pricing of Bond Purchase Agreement 1 and Bond Purchase Agreement 2.

RESPONSE:

Appx.0098

**INTERROGATORY NO. 13:**

As of when You signed the Bond Purchase Agreement 2, what was Your understanding as to whether Alliance at that time owned the $31,746,617.00 in Bonds the subject thereof or whether it would come to own said Bonds, including, how, when, from whom, and for what payments or transfers.

RESPONSE:

**INTERROGATORY NO. 14:**

How was the pricing for the Bonds the subject of Bond Purchase Agreement 2 decided, including who decided or negotiation the same or participated in said decision or negotiation (for the seller and buyer), when and how that decision was made, and what factors or facts went into said decision.

RESPONSE:

**INTERROGATORY NO. 15:**

Prior to the negotiation of Bond Purchase Agreement 2 and prior to the identification of Alliance, S. Auerbach, or N. Auerbach (or any entity affiliated with them) as the buyer of the GIH Bonds and the Genesis Bonds, had You informed Frinzi of the price that GIH and Genesis would accept to sell their Bonds?

RESPONSE:

**INTERROGATORY NO. 16:**

When You executed the Bond Purchase Agreement 2, did You know, suspect, or by then in any way discuss with anyone, that Alliance, N. Auerbach, S. Auerbach, or any entity or person affiliated with any of them, would earn a markup or profit or margin or arbitrage on the Bonds that they were purchasing to sell to the Debtor and, if so, what did you know or suspect, and why.

RESPONSE:

**INTERROGATORY NO. 17:**

Did You have anything to do with the Debtor terminating its retention of Bobby Forshey and Forshey Prostok, LLP, as its counsel, including by discussing the issue with Frinzi or with anyone else, giving any input and advice regarding the issue, and being asked your input or views regarding the same, and, if so, what was your role and what statements did You make and to whom. You are reminded that the Trustee has waived the Debtor's privilege regarding this issue.

RESPONSE:

**INTERROGATORY NO. 18:**

Did the Debtor's termination of its retention of Bobby Forshey and Forshey Prostok, LLP, as its counsel have anything to do with the Bond Purchase Agreement 2 or with the transactions contemplated by the Bond Purchase Agreement 1 and Bond Purchase Agreement 2 and, if so, what was the reason.  You are reminded that the Trustee has waived the Debtor's privilege regarding this issue.

RESPONSE:

**INTERROGATORY NO. 19:**

Did You personally, or any family member of Yours, or any entity that You owned in whole or in party (excluding GIH and Genesis), receive any portion of the funds paid pursuant to the Bond Purchase Agreement 2, directly or indirectly, including by way of distribution, dividend, or loan repayment and, if so, when and how much and for what.

RESPONSE:

DATED at Dallas Texas this 10th day of June, 2024.

MUNSCH HARDT KOPF & HARR, P.C.

By: _____

David Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
        tberghman@munsch.com
        jvasek@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 10th day of June, 2024, he caused a true and correct copy of this document to be served via email on James Goodman by and though his counsel of record, Randy Pullman Esq. at RPulman@pulmanlaw.com, and by U.S. mail first-class, postage prepaid, on the following:

James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

Micahel Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
2161 NW Military Hwy.
Suite 400
San Antonio, Texas 7821

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

By: _____
Davor Rukavina, Esq.

*Execution Version*

## BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Alliance Texas Holdings, LLC a Florida limited liability company ("Seller") and Goodman Networks Incorporated, a Texas corporation ("Purchaser").

WHEREAS, Purchaser intends to purchase $31,746,617 million in face amount outstanding aggregate principal amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") which Purchaser issued on May 31, 2017, held by Seller for a purchase price of $17,032,060.00 (the "Purchased GNI Bonds");

WHEREAS, Seller desires to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. Purchase and Sale:

    a. Purchaser shall acquire the Purchased GNI Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"). Purchaser shall purchase the Purchased GNI Bonds owned by Seller at an aggregate purchase price for $17,032,060.00 (the "Purchase Price") by wiring same-day funds to the account as instructed by seller. Purchaser shall pay the Purchase Price to Seller upon execution of this Agreement, and thereafter Seller shall instruct its prime broker to transfer within 15 days the Purchased GNI Bonds to Purchaser's brokerage account as directed by Purchaser.

    b. Purchaser's obligation to pay the Purchase Price and Seller's obligation to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically this Agreement. Purchaser and Seller further acknowledge and agree that the obligations of the Seller under this Agreement may be settled only with the Purchased GNI Bonds.

2. Indemnification:

    a. Seller agrees to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "Purchaser Indemnitee") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("Losses"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Seller's agreements,



covenants or representations or warranties under this Agreement. The Seller shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

b. Purchaser agrees to indemnify Seller, its affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "Seller Indemnitee") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement. Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3. <u>Tender Offer; Offers to other holders:</u>   Purchaser covenants to offer all or substantially all of the other holders of the GNI Bonds to purchase any outstanding GNI Bonds at the Purchase Price.

4. <u>No Legal Obligation; Confidentiality</u>. Each party hereto agrees that neither the Seller, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a Purchaser's intent to acquire the remaining GNI Bonds at a price per note equal or greater than the Purchase Price pursuant to a tender offer, series of tender offers or other offer to purchase such GNI Bonds or (B) the termination of this Agreement.

5. <u>Termination; Right of First Refusal</u>. This Agreement shall terminate upon the mutual written agreement of the parties.

6. <u>Miscellaneous:</u>

a. Seller and Purchaser each acknowledge and agree that:

(i) it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement. No communication (written or oral)

2

received from the other party shall be deemed to be an assurance or guarantee as to the expected results of entering into this Agreement;

(ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Agreement. It is also capable of assuming, and assumes, the risks of this Agreement;

(iii) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it in respect of the transactions contemplated by this Agreement and each party is acting for its own account and it has made its own independent decision to enter into this Agreement;

(iv) Neither party is receiving any compensation or fees in respect of the specific transactions contemplated in this Agreement; and

(v) All Purchased GNI Bonds subject to this Agreement shall be acquired in compliance with applicable law, including the Securities Act.

b. Purchaser represents to Seller:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited to deal under the laws of the United States, and (C) is not a Person identified as a terrorist organization on any other relevant lists maintained by governmental authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived from or related to any illegal activities, including, without limitation, money laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (B) employs one or more individuals on a full-time basis; (C) maintains operating records related to its banking activities; (D) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (E) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate;

(iv) it will provide to Seller at any time such information as Seller determines to be necessary or appropriate (A) to comply with the anti-money laundering laws, rules and regulations of any applicable jurisdiction and (B) to respond to requests for information concerning its identity from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information;

(v) as of the date hereof, Purchaser had Purchaser had $32 million of cash available to fund purchases of GNI bonds or for other general corporate purchases;

3

(vi) there are $48,195,171 million in aggregate face amount of GNI Bonds outstanding as of the date of this Agreement;

(vii) the GNI Bonds have a maturity date of May 31, 2022;

(viii)    no insolvency proceeding of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the GNI or any of its assets or properties, is pending or, to the knowledge of the Purchaser, threatened. GNI has not taken any action in contemplation of, or that would constitute the basis for, the institution of any such insolvency proceedings; and

(ix) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Seller. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Seller in writing.

c.  Seller hereby represents to Purchaser:

(i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

(ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d.  Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e.  This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f.  All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to

4

be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g.  Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h.  The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i.  This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j.  All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:                     Goodman Networks Incorporated
                                     2831 Eldorado Parkway, Suite 103
                                     Frisco, TX 75033
                                     Attn: James Frinzi
                                     James.Frinzi@gnetatc.com


If to Seller:                        Alliance Texas Holdings, LLC
                                     333 S.E. 2nd Avenue, Suite 3410
                                     Miami, FL 33131
                                     Attn: Neil Auerbach
                                     Neil.Auerbach@hudsonsustainable.com

                                     With a copy to:
                                     Baker Botts L.L.P
                                     910 Louisiana Street

5

Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

k. This Agreement shall be construed in accordance with and be governed by the laws of the State of Texas (without reference to choice of law doctrine). Any action brought in connection with this Agreement shall be brought in the federal or state courts located in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such courts and waive any objections as to venue or inconvenient forum. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY INTERPRETATION THEREOF, AND FOR ANY COUNTERCLAIM RELATED THERETO.

*[Signature Pages Follow]*

6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**GOODMAN NETWORKS INCORPORATED**

By: _____

Name:  James Frinzi

Title:  CEO

*Signature Page to Bond Purchase Agreement*

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____

Name: Neil Auerbach
Title:   Managing Member

*Signature Page to Bond Purchase Agreement*

*Execution Version*



EXHIBIT
B

71672585_2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0067



2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0112



3

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0113

HUDSON_0069



4

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0070



5

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0115



6

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0072



7

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0117



8

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0118

HUDSON_0074



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0119

HUDSON_0075



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0120



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx-0121

HUDSON_0077

# EXHIBIT 5

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC; ALLIANCE TEXAS | § | |
| HOLDINGS, LLC; NEIL Z. AUERBACH; | § | |
| JUDITH AUERBACH; AUERBACH | § | |
| PARTNERS, L.P.; JAMES GOODMAN; | § | |
| JAMES FRINZI; GOODMAN | § | |
| INVESTMENT HOLDINGS, LLC; | § | |
| GENESIS NETWORKS, INC.; GENESIS | § | |
| NETWORKS GLOBAL SERVICES, LLC; | § | |
| AUERBACH CHILDREN'S DYNASTY | § | |
| TRUST U/A/D OCTOBER 9, 2012; and | § | |
| AUERBACH FAMILY DYNASTY TRUST | § | |
| U/A/D OCTOBER 9, 2012, | § | |
| | § | |
| Defendants. | § | |

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GOODMAN INVESTMENT
HOLDINGS, LLC—Page 1

**TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO
DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC**

To:   Defendant, Goodman Investment Holdings, LLC, by and through its counsel of record, Randall A. Pulman, Esq., Pulman Cappuccio & Pullen, LLP, 2161 NW Military Hwy, Suite 400, San Antonio, Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon Goodman Investment Holdings, LLC ("GIH"), a defendant in this Adversary Proceeding, this his *Trustee's First Set of Requests for Production to Defendant Goodman Investment Holdings, LLC* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I.    **INSTRUCTIONS**

1.    These Requests are intended to cover all information, documents, and things in Your possession, custody, or control. A document or thing is deemed to be in Your possession, custody, or control, if:

   a.   It is in Your physical control or possession; or

   b.   It is in the physical control or possession of any other person or entity, and You, individually or otherwise

       i.   Own the document or thing in whole or in part;

       ii.  Have a right by contract, statute, or otherwise, to use, inspect, examine, or copy that document or thing on any terms; or

       iii. Have, as a practical matter, been able to use, inspect, examine, or copy that document or thing when You have sought to do so.

2.    Unless otherwise indicated, references in these requests to You or any party, business organization, or other legal entity specifically includes all of that entity's present or former employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

---

Appx.0123

3.      If any portion of any document, electronically stored information, or tangible thing is responsive to any Request, then the entire document, electronically stored information, or tangible thing must be produced.  Documents and electronically stored information shall be produced in the order in which they are found in your files.  Documents that are found stapled, clipped, or otherwise fastened shall be produced in such form.

4.      These requests cover and include all electronically stored information, as that term is used in the Federal Rules of Civil Procedure, including all means of communication such as Signal, Snapchat, e-mail, text messaging, and all other electronic means of communication or recording of information (collectively, "ESI"). ESI must be produced as follows:

    a.  ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

        i.  E-mail: E-mail and other and other electronic messages (*e.g.*, instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container.  Other email files should be produced as .eml or in .mbox format.

        ii.  Electronic documents. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business.  All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii) spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.*, non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

        iii.  Electronic audio recordings, photographs or images: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

Appx.0124

b. Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic document including family relationship data. Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format. Other documents may be requested to be produced in their native format if necessary

5.      In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

6.      If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

7.      You must serve your responses to the Requests and provide Your production pursuant to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
drukavina@munsch.com

## II.    **DEFINITIONS**

"Alliance" means Alliance Texas Holdings, LLC, and includes any agent thereof when acting on its behalf.

"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

"Bond Purchase Agreement 1" means the *Bond Purchase Agreement* attached hereto as Exhibit "A."

"Bond Purchase Agreement 2" means the *Bond Purchase Agreement* attached hereto as Exhibit "B."

"Bonds" means the 8% Senior Secured Notes due 2022 of Goodman Networks, Inc. (and issued by Goodman Networks, Inc.).

"Communication" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

"Computer data" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

"Debtor" means Goodman Networks, Inc., and includes any agent thereof when acting on its behalf.

"Document(s)" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated. "Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

"Electronic information system" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

"Electronic storage device" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

"ESI" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

"File" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

"Frinzi" means James Frinzi.

"Genesis" means either/or Genesis Networks, Inc. and/or Genesis Networks Global Services, LLC, and includes any agent of either when acting on either's behalf.

"Genesis Bonds" means any or all of the Bonds held by Genesis as of February 1, 2022.

"GIH" means Goodman Investment Holdings, LLC, and includes any agent thereof when acting on its behalf.

"GIH Bonds" means any or all of the Bonds held by GIH as of February 1, 2022.

"GNET" means GNET ATC, LLC.

"Goodman" means James Goodman.

"Hudson" means Hudson Clean Energy Enterprises, LLC, and includes any agent thereof when acting on its behalf.

"Including" means 'including but not limited to', and is not restrictive or limiting.

"Indenture Trustee" means UMB Bank, N.A., as indenture trustee regarding the Bonds.

"N. Auerbach" means Neil Auerbach.

"Person" or "persons" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

"S. Auerbach" means Shalom Auerbach.

"Transfer" shall have the same meaning as defined by 11 U.S.C. § 101(54).

"You" and "your" shall mean GIH.

## III.    FIRST SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 1:**

All Documents and Communications between You and Frinzi regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 2:**

All Documents and Communications between You and S. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 3:**

All Documents and Communications between You and N. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 4:**

All Documents and Communications between You and Alliance at any time.

RESPONSE:

Appx.0130

**REQUEST NO. 5:**

All Documents and Communications between You and any person (not already the subject of Requests No. 1, 2, and 3) regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 6:**

All internal Documents and Communications regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 7:**

All of Your corporate governance Documents in effect from January 1, 2022 through the present, including any limited liability company agreement, shareholder agreement, bylaws, and manager or member consents or resolutions.

RESPONSE:

**REQUEST NO. 8:**

Any Document and Communication regarding, related to, or referring to, or reviewed or consulted by You regarding, the price for the Bonds provided for in Bond Purchase Agreement 2.

RESPONSE:

**REQUEST NO. 9:**

Any Document and Communication, between January 1, 2022 and March 1, 2022, regarding, related to, referring to, or mentioning the solvency or insolvency of the Debtor and the ability or inability of the Debtor to pay on the Bonds at the time of their maturity in 2022.

RESPONSE:

**REQUEST NO. 10:**

Any Document and Communication related to the price at which the Bonds were trading as of February 3, 2022.

RESPONSE:

**REQUEST NO. 11:**

Any Document and Communication regarding, related to, referring to, or mentioning any attempt, effort, or solicitation by You to sell any of the Bonds You held to any person other than Alliance, or any such Document and Communication from any person to You inquiring into any such sale, at any time prior to February 3, 2022.

RESPONSE:

**REQUEST NO. 12:**

All Documents and Communications between You and the Indenture Trustee regarding, relating to, or referencing the Bonds.

RESPONSE:

**REQUEST NO. 13:**

All Documents and Communications regarding or evidencing Your ownership of any of the Bonds as of February 3, 2022.

RESPONSE:

---

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC—Page 11

**REQUEST NO. 14:**

Each statement, for January 1, 2022 through June 1, 2022, for each bank account held by You or in Your name or to which You had any access.

RESPONSE:

**REQUEST NO. 15:**

Any Document and Communication regarding relating to, or referencing the receipt by You of any payment pursuant to Bond Purchase Agreement 2.

RESPONSE:

**REQUEST NO. 16:**

Any Document and Communication regarding, relating to, or referencing any transfer or payment by You to any person from any of the funds received by You pursuant to Bond Purchase Agreement 2, including on account of any loan or obligation of You to any person.

RESPONSE:

**REQUEST NO. 17:**

To the extent that You used any of the funds transferred to You pursuant to Bond Purchase Agreement 2 to pay down or to pay off any debt obligation You had, all Documents evidencing such obligation, including any promissory note, guarantee instrument, security agreement, deed of trust, U.C.C. financing statement, and account control agreement.

RESPONSE:

**REQUEST NO. 18:**

All Communications regarding any payment of debt within Request No. 17.

RESPONSE:

---

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC—Page 12

Appx.0133

**REQUEST NO. 19:**

All Documents and Communications between You and any person regarding the transfer of the Bonds to Alliance or to any other person pursuant to Bond Purchase Agreement 2, including to any broker, broker/dealer, administrator, intermediary, or agent holding said Bonds for You, and including any such Documents and Communications with the Debtor regarding the cancellation of the Bonds.

RESPONSE:

**REQUEST NO. 20:**

Your federal tax returns for 2021 and 2022.

RESPONSE:

**REQUEST NO. 21:**

Any audit of You or Your financial records for 2022 or any portion thereof.

RESPONSE:

**REQUEST NO. 22:**

Your balance sheet for 2022 on an annual, quarterly, and monthly basis, or such other periodic basis as You so maintained it in Your ordinary course of business.

RESPONSE:

Appx.0134

DATED at Dallas Texas this 10th day of June, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: _____

Dayor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
        tberghman@munsch.com
        jvasek@munsch.com
        cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 10th day of June, 2024, he caused a true and correct copy of this document to be served via email on GIH by and though its counsel of record, Randy Pullman Esq. at RPulman@pulmanlaw.com, and by U.S. mail first-class, postage prepaid, on the following:

James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

Micahel Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
2161 NW Military Hwy.
Suite 400
San Antonio, Texas 7821

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

By: _____
        Davor Rukavina, Esq.

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC—Page 15
4884-4261-5494v.1 013229.00016

Appx.0136

*Execution Version*

## BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Alliance Texas Holdings, LLC a Florida limited liability company ("Seller") and Goodman Networks Incorporated, a Texas corporation ("Purchaser").

WHEREAS, Purchaser intends to purchase $31,746,617 million in face amount outstanding aggregate principal amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") which Purchaser issued on May 31, 2017, held by Seller for a purchase price of $17,032,060.00 (the "Purchased GNI Bonds");

WHEREAS, Seller desires to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.  Purchase and Sale:

    a.  Purchaser shall acquire the Purchased GNI Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"). Purchaser shall purchase the Purchased GNI Bonds owned by Seller at an aggregate purchase price for $17,032,060.00 (the "Purchase Price") by wiring same-day funds to the account as instructed by seller. Purchaser shall pay the Purchase Price to Seller upon execution of this Agreement, and thereafter Seller shall instruct its prime broker to transfer within 15 days the Purchased GNI Bonds to Purchaser's brokerage account as directed by Purchaser.

    b.  Purchaser's obligation to pay the Purchase Price and Seller's obligation to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically this Agreement. Purchaser and Seller further acknowledge and agree that the obligations of the Seller under this Agreement may be settled only with the Purchased GNI Bonds.

2.  Indemnification:

    a.  Seller agrees to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "Purchaser Indemnitee") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("Losses"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Seller's agreements,

71763608_3



covenants or representations or warranties under this Agreement. The Seller shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

b. Purchaser agrees to indemnify Seller, its affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "Seller Indemnitee") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement. Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3. <u>Tender Offer; Offers to other holders:</u>   Purchaser covenants to offer all or substantially all of the other holders of the GNI Bonds to purchase any outstanding GNI Bonds at the Purchase Price.

4. <u>No Legal Obligation; Confidentiality.</u> Each party hereto agrees that neither the Seller, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a Purchaser's intent to acquire the remaining GNI Bonds at a price per note equal or greater than the Purchase Price pursuant to a tender offer, series of tender offers or other offer to purchase such GNI Bonds or (B) the termination of this Agreement.

5. <u>Termination; Right of First Refusal.</u> This Agreement shall terminate upon the mutual written agreement of the parties.

6. <u>Miscellaneous:</u>

a. Seller and Purchaser each acknowledge and agree that:

(i) it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement. No communication (written or oral)

2

received from the other party shall be deemed to be an assurance or guarantee as to the expected results of entering into this Agreement;

(ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Agreement. It is also capable of assuming, and assumes, the risks of this Agreement;

(iii) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it in respect of the transactions contemplated by this Agreement and each party is acting for its own account and it has made its own independent decision to enter into this Agreement;

(iv) Neither party is receiving any compensation or fees in respect of the specific transactions contemplated in this Agreement; and

(v) All Purchased GNI Bonds subject to this Agreement shall be acquired in compliance with applicable law, including the Securities Act.

b. Purchaser represents to Seller:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited to deal under the laws of the United States, and (C) is not a Person identified as a terrorist organization on any other relevant lists maintained by governmental authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived from or related to any illegal activities, including, without limitation, money laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (B) employs one or more individuals on a full-time basis; (C) maintains operating records related to its banking activities; (D) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (E) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate;

(iv) it will provide to Seller at any time such information as Seller determines to be necessary or appropriate (A) to comply with the anti-money laundering laws, rules and regulations of any applicable jurisdiction and (B) to respond to requests for information concerning its identity from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information;

(v) as of the date hereof, Purchaser had Purchaser had $32 million of cash available to fund purchases of GNI bonds or for other general corporate purchases;

3

(vi) there are $48,195,171 million in aggregate face amount of GNI Bonds outstanding as of the date of this Agreement;

(vii) the GNI Bonds have a maturity date of May 31, 2022;

(viii)    no insolvency proceeding of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the GNI or any of its assets or properties, is pending or, to the knowledge of the Purchaser, threatened. GNI has not taken any action in contemplation of, or that would constitute the basis for, the institution of any such insolvency proceedings; and

(ix) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Seller. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Seller in writing.

c.   Seller hereby represents to Purchaser:

(i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

(ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d.   Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e.   This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f.   All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to

4

be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g. Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h. The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i. This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j. All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:          Goodman Networks Incorporated
                          2831 Eldorado Parkway, Suite 103
                          Frisco, TX 75033
                          Attn: James Frinzi
                          James.Frinzi@gnetatc.com


If to Seller:             Alliance Texas Holdings, LLC
                          333 S.E. 2nd Avenue, Suite 3410
                          Miami, FL 33131
                          Attn: Neil Auerbach
                          Neil.Auerbach@hudsonsustainable.com

                          With a copy to:
                          Baker Botts L.L.P
                          910 Louisiana Street

5

Appx.0141

Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

k. This Agreement shall be construed in accordance with and be governed by the laws of the State of Texas (without reference to choice of law doctrine). Any action brought in connection with this Agreement shall be brought in the federal or state courts located in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such courts and waive any objections as to venue or inconvenient forum. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY INTERPRETATION THEREOF, AND FOR ANY COUNTERCLAIM RELATED THERETO.

*[Signature Pages Follow]*

6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**GOODMAN NETWORKS INCORPORATED**

By: _____

Name: James Frinzi

Title:  CEO

*Signature Page to Bond Purchase Agreement*

Appx.0143

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____

Name: Neil Auerbach
Title:   Managing Member

*Signature Page to Bond Purchase Agreement*

*Execution Version*



71672585_2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0067

EXHIBIT
B



2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx0146



3



4

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0148



5

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0149



6

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0159



7

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0151

HUDSON_0073



8

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0074



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0153

HUDSON_0075



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0154

HUDSON_0076



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx-0155

HUDSON_0077

# EXHIBIT 6

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | | |
| | | (Chapter 7) |
| Debtor. | | |
| | | |
| SCOTT M. SEIDEL, TRUSTEE, | § § § § § § § § § § § § § § § § § § § § § § | |
| Plaintiff, | | ADVERSARY PROCEEDING NO: 23-03090-mvl |
| v. | | |
| HUDSON CLEAN ENERGY ENTERPRISES, LLC; ALLIANCE TEXAS HOLDINGS, LLC; NEIL Z. AUERBACH; JUDITH AUERBACH; AUERBACH PARTNERS, L.P.; JAMES GOODMAN; JAMES FRINZI; GOODMAN INVESTMENT HOLDINGS, LLC; GENESIS NETWORKS, INC.; GENESIS NETWORKS GLOBAL SERVICES, LLC; AUERBACH CHILDREN'S DYNASTY TRUST U/A/D OCTOBER 9, 2012; and AUERBACH FAMILY DYNASTY TRUST U/A/D OCTOBER 9, 2012, | | |
| Defendants. | | |

## TRUSTEE'S FIRST SET OF INTERROGATORIES TO
## DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC—Page 1

Appx.0156

To:   Defendant, Goodman Investment Holdings, LLC, by and through its counsel of record, Randall A. Pulman, Esq., Pulman Cappuccio & Pullen, LLP, 2161 NW Military Hwy, Suite 400, San Antonio, Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon Goodman Investment Holdings, LLC ("GIH"), a defendant in this Adversary Proceeding, this his *Trustee's First Set of Interrogatories to Defendant Goodman Investment Holdings, LLC* (the "Interrogatories") pursuant to Rule 33 of the Federal Rules of Civil Procedure as follows.

## I.      INSTRUCTIONS

GIH must serve its responses to the Interrogatories, no later than thirty (30) days following service of these Interrogatories, at the following address or email:

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
drukavina@munsch.com

## II.      DEFINITIONS

"Alliance" means Alliance Texas Holdings, LLC, and includes any agent thereof when acting on its behalf.

"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

"Bond Purchase Agreement 1" means the *Bond Purchase Agreement* attached hereto as Exhibit "A."

"Bond Purchase Agreement 2" means the *Bond Purchase Agreement* attached hereto as Exhibit "B."

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC—Page 2

"Bonds" means the 8% Senior Secured Notes due 2022 of Goodman Networks, Inc. (and issued by Goodman Networks, Inc.).

"Debtor" means Goodman Networks, Inc.

"Frinzi" means James Frinzi.

"Genesis" means either/or Genesis Networks, Inc. and/or Genesis Networks Global Services, LLC, and includes any agent of either when acting on either's behalf.

"Genesis Bonds" means any or all of the Bonds held by Genesis as of February 1, 2022.

"GIH" means Goodman Investment Holdings, LLC, and includes any agent thereof when acting on its behalf.

"GIH Bonds" means any or all of the Bonds held by GIH as of February 1, 2022.

"Goodman" means James Goodman.

"Hudson" means Hudson Clean Energy Enterprises, LLC, and includes any agent thereof when acting on its behalf.

"Including" means 'including but not limited to', and is not restrictive or limiting.

"Indenture Trustee" means UMB Bank, N.A., as indenture trustee regarding the Bonds.

"N. Auerbach" means Neil Auerbach.

"Person" or "persons" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

"S. Auerbach" means Shalom Auerbach.

"Transfer" shall have the same meaning as defined by 11 U.S.C. § 101(54).

"You" and "your" shall mean GIH.

### III.    FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

State each and every factual reason why You decided to sell Your Bonds pursuant to the Bond Purchase Agreement 2, including with respect to the timing thereof and the reason for a discount from the face amount thereof. If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE:

**INTERROGATORY NO. 2:**

Explain in detail and with specificity how the purchase price in the Bond Purchase Agreement 2 was negotiated or arrived at, including who negotiated or discussed the same on Your behalf and who negotiated or discussed the same on behalf of Alliance, how any such discussions or negotiations were undertaken, whether any third-party data was used in any such discussions or negotiations, and whether there was any discussion of a markup or profit or margin or arbitrage in favor of Alliance as part of the same. If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE:

**INTERROGATORY NO. 3:**

At the time that You entered into the Bond Purchase Agreement 2, were You aware, did You suspect, or had anyone discussed with You, that Alliance would be transferring, selling, reselling, or otherwise conveying the Bonds that it was purchasing from You to the Debtor and, if so, how and why were You aware of or suspected the same and what did you know or understand regarding the same.

RESPONSE:

**INTERROGATORY NO. 4:**

At the time that You entered into the Bond Purchase Agreement 2, from what source did You understand or believe that Alliance would obtain the funds needed to pay You under the Bond Purchase Agreement 2, and explain all factual bases for Your understanding or belief of the same.

RESPONSE:

**INTERROGATORY NO. 5:**

At the time that You entered into the Bond Purchase Agreement 2, were you aware of the fact or substance of Bond Purchase Agreement 1 or of the existence of any written or oral agreement or understanding between Alliance and the Debtor regarding or in any way related to the Bonds the subject of Bond Purchase Agreement 2 or whereby the Debtor would be funding the payment to You under Bond Purchase Agreement 2.

RESPONSE:

**INTERROGATORY NO. 6:**

Why did You not simply sell, transfer, or otherwise convey the Bonds You held as of February 3, 2022 directly to the Debtor, as opposed to going through Alliance, including whose idea was it to sell the Bonds through an intermediary instead of directly to the Debtor.

RESPONSE:

**INTERROGATORY NO. 7:**

As of the date You entered into the Bond Purchase Agreement 2, state every reason You understood or believed that Alliance was entering into that agreement with You, such as for a profit or gain of a certain amount, or to hold the Bonds, or any other reason, and explain all bases for your understanding or belief regarding the same. In other words, what did You think Alliance would do with those Bonds once it purchased them?

RESPONSE:

**INTERROGATORY NO. 8:**

Identify, as of February 3, 2022, each of Your members, managing members, managers, and officers, including by name and title.

RESPONSE:

**INTERROGATORY NO. 9:**

Identify each person known to You, as of February 3, 2022, involved in any way with the negotiation, drafting, or execution of the Bond Purchase Agreement 2, by name, affiliation, and title, whether on Your behalf or on behalf of any other person, including Alliance, and including any attorneys or advisors for any party.

RESPONSE:

**INTERROGATORY NO. 10:**

Explain in detail and with specificity how it was that You learned of Alliance's interest in purchasing Your Bonds, including the role of Frinzi, N. Auerbach, and S. Auerbach regarding the same.

RESPONSE:

**INTERROGATORY NO. 11:**

Do You as of now agree that the funds used by Alliance to pay You under the Bond Purchase Agreement 2 came from the Debtor and that You are a subsequent transferee of such funds? If You disagree, then state and every reason that You know of now regarding where such funds originated from.

RESPONSE:

Appx.0161

**INTERROGATORY NO. 12:**

Identify each and every transfer made to You for or on account of the Bond Purchase Agreement 2, including by date thereof, mode thereof, amount thereof, and transferor thereof.

RESPONSE:

**INTERROGATORY NO. 13:**

For each transfer the subject of Interrogatory No. 12, do You agree that, on the date thereof, the amount of the Debtor's liabilities exceeded the value of its assets? If You disagree, then state each and every fact or reason why.

RESPONSE:

**INTERROGATORY NO. 14:**

For each transfer the subject of Interrogatory No. 12, state and explain what return consideration You gave or provided to the transferor thereof for such transfer and what the value of such consideration was.

RESPONSE:

**INTERROGATORY NO. 15:**

As of the date of the Bond Purchase Agreement 2, did You believe that the Debtor would default on the Bonds when they matured later in 2022? If not, then state each reason and explain in detail why You agreed to sell Your Bonds for a discount as opposed to holding them for a few more months for full payment.

RESPONSE:

**INTERROGATORY NO. 16:**

At the time of each transfer the subject of Interrogatory No. 12, admit that You were a creditor of the Debtor on account of the Bonds. If You disagree, explain why.

RESPONSE:

**INTERROGATORY NO. 17:**

For each transfer the subject of Interrogatory No. 12, admit that such transfer was made to You for or on account of antecedent debt owed by the Debtor to You on the date of such transfer in the form of the Bonds. If You disagree, explain why.

RESPONSE:

**INTERROGATORY NO. 18:**

For each transfer the subject of Interrogatory No. 12, do You admit that the Debtor made such transfer to Alliance (as part of a larger transfer to Alliance) for Your benefit. If You disagree, explain why.

RESPONSE:

**INTERROGATORY NO. 19:**

For each transfer the subject of Interrogatory No. 12, state what You did with such transfer or what You intended to do with such transfer at the time of Your receipt thereof, including, if applicable, whether you transferred all or a portion of said transfer within ninety (90) days of the receipt thereof to any other person, and identify such person, the transfer to such person by date, amount, mode, and source, and the reason for such transfer.

RESPONSE:

**INTERROGATORY NO. 20:**

Identify, as of February 3, 2022, each broker, broker-dealer, nominee, bank, advisor, administrator, or agent who held any or all of the Bonds for Your benefit.

RESPONSE:

**INTERROGATORY NO. 21:**

Identify any payment or transfer You received from the Indenture Trustee or any other person (but excluding Alliance) for or on account of the Bonds after February 3, 2022, including for interest, and including by date of such payment or transfer and amount.

RESPONSE:

DATED at Dallas Texas this 10th day of June, 2024.

MUNSCH HARDT KOPF & HARR, P.C.

By: _____
       Davor Rukavina, Esq.
       Texas Bar No. 24030781
       Thomas D. Berghman, Esq.
       Texas Bar No. 24082683
       Julian P. Vasek, Esq.
       Texas Bar No. 24070790
       500 N. Akard Street, Suite 4000
       Dallas, Texas 75201-6659
       Telephone: (214) 855-7500
       Facsimile: (214) 855-7584
       Email: drukavina@munsch.com
             tberghman@munsch.com
             jvasek@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 10th day of June, 2024, he caused a true and correct copy of this document to be served via email on GIH by and though its counsel of record, Randy Pullman Esq. at RPulman@pulmanlaw.com, and by U.S. mail first-class, postage prepaid, on the following:

James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

Micahel Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
2161 NW Military Hwy.
Suite 400
San Antonio, Texas 7821

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

By: _____
Davor Rukavina, Esq.

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC—Page 11
4882-4166-7014v.1 013229.00016

Appx.0166

*Execution Version*

## BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Alliance Texas Holdings, LLC a Florida limited liability company ("Seller") and Goodman Networks Incorporated, a Texas corporation ("Purchaser").

WHEREAS, Purchaser intends to purchase $31,746,617 million in face amount outstanding aggregate principal amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") which Purchaser issued on May 31, 2017, held by Seller for a purchase price of $17,032,060.00 (the "Purchased GNI Bonds");

WHEREAS, Seller desires to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. Purchase and Sale:

   a. Purchaser shall acquire the Purchased GNI Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"). Purchaser shall purchase the Purchased GNI Bonds owned by Seller at an aggregate purchase price for $17,032,060.00 (the "Purchase Price") by wiring same-day funds to the account as instructed by seller. Purchaser shall pay the Purchase Price to Seller upon execution of this Agreement, and thereafter Seller shall instruct its prime broker to transfer within 15 days the Purchased GNI Bonds to Purchaser's brokerage account as directed by Purchaser.

   b. Purchaser's obligation to pay the Purchase Price and Seller's obligation to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically this Agreement. Purchaser and Seller further acknowledge and agree that the obligations of the Seller under this Agreement may be settled only with the Purchased GNI Bonds.

2. Indemnification:

   a. Seller agrees to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "Purchaser Indemnitee") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("Losses"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Seller's agreements,



covenants or representations or warranties under this Agreement. The Seller shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

b. Purchaser agrees to indemnify Seller, its affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "Seller Indemnitee") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement. Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3. <u>Tender Offer; Offers to other holders:</u>   Purchaser covenants to offer all or substantially all of the other holders of the GNI Bonds to purchase any outstanding GNI Bonds at the Purchase Price.

4. <u>No Legal Obligation; Confidentiality</u>. Each party hereto agrees that neither the Seller, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a Purchaser's intent to acquire the remaining GNI Bonds at a price per note equal or greater than the Purchase Price pursuant to a tender offer, series of tender offers or other offer to purchase such GNI Bonds or (B) the termination of this Agreement.

5. <u>Termination; Right of First Refusal</u>. This Agreement shall terminate upon the mutual written agreement of the parties.

6. <u>Miscellaneous</u>:

a. Seller and Purchaser each acknowledge and agree that:

(i) it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement. No communication (written or oral)

2

received from the other party shall be deemed to be an assurance or guarantee as
to the expected results of entering into this Agreement;

(ii) it is capable of assessing the merits of and understanding (on its own behalf or
through independent professional advice), and understands and accepts, the terms,
conditions and risks of this Agreement. It is also capable of assuming, and
assumes, the risks of this Agreement;

(iii) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it
in respect of the transactions contemplated by this Agreement and each party is
acting for its own account and it has made its own independent decision to enter
into this Agreement;

(iv) Neither party is receiving any compensation or fees in respect of the specific
transactions contemplated in this Agreement; and

(v) All Purchased GNI Bonds subject to this Agreement shall be acquired in
compliance with applicable law, including the Securities Act.

b.  Purchaser represents to Seller:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons
List of the Office of Foreign Assets Control of the United States Department of
the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited
to deal under the laws of the United States, and (C) is not a Person identified as a
terrorist organization on any other relevant lists maintained by governmental
authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived
from or related to any illegal activities, including, without limitation, money
laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts
transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in
connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address,
other than an electronic address or a post office box, in a country in which it is
authorized to conduct banking activities; (B) employs one or more individuals on
a full-time basis; (C) maintains operating records related to its banking activities;
(D) is subject to inspection by the banking authority that licensed it to conduct
banking activities; and (E) does not provide banking services to any other Non-
U.S. Bank that does not have a physical presence in any country and that is not a
registered affiliate;

(iv) it will provide to Seller at any time such information as Seller determines to be
necessary or appropriate (A) to comply with the anti-money laundering laws, rules
and regulations of any applicable jurisdiction and (B) to respond to requests for
information concerning its identity from any governmental authority, self-
regulatory organization or financial institution in connection with its anti-money
laundering compliance procedures, or to update such information;

(v) as of the date hereof, Purchaser had Purchaser had $32 million of cash available
to fund purchases of GNI bonds or for other general corporate purchases;

3

Appx.0169

(vi) there are $48,195,171 million in aggregate face amount of GNI Bonds outstanding as of the date of this Agreement;

(vii) the GNI Bonds have a maturity date of May 31, 2022;

(viii)　　no insolvency proceeding of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the GNI or any of its assets or properties, is pending or, to the knowledge of the Purchaser, threatened. GNI has not taken any action in contemplation of, or that would constitute the basis for, the institution of any such insolvency proceedings; and

(ix) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Seller. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Seller in writing.

c.  Seller hereby represents to Purchaser:

(i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

(ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d.  Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e.  This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f.  All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to

4

be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g.  Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h.  The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i.  This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j.  All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:          Goodman Networks Incorporated
                          2831 Eldorado Parkway, Suite 103
                          Frisco, TX 75033
                          Attn: James Frinzi
                          James.Frinzi@gnetatc.com


If to Seller:             Alliance Texas Holdings, LLC
                          333 S.E. 2nd Avenue, Suite 3410
                          Miami, FL 33131
                          Attn: Neil Auerbach
                          Neil.Auerbach@hudsonsustainable.com

                          With a copy to:
                          Baker Botts L.L.P
                          910 Louisiana Street

5

Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

k.  This Agreement shall be construed in accordance with and be governed by the laws of
the State of Texas (without reference to choice of law doctrine). Any action brought in
connection with this Agreement shall be brought in the federal or state courts located
in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such
courts and waive any objections as to venue or inconvenient forum. THE PARTIES
HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY
IN  ANY  LEGAL  ACTION  OR  PROCEEDING  RELATING  TO  THIS
AGREEMENT, OR ANY INTERPRETATION THEREOF, AND FOR ANY
COUNTERCLAIM RELATED THERETO.

*[Signature Pages Follow]*

6

Appx.0172

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**GOODMAN NETWORKS INCORPORATED**

By: _____
Name: James Frinzi
Title: CEO

*Signature Page to Bond Purchase Agreement*

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____

Name: Neil Auerbach

Title:   Managing Member

*Signature Page to Bond Purchase Agreement*

*Execution Version*

## BOND PURCHASE AGREEMENT





71672585_2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0175

HUDSON_0067



2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0176

HUDSON_0068



3

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx0177



4

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0070



5

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0179



6

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0180

HUDSON_0072



7

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0073



8

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx-0182



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0183

HUDSON_0075



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0184

HUDSON_0076



*Signature Page to Bond Purchase Agreement*

**CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

HUDSON_0077

# EXHIBIT 7

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22-31641-mvl-7 |
| | § | |
| GOODMAN NETWORKS, INC., | § | (Chapter 7) |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC; ALLIANCE TEXAS | § | |
| HOLDINGS, LLC; NEIL Z. AUERBACH; | § | |
| JUDITH AUERBACH; AUERBACH | § | |
| PARTNERS, L.P.; JAMES GOODMAN; | § | |
| JAMES FRINZI; GOODMAN | § | |
| INVESTMENT HOLDINGS, LLC; | § | |
| GENESIS NETWORKS, INC.; GENESIS | § | |
| NETWORKS GLOBAL SERVICES, LLC; | § | |
| AUERBACH CHILDREN'S DYNASTY | § | |
| TRUST U/A/D OCTOBER 9, 2012; and | § | |
| AUERBACH FAMILY DYNASTY TRUST | § | |
| U/A/D OCTOBER 9, 2012, | § | |
| | § | |
| Defendants. | | |

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GENESIS NETWORKS
GLOBAL SERVICES, LLC—Page 1

Appx.0186

## TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GENESIS NETWORKS GLOBAL SERVICES, LLC

To:    Defendant, Genesis Networks Global Services, LLC, by and through its counsel of record, Randall A. Pulman, Esq., Pulman Cappuccio & Pullen, LLP, 2161 NW Military Hwy, Suite 400, San Antonio, Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon Goodman Investment Holdings, LLC ("Genesis"), a defendant in this Adversary Proceeding, this his *Trustee's First Set of Requests for Production to Defendant Genesis Networks Global Services, LLC* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I.    INSTRUCTIONS

1.    These Requests are intended to cover all information, documents, and things in Your possession, custody, or control. A document or thing is deemed to be in Your possession, custody, or control, if:

    a.  It is in Your physical control or possession; or

    b.  It is in the physical control or possession of any other person or entity, and You, individually or otherwise

        i.  Own the document or thing in whole or in part;

        ii.  Have a right by contract, statute, or otherwise, to use, inspect, examine, or copy that document or thing on any terms; or

        iii.  Have, as a practical matter, been able to use, inspect, examine, or copy that document or thing when You have sought to do so.

2.    Unless otherwise indicated, references in these requests to You or any party, business organization, or other legal entity specifically includes all of that entity's present or former employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

---

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GENESIS NETWORKS GLOBAL SERVICES, LLC—Page 2

3.      If any portion of any document, electronically stored information, or tangible thing is responsive to any Request, then the entire document, electronically stored information, or tangible thing must be produced.  Documents and electronically stored information shall be produced in the order in which they are found in your files.  Documents that are found stapled, clipped, or otherwise fastened shall be produced in such form.

4.      These requests cover and include all electronically stored information, as that term is used in the Federal Rules of Civil Procedure, including all means of communication such as Signal, Snapchat, e-mail, text messaging, and all other electronic means of communication or recording of information (collectively, "ESI"). ESI must be produced as follows:

    a.  ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

        i.  E-mail: E-mail and other and other electronic messages (*e.g.*, instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container.  Other email files should be produced as .eml or in .mbox format.

        ii.  Electronic documents. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business.  All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii) spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.*, non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

        iii.  Electronic audio recordings, photographs or images: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

    b. Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic document including family relationship data. Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format. Other documents may be requested to be produced in their native format if necessary

5.    In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

6.    If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

7.    You must serve your responses to the Requests and provide Your production pursuant to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

<div align="center">

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
drukavina@munsch.com

</div>

## II.    **DEFINITIONS**

"Alliance" means Alliance Texas Holdings, LLC, and includes any agent thereof when acting on its behalf.

"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

"Bond Purchase Agreement 1" means the *Bond Purchase Agreement* attached hereto as Exhibit "A."

"Bond Purchase Agreement 2" means the *Bond Purchase Agreement* attached hereto as Exhibit "B."

"Bonds" means the 8% Senior Secured Notes due 2022 of Goodman Networks, Inc. (and issued by Goodman Networks, Inc.).

"Communication" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

"Computer data" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

"Debtor" means Goodman Networks, Inc., and includes any agent thereof when acting on its behalf.

"Document(s)" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated. "Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

"Electronic information system" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

"Electronic storage device" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

"ESI" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

"File" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

"Frinzi" means James Frinzi.

"Genesis" means either/or Genesis Networks, Inc. and/or Genesis Networks Global Services, LLC, and includes any agent of either when acting on either's behalf.

"Genesis Bonds" means any or all of the Bonds held by Genesis as of February 1, 2022.

"GIH" means Goodman Investment Holdings, LLC, and includes any agent thereof when acting on its behalf.

"GIH Bonds" means any or all of the Bonds held by GIH as of February 1, 2022.

"GNET" means GNET ATC, LLC.

"Goodman" means James Goodman.

"Hudson" means Hudson Clean Energy Enterprises, LLC, and includes any agent thereof when acting on its behalf.

"Including" means 'including but not limited to', and is not restrictive or limiting.

"Indenture Trustee" means UMB Bank, N.A., as indenture trustee regarding the Bonds.

"N. Auerbach" means Neil Auerbach.

"Person" or "persons" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

"S. Auerbach" means Shalom Auerbach.

"Transfer" shall have the same meaning as defined by 11 U.S.C. § 101(54).

"You" and "your" shall mean Genesis.

### III.   **FIRST SET OF REQUEST FOR PRODUCTION**

**REQUEST NO. 1:**

All Documents and Communications between You and Frinzi regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 2:**

All Documents and Communications between You and S. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 3:**

All Documents and Communications between You and N. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 4:**

All Documents and Communications between You and Alliance at any time.

RESPONSE:

**REQUEST NO. 5:**

All Documents and Communications between You and any person (not already the subject of Requests No. 1, 2, and 3) regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 6:**

All internal Documents and Communications regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE:

**REQUEST NO. 7:**

All of Your corporate governance Documents in effect from January 1, 2022 through the present, including any limited liability company agreement, shareholder agreement, bylaws, and manager or member consents or resolutions.

RESPONSE:

**REQUEST NO. 8:**

Any Document and Communication regarding, related to, or referring to, or review or consulted by You regarding, the price for the Bonds provided for in Bond Purchase Agreement 2.

RESPONSE:

Appx.0195

**REQUEST NO. 9:**

Any Document and Communication, between January 1, 2022 and March 1, 2022, regarding, related to, referring to, or mentioning the solvency or insolvency of the Debtor and the ability or inability of the Debtor to pay on the Bonds at the time of their maturity in 2022.

RESPONSE:

**REQUEST NO. 10:**

Any Document and Communication related to the price at which the Bonds were trading as of February 3, 2022.

RESPONSE:

**REQUEST NO. 11:**

Any Document and Communication regarding, related to, referring to, or mentioning any attempt, effort, or solicitation by You to sell any of the Bonds You held to any person other than Alliance, or any such Document and Communication from any person to You inquiring into any such sale, at any time prior to February 3, 2022.

RESPONSE:

**REQUEST NO. 12:**

All Documents and Communications from the Bond Trustee to You regarding, relating to, or referencing the Bonds.

RESPONSE:

**REQUEST NO. 13:**

All Documents and Communications regarding or evidencing Your ownership of any of the Bonds as of February 3, 2022.

RESPONSE:

**REQUEST NO. 14:**

Each statement, for January 1, 2022 through June 1, 2022, for each bank account held by You or in Your name or to which You had any access.

RESPONSE:

**REQUEST NO. 15:**

Any Document and Communication regarding relating to, or referencing the receipt by You of any payment pursuant to Bond Purchase Agreement 2.

RESPONSE:

**REQUEST NO. 16:**

Any Document and Communication regarding, relating to, or referencing any transfer or payment by You to any person from any of the funds received by You pursuant to Bond Purchase Agreement 2, including on account of any loan or obligation of You to any person.

RESPONSE:

**REQUEST NO. 17:**

To the extent that You used any of the funds transferred to You pursuant to Bond Purchase Agreement 2 to pay down or to pay off any debt obligation You had, all Documents evidencing such obligation, including any promissory note, guarantee instrument, security agreement, deed of trust, U.C.C. financing statement, and account control agreement.

RESPONSE:

**REQUEST NO. 18:**

All Communications regarding any payment of debt within Request No. 17.

RESPONSE:

**REQUEST NO. 19:**

All Documents and Communications between You and any person regarding the transfer of the Bonds to Alliance or to any other person pursuant to Bond Purchase Agreement 2, including to any broker, broker/dealer, administrator, intermediary, or agent holding said Bonds for You, and including any such Documents and Communications with the Debtor regarding the cancellation of the Bonds.

RESPONSE:

**REQUEST NO. 20:**

Your federal tax returns for 2021 and 2022.

RESPONSE:

**REQUEST NO. 21:**

Any audit of You or Your financial records for 2022 or any portion thereof.

RESPONSE:

**REQUEST NO. 22:**

Your balance sheet for 2022 on an annual, quarterly, and monthly basis, or such other periodic basis as You so maintained it in Your ordinary course of business.

RESPONSE:

**REQUEST NO. 23:**

All Documents and Communications between You and any person (excluding between You and Your counsel, however) regarding, referring to, relating to, or sent pursuant to, the Temporary Restraining Order or the Preliminary Injunction entered in this Adversary Proceeding.

RESPONSE:

DATED at Dallas Texas this 10th day of June, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: _____

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
tberghman@munsch.com
jvasek@munsch.com
cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

Appx.0199

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 10th day of June, 2024, he caused a true and correct copy of this document to be served via email on GIH by and though its counsel of record, Randy Pullman Esq. at RPulman@pulmanlaw.com, and by U.S. mail first-class, postage prepaid, on the following:

James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

Micahel Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
2161 NW Military Hwy.
Suite 400
San Antonio, Texas 7821

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204



By: _____
Davor Rukavina, Esq.

TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT GENESIS NETWORKS
GLOBAL SERVICES, LLC—Page 15
4872-2698-8486v.1 013229.00016

Appx.0200

*Execution Version*

## BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Alliance Texas Holdings, LLC a Florida limited liability company ("Seller") and Goodman Networks Incorporated, a Texas corporation ("Purchaser").

WHEREAS, Purchaser intends to purchase $31,746,617 million in face amount outstanding aggregate principal amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") which Purchaser issued on May 31, 2017, held by Seller for a purchase price of $17,032,060.00 (the "Purchased GNI Bonds");

WHEREAS, Seller desires to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. Purchase and Sale:

   a. Purchaser shall acquire the Purchased GNI Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"), Purchaser shall purchase the Purchased GNI Bonds owned by Seller at an aggregate purchase price for $17,032,060.00 (the "Purchase Price") by wiring same-day funds to the account as instructed by seller. Purchaser shall pay the Purchase Price to Seller upon execution of this Agreement, and thereafter Seller shall instruct its prime broker to transfer within 15 days the Purchased GNI Bonds to Purchaser's brokerage account as directed by Purchaser.

   b. Purchaser's obligation to pay the Purchase Price and Seller's obligation to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically this Agreement. Purchaser and Seller further acknowledge and agree that the obligations of the Seller under this Agreement may be settled only with the Purchased GNI Bonds.

2. Indemnification:

   a. Seller agrees to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "Purchaser Indemnitee") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("Losses"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Seller's agreements,



covenants or representations or warranties under this Agreement.  The Seller shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

b.  Purchaser agrees to indemnify Seller, its affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "Seller Indemnitee") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement.  Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3.  <u>Tender Offer; Offers to other holders:</u>  Purchaser covenants to offer all or substantially all of the other holders of the GNI Bonds to purchase any outstanding GNI Bonds at the Purchase Price.

4.  <u>No Legal Obligation; Confidentiality.</u>  Each party hereto agrees that neither the Seller, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a Purchaser's intent to acquire the remaining GNI Bonds at a price per note equal or greater than the Purchase Price pursuant to a tender offer, series of tender offers or other offer to purchase such GNI Bonds or (B) the termination of this Agreement.

5.  <u>Termination; Right of First Refusal.</u> This Agreement shall terminate upon the mutual written agreement of the parties.

6.  <u>Miscellaneous:</u>

a.  Seller and Purchaser each acknowledge and agree that:

(i)  it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement.  No communication (written or oral)

2

received from the other party shall be deemed to be an assurance or guarantee as to the expected results of entering into this Agreement;

(ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Agreement. It is also capable of assuming, and assumes, the risks of this Agreement;

(iii) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it in respect of the transactions contemplated by this Agreement and each party is acting for its own account and it has made its own independent decision to enter into this Agreement;

(iv) Neither party is receiving any compensation or fees in respect of the specific transactions contemplated in this Agreement; and

(v) All Purchased GNI Bonds subject to this Agreement shall be acquired in compliance with applicable law, including the Securities Act.

b. Purchaser represents to Seller:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited to deal under the laws of the United States, and (C) is not a Person identified as a terrorist organization on any other relevant lists maintained by governmental authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived from or related to any illegal activities, including, without limitation, money laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (B) employs one or more individuals on a full-time basis; (C) maintains operating records related to its banking activities; (D) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (E) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate;

(iv) it will provide to Seller at any time such information as Seller determines to be necessary or appropriate (A) to comply with the anti-money laundering laws, rules and regulations of any applicable jurisdiction and (B) to respond to requests for information concerning its identity from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information;

(v) as of the date hereof, Purchaser had Purchaser had $32 million of cash available to fund purchases of GNI bonds or for other general corporate purchases;

3

(vi) there are $48,195,171 million in aggregate face amount of GNI Bonds outstanding as of the date of this Agreement;

(vii) the GNI Bonds have a maturity date of May 31, 2022;

(viii)     no insolvency proceeding of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the GNI or any of its assets or properties, is pending or, to the knowledge of the Purchaser, threatened. GNI has not taken any action in contemplation of, or that would constitute the basis for, the institution of any such insolvency proceedings; and

(ix) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Seller. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Seller in writing.

c.  Seller hereby represents to Purchaser:

(i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

(ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d.  Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e.  This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f.  All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to

4

be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g. Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h. The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i. This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j. All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:    Goodman Networks Incorporated
                    2831 Eldorado Parkway, Suite 103
                    Frisco, TX 75033
                    Attn: James Frinzi
                    James.Frinzi@gnetatc.com

If to Seller:       Alliance Texas Holdings, LLC
                    333 S.E. 2nd Avenue, Suite 3410
                    Miami, FL 33131
                    Attn: Neil Auerbach
                    Neil.Auerbach@hudsonsustainable.com

                    With a copy to:
                    Baker Botts L.L.P
                    910 Louisiana Street

5

Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

k.  This Agreement shall be construed in accordance with and be governed by the laws of the State of Texas (without reference to choice of law doctrine). Any action brought in connection with this Agreement shall be brought in the federal or state courts located in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such courts and waive any objections as to venue or inconvenient forum. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY INTERPRETATION THEREOF, AND FOR ANY COUNTERCLAIM RELATED THERETO.

*[Signature Pages Follow]*

6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**GOODMAN NETWORKS INCORPORATED**

By: _____
Name:  James Frinzi
Title:  CEO

*Signature Page to Bond Purchase Agreement*

Appx.0207

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____

Name: Neil Auerbach
Title:   Managing Member

*Signature Page to Bond Purchase Agreement*

*Execution Version*

## BOND PURCHASE AGREEMENT



71672585_2

**EXHIBIT**

*B*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0067



2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0210

HUDSON_0068



3

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER



4

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0212

HUDSON_0070



5

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0213

HUDSON_0071



6

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0214

HUDSON_0072



7

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0215

HUDSON_0073



8

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0216

HUDSON_0074



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0075



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0077

# EXHIBIT 8

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC; ALLIANCE TEXAS | § | |
| HOLDINGS, LLC; NEIL Z. AUERBACH; | § | |
| JUDITH AUERBACH; AUERBACH | § | |
| PARTNERS, L.P.; JAMES GOODMAN; | § | |
| JAMES FRINZI; GOODMAN | § | |
| INVESTMENT HOLDINGS, LLC; | § | |
| GENESIS NETWORKS, INC.; GENESIS | § | |
| NETWORKS GLOBAL SERVICES, LLC; | § | |
| AUERBACH CHILDREN'S DYNASTY | § | |
| TRUST U/A/D OCTOBER 9, 2012; and | § | |
| AUERBACH FAMILY DYNASTY TRUST | § | |
| U/A/D OCTOBER 9, 2012, | § | |
| | | |
| Defendants. | | |

## TRUSTEE'S FIRST SET OF INTERROGATORIES TO
## DEFENDANT GENESIS NETWORKS GLOBAL SERVICES, LLC

TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT GENESIS NETWORKS GLOBAL
SERVICES, LLC—Page 1

Appx.0220

To:    Defendant, Genesis Networks Global Services, LLC, by and through its counsel of record, Randall A. Pulman, Esq., Pulman Cappuccio & Pullen, LLP, 2161 NW Military Hwy, Suite 400, San Antonio, Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon Genesis Networks Global Services, LLC ("Genesis"), a defendant in this Adversary Proceeding, this his *Trustee's First Set of Interrogatories to Defendant Genesis Networks Global Services, LLC* (the "Interrogatories") pursuant to Rule 33 of the Federal Rules of Civil Procedure as follows.

## I.    INSTRUCTIONS

Genesis must serve its responses to the Interrogatories, no later than thirty (30) days following service of these Interrogatories, at the following address or email:

<div align="center">

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
drukavina@munsch.com

</div>

## II.    DEFINITIONS

"Alliance" means Alliance Texas Holdings, LLC, and includes any agent thereof when acting on its behalf.

"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

"Bond Purchase Agreement 1" means the *Bond Purchase Agreement* attached hereto as Exhibit "A."

"Bond Purchase Agreement 2" means the *Bond Purchase Agreement* attached hereto as Exhibit "B."

"Bonds" means the 8% Senior Secured Notes due 2022 of Goodman Networks, Inc. (and issued by Goodman Networks, Inc.).

"Debtor" means Goodman Networks, Inc.

"Frinzi" means James Frinzi.

"Genesis" means either/or Genesis Networks, Inc. and/or Genesis Networks Global Services, LLC, and includes any agent of either when acting on either's behalf.

"Genesis Bonds" means any or all of the Bonds held by Genesis as of February 1, 2022.

"GIH" means Goodman Investment Holdings, LLC, and includes any agent thereof when acting on its behalf.

"GIH Bonds" means any or all of the Bonds held by GIH as of February 1, 2022.

"Goodman" means James Goodman.

"Including" means 'including but not limited to', and is not restrictive or limiting.

"Indenture Trustee" means UMB Bank, N.A., as indenture trustee regarding the Bonds.

"N. Auerbach" means Neil Auerbach.

"Person" or "persons" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

"S. Auerbach" means Shalom Auerbach.

"Transfer" shall have the same meaning as defined by 11 U.S.C. § 101(54).

"You" and "your" shall mean Genesis.

### III.    FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

State each and every factual reason why You decided to sell Your Bonds pursuant to the Bond Purchase Agreement 2, including with respect to the timing thereof and the reason for a discount from the face amount thereof. If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE:

**INTERROGATORY NO. 2:**

Explain in detail and with specificity how the purchase price in the Bond Purchase Agreement 2 was negotiated or arrived at, including who negotiated or discussed the same on Your behalf and who negotiated or discussed the same on behalf of Alliance, how any such discussions or negotiations were undertaken, whether any third-party data was used in any such discussions or negotiations, and whether there was any discussion of a markup or profit or margin or arbitrage in favor of Alliance as part of the same. If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE:

**INTERROGATORY NO. 3:**

At the time that You entered into the Bond Purchase Agreement 2, were You aware, did You suspect, or had anyone discussed with You, that Alliance would be transferring, selling, reselling, or otherwise conveying the Bonds that it was purchasing from You to the Debtor and, if so, how and why were You aware of or suspected the same and what did you know or understand regarding the same.

RESPONSE:

Appx.0223

**INTERROGATORY NO. 4:**

At the time that You entered into the Bond Purchase Agreement 2, from what source did You understand or believe that Alliance would obtain the funds needed to pay You under the Bond Purchase Agreement 2, and explain all factual bases for Your understanding or belief of the same.

RESPONSE:

**INTERROGATORY NO. 5:**

At the time that You entered into the Bond Purchase Agreement 2, were you aware of the fact or substance of Bond Purchase Agreement 1 or of the existence of any written or oral agreement or understanding between Alliance and the Debtor regarding or in any way related to the Bonds the subject of Bond Purchase Agreement 2 or whereby the Debtor would be funding the payment to You under Bond Purchase Agreement 2.

RESPONSE:

**INTERROGATORY NO. 6:**

Why did You not simply sell, transfer, or otherwise convey the Bonds You held as of February 3, 2022 directly to the Debtor, as opposed to going through Alliance, and whose idea was it to sell the Bonds through an intermediary instead of directly to the Debtor.

RESPONSE:

**INTERROGATORY NO. 7:**

As of the date You entered into the Bond Purchase Agreement 2, state every reason You understood or believed that Alliance was entering into that agreement with You, such as for a profit or gain of a certain amount, or to hold the Bonds, or any other reason, and explain all bases for your understanding or belief regarding the same. In other words, what did You think Alliance would do with those Bonds once it purchased them?

RESPONSE:

**INTERROGATORY NO. 8:**

Identify, as of February 3, 2022, each of Your members, managing members, managers, and officers, including by name and title.

RESPONSE:

**INTERROGATORY NO. 9:**

Identify each person known to You, as of February 3, 2022, involved in any way with the negotiation, drafting, or execution of the Bond Purchase Agreement 2, by name, affiliation, and title, whether on Your behalf or on behalf of any other person, including Alliance, and including any attorneys or advisors for any party.

RESPONSE:

**INTERROGATORY NO. 10:**

Explain in detail and with specificity how it was that You learned of Alliance's interest in purchasing Your Bonds, including the role of Frinzi, N. Auerbach, and S. Auerbach regarding the same.

RESPONSE:

**INTERROGATORY NO. 11:**

Do You as of now agree that the funds used by Alliance to pay You under the Bond Purchase Agreement 2 came from the Debtor and that You are a subsequent transferee of such funds? If You disagree, then state and every reason that You know of now regarding where such funds originated from.

RESPONSE:

**INTERROGATORY NO. 12:**

Identify each and every transfer made to You for or on account of the Bond Purchase Agreement 2, including by date thereof, mode thereof, amount thereof, and transferor thereof.

RESPONSE:

**INTERROGATORY NO. 13:**

For each transfer the subject of Interrogatory No. 12, do You agree that, on the date thereof, the amount of the Debtor's liabilities exceeded the value of its assets? If You disagree, then state each and every fact or reason why.

RESPONSE:

**INTERROGATORY NO. 14:**

For each transfer the subject of Interrogatory No. 12, state and explain what return consideration You gave or provided to the transferor thereof for such transfer and what the value of such consideration was.

RESPONSE:

**INTERROGATORY NO. 15:**

As of the date of the Bond Purchase Agreement 2, did You believe that the Debtor would default on the Bonds when they matured later in 2022? If not, then state each reason and explain in detail why You agreed to sell Your Bonds for a discount as opposed to holding them for a few more months for full payment.

RESPONSE:

**INTERROGATORY NO. 16:**

At the time of each transfer the subject of Interrogatory No. 12, admit that You were a creditor of the Debtor on account of the Bonds. If You disagree, explain why.

RESPONSE:

**INTERROGATORY NO. 17:**

For each transfer the subject of Interrogatory No. 12, admit that such transfer was made to You for or on account of antecedent debt owed by the Debtor to You on the date of such transfer in the form of the Bonds. If You disagree, explain why.

RESPONSE:

**INTERROGATORY NO. 18:**

For each transfer the subject of Interrogatory No. 12, do You admit that the Debtor made such transfer to Alliance (as part of a larger transfer to Alliance) for Your benefit. If You disagree, explain why.

RESPONSE:

**INTERROGATORY NO. 19:**

For each transfer the subject of Interrogatory No. 12, state what You did with such transfer or what You intended to do with such transfer at the time of Your receipt thereof, including, if applicable, whether you transferred all or a portion of said transfer within ninety (90) days of the receipt thereof to any other person, and identify such person, the transfer to such person by date, amount, mode, and source, and the reason for such transfer.

RESPONSE:

**INTERROGATORY NO. 20:**

Identify, as of February 3, 2022, each broker, broker-dealer, nominee, bank, advisor, administrator, or agent who held any or all of the Bonds for Your benefit.

RESPONSE:

**INTERROGATORY NO. 21:**

Did You in fact hold or own $1,600,000.00 of the Bonds on February 3, 2022, directly or indirectly?

RESPONSE:

**INTERROGATORY NO. 22:**

What did You do with the Bonds you held as of February 3, 2022 or what happened to those Bonds? If You assert that You transferred them to Alliance, then identify each and every document and communication that You assert evidences the same. Or, did You ever transfer them to someone else and, if so, who, when, and for what consideration? Or, do You still hold these Bonds and, if You do, do You agree that they should be delivered to the Debtor for cancellation?

RESPONSE:

**INTERROGATORY NO. 23:**

Identify any payment or transfer You received from the Indenture Trustee or any other person (but excluding Alliance) for or on account of the Bonds after February 3, 2022, including for interest, and including by date of such payment or transfer and amount.

RESPONSE:

DATED at Dallas Texas this 10th day of June, 2024.

MUNSCH HARDT KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
       tberghman@munsch.com
       jvasek@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 10th day of June, 2024, he caused a true and correct copy of this document to be served via email on Genesis by and though its counsel of record, Randy Pullman Esq. at RPulman@pulmanlaw.com, and by U.S. mail first-class, postage prepaid, on the following:

James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

Micahel Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
2161 NW Military Hwy.
Suite 400
San Antonio, Texas 7821

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

By: _____
Davor Rukavina, Esq.

*Execution Version*

## BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Alliance Texas Holdings, LLC a Florida limited liability company ("Seller") and Goodman Networks Incorporated, a Texas corporation ("Purchaser").

WHEREAS, Purchaser intends to purchase $31,746,617 million in face amount outstanding aggregate principal amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") which Purchaser issued on May 31, 2017, held by Seller for a purchase price of $17,032,060.00 (the "Purchased GNI Bonds"):

WHEREAS, Seller desires to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. Purchase and Sale:

   a. Purchaser shall acquire the Purchased GNI Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"). Purchaser shall purchase the Purchased GNI Bonds owned by Seller at an aggregate purchase price for $17,032,060.00 (the "Purchase Price") by wiring same-day funds to the account as instructed by seller. Purchaser shall pay the Purchase Price to Seller upon execution of this Agreement, and thereafter Seller shall instruct its prime broker to transfer within 15 days the Purchased GNI Bonds to Purchaser's brokerage account as directed by Purchaser.

   b. Purchaser's obligation to pay the Purchase Price and Seller's obligation to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically this Agreement. Purchaser and Seller further acknowledge and agree that the obligations of the Seller under this Agreement may be settled only with the Purchased GNI Bonds.

2. Indemnification:

   a. Seller agrees to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "Purchaser Indemnitee") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("Losses"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Seller's agreements,



covenants or representations or warranties under this Agreement. The Seller shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

b. Purchaser agrees to indemnify Seller, its affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "Seller Indemnitee") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement. Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3. <u>Tender Offer; Offers to other holders:</u>  Purchaser covenants to offer all or substantially all of the other holders of the GNI Bonds to purchase any outstanding GNI Bonds at the Purchase Price.

4. <u>No Legal Obligation; Confidentiality.</u> Each party hereto agrees that neither the Seller, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a Purchaser's intent to acquire the remaining GNI Bonds at a price per note equal or greater than the Purchase Price pursuant to a tender offer, series of tender offers or other offer to purchase such GNI Bonds or (B) the termination of this Agreement.

5. <u>Termination; Right of First Refusal</u>. This Agreement shall terminate upon the mutual written agreement of the parties.

6. <u>Miscellaneous</u>:

    a. Seller and Purchaser each acknowledge and agree that:

        (i) it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement. No communication (written or oral)

2

received from the other party shall be deemed to be an assurance or guarantee as to the expected results of entering into this Agreement;

(ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Agreement. It is also capable of assuming, and assumes, the risks of this Agreement;

(iii) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it in respect of the transactions contemplated by this Agreement and each party is acting for its own account and it has made its own independent decision to enter into this Agreement;

(iv) Neither party is receiving any compensation or fees in respect of the specific transactions contemplated in this Agreement; and

(v) All Purchased GNI Bonds subject to this Agreement shall be acquired in compliance with applicable law, including the Securities Act.

b. Purchaser represents to Seller:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited to deal under the laws of the United States, and (C) is not a Person identified as a terrorist organization on any other relevant lists maintained by governmental authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived from or related to any illegal activities, including, without limitation, money laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (B) employs one or more individuals on a full-time basis; (C) maintains operating records related to its banking activities; (D) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (E) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate;

(iv) it will provide to Seller at any time such information as Seller determines to be necessary or appropriate (A) to comply with the anti-money laundering laws, rules and regulations of any applicable jurisdiction and (B) to respond to requests for information concerning its identity from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information;

(v) as of the date hereof, Purchaser had Purchaser had $32 million of cash available to fund purchases of GNI bonds or for other general corporate purchases;

3

(vi) there are $48,195,171 million in aggregate face amount of GNI Bonds outstanding as of the date of this Agreement;

(vii) the GNI Bonds have a maturity date of May 31, 2022;

(viii)   no insolvency proceeding of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the GNI or any of its assets or properties, is pending or, to the knowledge of the Purchaser, threatened. GNI has not taken any action in contemplation of, or that would constitute the basis for, the institution of any such insolvency proceedings; and

(ix) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Seller. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Seller in writing.

c. Seller hereby represents to Purchaser:

(i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

(ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d. Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e. This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f. All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to

4

be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g.  Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h.  The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i.  This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j.  All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:        Goodman Networks Incorporated
                        2831 Eldorado Parkway, Suite 103
                        Frisco, TX 75033
                        Attn: James Frinzi
                        James.Frinzi@gnetatc.com


If to Seller:           Alliance Texas Holdings, LLC
                        333 S.E. 2nd Avenue, Suite 3410
                        Miami, FL 33131
                        Attn: Neil Auerbach
                        Neil.Auerbach@hudsonsustainable.com

                        With a copy to:
                        Baker Botts L.L.P
                        910 Louisiana Street

5

Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

k.  This Agreement shall be construed in accordance with and be governed by the laws of the State of Texas (without reference to choice of law doctrine). Any action brought in connection with this Agreement shall be brought in the federal or state courts located in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such courts and waive any objections as to venue or inconvenient forum. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY INTERPRETATION THEREOF, AND FOR ANY COUNTERCLAIM RELATED THERETO.

*[Signature Pages Follow]*

6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**GOODMAN NETWORKS INCORPORATED**

By: _____
Name: James Frinzi
Title: CEO

*Signature Page to Bond Purchase Agreement*

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____

Name: Neil Auerbach

Title:   Managing Member

*Signature Page to Bond Purchase Agreement*

*Execution Version*

### BOND PURCHASE AGREEMENT



71672585_2

EXHIBIT

B

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0067



2

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0068



3

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx-0241

HUDSON_0069



4

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0242



5

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0071



6

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

HUDSON_0072



7

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx-0245



8

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0246

HUDSON_0074



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0247

HUDSON_0075



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0249

HUDSON_0076



*Signature Page to Bond Purchase Agreement*

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Appx 0249

# EXHIBIT 9

Randall A. Pulman
Texas State Bar No. 16393250
Anna K. MacFarlane
Texas State Bar No. 24116701
PULMAN, CAPPUCCIO & PULLEN, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

COUNSEL FOR JAMES E. GOODMAN,
GOODMAN INVESTMENT HOLDINGS,
AND GENESIS NETWORKS INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC et al., | § | |
| | § | |
| Defendants. | § | |

**JAMES GOODMAN'S OBJECTIONS AND RESPONSES TO TRUSTEE'S FIRST SET
OF REQUESTS FOR PRODUCTION TO DEFENDANT JAMES GOODMAN**

To:    **SCOTT M. SEIDEL, TRUSTEE BY AND THROUGH HIS COUNSEL OF RECORD**
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

James Goodman ("Goodman"), a defendant in this Adversary Proceeding, hereby serves

upon Scott M. Seidel, Trustee ("Trustee"), his *Responses to Trustee's First Set of Requests for*

*Production to Defendant James Goodman* (the "Requests") pursuant to Rule 34 of the Federal

Rules of Civil Procedure as follows.

DATED this 26th of July, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR JAMES E. GOODMAN, JR.**

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 26th day of July, 2024, he caused a true and correct copy of this document to be served on the following as described below:

***<u>Via e-mail to: drukavina@munsch.com</u>***
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

***<u>Via E-Mail to james@frinzi.net and
Via First Class Mail:</u>***
James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

***<u>Via e-mail to: mcancienne@jlcfirm.com</u>***
Michael Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

***<u>Via E-Mail to Jason.rudd@wickphillips.com</u>***
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/ Randall A. Pulman*
Randall A. Pulman

3

<u>**OBJECTIONS AND RESPONSES TO FIRST SET OF REQUEST FOR PRODUCTION**</u>

<u>**REQUEST NO. 1:**</u>

All Documents and Communications between You and Frinzi regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

<u>**REQUEST NO. 2:**</u>

All Documents and Communications between You and S. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

<u>**REQUEST NO. 3:**</u>

All Documents and Communications between You and N. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

<u>**REQUEST NO. 4:**</u>

All Documents and Communications between You and any person (not already the subject of Requests No. 1, 2, and 3) regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Goodman objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable

time and place. Relevant responsive non-privileged documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 5:**

Any Document and Communication regarding, related to, or referring to any approval by any director, shareholder, officer, manager, or other person at the Debtor, including any attorney of the Debtor and including any financial advisor of the Debtor (such as Sierra Constellation Partners or CFGI), of the Bond Purchase Agreement 1 or the transactions and Transfers contemplated thereby.

RESPONSE: After a diligent review of documents within Goodman's possession, custody, and control, no responsive documents were found.

**REQUEST NO. 6:**

Any Document and Communication regarding, related to, or referring to any due diligence You undertook, or had undertaken for You, regarding the Bond Purchase Agreement 2 or the transactions contemplated thereby.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 7:**

Any Document and Communication regarding, related to, or referring to any approval by any director, shareholder, officer, manager, or other person at GIH and Genesis of the Bond Purchase Agreement 2 or the transactions and Transfers contemplated thereby.

RESPONSE: After a diligent review of documents within Goodman's possession, custody, and control, no responsive documents were found. Because Goodman was the representative of GIH and Genesis, no additional approvals were sought or required.

**REQUEST NO. 8:**

Any Document and Communication related to the price at which the Bonds were trading as of February 3, 2022.

RESPONSE: Goodman objects to this Request because the documents referred to when negotiating the price of the Bonds are publicly available and thus equally available to the Trustee.

## REQUEST NO. 9:

Any Document and Communication regarding, related to, or referring to transfer of the GIH Bonds to Alliance, the Debtor, or any other person.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

## REQUEST NO. 10:

Any Document and Communication regarding, related to, or referring to transfer of the Genesis Bonds to Alliance, the Debtor, or any other person.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

## REQUEST NO. 11:

All Communications between You and any person, at any time during 2021 or 2022, regarding, related to, or referring to any potential sale by GIH or Genesis of any of their Bonds, or any potential purchase by any person of the same, directly or indirectly.

RESPONSE: Relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

## REQUEST NO. 12:

All Communications between You and any person, at any time during 2021 or 2022, regarding, related to, or referring to the Bonds, the Debtor's performance under the Bonds, and the Debtor's payment or non-payment of the Bonds at their maturity.

RESPONSE: Goodman objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request

6

will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 13:**

All Documents and Communications between You and Bobby Forshey or any other attorney or person at Forshey Prostok, LLP regarding the Debtor.  You are reminded that the Trustee has waived the privilege for this.

RESPONSE: Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and Bobby Forshey or other individuals at Forshey Prostok, LLP regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objection.

**REQUEST NO. 14:**

All Documents and Communications between You and Sierra Constellation Partners, LLC regarding the Debtor.

RESPONSE: Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and Sierra Constellation Partners, LLC regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objection.

**REQUEST NO. 15:**

All Documents and Communications between You and Joseph Baum or CFGI, LLC regarding the Debtor.

RESPONSE: Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and Joseph Baum or CFGI, LLC regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objection.

4887-5296-7879, v. 1 / 6514.005

Appx.0256

**REQUEST NO. 16:**

All Documents and Communications between You and Winstead, PC regarding the Debtor.

RESPONSE: Goodman objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Goodman further objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and Winstead, PC regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objections.

**REQUEST NO. 17:**

All Documents and Communications between You and any sibling of Yours, including John Goodman, from December 1, 2021 through June 1, 2022, regarding the Debtor, the Bonds, GIH, or Genesis.

RESPONSE: Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and his siblings regarding the Debtor, GIH, or Genesis are relevant or material to this dispute. Documents will be withheld based on the foregoing objection. Relevant responsive documents regarding the Bonds within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 18:**

All Documents and Communications between You and any shareholder, member, owner, or investor in GIH or Genesis, from December 1, 2021 through June 1, 2022, regarding the Debtor or the Bonds.

RESPONSE: Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and any shareholder, member, owner, or investor in GIH or Genesis regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objection. Regarding the Bonds, relevant responsive documents within Goodman's possession, custody, and control will be produced on a rolling basis. Goodman is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

8

Appx.0257

**REQUEST NO. 19:**

All Documents and Communications between You and T. Denny Sanford regarding the Debtor, the Bonds, GIH, or Genesis, prior to June 1, 2022.

RESPONSE: Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and T. Denny Sandford regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objection.

**REQUEST NO. 20:**

Any guarantee by You of any debt of GIH or Genesis in place at any time between January 1, 2022 and June 1, 2022 and, for each such guarantee, each related promissory note, security instrument, pledge of collateral, deed of trust, financing statement, and each other related agreement or instrument.

RESPONSE: Goodman objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested are personal financial documents of Goodman and have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 21:**

All Communications between You and any person regarding any guarantee within Request No. 20, between January 1, 2022 and June 1, 2022.

RESPONSE: Goodman objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested are personal financial documents of Goodman and have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 22:**

All Documents and Communications from or with GIH or Genesis at any time during 2021 and 2022 regarding, related to, or referring to any distribution, dividend, or loan payment to You or to any entity affiliated with You.

RESPONSE: Goodman objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested are personal financial documents of Goodman and have no bearing on the issues in this proceeding. This request is an improper and premature request in aid

9

Appx.0258

of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 23:**

Your federal income tax return for 2022.

RESPONSE: Goodman objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested are personal financial documents of Goodman and have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

10

Appx.0259

# EXHIBIT 10

Randall A. Pulman
Texas State Bar No. 16393250
Anna K. MacFarlane
Texas State Bar No. 24116701
PULMAN, CAPPUCCIO & PULLEN, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

COUNSEL FOR JAMES E. GOODMAN,
GOODMAN INVESTMENT HOLDINGS,
AND GENESIS NETWORKS GLOBAL
SERVICES, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO:  23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC, et al, | § | |
| | § | |
| Defendants. | § | |

**JAMES GOODMAN'S OBJECTIONS AND RESPONSES TO TRUSTEE'S FIRST SET
OF INTERROGATORIES TO DEFENDANT JAMES GOODMAN**

To:    **SCOTT M. SEIDEL, TRUSTEE BY AND THROUGH HIS COUNSEL OF RECORD**
       Davor Rukavina
       Munsch Hardt Kopf & Harr, P.C.
       4000 Ross Tower
       500 N. Akard Street
       Dallas, Texas 75201

       James Goodman ("Goodman"), a defendant in this Adversary Proceeding, this his

*Objections and Responses to Trustee's First Set of Interrogatories to James Goodman*

(the "<u>Responses</u>") pursuant to Rule 33 of the Federal Rules of Civil Procedure as follows.

DATED this 26th of July, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: <u>*/s/ Randall A. Pulman*</u>
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Anna K. MacFarlane
    Texas State Bar No. 24116701
    amacfarlane@pulmanlaw.com

**COUNSEL FOR JAMES E. GOODMAN, JR.**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on the 26th day of July, 2024, he caused a true and correct copy of this document to be served on the following as described below:

***Via e-mail to: drukavina@munsch.com***
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

***Via E-Mail to james@frinzi.net and
Via First Class Mail:***
James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

***Via e-mail to: mcancienne@jlcfirm.com***
Michael Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

***Via E-Mail to Jason.rudd@wickphillips.com***
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/ Randall A. Pulman*
Randall A. Pulman

Appx.0262

## OBJECTIONS AND RESPONSES TO FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

Explain why You decided to cause GIH and Genesis to sell their Bonds at the time that they did and for the discount that they did, including whether there were any liquidity issues at these entities, whether they needed to pay down any debt, whether You were concerned that the Debtor would soon default on the Bonds, and any other fact or belief You had or considered in so deciding as of February 3, 2022.

RESPONSE: I decided to sell the Bonds held by GIH and Genesis to an independent third-party purchaser because I did not think that the Debtor could pay for the Bonds at the time, and I wanted to liquidate the holdings.

### INTERROGATORY NO. 2:

Explain why, in causing GIH and Genesis to sell their Bonds, You did not simply ask the Debtor or cause the Debtor to purchase or redeem the Bonds directly, as opposed to selling them to Alliance for the subsequent transfer to the Debtor.

RESPONSE: I did not approach the Debtor about purchasing the GIH and Genesis Bonds because I did not believe the Debtor had the funds to purchase them. The idea was never to sell to Alliance as an "intermediary" to subsequent transfer to the Debtor. Rather, Alliance was presented by Frinzi as an independent third-party with funds immediately available to purchase the GIH and Genesis Bonds.

### INTERROGATORY NO. 3:

Explain in detail and with specificity the course of events that led from the initial decision or desire to cause GIH and Genesis to sell their Bonds to the execution of Bond Purchase Agreement 2, including whose idea it originally was to sell the Bonds, whose idea it was to sell them to a third party as opposed to the Debtor, who first located Alliance (or S. Shalom, N. Shalom, or any other person affiliated with Alliance) as the buyer, and each person who participated in the negotiation, drafting, or execution of Bond Purchase Agreement 2.

RESPONSE: Frinzi presented Alliance as an independent third-party buyer with the requisite funds immediately available to purchase the GIH and Genesis Bonds with a quick closing timeline. At the time of entering into Bond Purchase Agreement 2, Alliance represented to me that it was purchasing the GIH and Genesis Bonds to hold them for investment purposes.

**INTERROGATORY NO. 4:**

Did You know or believe, or had anyone informed You of any intent, that Alliance would, after purchasing the Bonds from GIH and Genesis, then sell, transfer, or redeem the purchased Bonds to the Debtor, and state and explain all You may have known or believed regarding the same, including from whom, and including for what price Alliance would do so with the Debtor, including whether You knew of the fact, existence, or substance of Bond Purchase Agreement 1.

RESPONSE: No.

**INTERROGATORY NO. 5:**

Where did You believe or understand that Alliance was obtaining the funds to pay GIH and Genesis for the Bonds under the Bond Purchase Agreement 2, and did You know or believe, or had anyone informed You, that any portion of such funds would be coming from the Debtor, whether pursuant to Bond Purchase Agreement 1 or otherwise.

RESPONSE: I was told and I believed that Alliance had its own funds to purchase the GIH and Genesis Bonds as contemplated under Bond Purchase Agreement 2, which is the agreement that is reflected in that document and the flow of funds memorandum.

**INTERROGATORY NO. 6:**

Did You believe that the Debtor was insolvent on February 3, 2022 (meaning did You believe it at that time), as "insolvent" is defined in section 101 of the Bankruptcy Code, and explain the basis for such belief as of such date.

RESPONSE: Objection, this Interrogatory calls for a legal conclusion. At the time the Bond Purchase Agreement 2 was executed, Goodman did not know what the Bankruptcy Code had to say about insolvency.

**INTERROGATORY NO. 7:**

On February 3, 2022, did You expect that the Debtor would default on the Bonds when they matured later that year, and explain the basis for such belief as of such date.

RESPONSE: Yes, as of the date of the Bond Purchase Agreement 2, I knew there was a likelihood that the Debtor would default on the Bonds when they matured. However, based on past experience, it was also possible that a negotiated settlement could be reached with the bondholders so that the Debtor would not default. I sold the Genesis and GIH Bonds in what I believed to be an independent third-party transaction that should have had no impact on the Debtor.

**INTERROGATORY NO. 8:**

At any time prior to February 3, 2022, did You discuss the Debtor's solvency, insolvency, or potential default on the Bonds when they matured later that year, with any of Frinzi, N. Auerbach, S. Auerbach, or any agent of any of the foregoing and, if so, what did You discuss or say, with whom, how, and when.

RESPONSE: No, but the financial condition of the Debtor was disclosed in the Bond Purchase Agreement 2.

**INTERROGATORY NO. 9:**

Did You have anything to do with Bond Purchase Agreement 1, or the agreement evidenced thereby, prior to its execution, including anything to do with the negotiation of the terms thereof or the drafting thereof, and including whether You saw any draft thereof, and whether You discussed the form or substance thereof or of any draft thereof with Frinzi prior to its execution, and, if not, state when and how You first learned of the fact or substance of Bond Purchase Agreement 1.

RESPONSE: No.

**INTERROGATORY NO. 10:**

As of February 3, 2022, what did You understand or believe to be the reason that Alliance was entering into Bond Purchase Agreement 2, including whether You had any understanding or belief that it would subsequently transfer the Bonds or hold the Bonds for maturity, and including any understanding or belief of any profit, gain, margin, or arbitrage that Alliance may make from the transaction and, if You had any such understanding or belief, state where it came from.

RESPONSE: Frinzi presented Alliance as an independent third-party buyer with the requisite funds immediately available to purchase the GIH Bonds with a quick closing timeline. At the time of entering into Bond Purchase Agreement 2, Alliance represented to GIH that it was purchasing the GIH Bonds to hold them for investment purposes. Bond Purchase Agreement 2 ¶ 5(b)(x).

**INTERROGATORY NO. 11:**

Do You have any information, fact, document, or evidence to the effect that Frinzi personally benefited, monetarily or otherwise, from causing the Debtor to execute Bond Purchase Agreement 1 or from the overall transactions the subject of Bond Purchase Agreement 1 and Bond Purchase Agreement 2, and, if so, what is it.

RESPONSE: No.

**INTERROGATORY NO. 12:**

State and explain in detail Frinzi's role with respect to the Bond Purchase Agreement 1, Bond Purchase Agreement 2, and the transactions the subject thereof, including any such role in introducing Alliance, N. Auerbach, or S. Auerbach to You for such purpose, and including any such role in negotiating or drafting the deal terms, including the pricing of Bond Purchase Agreement 1 and Bond Purchase Agreement 2.

RESPONSE: I have no knowledge of Frinzi's role in Bond Purchase Agreement 1, other than seeing that he signed the document on behalf of the Debtor as its CEO. With respect to Bond Purchase Agreement 2, Frinzi introduced me to Shalom Auerbach as an independent third-party buyer interested in purchasing the Bonds held by Genesis and GIH. All other negotiations were directly between me and Shalom or our lawyers/representatives.

**INTERROGATORY NO. 13:**

As of when You signed the Bond Purchase Agreement 2, what was Your understanding as to whether Alliance at that time owned the $31,746,617.00 in Bonds the subject thereof or whether it would come to own said Bonds, including, how, when, from whom, and for what payments or transfers.

RESPONSE: When I signed the Bond Purchase Agreement 2, my understanding was that Alliance did not own any Bonds. My understanding was that any Bonds that Alliance would ultimately own would be the ones that it bought from GIH and Genesis.

**INTERROGATORY NO. 14:**

How was the pricing for the Bonds the subject of Bond Purchase Agreement 2 decided, including who decided or negotiation (sic) the same or participated in said decision or negotiation (for the seller and buyer), when and how that decision was made, and what factors or facts went into said decision.

RESPONSE: Regarding the price, I felt that the bonds would not sell at full par value. This was based on publicly available pricing information. Prior sales of the GNI Bonds were at below market value. I thus believed that selling the Bonds at below market value was reasonable based on past public sales because something is only worth what a purchaser is willing to pay for it.

**INTERROGATORY NO. 15:**

Prior to the negotiation of Bond Purchase Agreement 2 and prior to the identification of Alliance, S. Auerbach, or N. Auerbach (or any entity affiliated with them) as the buyer of the GIH Bonds and the Genesis Bonds, had You informed Frinzi of the price that GIH and Genesis would accept to sell their Bonds?

RESPONSE: Not specifically, other than potentially telling Frinzi a price range that I believed was reasonable based on past public sales data for the Bonds.

## INTERROGATORY NO. 16:

When You executed the Bond Purchase Agreement 2, did You know, suspect, or by then in any way discuss with anyone, that Alliance, N. Auerbach, S. Auerbach, or any entity or person affiliated with any of them, would earn a markup or profit or margin or arbitrage on the Bonds that they were purchasing to sell to the Debtor and, if so, what did you know or suspect, and why.

RESPONSE: No.

## INTERROGATORY NO. 17:

Did You have anything to do with the Debtor terminating its retention of Bobby Forshey and Forshey Prostok, LLP, as its counsel, including by discussing the issue with Frinzi or with anyone else, giving any input and advice regarding the issue, and being asked your input or views regarding the same, and, if so, what was your role and what statements did You make and to whom. You are reminded that the Trustee has waived the Debtor's privilege regarding this issue.

RESPONSE: I did provide my opinion to James Frinzi that I believed Bobby Forshey and Forshey Prostok, LLP should be terminated as the Debtor's counsel. I disagreed with Bobby's desire to file a chapter 7 liquidation for the Debtor. On January 24, 2022, I texted James Frinzi that Bobby should be fired. At the time, I was a director of the Debtor.

## INTERROGATORY NO. 18:

Did the Debtor's termination of its retention of Bobby Forshey and Forshey Prostok, LLP, as its counsel have anything to do with the Bond Purchase Agreement 2 or with the transactions contemplated by the Bond Purchase Agreement 1 and Bond Purchase Agreement 2 and, if so, what was the reason.  You are reminded that the Trustee has waived the Debtor's privilege regarding this issue.

RESPONSE: No.

## INTERROGATORY NO. 19:

Did You personally, or any family member of Yours, or any entity that You owned in whole or in party (excluding GIH and Genesis), receive any portion of the funds paid pursuant to the Bond Purchase Agreement 2, directly or indirectly, including by way of distribution, dividend, or loan repayment and, if so, when and how much and for what.

RESPONSE: Goodman objects to this Interrogatory as irrelevant and immaterial to the issues in this proceeding. The information requested involves personal financial documents of Goodman and/or his family members and has no bearing on the issues in this proceeding. This Interrogatory is an improper and premature request in aid of execution prior to any judgment being entered.

# EXHIBIT 11

Randall A. Pulman
Texas State Bar No. 16393250
Anna K. MacFarlane
Texas State Bar No. 24116701
PULMAN, CAPPUCCIO & PULLEN, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

COUNSEL FOR JAMES E. GOODMAN,
GOODMAN INVESTMENT HOLDINGS,
AND GENESIS NETWORKS GLOBAL
SERVICES, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC et al., | § | |
| | § | |
| Defendants. | § | |

**GOODMAN INVESTMENT HOLDINGS, LLC'S OBJECTIONS AND RESPONSES TO
TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO
DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC**

To:   **SCOTT M. SEIDEL, TRUSTEE BY AND THROUGH HIS COUNSEL OF RECORD**
      Davor Rukavina
      Munsch Hardt Kopf & Harr, P.C.
      4000 Ross Tower
      500 N. Akard Street
      Dallas, Texas 75201

Goodman Investment Holdings, LLC ("GIH"), a defendant in this Adversary Proceeding,

this its *Objections and Responses to Trustee's First Set of Requests for Production to Defendant*

*Goodman Investment Holdings, LLC* (the "<u>Responses</u>") pursuant to Rule 34 of the Federal Rules

of Civil Procedure as follows.

DATED this 26th of July, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR GOODMAN INVESTMENT
HOLDINGS, LLC**

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 26th day of July, 2024, he caused a true and correct copy of this document to be served on the following as described below:

***<u>Via e-mail to: drukavina@munsch.com</u>***
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

***<u>Via E-Mail to james@frinzi.net and
Via First Class Mail:</u>***
James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

***<u>Via e-mail to: mcancienne@jlcfirm.com</u>***
Michael Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

***<u>Via E-Mail to Jason.rudd@wickphillips.com</u>***
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/ Randall A. Pulman*
Randall A. Pulman

## OBJECTIONS AND RESPONSES TO FIRST SET OF REQUEST FOR PRODUCTION

### REQUEST NO. 1:

All Documents and Communications between You and Frinzi regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

### REQUEST NO. 2:

All Documents and Communications between You and S. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

### REQUEST NO. 3:

All Documents and Communications between You and N. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

### REQUEST NO. 4:

All Documents and Communications between You and Alliance at any time.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 5:**

All Documents and Communications between You and any person (not already the subject of Requests No. 1, 2, and 3) regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: GIH objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 6:**

All internal Documents and Communications regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: GIH objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 7:**

All of Your corporate governance Documents in effect from January 1, 2022 through the present, including any limited liability company agreement, shareholder agreement, bylaws, and manager or member consents or resolutions.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 8:**

Any Document and Communication regarding, related to, or referring to, or reviewed or consulted by You regarding, the price for the Bonds provided for in Bond Purchase Agreement 2.

RESPONSE: GIH objects to this Request because the documents referred to when negotiating the price of the Bonds are publicly available and thus equally available to the Trustee.

**REQUEST NO. 9:**

Any Document and Communication, between January 1, 2022 and March 1, 2022, regarding, related to, referring to, or mentioning the solvency or insolvency of the Debtor and the ability or inability of the Debtor to pay on the Bonds at the time of their maturity in 2022.

RESPONSE: GIH objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 10:**

Any Document and Communication related to the price at which the Bonds were trading as of February 3, 2022.

RESPONSE: GIH objects to this Request because the documents referred to when negotiating the price of the Bonds are publicly available and thus equally available to the Trustee.

**REQUEST NO. 11:**

Any Document and Communication regarding, related to, referring to, or mentioning any attempt, effort, or solicitation by You to sell any of the Bonds You held to any person other than Alliance, or any such Document and Communication from any person to You inquiring into any such sale, at any time prior to February 3, 2022.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 12:**

All Documents and Communications between You and the Indenture Trustee regarding, relating to, or referencing the Bonds.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 13:**

All Documents and Communications regarding or evidencing Your ownership of any of the Bonds as of February 3, 2022.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 14:**

Each statement, for January 1, 2022 through June 1, 2022, for each bank account held by You or in Your name or to which You had any access.

RESPONSE: GIH objects to this request on the grounds that it is overly broad. The Trustee has not established why he needs bank statements for all of GIH's accounts or why those account statements would be relevant or material to this dispute. GIH is withholding documents based on the foregoing objection. GIH will produce the bank statements where the funds were transferred under the Bond Purchase Agreement 2. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 15:**

Any Document and Communication regarding relating to, or referencing the receipt by You of any payment pursuant to Bond Purchase Agreement 2.

RESPONSE: Relevant responsive documents within GIH's possession, custody, and control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 16:**

Any Document and Communication regarding, relating to, or referencing any transfer or payment by You to any person from any of the funds received by You pursuant to Bond Purchase Agreement 2, including on account of any loan or obligation of You to any person.

RESPONSE: GIH objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 17:**

To the extent that You used any of the funds transferred to You pursuant to Bond Purchase Agreement 2 to pay down or to pay off any debt obligation You had, all Documents evidencing such obligation, including any promissory note, guarantee instrument, security agreement, deed of trust, U.C.C. financing statement, and account control agreement.

RESPONSE: GIH objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 18:**

All Communications regarding any payment of debt within Request No. 17.

RESPONSE: GIH objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 19:**

All Documents and Communications between You and any person regarding the transfer of the Bonds to Alliance or to any other person pursuant to Bond Purchase Agreement 2, including to any broker, broker/dealer, administrator, intermediary, or agent holding said Bonds for You, and including any such Documents and Communications with the Debtor regarding the cancellation of the Bonds.

RESPONSE: GIH objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within GIH's possession, custody, and

control will be produced on a rolling basis. GIH is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 20:**

Your federal tax returns for 2021 and 2022.

RESPONSE: GIH objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 21:**

Any audit of You or Your financial records for 2022 or any portion thereof.

RESPONSE: GIH objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 22:**

Your balance sheet for 2022 on an annual, quarterly, and monthly basis, or such other periodic basis as You so maintained it in Your ordinary course of business.

RESPONSE: GIH objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

# EXHIBIT 12

Randall A. Pulman
Texas State Bar No. 16393250
Anna K. MacFarlane
Texas State Bar No. 24116701
PULMAN, CAPPUCCIO & PULLEN, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

COUNSEL FOR JAMES E. GOODMAN,
GOODMAN INVESTMENT HOLDINGS,
AND GENESIS NETWORKS GLOBAL
SERVICES, LLC

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC et al, | § | |
| | § | |
| Defendants. | § | |

**GOODMAN INVESTMENT HOLDINGS, LLC'S OBJECTIONS AND RESPONSES TO
TRUSTEE'S FIRST SET OF INTERROGATORIES TO
DEFENDANT GOODMAN INVESTMENT HOLDINGS, LLC**

To:   **SCOTT M. SEIDEL, TRUSTEE BY AND THROUGH HIS COUNSEL OF RECORD**
      Davor Rukavina
      Munsch Hardt Kopf & Harr, P.C.
      4000 Ross Tower
      500 N. Akard Street
      Dallas, Texas 75201

Goodman Investment Holdings, LLC ("GIH"), a defendant in this Adversary Proceeding,

this its *Objections And Responses to Trustee's First Set of Interrogatories to Defendant Goodman*

*Investment Holdings, LLC* (the "<u>Responses</u>") pursuant to Rule 33 of the Federal Rules of Civil

Procedure as follows.

DATED this 26th of July, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR GOODMAN INVESTMENT
HOLDINGS, LLC**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on the 26th day of July, 2024, he caused a true and correct copy of this document to be served on the following as described below:

***Via e-mail to: drukavina@munsch.com***
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

***Via E-Mail to james@frinzi.net and***
***Via First Class Mail:***
James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

***Via e-mail to: mcancienne@jlcfirm.com***
Michael Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

***Via E-Mail to Jason.rudd@wickphillips.com***
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/ Randall A. Pulman*
Randall A. Pulman

**<u>OBJECTIONS AND RESPONSES TO FIRST SET OF INTERROGATORIES</u>**

**<u>INTERROGATORY NO. 1:</u>**

State each and every factual reason why You decided to sell Your Bonds pursuant to the Bond Purchase Agreement 2, including with respect to the timing thereof and the reason for a discount from the face amount thereof.  If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE: GIH had wanted to sell its bonds for several months prior to the execution of Bond Purchase Agreement 2. The timing was driven by James Frinzi telling GIH's representative, James Goodman, that he knew of an independent third-party buyer who wanted to purchase the Goodman Networks bonds and was able to close on the transaction quickly. Alliance drove the timing, not GIH.

Regarding the price, GIH's representative, James Goodman, felt that the bonds would not sell at full par value. This was based on publicly available trading data. Prior sales of the GNI Bonds were at below the repeated trading value. Goodman thus believed that selling the GNI Bonds at less than repeated trading value was reasonable based on past public sales because something is only worth what a purchaser is willing to pay.

**<u>INTERROGATORY NO. 2:</u>**

Explain in detail and with specificity how the purchase price in the Bond Purchase Agreement 2 was negotiated or arrived at, including who negotiated or discussed the same on Your behalf and who negotiated or discussed the same on behalf of Alliance, how any such discussions or negotiations were undertaken, whether any third-party data was used in any such discussions or negotiations, and whether there was any discussion of a markup or profit or margin or arbitrage in favor of Alliance as part of the same.  If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE: The bond purchase price in Bond Purchase Agreement 2 was negotiated for GIH by James E. Goodman, and for Alliance by Shalom Auerbach. The third-party trading data was used when negotiating the price for the GNI Bonds. There were no discussions of markup, profit, or margin, or arbitrage in favor of Alliance as part of the same.

**<u>INTERROGATORY NO. 3:</u>**

At the time that You entered into the Bond Purchase Agreement 2, were You aware, did You suspect, or had anyone discussed with You, that Alliance would be transferring, selling, reselling, or otherwise conveying the Bonds that it was purchasing from You to the Debtor and, if so, how and why were You aware of or suspected the same and what did you know or understand regarding the same.

RESPONSE: No.

**INTERROGATORY NO. 4:**

At the time that You entered into the Bond Purchase Agreement 2, from what source did You understand or believe that Alliance would obtain the funds needed to pay You under the Bond Purchase Agreement 2, and explain all factual bases for Your understanding or belief of the same.

RESPONSE: At the time GIH entered into the Bond Purchase Agreement 2, GIH was told and understood that Alliance would use exclusively its own independent funds to purchase the GIH Bonds. This agreement was memorialized in the flow of funds memorandum executed contemporaneously with Bond Purchase Agreement 2.

**INTERROGATORY NO. 5:**

At the time that You entered into the Bond Purchase Agreement 2, were you aware of the fact or substance of Bond Purchase Agreement 1 or of the existence of any written or oral agreement or understanding between Alliance and the Debtor regarding or in any way related to the Bonds the subject of Bond Purchase Agreement 2 or whereby the Debtor would be funding the payment to You under Bond Purchase Agreement 2.

RESPONSE: No.

**INTERROGATORY NO. 6:**

Why did You not simply sell, transfer, or otherwise convey the Bonds You held as of February 3, 2022 directly to the Debtor, as opposed to going through Alliance, including whose idea was it to sell the Bonds through an intermediary instead of directly to the Debtor.

RESPONSE: GIH did not approach the Debtor about purchasing the GIH Bonds because it did not believe the Debtor had the funds to purchase them. The idea was never to sell to Alliance as an "intermediary." Rather, Alliance was presented by Frinzi as an independent third-party with funds immediately available to purchase the GIH Bonds.

**INTERROGATORY NO. 7:**

As of the date You entered into the Bond Purchase Agreement 2, state every reason You understood or believed that Alliance was entering into that agreement with You, such as for a profit or gain of a certain amount, or to hold the Bonds, or any other reason, and explain all bases for your understanding or belief regarding the same.  In other words, what did You think Alliance would do with those Bonds once it purchased them?

RESPONSE: Frinzi presented Alliance as an independent third-party buyer with the requisite funds immediately available to purchase the GIH Bonds with a quick closing timeline. At the time of entering into Bond Purchase Agreement 2, Alliance represented to GIH that it was purchasing the GIH Bonds to hold them for investment purposes. Bond Purchase Agreement 2 ¶ 5(b)(x).

**INTERROGATORY NO. 8:**

Identify, as of February 3, 2022, each of Your members, managing members, managers, and officers, including by name and title.

RESPONSE: At the specified time, the sole officer of GIH was James E. Goodman, Jr. James E. Goodman, Jr. and Network Investments, LLC are members of GIH.

**INTERROGATORY NO. 9:**

Identify each person known to You, as of February 3, 2022, involved in any way with the negotiation, drafting, or execution of the Bond Purchase Agreement 2, by name, affiliation, and title, whether on Your behalf or on behalf of any other person, including Alliance, and including any attorneys or advisors for any party.

RESPONSE: James E. Goodman, Jr. as representative for Genesis and Goodman Investment Holdings; Anthony Rao, General Counsel as a representative for Genesis and Goodman Investment Holdings; attorneys at Winstead P.C. representing Genesis and Goodman Investment Holdings and James E. Goodman (Jason Cramer, Billy Rohrlich, Tony Galloway); Baker Botts attorneys representing Alliance (Doug Getten, Thomas Blackwell); Shalom Auerbach as representative of Alliance; Alex McKenzie of San Blas Securities; and Neil Auerbach, Max Klein, and John McMullan at Hudson Clean Energy Enterprises, LLC, which was the agent for Alliance.

**INTERROGATORY NO. 10:**

Explain in detail and with specificity how it was that You learned of Alliance's interest in purchasing Your Bonds, including the role of Frinzi, N. Auerbach, and S. Auerbach regarding the same.

RESPONSE: Frinzi informed James E. Goodman via email dated December 31, 2021 that he knew of an independent third-party purchaser named Shalom Auerbach who was interested in buying the Genesis Bonds. Shalom and James communicated directly and then through their counsel and representatives.

**INTERROGATORY NO. 11:**

Do You as of now agree that the funds used by Alliance to pay You under the Bond Purchase Agreement 2 came from the Debtor and that You are a subsequent transferee of such funds? If You disagree, then state and every reason that You know of now regarding where such funds originated from.

RESPONSE: Yes.

**INTERROGATORY NO. 12:**

Identify each and every transfer made to You for or on account of the Bond Purchase Agreement 2, including by date thereof, mode thereof, amount thereof, and transferor thereof.

RESPONSE: On February 4, 2022, Hudson Clean Energy Enterprises, LLC (agent for Alliance) transferred $10,570,912.00 to GIH's bank account via wire transfer.

**INTERROGATORY NO. 13:**

For each transfer the subject of Interrogatory No. 12, do You agree that, on the date thereof, the amount of the Debtor's liabilities exceeded the value of its assets? If You disagree, then state each and every fact or reason why.

RESPONSE: On a book basis, the Debtor's liabilities exceeded the value of its assets. However, the Debtor had many active deals and had significant goodwill and intangible value that is not accounted for on the books and records of the Debtor.

**INTERROGATORY NO. 14:**

For each transfer the subject of Interrogatory No. 12, state and explain what return consideration You gave or provided to the transferor thereof for such transfer and what the value of such consideration was.

RESPONSE: The consideration under the Bond Purchase Agreement 2 was to provide GNI Bonds held by GIH to the purchaser.

**INTERROGATORY NO. 15:**

As of the date of the Bond Purchase Agreement 2, did You believe that the Debtor would default on the Bonds when they matured later in 2022? If not, then state each reason and explain in detail why You agreed to sell Your Bonds for a discount as opposed to holding them for a few more months for full payment.

RESPONSE: Yes, as of the date of the Bond Purchase Agreement 2, GIH knew there was a likelihood that the Debtor would default on the Bonds when they matured. However, based on past experience, it was also possible that a negotiated settlement could be reached with the bondholders so that the Debtor would not default. GIH sold the GIH Bonds in what it believed to be an independent third-party transaction that would not hurt the Debtor.

**INTERROGATORY NO. 16:**

At the time of each transfer the subject of Interrogatory No. 12, admit that You were a creditor of the Debtor on account of the Bonds.  If You disagree, explain why.

RESPONSE: Yes.


**INTERROGATORY NO. 17:**

For each transfer the subject of Interrogatory No. 12, admit that such transfer was made to You for or on account of antecedent debt owed by the Debtor to You on the date of such transfer in the form of the Bonds.  If You disagree, explain why.

RESPONSE: No.


**INTERROGATORY NO. 18:**

For each transfer the subject of Interrogatory No. 12, do You admit that the Debtor made such transfer to Alliance (as part of a larger transfer to Alliance) for Your benefit.  If You disagree, explain why.

RESPONSE: No, GIH does not admit that the Debtor made any transfer to Alliance for GIH's benefit.


**INTERROGATORY NO. 19:**

For each transfer the subject of Interrogatory No. 12, state what You did with such transfer or what You intended to do with such transfer at the time of Your receipt thereof, including, if applicable, whether you transferred all or a portion of said transfer within ninety (90) days of the receipt thereof to any other person, and identify such person, the transfer to such person by date, amount, mode, and source, and the reason for such transfer.

RESPONSE: GIH objects to this Interrogatory as irrelevant and immaterial to the issues in this proceeding. The information requested has no bearing on the issues in this proceeding. This Interrogatory is an improper and premature request in aid of execution prior to any judgment being entered.


**INTERROGATORY NO. 20:**

Identify, as of February 3, 2022, each broker, broker-dealer, nominee, bank, advisor, administrator, or agent who held any or all of the Bonds for Your benefit.

RESPONSE: As of February 3, 2022, the Bonds were held by Aspireon Wealth Advisors and were then transferred to San Blas Securities shortly before the Bond Purchase Agreement 2 was executed and finalized because Aspireon did not feel comfortable brokering the deal as it was

Appx.0285

not in their typical line of work.

**INTERROGATORY NO. 21:**

Identify any payment or transfer You received from the Indenture Trustee or any other person (but excluding Alliance) for or on account of the Bonds after February 3, 2022, including for interest, and including by date of such payment or transfer and amount.

RESPONSE: None.

# EXHIBIT 13

Randall A. Pulman
Texas State Bar No. 16393250
Anna K. MacFarlane
Texas State Bar No. 24116701
PULMAN, CAPPUCCIO & PULLEN, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

COUNSEL FOR JAMES E. GOODMAN,
GOODMAN INVESTMENT HOLDINGS,
AND GENESIS NETWORKS GLOBAL
SERVICES, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC et al, | § | |
| | § | |
| Defendants. | § | |

**GENESIS NETWORKS GLOBAL SERVICES, LLC'S OBJECTIONS AND RESPONSES
TO TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION TO
DEFENDANT GENESIS NETWORKS GLOBAL SERVICES, LLC**

To:    **SCOTT M. SEIDEL, TRUSTEE BY AND THROUGH HIS COUNSEL OF RECORD**
       Davor Rukavina
       Munsch Hardt Kopf & Harr, P.C.
       4000 Ross Tower
       500 N. Akard Street
       Dallas, Texas 75201

Genesis Networks Global Services, LLC ("Genesis"), a defendant in this Adversary

Proceeding, this its *Objections and Responses to Trustee's First Set of Requests for Production to Defendant Genesis Networks Global Services, LLC* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

DATED this 26th of July, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR GENESIS NETWORKS
GLOBAL SERVICES, LLC**

Appx.0288

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 26th day of July, 2024, he caused a true and correct copy of this document to be served on the following as described below:

***<u>Via e-mail to: drukavina@munsch.com</u>***
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

***<u>Via E-Mail to james@frinzi.net and
Via First Class Mail:</u>***
James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

***<u>Via e-mail to: mcancienne@jlcfirm.com</u>***
Michael Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

***<u>Via E-Mail to Jason.rudd@wickphillips.com</u>***
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/ Randall A. Pulman*
Randall A. Pulman

4892-7299-6039, v. 1 / 6514.005

## OBJECTIONS AND RESPONSES TO
## FIRST SET OF REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**

All Documents and Communications between You and Frinzi regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 2:**

All Documents and Communications between You and S. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 3:**

All Documents and Communications between You and N. Auerbach regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 4:**

All Documents and Communications between You and Alliance at any time.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 5:**

All Documents and Communications between You and any person (not already the subject of Requests No. 1, 2, and 3) regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Genesis objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 6:**

All internal Documents and Communications regarding, related to, or referring to: the Bond Purchase Agreement 1; the Bond Purchase Agreement 2; the GIH Bonds; the Genesis Bonds; N. Auerbach; S. Auerbach; Alliance; or Hudson.

RESPONSE: Genesis objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 7:**

All of Your corporate governance Documents in effect from January 1, 2022 through the present, including any limited liability company agreement, shareholder agreement, bylaws, and manager or member consents or resolutions.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 8:**

Any Document and Communication regarding, related to, or referring to, or review or consulted by You regarding, the price for the Bonds provided for in Bond Purchase Agreement 2.

RESPONSE: Genesis objects to this Request because the documents referred to when negotiating the price of the Bonds are publicly available and thus equally available to the Trustee.

**REQUEST NO. 9:**

Any Document and Communication, between January 1, 2022 and March 1, 2022, regarding, related to, referring to, or mentioning the solvency or insolvency of the Debtor and the ability or inability of the Debtor to pay on the Bonds at the time of their maturity in 2022.

RESPONSE: Genesis objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 10:**

Any Document and Communication related to the price at which the Bonds were trading as of February 3, 2022.

RESPONSE: Genesis objects to this Request because the documents referred to when negotiating the price of the Bonds are publicly available and thus equally available to the Trustee.

**REQUEST NO. 11:**

Any Document and Communication regarding, related to, referring to, or mentioning any attempt, effort, or solicitation by You to sell any of the Bonds You held to any person other than Alliance, or any such Document and Communication from any person to You inquiring into any such sale, at any time prior to February 3, 2022.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 12:**

All Documents and Communications from the Bond Trustee to You regarding, relating to, or referencing the Bonds.

RESPONSE: Genesis objects to this Request because it lacks specificity. Bond Trustee is not defined herein. Based on this objection, no documents will be produced responsive to this Request.

**REQUEST NO. 13:**

All Documents and Communications regarding or evidencing Your ownership of any of the Bonds as of February 3, 2022.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 14:**

Each statement, for January 1, 2022 through June 1, 2022, for each bank account held by You or in Your name or to which You had any access.

RESPONSE: Genesis objects to this request on the grounds that it is overly broad. The Trustee has not established why he needs bank statements for all of Genesis's accounts or why those account statements would be relevant or material to this dispute. Genesis is withholding documents based on the foregoing objection. Genesis will produce the bank statements where the funds were transferred under the Bond Purchase Agreement 2. Genesis is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 15:**

Any Document and Communication regarding relating to, or referencing the receipt by You of any payment pursuant to Bond Purchase Agreement 2.

RESPONSE: Relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 16:**

Any Document and Communication regarding, relating to, or referencing any transfer or payment by You to any person from any of the funds received by You pursuant to Bond Purchase Agreement 2, including on account of any loan or obligation of You to any person.

RESPONSE: Genesis objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 17:**

To the extent that You used any of the funds transferred to You pursuant to Bond Purchase Agreement 2 to pay down or to pay off any debt obligation You had, all Documents evidencing such obligation, including any promissory note, guarantee instrument, security agreement, deed of trust, U.C.C. financing statement, and account control agreement.

RESPONSE: Genesis objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 18:**

All Communications regarding any payment of debt within Request No. 17.

RESPONSE: Genesis objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 19:**

All Documents and Communications between You and any person regarding the transfer of the Bonds to Alliance or to any other person pursuant to Bond Purchase Agreement 2, including to any broker, broker/dealer, administrator, intermediary, or agent holding said Bonds for You, and including any such Documents and Communications with the Debtor regarding the cancellation of the Bonds.

RESPONSE: Genesis objects to this request to the extent that it seeks communications that are protected by the attorney client privilege and documents that are protected by the attorney work product privilege. Privileged communications that are relevant and responsive to this request will be withheld from production and logged and the log will be provided at a mutually agreeable time and place. Relevant responsive non-privileged documents within Genesis's possession, custody,

and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the rolling production of relevant responsive documents on or about August 9, 2024.

**REQUEST NO. 20:**

Your federal tax returns for 2021 and 2022.

RESPONSE: Genesis objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 21:**

Any audit of You or Your financial records for 2022 or any portion thereof.

RESPONSE: Genesis objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 22:**

Your balance sheet for 2022 on an annual, quarterly, and monthly basis, or such other periodic basis as You so maintained it in Your ordinary course of business.

RESPONSE: Genesis objects to this request as irrelevant and immaterial to the issues in this proceeding. The items requested have no bearing on the issues in this proceeding. This request is an improper and premature request in aid of execution prior to any judgment being entered. Requested documents are being withheld based on these objections.

**REQUEST NO. 23:**

All Documents and Communications between You and any person (excluding between You and Your counsel, however) regarding, referring to, relating to, or sent pursuant to, the Temporary Restraining Order or the Preliminary Injunction entered in this Adversary Proceeding.

RESPONSE: Other than documents and communications protected by the attorney-client privilege, relevant responsive documents within Genesis's possession, custody, and control will be produced on a rolling basis. Genesis is currently reviewing a large volume of documents and communications and expects to complete the production of relevant responsive documents on or about August 9, 2024.

4892-7299-6039, v. 1 / 6514.005

# EXHIBIT 14

Randall A. Pulman
Texas State Bar No. 16393250
Anna K. MacFarlane
Texas State Bar No. 24116701
PULMAN, CAPPUCCIO & PULLEN, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

COUNSEL FOR JAMES E. GOODMAN,
GOODMAN INVESTMENT HOLDINGS,
AND GENESIS NETWORKS GLOBAL
SERVICES, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: 23-03090-mvl |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC et al., | § | |
| | § | |
| Defendants. | § | |

## GENESIS NETWORKS GLOBAL SERVICES, LLC'S OBJECTIONS AND RESPONSES TO TRUSTEE'S FIRST SET OF INTERROGATORIES TO DEFENDANT GENESIS NETWORKS GLOBAL SERVICES, LLC

To:   **SCOTT M. SEIDEL, TRUSTEE BY AND THROUGH HIS COUNSEL OF RECORD**
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

Genesis Networks Global Services, LLC ("Genesis"), a defendant in this Adversary

Proceeding, hereby serves upon Scott M. Seidel, Trustee ("Trustee"), its *Responses to Trustee's*

Appx.0296

*First Set of Interrogatories to Defendant Genesis Networks Global Services, LLC*

(the "Responses") pursuant to Rule 33 of the Federal Rules of Civil Procedure as follows.

DATED this 26th of July, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR GENESIS NETWORKS
GLOBAL SERVICES, LLC**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 26th day of July, 2024, he caused a true and correct copy of this document to be served on the following as described below:

***Via e-mail to: drukavina@munsch.com***
Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
4000 Ross Tower
500 N. Akard Street
Dallas, Texas 75201

***Via e-mail to: mcancienne@jlcfirm.com***
Michael Cancienne
Joseph W. Golinkin II
Jordan, Lynch, & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

***Via E-Mail to james@frinzi.net and
Via First Class Mail:***
James Frinzi
3736 Bee Cave Road
Suite 1164
Austin, Texas 78746

***Via E-Mail to Jason.rudd@wickphillips.com***
Jason M. Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/ Randall A. Pulman*
Randall A. Pulman

## OBJECTIONS AND RESPONSES TO FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

State each and every factual reason why You decided to sell Your Bonds pursuant to the Bond Purchase Agreement 2, including with respect to the timing thereof and the reason for a discount from the face amount thereof.  If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE: Genesis had wanted to sell its bonds for several months prior to the execution of Bond Purchase Agreement 2. The timing was driven by James Frinzi telling Genesis' representative, James Goodman, that he knew of an independent third-party buyer who wanted to purchase the Goodman Networks bonds and was able to close on the transaction quickly. Alliance drove the timing, not Genesis.

Regarding the price, Genesis's representative, James Goodman, felt that the bonds would not sell at full par value. This was based on publicly available trading data. Prior sales of the GNI Bonds were below repeated trading value. Goodman thus believed that selling the GNI Bonds at less than repeated trading value was reasonable based on past public sales because something is only worth what a purchaser is willing to pay.

### INTERROGATORY NO. 2:

Explain in detail and with specificity how the purchase price in the Bond Purchase Agreement 2 was negotiated or arrived at, including who negotiated or discussed the same on Your behalf and who negotiated or discussed the same on behalf of Alliance, how any such discussions or negotiations were undertaken, whether any third-party data was used in any such discussions or negotiations, and whether there was any discussion of a markup or profit or margin or arbitrage in favor of Alliance as part of the same.  If You answer that this was Your business judgment, identify each and every fact, reason, or belief You had as of February 3, 2022 You relied on in forming said business judgment.

RESPONSE: The bond purchase price in Bond Purchase Agreement 2 was negotiated for Genesis by James E. Goodman, and Shalom Auerbach for Alliance. The third-party publicly available trading data was used when negotiating the price for the GNI Bonds. There were no discussions of markup, profit, or margin, or arbitrage in favor of Alliance as part of the same.

### INTERROGATORY NO. 3:

At the time that You entered into the Bond Purchase Agreement 2, were You aware, did You suspect, or had anyone discussed with You, that Alliance would be transferring, selling, reselling, or otherwise conveying the Bonds that it was purchasing from You to the Debtor and, if so, how and why were You aware of or suspected the same and what did you know or understand regarding the same.

RESPONSE: No.

**INTERROGATORY NO. 4:**

At the time that You entered into the Bond Purchase Agreement 2, from what source did You understand or believe that Alliance would obtain the funds needed to pay You under the Bond Purchase Agreement 2, and explain all factual bases for Your understanding or belief of the same.

RESPONSE: At the time Genesis entered into the Bond Purchase Agreement 2, Genesis was told and understood that Alliance would use exclusively its own independent funds to purchase the Genesis Bonds. This agreement was memorialized in the flow of funds memorandum executed contemporaneously with Bond Purchase Agreement 2.

**INTERROGATORY NO. 5:**

At the time that You entered into the Bond Purchase Agreement 2, were you aware of the fact or substance of Bond Purchase Agreement 1 or of the existence of any written or oral agreement or understanding between Alliance and the Debtor regarding or in any way related to the Bonds the subject of Bond Purchase Agreement 2 or whereby the Debtor would be funding the payment to You under Bond Purchase Agreement 2.

RESPONSE: No.

**INTERROGATORY NO. 6:**

Why did You not simply sell, transfer, or otherwise convey the Bonds You held as of February 3, 2022 directly to the Debtor, as opposed to going through Alliance, and whose idea was it to sell the Bonds through an intermediary instead of directly to the Debtor.

RESPONSE: Genesis did not approach the Debtor about purchasing the Genesis Bonds because it did not believe the Debtor had the funds to purchase them. The idea was never to sell to Alliance as an "intermediary." Rather, Alliance was presented by Frinzi as an independent third-party with funds immediately available to purchase the Genesis Bonds.

**INTERROGATORY NO. 7:**

As of the date You entered into the Bond Purchase Agreement 2, state every reason You understood or believed that Alliance was entering into that agreement with You, such as for a profit or gain of a certain amount, or to hold the Bonds, or any other reason, and explain all bases for your understanding or belief regarding the same.  In other words, what did You think Alliance would do with those Bonds once it purchased them?

RESPONSE: Frinzi presented Alliance as an independent third-party buyer with the requisite funds immediately available to purchase the Genesis Bonds with a quick closing timeline. At the time of entering into Bond Purchase Agreement 2, Alliance represented to Genesis that it was purchasing the Genesis Bonds to hold them for investment purposes.

**INTERROGATORY NO. 8:**

Identify, as of February 3, 2022, each of Your members, managing members, managers, and officers, including by name and title.

RESPONSE: On February 3, 2022, the sole manager of Genesis was Genesis Networks Enterprises, LLC. James E. Goodman, Jr. is the sole Member.

**INTERROGATORY NO. 9:**

Identify each person known to You, as of February 3, 2022, involved in any way with the negotiation, drafting, or execution of the Bond Purchase Agreement 2, by name, affiliation, and title, whether on Your behalf or on behalf of any other person, including Alliance, and including any attorneys or advisors for any party.

RESPONSE: James E. Goodman, Jr. as representative for Genesis and Goodman Investment Holdings; Anthony Rao as a representative for Genesis and Goodman Investment Holdings; attorneys at Winstead P.C. representing Genesis and Goodman Investment Holdings and James E. Goodman (Jason Cramer, Billy Rohrlich, Tony Galloway); Baker Botts attorneys representing Alliance (Doug Getten, Thomas Blackwell); Shalom Auerbach and as representative of Alliance; Alex McKenzie of San Blas Securities; and Neil Auerbach, Max Klein, and John McMullan at Hudson Clean Energy Enterprises, LLC, which was the agent for Alliance.

**INTERROGATORY NO. 10:**

Explain in detail and with specificity how it was that You learned of Alliance's interest in purchasing Your Bonds, including the role of Frinzi, N. Auerbach, and S. Auerbach regarding the same.

RESPONSE: Frinzi informed James E. Goodman via email dated December 31, 2021 that he knew of an independent third-party purchaser named Shalom Auerbach who was interested in buying the Genesis Bonds. Shalom and James communicated directly and then through their counsel and representatives.

**INTERROGATORY NO. 11:**

Do You as of now agree that the funds used by Alliance to pay You under the Bond Purchase Agreement 2 came from the Debtor and that You are a subsequent transferee of such funds? If You disagree, then state and every reason that You know of now regarding where such funds originated from.

RESPONSE: Yes.

**INTERROGATORY NO. 12:**

Identify each and every transfer made to You for or on account of the Bond Purchase Agreement 2, including by date thereof, mode thereof, amount thereof, and transferor thereof.

RESPONSE: On February 4, 2022, Hudson Clean Energy Enterprises, LLC (agent for Alliance) transferred $561,041.00 to Genesis's bank account via wire transfer.

**INTERROGATORY NO. 13:**

For each transfer the subject of Interrogatory No. 12, do You agree that, on the date thereof, the amount of the Debtor's liabilities exceeded the value of its assets? If You disagree, then state each and every fact or reason why.

RESPONSE: On a book basis, the Debtor's liabilities exceeded the value of its assets. However, the Debtor had many active deals and had significant goodwill and intangible value that is not accounted for on the books and records.

**INTERROGATORY NO. 14:**

For each transfer the subject of Interrogatory No. 12, state and explain what return consideration You gave or provided to the transferor thereof for such transfer and what the value of such consideration was.

RESPONSE: The consideration under the Bond Purchase Agreement 2 was to provide GNI Bonds held by Genesis to the purchaser.

**INTERROGATORY NO. 15:**

As of the date of the Bond Purchase Agreement 2, did You believe that the Debtor would default on the Bonds when they matured later in 2022? If not, then state each reason and explain in detail why You agreed to sell Your Bonds for a discount as opposed to holding them for a few more months for full payment.

RESPONSE: Yes, as of the date of the Bond Purchase Agreement 2, Genesis knew there was a likelihood that the Debtor would default on the Bonds when they matured. However, based on past experience, it was also possible that a negotiated settlement could be reached with the bondholders so that the Debtor would not default. Genesis sold the Genesis Bonds in what it believed to be an independent third-party transaction that would not hurt the Debtor.

**INTERROGATORY NO. 16:**

At the time of each transfer the subject of Interrogatory No. 12, admit that You were a creditor of the Debtor on account of the Bonds. If You disagree, explain why.

RESPONSE: Yes.

Appx.0302

**INTERROGATORY NO. 17:**

For each transfer the subject of Interrogatory No. 12, admit that such transfer was made to You for or on account of antecedent debt owed by the Debtor to You on the date of such transfer in the form of the Bonds.  If You disagree, explain why.

RESPONSE: No.

**INTERROGATORY NO. 18:**

For each transfer the subject of Interrogatory No. 12, do You admit that the Debtor made such transfer to Alliance (as part of a larger transfer to Alliance) for Your benefit.  If You disagree, explain why.

RESPONSE: No, Genesis does not admit that the Debtor made any transfer to Alliance for Genesis's benefit.

**INTERROGATORY NO. 19:**

For each transfer the subject of Interrogatory No. 12, state what You did with such transfer or what You intended to do with such transfer at the time of Your receipt thereof, including, if applicable, whether you transferred all or a portion of said transfer within ninety (90) days of the receipt thereof to any other person, and identify such person, the transfer to such person by date, amount, mode, and source, and the reason for such transfer.

RESPONSE: Genesis objects to this Interrogatory as irrelevant and immaterial to the issues in this proceeding. The information requested has no bearing on the issues in this proceeding. This Interrogatory is an improper and premature request in aid of execution prior to any judgment being entered.

**INTERROGATORY NO. 20:**

Identify, as of February 3, 2022, each broker, broker-dealer, nominee, bank, advisor, administrator, or agent who held any or all of the Bonds for Your benefit.

RESPONSE: As of February 3, 2022, the Bonds were held by Aspireon Wealth Advisors.

**INTERROGATORY NO. 21:**

Did You in fact hold or own $1,600,000.00 of the Bonds on February 3, 2022, directly or indirectly?

RESPONSE: Yes.

**INTERROGATORY NO. 22:**

What did You do with the Bonds you held as of February 3, 2022 or what happened to those Bonds?  If You assert that You transferred them to Alliance, then identify each and every document and communication that You assert evidences the same.  Or, did You ever transfer them to someone else and, if so, who, when, and for what consideration?  Or, do You still hold these Bonds and, if You do, do You agree that they should be delivered to the Debtor for cancellation?

RESPONSE: Per the Bond Purchase Agreement 2, the Bonds should have been transferred to Alliance. However, the Bonds stayed in Genesis's account with Aspireon Wealth Advisors and were ultimately transferred to a Fidelity account in May of 2022.

**INTERROGATORY NO. 23:**

Identify any payment or transfer You received from the Indenture Trustee or any other person (but excluding Alliance) for or on account of the Bonds after February 3, 2022, including for interest, and including by date of such payment or transfer and amount.

RESPONSE: Genesis received an interest payment on April 15, 2022 in the amount of $64,000.00.

# EXHIBIT 15



Ross Tower
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6605
Main 214.855.7500
Fax 214.855.7584
munsch.com

Conor White
Direct Dial 214.880.1085
cwhite@munsch.com

November 8, 2024

***Via Electronic Mail***
Randy Pulman
Anna MacFarlane
Pulman, Cappuccio & Pullen, LLP
2161 NW Military Hwy, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

     Re:     *Seidel v. Hudson Clean Energy Enterprises, LLC, et al.*, No. 23-03090 (Bankr. N.D. Tex.)

Dear Randy and Anna:

I write on behalf of Scott M. Seidel, the chapter 7 trustee (the "<u>Trustee</u>") of Goodman Networks, Inc. (the "<u>Debtor</u>") and plaintiff in the above-referenced adversary proceeding (the "<u>Adversary Proceeding</u>"), to address various deficiencies and improper objections by James E. Goodman ("<u>James</u>"), Goodman Investment Holdings, LLC n/k/a Symbiont Ventures, LLC ("<u>GIH</u>"), and Genesis Networks Global Services, LLC ("<u>Genesis Global</u>," collectively, the "<u>Defendants</u>") in connection with their responses to the Trustee's interrogatories and requests for production.

In particular, the Defendants must amend their responses and produce documents to the extent and for the reasons set forth below, by no later than **November 20, 2024**.  In the meantime, I stand ready and willing to discuss these issues and reach a mutual resolution.  In the event we cannot reach an agreement, the Trustee will seek appropriate relief from the Court.

**A.**    ***Heller v. City of Dallas* sets out the standards for responding to discovery in the Northern District of Texas.**

Judge Horan's opinion in *Heller v. City of Dallas*, 303 F.R.D. 466, 486–88 (N.D. Tex. 2014), provides the most detailed and comprehensive analysis available concerning discovery obligations in the Northern District of Texas.  It also represents the most compelling authority on the topic.  During the past ten years, courts have cited this opinion 310 times, including 156 times in the Northern District of Texas alone.

The following admonitions, among others, bear upon the Trustee's concerns with respect to the Defendants' discovery responses:

> So-called boilerplate or unsupported objections—even when asserted in response to a specific discovery request and not as part of a general list of generic objections preceding any responses to specific discovery requests—are … improper and ineffective and may rise (or fall) to the level of what the Fifth Circuit has described as "an all-too-common example of

the sort of 'Rambo tactics' that have brought disrepute upon attorneys and the legal system."

* * *

A party served with written discovery must fully answer each interrogatory or document request to the full extent that it is not objectionable and affirmatively explain what portion of an interrogatory or document request is objectionable and why, affirmatively explain what portion of the interrogatory or document request is not objectionable and the subject of the answer or response, and affirmatively explain whether any responsive information or documents have been withheld.

* * *

[R]esponding to a document request or interrogatory "subject to" and "without waiving" objections is not consistent with the Federal Rules or warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

* * *

If a discovery request is overbroad, the responding party must, to comply with Rule 33 or Rule 34, explain the extent to which it is overbroad and answer or respond to the extent that it is not—and explain the scope of what the responding party is answering or responding to.

* * *

Similarly, if answering or responding to a discovery request would impose an undue burden, the responding party must, as discussed below, properly substantiate that assertion and then should only answer or respond to the part or extent, if any, of the request that would not involve an undue burden.

*Heller*, 303 F.R.D. at 483-89 (citations omitted).  As set forth below, the Defendants' discovery response fail to comply with these straightforward mandates.

**B.    The Defendants makes numerous unsubstantiated boilerplate objections on the basis of overbreadth and relevance.**

James gave numerous responses to requests for production that the requests are overly broad, irrelevant, and that the Trustee has not established why the requested communications are relevant or material to the dispute.  In response to four discovery requests,[1] James asserts the following boilerplate objection:

---

[1] *See* James's responses to RFP Nos. 13, 14, 15, 19.  The Trustee notes that the same objection is lodged in Goodman's response to RFP No. 16, but includes an objection on attorney client privilege.  To the extent any non-privileged documents exist, or any documents include the privilege held by the Debtor, the Trustee also

> Goodman objects to this request because it is overly broad and irrelevant. The Trustee has not established why all communications between Goodman and [the third party] regarding the Debtor are relevant or material to this dispute. Documents are being withheld from production based on the foregoing objection.

Additionally, in response to twelve requests for production issued to GIH and Genesis,[2] GIH and Genesis lodged substantially similar boilerplate responses on the basis of overbreadth and relevance. But the Defendants did not, for example, "explain the extent to which [each request] is overbroad" or disproportionate. *See id.* at 488. The Defendants did not "explain the scope of what the responding party is answering or responding to …." *See id.* And they did not "properly substantiate" their undue burden claims. *See id.* at 489. The Trustee therefore requires the Defendants to amend their written responses either to omit these objections or to properly substantiate them. "A party resisting discovery must show **specifically** how each interrogatory or document request is overly broad, unduly burdensome, or oppressive." *Id.* at 490 (emphasis added).

As to the assertion that documents may be withheld on the basis of relevance, the Trustee disagrees that any request is irrelevant, and "an opposing party cannot unilaterally decide what is relevant …." *Smith v. BNSF Railway Co.*, 17-cv-0977-KMT, 2018 WL 11436420, *5 (D. Colo. March 28, 2018) (citing, *inter alia*, *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1192 (10th Cir. 2009), for the proposition that "[A] party should not be limited by its opponent's theory of the case in determining what is discoverable", and *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 926 (8th Cir. 2014), for the proposition that "parties do not 'possess the unilateral ability to dictate the scope of discovery based on their own view of the parties' respective theories of the case'"); *Marshall v. The Billings Clinic*, CV-14-93-BLG-SPW-CSO, 2015 WL 7574758, *4 (D. Mont. Nov. 25, 2015) ("no party may unilaterally decide what is relevant and produce on those documents she chooses to produce"). Furthermore, the fact "[t]hat a requested document or information will not be admissible **or relevant to the merits of a claim or defense is not a proper objection** to discovery of the document or information under the Federal Rules if the discovery request is reasonably calculated to lead to the discovery of admissible evidence." *Heller*, 303 F.R.D. at 489 (emphasis added).

Accordingly, the Trustee requires the Defendants produce responsive documents as a result of any amended discovery responses with respect to the overbreadth and relevance objections to the extent the Defendants indicated documents were being withheld in his Responses.

---

seeks production of those documents. The Trustee makes the same request as to any potentially non-privileged documents as noted in James's responses to RFP Nos. 4 and 12; Genesis's responses to RFP Nos. 5, 9, 19, and 23; and GIH's responses to RFP Nos. 5, 6, 9, and 19.

[2] *See* Genesis's responses to RFP Nos. 16, 17, 18, 20, 21, and 22; GIH's responses to RFP Nos. 16, 17, 18, 20, 21, and 22.

Randy Putnam
November 8, 2024
Page 4

C.    **The Defendants improperly withheld documents and Interrogatory responses on the basis of improper and premature discovery in the aid of execution.**

In response to sixteen of the Trustee's requests for production[3] and two of the Trustee's Interrogatories,[4] the Defendants object that the requests are "an improper and premature request in aid of execution prior to any judgment being entered."  The Trustee interprets these objections to mean that the Defendants assert the requested documents and communications are only discoverable pursuant to a request under Federal Rule of Civil Procedure 69(a)(2).  However, this argument is unavailing.  Federal Rule of Civil Procedure 34 provides that a party may serve "on any other party a request within the scope of Rule 26(b)," including a request for any "designated documents or electronically stored information."  Fed. R. Civ. P. 34(a).  Federal Rule of Civil Procedure 33(a)(2) likewise provides that an interrogatory "may relate to any matter that may be inquired into under Rule 26(b)."  Fed. R. Civ. P. 33(a)(2).

Rule 26 clarifies that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Relevant information encompasses "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  At the core of this Adversary Proceeding is the systematic and persistent transfer of the Debtor's assets to third parties, in an apparent effort to shield the flow of funds from creditors.  Where those funds subsequently went are fundamentally related to the Trustee's claims in the Adversary Proceeding.

Nothing in Rules 26, 33 or 34 provides that certain types of discoverable information are only discoverable as part of post-judgment discovery pursuant to Rule 69.  If anything, Rule 69 is merely an extension of Rules 33 and 34 as "Rule 69 allows post-judgment discovery to proceed according to the federal rules governing **pre-trial discovery**."  *Natural Gas Pipeline Co. of America v. Energy Gathering, Inc.*, 2 F.3d 1397, 1405 (5th Cir. 1993) (emphasis added).

Rules 33 and 34 properly encompass information that "bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case" regardless of whether such information may be used in aid of execution of an eventual judgment.  *See Oppenheimer Fund*, 437 U.S. at 351.  The Northern District of Texas explained, in ruling on a pre-trial discovery request under Rule 34, that:

> [T]he distinction [the responding party] attempts to draw between tracing expenditures for the purpose of imposing a constructive trust versus establishing expenditures as an element of a TUFTA claim is one without a difference….  In other words, a creditor must prove a fraudulent transfer to either recover under TUFTA or impose a constructive trust—discovery used to trace the proceeds involved in such transfers (including the exchange for other assets) simply provides the means by which the fraudulent transfer can be remedied.  The information sought by the

---

[3] *See* James's responses to RFP Nos. 20, 21, 22, and 23; Genesis's responses to RFP Nos. 16, 17, 18, 20, 21, and 22; GIH's responses to RFP Nos. 16, 17, 18, 20, 21, and 22.

[4] *See* Genesis's response to Interrogatory No. 19; GIH's response to Interrogatory No. 19.

Appx.0308

Receiver is clearly relevant to his claims asserted herein and proportional to the needs of the case, as it directly impacts issues central to the resolution of the parties' claims and defenses.

*Janvey v. Proskauer Rose LLP*, Case No. 3:13-CV-477-N-BG, 2017 WL 11499756, at *6 (N.D. Tex. June 19, 2017). In this Adversary Proceeding, the Trustee seeks recovery of funds under a theory of fraudulent transfer, as in the *Janvey* case.

Moreover, as a practical matter, the Trustee directs the Defendants to the Court's prior ruling on the Trustee's *Motion to Compel Written Discovery Responses and Production of Documents from 18920 NW 11th, LLC, Steven Zakharyayev, and Evelina Pinkhasova* in Adversary Proceeding No. 23-03072 [18920 Docket No. 49] (the "18920 Motion to Compel"). In the subject of the 18920 Motion to Compel, the responding parties lodged objections to substantially similar requests for information related to subsequent transfers by the responding parties. The Trustee required those responses to be amended and documents produced in accordance with the requests as written. At the hearing on the 18920 Motion to Compel, the Court indicated that the Trustee had the right to seek the requested information given the nature of the claims, the nature of which the Trustee asserts are substantially similar here, and subsequently entered its *Order Granting in Part and Denying in Part Trustee's Motion to Compel Written Discovery Responses and Production of Documents from 18920 NW 11th, LLC, Steven Zakharyayev, and Evelina Pinkhasova* [18920 Docket No. 58] granting the Trustee his requested relief as it related to information on subsequent transfers.

For all of these reasons, the Trustee asserts that withholding of the requested documents on the basis of overbreadth, relevance, and improper or premature requests in aid of execution are unavailing. Accordingly, the Trustee requires that the Defendants amend their responses and produce the withheld documents as indicated in their Responses.

**D.    James inappropriately failed to respond to an Interrogatory on the basis that it called for a legal conclusion.**

In response to Interrogatory Number 6, James failed to respond to the interrogatory on the basis that the Interrogatory called for a legal conclusion. Interrogatory Number 6 commanded James to answer whether he believed "that the Debtor was insolvent on February 3, 2022 (meaning did you believe it at the time), as 'insolvent' is defined in section 101 of the Bankruptcy Code, and explain the basis for such belief as of such date." James's response explained that at the "time the Bond Purchase Agreement 2 was executed, Goodman did not know what the Bankruptcy Code had to say about insolvency."

The text of Federal Rule of Civil Procedure 33(a)(2) is clear: an "interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of fact to law to fact." Fed. R. Civ. P. 33(a)(2). This is precisely what Interrogatory Number 6 calls for. As requested here, "opinion and contention interrogatories are used routinely." *See In re Adkins Supply Co.*, 555 B.R. 579, 591 (Bankr. N.D. Tex. 2016). In fact, an objection to an interrogatory on the basis that it may call for a legal conclusion is "per se improper under the Rules." *Eubank v. Lockhart Independent School District*, A-15-CV-1019-RP-ML, 2016 WL 11214437, at *3 (W.D. Tex. Nov. 8, 2016). A party cannot "undeservedly refuse[] to answer because the answers will include legal conclusion," as such an objection is "baseless under Rule 33." *Id.*

Accordingly, the Trustee requires James to amend his response to Interrogatory Number 6 to identify and explain whether he believed, as of February 3, 2022, the Debtor was insolvent given his understanding of the Debtor's finances and the definition provided in section 101 of the Bankruptcy Code.

**E.     The Defendants gave incomplete answers to numerous interrogatories.**

As Judge Horan observed in *Heller*, "Rule 33(b)(3) requires that the responding party must answer each interrogatory 'to the extent it is not objected to.'" *Heller*, 303 F.R.D. at 487) (citing Fed. R. Civ. P. 33(b)(3)). "The responding party 'must provide true, explicit, responsive, complete, and candid answers to interrogatories.'" *Lakeland Partners, LLC v. U.S.*, 88 Fed. Cl. 124, 132 (Ct. Fed. Cl. 2009) (quoting *Hansel v. Shell Oil Corp.*, 169 F.R.D. 303, 305 (E.D. Pa. 1996)). "Interrogatories 'should be answered directly and without evasion in accordance with information that the answering party possesses after due inquiry.'" *Id.* (quoting 8A Wright, Miller & Marcus, Federal Practice and Procedure, § 2177 (2d ed. 1994)). Furthermore, "**an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond**." Fed. R. Civ. P. 37(a)(4) (emphasis added).

The Defendants did not object to any of the following interrogatories (and therefore waived any objections) but nevertheless failed to provide complete answers:

> **INTERROGATORY NO. 17 [to Genesis]**: For each transfer the subject of Interrogatory No. 12, admit that such transfer was made to You for or on account of antecedent debt owed by the Debtor to You on the date of such transfer in the form of the Bonds. If You disagree, explain why.
>
> **RESPONSE**: No.
>
> - The interrogatory response provides no explanation as to why Genesis disagrees with the contention.
>
> **INTERROGATORY NO. 18 [to Genesis]**: For each transfer the subject of Interrogatory No. 12, do You admit that the Debtor made such transfer to Alliance (as part of a larger transfer to Alliance) for Your benefit. If You disagree, explain why.
>
> **RESPONSE**: No, Genesis does not admit that the Debtor made any transfer to Alliance for Genesis's benefit.
>
> - The interrogatory response provides no explanation as to why Genesis disagrees with the contention.
>
> **INTERROGATORY NO. 17 [to GIH]**: For each transfer the subject of Interrogatory No. 12, admit that such transfer was made to You for or on account of antecedent debt owed by the Debtor to You on the date of such transfer in the form of the Bonds. If You disagree, explain why.
>
> **RESPONSE**: No.

- The interrogatory response provides no explanation as to why GIH disagrees with the contention.

**INTERROGATORY NO. 18 [to GIH]**:  For each transfer the subject of Interrogatory No. 12, do You admit that the Debtor made such transfer to Alliance (as part of a larger transfer to Alliance) for Your benefit.  If You disagree, explain why.

**RESPONSE**: No, GIH does not admit that the Debtor made any transfer to Alliance for GIH's benefit.

- The interrogatory response provides no explanation as to why Genesis disagrees with the contention.

The Defendants must amend their answers to these interrogatories to cure these deficiencies. Otherwise the Trustee reserves the right to file a motion to compel and seek sanctions.

**F.    The Trustee Reserves all rights.**

This letter sets for the Trustee's principal issues with the Defendants' discovery responses, but it does not constitute a comprehensive list.  In the event the issues described herein are not resolved promptly to the Trustee's satisfaction, the Trustee will file a motion to compel, which may include more detailed allegations of discovery abuse.  Nonetheless, the undersigned remains ready and willing to discuss potential resolution of the above-detailed deficiencies in an effort to resolve these issues without the need to invoke the Court's authority.

Sincerely,

/s/ Conor P. White

Conor P. White

Cc:    Jason Rudd (jason.rudd@wickphillips.com)
Paul Elkins (paul.elkins@wickphillips.com)
Brittainie Zinsmeyer (bzinsmeyer@jlcfirm.com)
Michael Cancienne (mcancienne@jlcfirm.com)
Leslie Hyman (lhyman@pulmanlaw.com)

# EXHIBIT 16

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No.  23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S SECOND SET OF REQUESTS FOR PRODUCTION TO
## DEFENDANT JAMES GOODMAN

To:   Defendant, James Goodman, by and through hisd attorneys of record, Randall A. Pulman,
Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio,
Texas 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon James Goodman ("Goodman"), a defendant in this Adversary Proceeding, this his *Trustee's Second Set of Requests for Production to Defendant James Goodman* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I.    INSTRUCTIONS

1.    These Requests are intended to cover all information, documents, and things in Your possession, custody, or control. A document or thing is deemed to be in Your possession, custody, or control, if:

   a. It is in Your physical control or possession; or

   b. It is in the physical control or possession of any other person or entity, and You, individually or otherwise

      i. Own the document or thing in whole or in part;

      ii. Have a right by contract, statute, or otherwise, to use, inspect, examine, or copy that document or thing on any terms; or

      iii. Have, as a practical matter, been able to use, inspect, examine, or copy that document or thing when You have sought to do so.

2.    Unless otherwise indicated, references in these requests to You or any party, business organization, or other legal entity specifically includes all of that entity's present or former employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

3.    If any portion of any document, electronically stored information, or tangible thing is responsive to any Request, then the entire document, electronically stored information, or tangible thing must be produced. Documents and electronically stored information shall be produced in the order in which they are found in your files. Documents that are found stapled, clipped, or otherwise fastened shall be produced in such form.

4.      In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

5.      If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

6.      Requests for production "may specify the form or forms in which electronically stored information is to be produced."  Fed. R. Civ. P. 34(b)(1)(C).  Accordingly, ESI must be produced as follows:

a.      ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

i.      E-mail: E-mail and other electronic messages (*e.g.*, instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container.  Other email files should be produced as .eml or in .mbox format.

ii.     Electronic documents. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business.  All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii) spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.*, non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

      iii.      <u>Electronic audio recordings, photographs or images</u>: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

      b.      Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native PDF format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic document including family relationship data. Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format. Other documents may be requested to be produced in their native format if necessary.

7.      You must serve your responses to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

| | |
|---|---|
| Munsch Hardt Kopf & Harr, P.C. | Munsch Hardt Kopf & Harr, P.C. |
| Attn: Davor Rukavina | Attn: Julian Vasek |
| 500 N. Akard Street, Suite 4000 | 500 N. Akard Street, Suite 4000 |
| Dallas, Texas 75201 | Dallas, Texas 75201 |
| drukavina@munsch.com | jvasek@munsch.com |

## II.   <u>DEFINITIONS</u>

8.      "<u>18920</u>" means 18920 NW 11th, LLC, and includes any person known to You to have been acting for it or on its behalf as its agent, including any member, manager, attorney, or agent thereof.

9.      "<u>And</u>" and "<u>or</u>" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

10.      "<u>Communication</u>" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation,

written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

11.    "Computer data" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

12.    "Debtor" means Goodman Networks, Inc.

13.    "Document(s)" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated. "Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in

whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

14.    "Electronic information system" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

15.    "Electronic storage device" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

16.    "ESI" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

17.     "<u>File</u>" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

18.     "<u>Frinzi</u>" means James Frinzi.

19.     "<u>GDMN</u>" means GDMN Family Investments 2, LLC and includes any person or agent acting or known by You to be acting for it or on its behalf.

20.     "<u>GNET</u>" means GNET ATC, LLC.

21.     "<u>Including</u>" means 'including but not limited to', and is not restrictive or limiting.

22.     "<u>JJCP</u>" means JJC & People LLC and includes any person or agent acting or known by You to be acting for it or on its behalf.

23.     "<u>People</u>" means People NQ Inc. and includes any person or agent acting or known by You to be acting for it or on its behalf.

24.     "<u>Person</u>" or "<u>persons</u>" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

25.     "<u>Pinkhasova</u>" means Evelina Pinkhasova.

26.     "<u>Purchase Agreements</u>" means those certain *Share Purchase Agreement* dated on or about March 9, 2022 between each of the Sellers and 18920.

27.     "<u>Sellers</u>" means People, JJCP, and GDMN.

28.     "<u>Transaction Shares</u>" shall mean the stock the subject of the Purchase Agreements.

29.     "<u>Transfer</u>" shall have the same meaning as defined by 11 U.S.C. § 101(54). In particular, Transfer shall mean any creation of a lien, retention of title as a security interest, foreclosure of a debtor's equity of redemption, or each mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing or parting with property or an interest in property.

30.     "<u>You</u>" and "<u>your</u>" shall mean Goodman.

31.     "<u>Zakharyayev</u>" means Steven Zakharyayev.

### III.     <u>SECOND SET OF REQUEST FOR PRODUCTION</u>

**REQUEST NO. 22:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30, including any drafts or other copies thereof.

RESPONSE:


**REQUEST NO. 23:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:


**REQUEST NO. 24:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreements), including any portion(s) thereof.

RESPONSE:


**REQUEST NO. 25:**

All statements from January 1, 2022 to present for any and all bank and other financial accounts into which any portion(s) of the "Purchase Price" (as defined in the Purchase Agreements) was(were) initially or subsequently deposited.

RESPONSE:


**REQUEST NO. 26:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-

98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE:

**REQUEST NO. 27:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE:

**REQUEST NO. 28:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000467-496 and GOODMAN_A-1-00000587-616, including any drafts or other copies thereof.

RESPONSE:

**REQUEST NO. 29:**

Executed copies of the documents produced at GOODMAN_A-1-00000467-496 and GOODMAN_A-1-00000587-616.

RESPONSE:

**REQUEST NO. 29:**

All engagement letters with Winstead P.C. that govern or are otherwise related to the attorney-client relationship pursuant to which You and/or the Sellers withheld the Documents and Communications described in the privilege log produced to the Trustee in this adversary proceeding.

RESPONSE:

**REQUEST NO. 30:**

All Communications transmitting or discussing to the documents produced at GOODMAN_A-1-00000146,   GOODMAN_A-1-00000197,   GOODMAN_A-1-00000216, GOODMAN_A-1-00000218,   GOODMAN_A-1-00000261,   GOODMAN_A-1-00000296, GOODMAN_A-1-00000314,   GOODMAN_A-1-00000366,   GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE:

**REQUEST NO. 31:**

All Communications between James E. Goodman and James S. "Jake" Goodman related to the transaction contemplated by the Purchase Agreement.

RESPONSE:

DATED this 21st day of August, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:   /s/ *Julian P. Vasek*
        Davor Rukavina, Esq.
        Texas Bar No. 24030781
        Thomas D. Berghman, Esq.
        Texas Bar No. 24082683
        Julian P. Vasek, Esq.
        Texas Bar No. 24070790
        Conor P. White, Esq.
        Texas Bar No. 24125722
        500 N. Akard Street, Suite 4000
        Dallas, Texas  75201-6659
        Telephone: (214) 855-7500
        Email: drukavina@munsch.com
                   tberghman@munsch.com
                   jvasek@munsch.com
                   cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 21st day of August, 2024, he caused a true and correct copy of this document to be served via email on the following counsel of record:

Michael Cancienne
Jordan, Lynch, & Cancienne PLLC
mcancienne@jlcfirm.com

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
rpulman@pulmanlaw.com

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
jason.rudd@wickphillips.com

By: *Julian P. Vasek*
    Julian P. Vasek, Esq.

# EXHIBIT 17

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No.  23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S SECOND SET OF REQUESTS FOR PRODUCTION TO
## DEFENDANT PEOPLE NQ INC.

To:   Defendant, People NQ Inc., by and through its attorneys of record, Randall A. Pulman,
      Esq., Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San
      Antonio, TX 78213.

---

Appx.0323

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves

upon People NQ Inc. ("People"), the defendant in this Adversary Proceeding, this his *Trustee's*

*Corrected Second Set of Requests for Production to Defendant People NQ Inc* (the "Requests")

pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I.  INSTRUCTIONS

1.     These Requests are intended to cover all information, documents, and things in

Your possession, custody, or control. A document or thing is deemed to be in Your possession,

custody, or control, if:

    a. It is in Your physical control or possession; or

    b. It is in the physical control or possession of any other person or entity, and You,
    individually or otherwise

        i. Own the document or thing in whole or in part;

        ii. Have a right by contract, statute, or otherwise, to use, inspect, examine, or
        copy that document or thing on any terms; or

        iii. Have, as a practical matter, been able to use, inspect, examine, or copy that
        document or thing when You have sought to do so.

2.     Unless otherwise indicated, references in these requests to You or any party,

business organization, or other legal entity specifically includes all of that entity's present or

former employees, officers, directors, agents, representatives, members, attorneys, departments,

sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

3.     If any portion of any document, electronically stored information, or tangible thing

is responsive to any Request, then the entire document, electronically stored information, or

tangible thing must be produced.  Documents and electronically stored information shall be

produced in the order in which they are found in your files.  Documents that are found stapled,

clipped, or otherwise fastened shall be produced in such form.

4.      In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

5.      If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

6.      Requests for production "may specify the form or forms in which electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(C).  Accordingly, ESI must be produced as follows:

     a.      ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

       i.      <u>E-mail</u>: E-mail and other electronic messages (*e.g.*, instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container.  Other email files should be produced as .eml or in .mbox format.

       ii.      <u>Electronic documents</u>. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business.  All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii) spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.*, non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

---

TRUSTEE'S SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT PEOPLE NQ INC.—Page 3

iii.　　　Electronic audio recordings, photographs or images: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

b.　　　Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native PDF format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic document including family relationship data.  Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format.  Other documents may be requested to be produced in their native format if necessary.

7.　　　You must serve your responses to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

Munsch Hardt Kopf & Harr, P.C.　　　　　Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina　　　　　　　　　　Attn: Julian Vasek
500 N. Akard Street, Suite 4000　　　　　　500 N. Akard Street, Suite 4000
Dallas, Texas 75201　　　　　　　　　　　Dallas, Texas 75201
drukavina@munsch.com　　　　　　　　　jvasek@munsch.com

## II.　　DEFINITIONS

8.　　　"18920" means 18920 NW 11th, LLC, and includes any person known to You to have been acting for it or on its behalf as its agent, including any member, manager, attorney, or agent thereof.

9.　　　"And" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

10.　　"Communication" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted

messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

11.     "Computer data" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

12.     "Debtor" means Goodman Networks, Inc.

13.     "Document(s)" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated. "Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in

whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

14.    "Electronic information system" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

15.    "Electronic storage device" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

16.    "ESI" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

17.    "<u>File</u>" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

18.    "<u>Financial Document</u>" means any document related to or evidencing the financial condition of a company, including a financial statement, cash flow statement, balance sheet, or income statement, whether internal or created for or provided to a third person.

19.    "<u>Frinzi</u>" means James Frinzi.

20.    "<u>GNET</u>" means GNET ATC, LLC.

21.    "<u>Goodman</u>" means James Goodman.

22.    "<u>Including</u>" means 'including but not limited to', and is not restrictive or limiting.

23.    "<u>Person</u>" or "<u>persons</u>" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

24.    "<u>Pinkhasova</u>" means Evelina Pinkhasova.

25.    "<u>Purchase Agreement</u>" means that certain *Share Purchase Agreement* dated on or about March 9, 2022 between You and 18920.

26.    "<u>Transaction Shares</u>" shall mean the stock the subject of the Purchase Agreement.

27.    "<u>Transfer</u>" shall have the same meaning as defined by 11 U.S.C. § 101(54). In particular, Transfer shall mean any creation of a lien, retention of title as a security interest, foreclosure of a debtor's equity of redemption, or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with property or an interest in property.

28.     "<u>You</u>" and "<u>your</u>" shall mean People and its present and former parents, subsidiaries, affiliates, agents, employees, representatives, assigns, attorneys, predecessors-in-interest, and all other natural persons or businesses or legal entities, presently or previously, acting on behalf of it.

29.     "<u>Zakharyayev</u>" means Steven Zakharyayev.

### III.     <u>SECOND SET OF REQUEST FOR PRODUCTION</u>

**<u>REQUEST NO. 27</u>:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE:

**<u>REQUEST NO. 28</u>:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:

**<u>REQUEST NO. 29</u>:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE:

**<u>REQUEST NO. 30</u>:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE:


**REQUEST NO. 31:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreement), including any portion(s) thereof.

RESPONSE:


**REQUEST NO. 32:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:


DATED this 21st day of August, 2024.

<div style="margin-left: 40%;">

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Julian P. Vasek*
_____
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Email: drukavina@munsch.com
        tberghman@munsch.com
        jvasek@munsch.com
        cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

</div>

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, on the 21st day of August, 2024, he caused a true and correct copy of this document to be served via email on the following counsel of record:

Michael Cancienne
Jordan, Lynch, & Cancienne PLLC
mcancienne@jlcfirm.com

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
rpulman@pulmanlaw.com

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
jason.rudd@wickphillips.com

By: *Julian P. Vasek*
    Julian P. Vasek, Esq.

# EXHIBIT 18

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT JJC & PEOPLE LLC

To:     Defendant, JJC & People, LLC, by and through its attorneys of record, Randall A. Pulman, Esq., Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, TX 78213.

TRUSTEE'S CORRECTED SECOND SET OF REQUESTS FOR PRODUCTION
TO DEFENDANT JJC & PEOPLE, LLC—Page 1

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon JJC & People LLC ("JJCP"), a defendant in this Adversary Proceeding, this his *Trustee's Corrected Second Set of Requests for Production to Defendant JJC & People, LLC* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I.   INSTRUCTIONS

1.     These Requests are intended to cover all information, documents, and things in Your possession, custody, or control. A document or thing is deemed to be in Your possession, custody, or control, if:

    a.  It is in Your physical control or possession; or

    b.  It is in the physical control or possession of any other person or entity, and You, individually or otherwise

        i.  Own the document or thing in whole or in part;

        ii.  Have a right by contract, statute, or otherwise, to use, inspect, examine, or copy that document or thing on any terms; or

        iii.  Have, as a practical matter, been able to use, inspect, examine, or copy that document or thing when You have sought to do so.

2.     Unless otherwise indicated, references in these requests to You or any party, business organization, or other legal entity specifically includes all of that entity's present or former employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

3.     If any portion of any document, electronically stored information, or tangible thing is responsive to any Request, then the entire document, electronically stored information, or tangible thing must be produced.  Documents and electronically stored information shall be produced in the order in which they are found in your files.  Documents that are found stapled, clipped, or otherwise fastened shall be produced in such form.

4.      In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

5.      If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

6.      Requests for production "may specify the form or forms in which electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(C). Accordingly, ESI must be produced as follows:

     a.      ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

       i.      E-mail: E-mail and other electronic messages (*e.g.*, instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container. Other email files should be produced as .eml or in .mbox format.

       ii.     Electronic documents. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business. All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii) spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.*, non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

---

TRUSTEE'S CORRECTED SECOND SET OF REQUESTS FOR PRODUCTION
TO DEFENDANT JJC & PEOPLE, LLC—Page 3

      iii.     <u>Electronic audio recordings, photographs or images</u>: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

    b.    Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native PDF format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic document including family relationship data. Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format. Other documents may be requested to be produced in their native format if necessary.

7.    You must serve your responses to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

<div align="center">

Munsch Hardt Kopf & Harr, P.C.        Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina                Attn: Julian Vasek
500 N. Akard Street, Suite 4000    500 N. Akard Street, Suite 4000
Dallas, Texas 75201                 Dallas, Texas 75201
drukavina@munsch.com           jvasek@munsch.com

</div>

## II.   <u>DEFINITIONS</u>

8.    "<u>18920</u>" means 18920 NW 11th, LLC, and includes any person known to You to have been acting for it or on its behalf as its agent, including any member, manager, attorney, or agent thereof.

9.    "<u>And</u>" and "<u>or</u>" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

10.    "<u>Communication</u>" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation,

written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

11.    "Computer data" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

12.    "Debtor" means Goodman Networks, Inc.

13.    "Document(s)" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated. "Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in

whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

14.  "Electronic information system" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

15.  "Electronic storage device" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

16.  "ESI" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

17.     "<u>File</u>" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

18.     "<u>Financial Document</u>" means any document related to or evidencing the financial condition of a company, including a financial statement, cash flow statement, balance sheet, or income statement, whether internal or created for or provided to a third person.

19.      "<u>Frinzi</u>" means James Frinzi.

20.     "<u>GNET</u>" means GNET ATC, LLC.

21.     "<u>Goodman</u>" means James Goodman.

22.     "<u>Including</u>" means 'including but not limited to', and is not restrictive or limiting.

23.      "<u>Person</u>" or "<u>persons</u>" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

24.     "<u>Pinkhasova</u>" means Evelina Pinkhasova.

25.     "<u>Purchase Agreement</u>" means that certain *Share Purchase Agreement* dated on or about March 9, 2022 between You and 18920.

26.     "<u>Transaction Shares</u>" shall mean the stock the subject of the Purchase Agreement.

27.      "<u>Transfer</u>" shall have the same meaning as defined by 11 U.S.C. § 101(54). In particular, Transfer shall mean any creation of a lien, retention of title as a security interest, foreclosure of a debtor's equity of redemption, or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with property or an interest in property.

28.      "You" and "your" shall mean JJCP and its present and former parents, subsidiaries, affiliates, agents, employees, representatives, assigns, attorneys, predecessors-in-interest, and all other natural persons or businesses or legal entities, presently or previously, acting on behalf of it.

29.      "Zakharyayev" means Steven Zakharyayev.

## III.    SECOND SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 27:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE:

**REQUEST NO. 28:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:

**REQUEST NO. 29:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE:

**REQUEST NO. 30:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE:

**REQUEST NO. 31:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreement), including any portion(s) thereof.

RESPONSE:

**REQUEST NO. 32:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:

**REQUEST NO. 33:**

All Documents and Communications pursuant to which James E. Goodman had authority to act on Your behalf in connection with the transaction contemplated by the Purchase Agreement.

RESPONSE:

**REQUEST NO. 34:**

All Communications between James E. Goodman and James S. "Jake" Goodman related to the transaction contemplated by the Purchase Agreement.

RESPONSE:

DATED this 21st day of August, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ *Julian P. Vasek*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
tberghman@munsch.com
jvasek@munsch.com
cwhite@munsch.com

**COUNSEL FOR SCOTT SEIDEL,
CHAPTER 7 TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 21st day of August, 2024, he caused a true and correct copy of this document to be served via email on the following counsel of record:

Michael Cancienne
Jordan, Lynch, & Cancienne PLLC
mcancienne@jlcfirm.com

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
rpulman@pulmanlaw.com

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
jason.rudd@wickphillips.com

By: *Julian P. Vasek*

Julian P. Vasek, Esq.

# EXHIBIT 19

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No.  23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S SECOND SET OF REQUESTS FOR PRODUCTION TO
## DEFENDANT GDMN FAMILY INVESTMENTS 2, LLC

To:    Defendant, GDMN Family Investments 2, LLC, by and through its attorneys of record,
Randall A. Pulman, Esq., Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway,
Suite 400, San Antonio, TX 78213.

Scott M. Seidel, Trustee (the "Trustee"), the plaintiff in this Adversary Proceeding, hereby serves upon GDMN Family Investments 2, LLC ("GDMN"), a defendant in this Adversary Proceeding, this his *Trustee's Corrected Second Set of Requests for Production to Defendant GDMN Family Investments 2, LLC* (the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

## I. <u>INSTRUCTIONS</u>

1.  These Requests are intended to cover all information, documents, and things in Your possession, custody, or control. A document or thing is deemed to be in Your possession, custody, or control, if:

   a.  It is in Your physical control or possession; or

   b.  It is in the physical control or possession of any other person or entity, and You, individually or otherwise

       i.  Own the document or thing in whole or in part;

       ii.  Have a right by contract, statute, or otherwise, to use, inspect, examine, or copy that document or thing on any terms; or

       iii.  Have, as a practical matter, been able to use, inspect, examine, or copy that document or thing when You have sought to do so.

2.  Unless otherwise indicated, references in these requests to You or any party, business organization, or other legal entity specifically includes all of that entity's present or former employees, officers, directors, agents, representatives, members, attorneys, departments, sections, affiliates, subsidiaries, parents, and all other persons acting on its behalf.

3.  If any portion of any document, electronically stored information, or tangible thing is responsive to any Request, then the entire document, electronically stored information, or tangible thing must be produced. Documents and electronically stored information shall be

produced in the order in which they are found in your files.  Documents that are found stapled, clipped, or otherwise fastened shall be produced in such form.

4.      In the event that no document, electronically stored information, or tangible thing exists that is responsive to a particular Request, a written response indicating the same shall be provided.

5.      If any document, electronically stored information, or tangible thing is withheld on the basis of privilege, or any Request is objected to on the basis of privilege, you must nevertheless produce other responsive documents, electronically stored information, or tangible things pursuant to such Request that are not subject to any privilege, and you must produce a privilege log concerning documents, electronically stored information, and tangible things withheld on the basis of privilege providing sufficient information to allow the Trustee to evaluate and determine the propriety of each such claim of privilege.

6.      Requests for production "may specify the form or forms in which electronically stored information is to be produced."  Fed. R. Civ. P. 34(b)(1)(C).  Accordingly, ESI must be produced as follows:

    a.      ESI that is responsive to any request for production shall be produced in native format such that the information produced is searchable and contains all metadata, including but not limited to, as follows:

        i.      E-mail: E-mail and other electronic messages (*e.g.*, instant messages and text messaging) should be produced in native format with attachments intact. For example, Outlook message files shall be produced in a .pst container.  Other email files should be produced as .eml or in .mbox format.

        ii.     Electronic documents. This includes, but is not limited to, word processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere. Files should be produced with filepath information as kept in the normal course of business.  All passwords and encryption must be removed from electronic documents prior to production. For example: (i) word documents shall be produced as .doc or .docx files; (ii)

spreadsheets shall be produced as .xls or .xlsx files; (iii) presentations shall be produced as .ppt or .pptx files; and (iv) image-only files (*e.g.*, non-searchable .pdfs, multi-page .tifs, Snipping Tool screenshots, etc.) shall be produced with associated OCR text.

    iii.   <u>Electronic audio recordings, photographs or images</u>: This includes but is not limited to images, such as photographs, videos, motion pictures and audio recordings. Items falling within this category shall be produced in their native format, and shall include all associated metadata, such as date stamp and time stamp showing date and time of creation and any subsequent modifications or revisions.

    b.   Alternatively, all ESI that is responsive to any of the requests for production shall be produced in a near native format including: (i) multi-page PDF files and IPRO-ready OPT files; (ii) a Concordance DAT delimited file with boundaries; (iii) extracted full text, or OCR text for image-only native files, with text files provided on a document level; and (iv) all metadata fields associated with each electronic document including family relationship data.  Files that are not usable in image format, such as spreadsheets created in Microsoft Excel or similar spreadsheet program, video and audio files must be produced in their native format.  Other documents may be requested to be produced in their native format if necessary.

7.    You must serve your responses to the Requests, no later than thirty (30) days following service of these Requests, at the following address or email:

| Munsch Hardt Kopf & Harr, P.C. | Munsch Hardt Kopf & Harr, P.C. |
|---|---|
| Attn: Davor Rukavina | Attn: Julian Vasek |
| 500 N. Akard Street, Suite 4000 | 500 N. Akard Street, Suite 4000 |
| Dallas, Texas 75201 | Dallas, Texas 75201 |
| drukavina@munsch.com | jvasek@munsch.com |

## II.   <u>DEFINITIONS</u>

8.    "<u>18920</u>" means 18920 NW 11th, LLC, and includes any person known to You to have been acting for it or on its behalf as its agent, including any member, manager, attorney, or agent thereof.

9.    "<u>And</u>" and "<u>or</u>" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

10.   "<u>Communication</u>" shall mean any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, telegrams, telexes, electronically transmitted messages, e-mails, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone conversations that are transcribed, notated, or in any other manner memorialized in written, typed, or recorded form.

11.   "<u>Computer data</u>" means any documents, information, or data ever placed into or stored on any of your computers, including but not limited to the hard drive, laptops, disks, storage systems, retrieval systems and similar systems, e-mails, Internet transmissions, electronic bulletin boards, websites, diary systems, calendar systems, tickler systems, and any other programs.

12.   "<u>Debtor</u>" means Goodman Networks, Inc.

13.   "<u>Document(s)</u>" means all written, recorded or graphic matter, whether in hard copy or generated or stored electronically or magnetically or by any other means, including without limitation, all papers, books, records, files, ESI, electronic information systems, electronic storage devices, computer data, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, recordings of telephone or other conversations, interviews, conferences or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, advertisements, instructions, charges, brochures, publications, schedules, lists, journals, statistical records or calculations, desk calendars, appointment books, diaries, tabulations, programs, data process input and output, microfilm, ledgers, journals or books of account, records and invoices reflecting business operations, records kept by electronic, photographic or mechanical means, any notes or drafts relating to the foregoing, and all things similar to any of the foregoing, however denominated.

"Document" or "documents" shall also mean and include the original, drafts of the original and each non-identical copy (whether different from the original because of marginal notes or in whatever respect), including translations, of any written or graphic matter, whether typed, printed, recorded, filmed, produced by hand, or reproduced by any other mechanical process or means.

14.     "<u>Electronic information system</u>" refers to a computer system or network, cell phone, smart phone, tablet computer, PDA, cloud storage, online storage or other similar system or device that contains electronic storage.

15.     "<u>Electronic storage device</u>" refers to magnetic, optical, flash, or other storage media, such as hard drives, flash or thumb drives, DVDs, CDs, tapes, cartridges, floppy diskettes, cloud storage, internet storage, smart cards, integrated circuit cards (e.g., SIM cards), cell phone, smart phone, tablet, or PDA drives.

16.     "<u>ESI</u>" shall mean all electronically stored information or electronic files in an electronic information system or on electronic storage device, as defined herein. ESI includes, without limitation, voicemail messages; email messages and their attachments; text messages and their attachments; Signal and WhatsApp; instant -messaging messages and their attachments; voicemail, email text and instant-messaging messages, and other electronic messages including all versions of these messages such as draft, sent, received, deleted, archived, and saved messages; electronic files such as word processing, spreadsheet, presentation, and other electronic files; draft, archived, and deleted versions of any kind of electronic file; temporary files; system history files; internet or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; computer activity logs; metadata; all digital communications; accounting applications data; calendar and diary application data; presentations; network-access and server activity logs; and back-up and archival files. ESI also specifically includes any metadata associated with the ESI.

17.    "<u>File</u>" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

18.    "<u>Financial Document</u>" means any document related to or evidencing the financial condition of a company, including a financial statement, cash flow statement, balance sheet, or income statement, whether internal or created for or provided to a third person.

19.    "<u>Frinzi</u>" means James Frinzi.

20.    "<u>GNET</u>" means GNET ATC, LLC.

21.    "<u>Goodman</u>" means James Goodman.

22.    "<u>Including</u>" means 'including but not limited to', and is not restrictive or limiting.

23.    "<u>Person</u>" or "<u>persons</u>" means any natural persons, firms, partnerships, associations, joint ventures, corporations and any other form of business organization or arrangement, as well as government or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

24.    "<u>Pinkhasova</u>" means Evelina Pinkhasova.

25.    "<u>Purchase Agreement</u>" means that certain *Share Purchase Agreement* dated on or about March 9, 2022 between You and 18920.

26.    "<u>Transaction Shares</u>" shall mean the stock the subject of the Purchase Agreement.

27.    "<u>Transfer</u>" shall have the same meaning as defined by 11 U.S.C. § 101(54). In particular, Transfer shall mean any creation of a lien, retention of title as a security interest, foreclosure of a debtor's equity of redemption, or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with property or an interest in property.

28.     "<u>You</u>" and "<u>your</u>" shall mean GDMN and its present and former parents, subsidiaries, affiliates, agents, employees, representatives, assigns, attorneys, predecessors-in-interest, and all other natural persons or businesses or legal entities, presently or previously, acting on behalf of it.

29.     "<u>Zakharyayev</u>" means Steven Zakharyayev.

### III.     <u>SECOND SET OF REQUEST FOR PRODUCTION</u>

**<u>REQUEST NO. 27:</u>**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE:


**<u>REQUEST NO. 28:</u>**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:


**<u>REQUEST NO. 29:</u>**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE:


**<u>REQUEST NO. 30:</u>**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-

00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE:


**REQUEST NO. 31:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreement), including any portion(s) thereof.

RESPONSE:


**REQUEST NO. 32:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE:


DATED this 21st day of August, 2024.

                                        **MUNSCH HARDT KOPF & HARR, P.C.**

                                        By:   /s/  *Julian P. Vasek*
                                        _____
                                             Davor Rukavina, Esq.
                                             Texas Bar No. 24030781
                                             Thomas D. Berghman, Esq.
                                             Texas Bar No. 24082683
                                             Julian P. Vasek, Esq.
                                             Texas Bar No. 24070790
                                             Conor P. White, Esq.
                                             Texas Bar No. 24125722
                                             500 N. Akard Street, Suite 4000
                                             Dallas, Texas  75201-6659
                                             Telephone: (214) 855-7500
                                             Facsimile: (214) 855-7584
                                             Email: drukavina@munsch.com
                                                      tberghman@munsch.com
                                                      jvasek@munsch.com
                                                      cwhite@munsch.com

                                        **COUNSEL FOR SCOTT SEIDEL,
                                        CHAPTER 7 TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 21st day of August, 2024, he caused a true and correct copy of this document to be served via email on the following counsel of record:

Michael Cancienne
Jordan, Lynch, & Cancienne PLLC
mcancienne@jlcfirm.com

Randall A. Pulman
Pulman Cappuccio & Pullen, LLP
rpulman@pulmanlaw.com

Jason M. Rudd
Wick Phillips Gould & Martin, LLP
jason.rudd@wickphillips.com

By: *Julian P. Vasek*
    Julian P. Vasek, Esq.

# EXHIBIT 20

Randall A. Pulman
State Bar No. 16393250
Anna K. MacFarlane
State Bar No. 24116701
**PULMAN CAPPUCCIO & PULLEN, LLP**
2161 NW Military Hwy., Suite 400
San Antonio, Texas  78213
Telephone: (210) 222-9494
Facsimile: (210) 892-1610
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

**COUNSEL FOR JAMES GOODMAN,** *et al.*

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No.  23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

<div align="center">

**JAMES GOODMAN'S RESPONSES TO
TRUSTEE'S SECOND SET OF REQUESTS FOR PRODUCTION TO
DEFENDANT JAMES GOODMAN**

</div>

To:    Trustee, Scott M. Seidel, by and through his attorneys of record, Davor Rukavina, Munsch
Hardt, Kopf & Harr, P.C., 500 N. Akard St., Ste. 4000, Dallas, Texas, 75201.

James Goodman ("Goodman"), a defendant in this Adversary Proceeding, serves his

responses to *Trustee's Second Set of Requests for Production to Defendant James Goodman*

<div align="center">

Appx.0353

</div>

(the "<u>Requests</u>") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

DATED this 6th day of December, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: *<u>/s/ Randall A. Pulman</u>*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR JJC & PEOPLE, LLC,
GDMN FAMILY INVESTMENTS 2, LLC,
AND JAMES GOODMAN**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 6, 2024, the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District, including the following:

*Via email drukavina@munsch.com*
Davor Rukavina
Munsch, Hardt, Kopf & Harr
500 N. Akard Street, Ste 3800
Dallas, TX 75201-6659

*Via email: jgolinkin@jlcfirm.com;*
*mcancienne@jlcfirm.com*
Michael Cancienne
Joseph Webster Golinkin, II
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd. Ste 2300
Houston, TX 77056

*Via email: Jason.rudd@wickphillips.com*
Jason Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204


/s/   Randall A. Pulman
Randall A. Pulman

## SECOND SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 22:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30, including any drafts or other copies thereof.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 23:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 24:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreements), including any portion(s) thereof.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 25:**

All statements from January 1, 2022 to present for any and all bank and other financial accounts into which any portion(s) of the "Purchase Price" (as defined in the Purchase Agreements) was(were) initially or subsequently deposited.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 26:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE: Goodman has not been able to locate the fully executed AST documents after a diligent search.

**REQUEST NO. 27:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE: See documents already produced at GOODMAN_A-1-00000260, GOODMAN_A-1-00000217, GOODMAN_A-1-00000198, GOODMAN_A-1-00000179, GOODMAN_A-1-00000259, GOODMAN_A-1-00000383, GOODMAN_A-1-00000384, GOODMAN_A-1-00000385, GOODMAN_A-1-00000386, GOODMAN_A-1-00000387, GOODMAN_A-1-00000388, GOODMAN_A-1-00000389, GOODMAN_A-1-00000390, GOODMAN_A-1-00000391, GOODMAN_A-1-00000412.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 28:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000467-496 and GOODMAN_A-1-00000587-616, including any drafts or other copies thereof.

RESPONSE: See already produced documents: GOODMAN_A-1-00000466 and GOODMAN_A-1-00000569.

**REQUEST NO. 29:**

Executed copies of the documents produced at GOODMAN_A-1-00000467-496 and GOODMAN_A-1-00000587-616.

RESPONSE: Goodman has been unable to locate executed copies of the specified documents after a diligent search.

**REQUEST NO. 29:**

All engagement letters with Winstead P.C. that govern or are otherwise related to the attorney-client relationship pursuant to which You and/or the Sellers withheld the Documents and Communications described in the privilege log produced to the Trustee in this adversary proceeding.

RESPONSE: Goodman does not believe there were separate engagement letters with Winstead P.C.

**REQUEST NO. 30:**

All Communications transmitting or discussing to the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE: See already produced: GOODMAN_A-1-00000145, GOODMAN_A-1-0000079, GOODMAN_A-1-00000198, GOODMAN_A-1-00000217, GOODMAN_A-1-00000514, GOODMAN_A-1-00000533, GOODMAN_A-1-00000770, GOODMAN_A-1-00000679, GOODMAN_A-1-00000399, GOODMAN_A-1-00000260, GOODMAN_A-1-00000145.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 31:**

All Communications between James E. Goodman and James S. "Jake" Goodman related to the transaction contemplated by the Purchase Agreement.

RESPONSE: Because it is impossible to produce oral communications that were not transcribed, Goodman has nothing to produce.

# EXHIBIT 21

Randall A. Pulman
State Bar No. 16393250
Anna K. MacFarlane
State Bar No. 24116701
**PULMAN CAPPUCCIO & PULLEN, LLP**
2161 NW Military Hwy., Suite 400
San Antonio, Texas  78213
Telephone: (210) 222-9494
Facsimile: (210) 892-1610
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

**COUNSEL FOR JAMES GOODMAN,** *et al.*

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No.  23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

**PEOPLE NQ, INC.'S RESPONSES TO TRUSTEE'S SECOND SET OF REQUESTS FOR
PRODUCTION TO DEFENDANT PEOPLE NQ INC.**

To:   Trustee, Scott M. Seidel, by and through his attorneys of record, Davor Rukavina, Munsch
      Hardt, Kopf & Harr, P.C., 500 N. Akard St., Ste. 4000, Dallas, Texas, 75201.

      People NQ Inc. ("People"), a defendant in this Adversary Proceeding, serves its responses

to *Trustee's Second Set of Requests for Production to Defendant People NQ Inc* (the "Requests")

pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

DATED this 6th day of December, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Anna K. MacFarlane
Texas State Bar No. 24116701
amacfarlane@pulmanlaw.com

**COUNSEL FOR JJC & PEOPLE, LLC,
GDMN FAMILY INVESTMENTS 2, LLC,
AND JAMES GOODMAN**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 6, 2024, the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District, including the following:

*Via email* *drukavina@munsch.com*
Davor Rukavina
Munsch, Hardt, Kopf & Harr
500 N. Akard Street, Ste 3800
Dallas, TX 75201-6659

*Via email:* *jgolinkin@jlcfirm.com;*
*mcancienne@jlcfirm.com*
Michael Cancienne
Joseph Webster Golinkin, II
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd. Ste 2300
Houston, TX 77056

*Via email:* *Jason.rudd@wickphillips.com*
Jason Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

*/s/   Randall A. Pulman*
Randall A. Pulman

## SECOND SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 27:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE: See already produced: GOODMAN_A-1-00000145, GOODMAN_A-1-0000079, GOODMAN_A-1-00000198, GOODMAN_A-1-00000217, GOODMAN_A-1-00000514, GOODMAN_A-1-00000533, GOODMAN_A-1-00000770, GOODMAN_A-1-00000679, GOODMAN_A-1-00000399, GOODMAN_A-1-00000260, GOODMAN_A-1-00000145.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 28:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 29:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE: People NQ has not been able to locate the fully executed AST documents after a diligent search.

**REQUEST NO. 30:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE: See documents already produced at GOODMAN_A-1-00000260, GOODMAN_A-1-00000217, GOODMAN_A-1-00000198, GOODMAN_A-1-00000179, GOODMAN_A-1-00000259, GOODMAN_A-1-00000383, GOODMAN_A-1-00000384,

GOODMAN_A-1-00000385,      GOODMAN_A-1-00000386,      GOODMAN_A-1-00000387,
GOODMAN_A-1-00000388,      GOODMAN_A-1-00000389,      GOODMAN_A-1-00000390,
GOODMAN_A-1-00000391, GOODMAN_A-1-00000412.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 31:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreement), including any portion(s) thereof.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 32:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Responsive documents will be produced by December 13, 2024.

# EXHIBIT 22

Randall A. Pulman
State Bar No. 16393250
Anna K. MacFarlane
State Bar No. 24116701
**PULMAN CAPPUCCIO & PULLEN, LLP**
2161 NW Military Hwy., Suite 400
San Antonio, Texas  78213
Telephone: (210) 222-9494
Facsimile: (210) 892-1610
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

**COUNSEL FOR JAMES GOODMAN,** *et al.*

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

<div align="center">

**JJC & PEOPLE, LLC'S RESPONSES TO TRUSTEE'S SECOND SET OF REQUESTS
FOR PRODUCTION TO DEFENDANT JJC & PEOPLE LLC**

</div>

To:    Trustee, Scott M. Seidel, by and through his attorneys of record, Davor Rukavina, Munsch
Hardt, Kopf & Harr, P.C., 500 N. Akard St., Ste. 4000, Dallas, Texas, 75201.

JJC & People LLC ("JJCP"), a defendant in this Adversary Proceeding, serves its responses

to *Trustee's Second Set of Requests for Production to Defendant JJC & People, LLC*

(the "Requests") pursuant to Rule 34 of the Federal Rules of Civil Procedure as follows.

<div align="center">

<span style="color:red">Appx.0364</span>

</div>

DATED this 6th day of December, 2024.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Anna K. MacFarlane
    Texas State Bar No. 24116701
    amacfarlane@pulmanlaw.com

**COUNSEL FOR JJC & PEOPLE, LLC,
GDMN FAMILY INVESTMENTS 2, LLC,
AND JAMES GOODMAN**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 6, 2024, the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District, including the following:

*Via email* **drukavina@munsch.com**
Davor Rukavina
Munsch, Hardt, Kopf & Harr
500 N. Akard Street, Ste 3800
Dallas, TX 75201-6659

*Via email:* **jgolinkin@jlcfirm.com;**
**mcancienne@jlcfirm.com**
Michael Cancienne
Joseph Webster Golinkin, II
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd. Ste 2300
Houston, TX 77056

*Via email:* **Jason.rudd@wickphillips.com**
Jason Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204

/s/  Randall A. Pulman
Randall A. Pulman

## SECOND SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 27:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE: See already produced: GOODMAN_A-1-00000145, GOODMAN_A-1-0000079, GOODMAN_A-1-00000198, GOODMAN_A-1-00000217, GOODMAN_A-1-00000514, GOODMAN_A-1-00000533, GOODMAN_A-1-00000770, GOODMAN_A-1-00000679, GOODMAN_A-1-00000399, GOODMAN_A-1-00000260, GOODMAN_A-1-00000145.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 28:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 29:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE: JJC has not been able to locate the fully executed AST documents after a diligent search.

**REQUEST NO. 30:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE: See documents already produced at GOODMAN_A-1-00000260, GOODMAN_A-1-00000217, GOODMAN_A-1-00000198, GOODMAN_A-1-00000179, GOODMAN_A-1-00000259, GOODMAN_A-1-00000383, GOODMAN_A-1-00000384, GOODMAN_A-1-00000385, GOODMAN_A-1-00000386, GOODMAN_A-1-00000387,

GOODMAN_A-1-00000388,     GOODMAN_A-1-00000389,     GOODMAN_A-1-00000390,
GOODMAN_A-1-00000391, GOODMAN_A-1-00000412.

Additional responsive documents will be produced by December 13, 2024.


**REQUEST NO. 31:**

All Documents and Communications that show when, where and to whom 18920 paid the
"Purchase Price" (as defined in the Purchase Agreement), including any portion(s) thereof.

RESPONSE: Responsive documents will be produced by December 13, 2024.


**REQUEST NO. 32:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the
document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Responsive documents will be produced by December 13, 2024.


**REQUEST NO. 33:**

All Documents and Communications pursuant to which James E. Goodman had authority
to act on Your behalf in connection with the transaction contemplated by the Purchase Agreement.

RESPONSE: Because it is impossible to produce oral communications that were not
transcribed, JJC has nothing to produce.


**REQUEST NO. 34:**

All Communications between James E. Goodman and James S. "Jake" Goodman related
to the transaction contemplated by the Purchase Agreement.

RESPONSE: Because it is impossible to produce oral communications that were not
transcribed, JJC has nothing to produce.

# EXHIBIT 23

Randall A. Pulman
State Bar No. 16393250
Anna K. MacFarlane
State Bar No. 24116701
**PULMAN CAPPUCCIO & PULLEN, LLP**
2161 NW Military Hwy., Suite 400
San Antonio, Texas 78213
Telephone: (210) 222-9494
Facsimile: (210) 892-1610
rpulman@pulmanlaw.com
amacfarlane@pulmanlaw.com

**COUNSEL FOR JAMES GOODMAN,** *et al.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No.  23-03072-mvl |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

### GDMN FAMILY INVESTMENTS 2, LLC'S RESPONSES TO TRUSTEE'S
### SECOND SET OF REQUESTS FOR PRODUCTION TO
### <u>DEFENDANT GDMN FAMILY INVESTMENTS 2, LLC</u>

To:    Trustee, Scott M. Seidel, by and through his attorneys of record, Davor Rukavina, Munsch
       Hardt, Kopf & Harr, P.C., 500 N. Akard St., Ste. 4000, Dallas, Texas, 75201.

       GDMN Family Investments 2, LLC ("<u>GDMN</u>"), a defendant in this Adversary Proceeding,

serves its responses to *Trustee's Second Set of Requests for Production to Defendant GDMN*

*Family Investments 2, LLC* (the "<u>Requests</u>") pursuant to Rule 34 of the Federal Rules of Civil

Procedure as follows.

       DATED this 6th day of December, 2024.

                        Respectfully submitted,

                        **PULMAN, CAPPUCCIO & PULLEN, LLP**
                        2161 NW Military Highway, Suite 400
                        San Antonio, Texas  78213
                        (210) 222-9494 Telephone
                        (210) 892-1610 Facsimile

                        By: *<u>/s/ Randall A. Pulman</u>*
                           Randall A. Pulman
                           Texas State Bar No. 16393250
                           rpulman@pulmanlaw.com
                           Anna K. MacFarlane
                           Texas State Bar No. 24116701
                           amacfarlane@pulmanlaw.com

                        **COUNSEL FOR JJC & PEOPLE, LLC,
GDMN FAMILY INVESTMENTS 2, LLC,
AND JAMES GOODMAN**

### CERTIFICATE OF SERVICE

The undersigned certifies that on December 6, 2024, the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District, including the following:

*Via email drukavina@munsch.com*
Davor Rukavina
Munsch, Hardt, Kopf & Harr
500 N. Akard Street, Ste 3800
Dallas, TX 75201-6659

*Via email: jgolinkin@jlcfirm.com;*
*mcancienne@jlcfirm.com*
Michael Cancienne
Joseph Webster Golinkin, II
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd. Ste 2300
Houston, TX 77056

*Via email: Jason.rudd@wickphillips.com*
Jason Rudd
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204


*/s/   Randall A. Pulman*
Randall A. Pulman

## SECOND SET OF REQUEST FOR PRODUCTION

**REQUEST NO. 27:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000146, GOODMAN_A-1-00000197, GOODMAN_A-1-00000216, GOODMAN_A-1-00000218, GOODMAN_A-1-00000261, GOODMAN_A-1-00000296, GOODMAN_A-1-00000314, GOODMAN_A-1-00000366, GOODMAN_A-1-00000532, GOODMAN_A-1-00000551, and/or GOODMAN_A-1-00000788.

RESPONSE: See already produced: GOODMAN_A-1-00000145, GOODMAN_A-1-0000079, GOODMAN_A-1-00000198, GOODMAN_A-1-00000217, GOODMAN_A-1-00000514, GOODMAN_A-1-00000533, GOODMAN_A-1-00000770, GOODMAN_A-1-00000679, GOODMAN_A-1-00000399, GOODMAN_A-1-00000260, GOODMAN_A-1-00000145.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 28:**

All Communications transmitting or discussing the document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 29:**

All fully executed copies of the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59.

RESPONSE: GDMN has not been able to locate the fully executed AST documents after a diligent search.

**REQUEST NO. 30:**

All Communications transmitting or discussing the documents produced at GOODMAN_A-1-00000369-70, GOODMAN_A-1-00000393-94, GOODMAN_A-1-00000395-96, GOODMAN_A-1-00000397-98, GOODMAN_A-1-00000413-14, GOODMAN_A-1-00000553-54, and GOODMAN_A-1-00000558-59, including any additional signed or unsigned copies thereof.

RESPONSE: See documents already produced at GOODMAN_A-1-00000260, GOODMAN_A-1-00000217, GOODMAN_A-1-00000198, GOODMAN_A-1-00000179, GOODMAN_A-1-00000259, GOODMAN_A-1-00000383, GOODMAN_A-1-00000384, GOODMAN_A-1-00000385, GOODMAN_A-1-00000386, GOODMAN_A-1-00000387,

Appx.0372

GOODMAN_A-1-00000388,      GOODMAN_A-1-00000389,      GOODMAN_A-1-00000390,
GOODMAN_A-1-00000391, GOODMAN_A-1-00000412.

Additional responsive documents will be produced by December 13, 2024.

**REQUEST NO. 31:**

All Documents and Communications that show when, where and to whom 18920 paid the "Purchase Price" (as defined in the Purchase Agreement), including any portion(s) thereof.

RESPONSE: Responsive documents will be produced by December 13, 2024.

**REQUEST NO. 32:**

All statements from January 1, 2022 to present for the "BTH account" referred to in the document produced at GOODMAN_A-1-00000329-30.

RESPONSE: Responsive documents will be produced by December 13, 2024.

# EXHIBIT 24

| | |
|---|---|
| **From:** | White, Conor |
| **To:** | "Anna MacFarlane" |
| **Cc:** | King, Jacob; Randy Pulman; MaryAnn Villa |
| **Subject:** | 18920 - Document Deficiencies |
| **Date:** | Wednesday, December 18, 2024 11:54:00 AM |

Anna,

Thank you for your time yesterday. As a follow up to and as discussed on our call, this email serves as an identification of deficiencies in the production received on December 13, 2024 in connection with the Goodman Parties' responses to the Trustee's second set of discovery requests in the Seidel v. 18920 litigation.

We request correction of the following deficiencies in connection with the production provided pursuant to the Trustee's second set of requests for production:

1. The unitized/individual emails in the email chain produced as GOODMAN_A-1-00000869-871, including the attachments to each email;

2. An unredacted version of the email produced as GOODMAN_A-1-00000872 with the attachment to the email included (or, if you intend to stand on your redactions, a basis for the redacted portions);

3. The remaining statements for the BTH account of James Goodman (RFP No. 23 to James Goodman, RFP No. 32 to GDMN, RFP No. 32 to People NQ, and RFP No. 32 to JJC all request the BTH account statements from January 1, 2022 to present, and your production appears to only include the statements for the periods ending 3/15/2022 through 10/10/2022);

4. The unredacted statements for the BTH accounts produced as GOODMAN_A-1-00000873-918 and for the statements requested in bullet point 3 (RFP No. 25 to James Goodman requests all "statements from January 1, 2022 to present for any and all bank and other financial accounts into which any portion(s) of the 'Purchase Price' (as defined in the Purchase Agreements) was(were) initially **or subsequently** deposited.");

5. Any additional statements from January 1, 2022 to present for any and all bank or other financial accounts which identify where any portion of the Purchase Price was or were subsequently deposited, as requested in RFP No. 25 to James Goodman.

Please let me know if you are willing to correct any of the deficiencies identified above. As always, I remain willing and able to discuss resolution of this demand without the need for court intervention. Should you like to discuss, I am generally available today and tomorrow to discuss.

Regards,

# EXHIBIT 25



**From:** Cirone, Vito <vcirone@astfinancial.com>
**Sent:** Thursday, January 27, 2022 10:48:27 AM
**To:** Fry, Matt <Matt.Fry@haynesboone.com>
**Cc:** james.goodman <james.goodman@genesisnet.com>; Newsome, Bruce <Bruce.Newsome@haynesboone.com>; Haden, Mike <Mike.Haden@haynesboone.com>
**Subject:** RE: [EXTERNAL] FW: transfer preferred and common stock


Hi Matt. That's correct we would need to have the medallion, unless the co would provide AST with a request to waive the requirement so long as they provide indemnification?

Would you be able to have someone at the company do this on co letterhead for us to proceed?

Attached is the verbiage.  You can have some of the transfer particulars mentioned and then add the indemnification clause?
I would have to get it approved by my management but it usually goes through with no issues.
The co would have to be comfortable with providing it though.
Thanks!


**VITO CIRONE**
Senior Relationship Manager
Relationship Management
6201 15th Avenue | Brooklyn, NY 11219
**T:** 718.921.8300 ext.6449 **C:** 347.977.3874 F: 718.765.8782
**E:** vcirone@astfinancial.com | astfinancial.com

Connect with us on: ☐ ☐ ☐ ☐

NOTICE TO RECIPIENT: The information contained in this e-mail message, together with any attachments thereto, is for the exclusive use of the intended recipient(s) and may contain confidential and/or privileged information. Any use, copying, disclosure or dissemination by a person other than the intended recipient(s) or the taking of any action in reliance upon the information contained in this e-mail or any of the attachments to this e-mail is strictly prohibited. If you are not the intended recipient and have received this message in error, please notify the sender immediately by return e-mail and delete/destroy all copies of this communication. Thank you.

**From:** Fry, Matt <Matt.Fry@haynesboone.com>
**Sent:** Wednesday, January 26, 2022 3:47 PM
**To:** Cirone, Vito <vcirone@astfinancial.com>
**Cc:** james.goodman@genesisnet.com; Newsome, Bruce <Bruce.Newsome@haynesboone.com>; Haden, Mike <Mike.Haden@haynesboone.com>
**Subject:** FW: [EXTERNAL] FW: transfer preferred and common stock

**CAUTION: EXTERNAL EMAIL**
This email originated from outside of the organization.
Do not click links or open attachments unless you recognize the sender and know the content is safe.

Vito,

I just spoke with James Goodman, and he would like to have the attached transfer processed. Can you please review and let James know of any issues (I believe you previously noted that a Medallion stamp was missing).

Thanks,
Matt

**Matthew L. Fry** | Partner
matt.fry@haynesboone.com | (t) +1 214.651.5443 (m) +1 817.917.7055

**From:** james.goodman <james.goodman@genesisnet.com>
**Sent:** Friday, February 28, 2020 9:10 AM
**To:** Cirone, Vito <vcirone@astfinancial.com>
**Cc:** A. Goodman-New cell John <jg8622@goodmannetworks.com>; Rao, Anthony J. <arao@goodmannetworks.com>; Jake Goodman <jake.goodman@genesisnet.com>
**Subject:** [EXTERNAL] FW: transfer preferred and common stock

**CAUTION: EXTERNAL EMAIL**
This email originated from outside of the organization.
Do not click links or open attachments unless you recognize the sender and know the content is safe.

Signed transfer documents.

From: Jake Goodman <jake.goodman@genesisnet.com>
**Date:** Tuesday, January 21, 2020 at 3:59 PM
**To:** James Goodman <james.goodman@genesisnet.com>

GOODMAN_A-1-00000870

**Subject:** Fwd: transfer preferred and common stock

Here you go

**From:** Jake Goodman <jake.goodman7@icloud.com>
**Sent:** Tuesday, January 21, 2020 3:59:18 PM
**To:** Jake Goodman <jake.goodman@genesisnet.com>
**Subject:** Re: transfer preferred and common stock

On Jan 21, 2020, at 3:33 PM, Jake Goodman <jake.goodman@genesisnet.com> wrote:

**From:** james.goodman <james.goodman@genesisnet.com>
**Sent:** Friday, January 17, 2020 8:41:18 PM
**To:** Jake Goodman <jake.goodman@genesisnet.com>
**Cc:** James <James@genesisnet.com>; james.goodman <james.goodman@genesisnet.com>
**Subject:** FW: transfer preferred and common stock

From: "A. Goodman-New cell John" <jg8622@goodmannetworks.com>
**Date:** Tuesday, December 31, 2019 at 3:41 PM
**To:** James Goodman <james.goodman@genesisnet.com>
**Subject:** transfer preferred and common stock

James
I filled out the documents to send to ATS to transfer the remaining preferred and common to JJC & People LLC.
John
CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

GOODMAN_A-1-00000871

**From:**        Cathy Kincy
**To:**          james.goodman
**Subject:**     Finalizing ███
**Date:**        Thursday, May 12, 2022 11:31:17 AM
**Attachments:** 1. Letter of Explanation Share Purchase and Funds.pdf

James:

Just for your record attached is the "letter of explanation" I provided to ████████ Tuesday evening
regarding the ████████████████████████  The letter satisfied the underwriting teams
concern regarding both and allowed for them to move forward with a "Clear to Close"

████████████████████████████████████████████████████████████████

-ck

GOODMAN_A-1-00000872



**BTH Bank**

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

**Statement Ending 03/15/2022**

James E Goodman                                Page 1 of 4
Customer Number: XXXXXXXX9852

### Managing Your Accounts

Dallas Banking       214-363-2265
Center

Website              www.bthbank.com

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | XXXXXXXX9852 | |

Talk to a banker about our customer beneficial accounts!

**BTH Bank**

Member FDIC

## Classic Checking-XXXXXXXX9852

### Account Summary

### Other Debits



Member FDIC

## How To Balance Your Account

**Step 1**
- Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.
- Record all automated deductions, debit card transactions and electronic bill payments.
- Record and deduct service charges, check printing charges, and other bank fees.
- If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** · If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** · List any deposits or credits you have made that do not appear on this statement (See space provided below).

**Step 4** · List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| Step 4 Total | | $ |

## Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. | |
| Add total from Step 3. | |
| Subtotal | |
| Subtract total from Step 4. | |
| This balance should equal your register balance. | |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following. Compare all your addition and subtraction above to your account register. Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register. Amounts of deposits and withdrawals on this statement should match your register entries. If you have questions or need assistance, please contact customer service.

## IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement, or if you think your statement or receipt is wrong, please telephone or write us as soon as possible at the phone number designated below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).

(2) To better assist us in researching your request, please describe the error or the transfer you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.

(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

If you would like to confirm that an automatic deposit to your account has been made as scheduled, you may call us during normal business hours at the phone number designated below.

## Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors, or unauthorized transactions within the time periods specified in the Terms and Conditions of Your Account, we are not liable to you for any loss related to the problem, error, or unauthorized transaction.

## Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
| | Address: | PO Box 7220 Tyler, TX 75711 |
| | Website: | www.bthbank.com |
| | Email: | support@bthbank.com |

## Classic Checking-XXXXXXXX9852 (continued)

**Daily Balances**

| Date | Amount | Date | Amount |
|------|--------|------|--------|
|      |        |      |        |

**Overdraft and Returned Item Fees**

|                          | Total for this period | Total year-to-date |
|--------------------------|-----------------------|--------------------|
| Total Overdraft Fees     |                       |                    |
| Total Returned Item Fees |                       |                    |

GOODMAN_A-1-00000875

This page left intentionally blank

GOODMAN_A-1-00000876



**Statement Ending 04/19/2022**

James E Goodman                                                  Page 1 of 6
Customer Number: XXXXXXXX9852

P.O. Box 7220
Tyler, TX 75711

RETURN SERVICE REQUESTED

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Managing Your Accounts

| | Dallas Banking Center | 214-363-2265 |
| --- | --- | --- |
| | Website | www.bthbank.com |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
| --- | --- | --- |



## Classic Checking-XXXXXXXX9852

### Account Summary

| Date | Description | Amount | Description | Amount |
| --- | --- | --- | --- | --- |

### Electronic Credits

| Date | Description | Amount |
| --- | --- | --- |
| 03/22/2022 | Wire Trf Deposit 18920 NW 11TH LLC Wires | $10,000,000.00 |



## How To Balance Your Account

**Step 1** • Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.
    • Record all automated deductions, debit card transactions and electronic bill payments.
    • Record and deduct service charges, check printing charges, and other bank fees.
    • If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** • If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** • List any deposits or credits you have made that do not appear on this statement (See space provided below).

**Step 4** • List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Step 4 Total | $ |

### Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. | |
| Add total from Step 3. | |
| Subtotal | |
| Subtract total from Step 4. | |
| This balance should equal your register balance. | |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following. Compare all your addition and subtraction above to your account register. Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register. Amounts of deposits and withdrawals on this statement should match your register entries. If you have questions or need assistance, please contact customer service.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement, or if you think your statement or receipt is wrong, please telephone or write us as soon as possible at the phone number designated below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).

    (2) To better assist us in researching your request, please describe the error or the transfer you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.

    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

If you would like to confirm that an automatic deposit to your account has been made as scheduled, you may call us during normal business hours at the phone number designated below.

### Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors, or unauthorized transactions within the time periods specified in the Terms and Conditions of Your Account, we are not liable to you for any loss related to the problem, error, or unauthorized transaction.

### Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
| | Address: | PO Box 7220 Tyler, TX 75711 |
| | Website: | www.bthbank.com |
| | Email: | support@bthbank.com |

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits**

| Date | Description | Amount |
|------|-------------|--------|
| 03/22/2022 | Wire Trf Fee<br>18920 NW 11TH LLC Wires | $5.00 |

**Other Debits**

| Date | Description | Amount |
|------|-------------|--------|

**Checks Cleared**

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|-----------|------|--------|-----------|------|--------|

* Indicates skipped check number

**Daily Balances**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|

James E Goodman                    XXXXXXXX9852        Statement Ending 04/19/2022                    Page 4 of 6

## Classic Checking-XXXXXXXX9852 (continued)

**Overdraft and Returned Item Fees**

|  | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees |  |  |
| Total Returned Item Fees |  |  |

GOODMAN_A-1-00000880



GOODMAN_A-1-00000881

This page left intentionally blank

GOODMAN_A-1-00000882



**BTH Bank**

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Statement Ending 05/17/2022

*James E Goodman*                                                      **Page 1 of 4**
*Customer Number: XXXXXXXX9852*

### Managing Your Accounts

| | Dallas Banking Center | 214-363-2265 |
| | Website | www.bthbank.com |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | | |



Talk to a banker about our customer beneficial accounts!

**BTH Bank**

Member FDIC

## Classic Checking-XXXXXXXX9852

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| | | | | |

### Electronic Debits

| Date | Description | Amount |
|---|---|---|
| | | |



Member **FDIC**

EQUAL HOUSING LENDER

## How To Balance Your Account

Step 1  &bull;  Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.
    &bull;  Record all automated deductions, debit card transactions and electronic bill payments.
    &bull;  Record and deduct service charges, check printing charges, and other bank fees.
    &bull;  If you have an interest bearing account, add any interest earned shown on this statement.

Step 2  &bull;  If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

Step 3  &bull;  List any deposits or credits you have made that do not appear on this statement (See space provided below).

Step 4  &bull;  List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Step 4 Total | $ |

### Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. |  |
| Add total from Step 3. |  |
| Subtotal |  |
| Subtract total from Step 4. |  |
| This balance should equal your register balance. |  |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following. Compare all your addition and subtraction above to your account register. Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register. Amounts of deposits and withdrawals on this statement should match your register entries. If you have questions or need assistance, please contact customer service.

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement, or if you think your statement or receipt is wrong, please telephone or write us as soon as possible at the phone number designated below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).

    (2) To better assist us in researching your request, please describe the error or the transfer you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.

    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

If you would like to confirm that an automatic deposit to your account has been made as scheduled, you may call us during normal business hours at the phone number designated below.

**Reporting Other Problems**

Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors, or unauthorized transactions within the time periods specified in the Terms and Conditions of Your Account, we are not liable to you for any loss related to the problem, error, or unauthorized transaction.

**Change Of Address**

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
|  | Address: | PO Box 7220 Tyler, TX 75711 |
|  | Website: | www.bthbank.com |
|  | Email: | support@bthbank.com |

GOODMAN_A-1-00000884

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|



**Daily Balances**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|

**Overdraft and Returned Item Fees**

|  | Total for this period | Total year-to-date |
|------|-----------------------|--------------------|
| **Total Overdraft Fees** | | |
| **Total Returned Item Fees** | | |

This page left intentionally blank

GOODMAN_A-1-00000886

# BTH Bank

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Statement Ending 06/21/2022

James E Goodman                                    Page 1 of 8
Customer Number: XXXXXXXX9852

### Managing Your Accounts

| | Dallas Banking Center | 214-363-2265 |
| | Website | www.bthbank.com |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | | |



Talk to a banker about our customer beneficial accounts!

**BTH Bank**

Member FDIC

## Classic Checking-XXXXXXXX9852

| Account Summary | | | Interest Summary | |
|---|---|---|---|---|
| Date | Description | Amount | Description | Amount |

**Deposits**

| Date | Description | Amount |
|---|---|---|



Member **FDIC**
EQUAL HOUSING LENDER

## How To Balance Your Account

Step 1 · Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.
· Record all automated deductions, debit card transactions and electronic bill payments.
· Record and deduct service charges, check printing charges, and other bank fees.
· If you have an interest bearing account, add any interest earned shown on this statement.

Step 2 · If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

Step 3 · List any deposits or credits you have made that do not appear on this statement (See space provided below).

Step 4 · List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Step 4 Total | | $ |

## Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. | |
| Add total from Step 3. | |
| Subtotal | |
| Subtract total from Step 4. | |
| This balance should equal your register balance. | |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following. Compare all your addition and subtraction above to your account register. Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register. Amounts of deposits and withdrawals on this statement should match your register entries. If you have questions or need assistance, please contact customer service.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement, or if you think your statement or receipt is wrong, please telephone or write us as soon as possible at the phone number designated below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).

    (2) To better assist us in researching your request, please describe the error or the transfer you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.

    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

If you would like to confirm that an automatic deposit to your account has been made as scheduled, you may call us during normal business hours at the phone number designated below.

### Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors, or unauthorized transactions within the time periods specified in the Terms and Conditions of Your Account, we are not liable to you for any loss related to the problem, error, or unauthorized transaction.

### Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
| | Address: | PO Box 7220<br>Tyler, TX 75711 |
| | Website: | www.bthbank.com |
| | Email: | support@bthbank.com |

GOODMAN_A-1-00000888

## Classic Checking-XXXXXXXX9852 (continued)

**Deposits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

**Electronic Debits**

| Date | Description | Amount |
|------|-------------|--------|

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

GOODMAN_A-1-00000890

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

James E Goodman
XXXXXXXX9852    Statement Ending 06/21/2022    Page 6 of 8

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

Date        Description                                                    Amount



**Daily Balances**

Date                    Amount    Date                    Amount    Date                    Amount

GOODMAN_A-1-00000892

## Classic Checking-XXXXXXXX9852 (continued)

**Overdraft and Returned Item Fees**

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | | |
| Total Returned Item Fees | | |

This page left intentionally blank

GOODMAN_A-1-00000894

# BTH Bank

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Statement Ending 07/19/2022

James E Goodman                                    Page 1 of 6
Customer Number: XXXXXXXX9852

### Managing Your Accounts

| | Dallas Banking Center | 214-363-2265 |
| | Website | www.bthbank.com |



## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | | |

## Classic Checking-XXXXXXXX9852

### Account Summary

| Date | Description | Amount |
|---|---|---|
| | | |

### Interest Summary

| Description | Amount |
|---|---|
| | |

### Deposits

| Date | Description | Amount |
|---|---|---|
| | | |


**Member FDIC**

GOODMAN_A-1-00000895

James E Goodman    XXXXXXXX9852    Statement Ending 07/19/2022    Page 2 of 6

## How To Balance Your Account

Step 1  • Enter all checks, deposits, and other automated teller
        card (ATM) transactions in your register.
        • Record all automated deductions, debit card
        transactions and electronic bill payments.
        • Record and deduct service charges, check printing
        charges, and other bank fees.
        • If you have an interest bearing account, add any
        interest earned shown on this statement.
Step 2  • If applicable, sort checks in numerical order and mark
        in your register each check or other transaction that is
        listed on this statement.
Step 3  • List any deposits or credits you have made that do not
        appear on this statement (See space provided below).
Step 4  • List any checks you have written, debit card
        transactions, electronic payments and other
        deductions that do not appear on this statement (see
        space provided below).

| Date/Description | Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Step 4 Total | $ |

### Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. | |
| Add total from Step 3. | |
| Subtotal | |
| Subtract total from Step 4. | |
| This balance should equal your register balance. | |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following.
Compare all your addition and subtraction above to your account
register. Make sure you remembered to subtract service charges
listed on this statement and add any interest earned to your register.
Amounts of deposits and withdrawals on this statement should
match your register entries. If you have questions or need
assistance, please contact customer service.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement,
or if you think your statement or receipt is wrong, please telephone or write us as
soon as possible at the phone number designated below. We must hear from you no
later than 60 days after we sent you the FIRST statement on which the error or problem
appeared.

(1) Tell us your name and account number (if any).

(2) To better assist us in researching your request, please describe the error
    or the transfer you are unsure about and explain as clearly as you can
    why you believe there is an error or why you need more information.

(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more
than 10 business days to do this, we will credit your account the amount you think is
in error, so that you will have use of the money during the time it takes us to complete
our investigation.

If you would like to confirm that an automatic deposit to your account has been made
as scheduled, you may call us during normal business hours at the phone number
designated below.

### Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any
improper transactions on your account be reported to us as soon as reasonably
possible. If you fail to notify us of any suspected problems, errors, or unauthorized
transactions within the time periods specified in the Terms and Conditions of Your
Account, we are not liable to you for any loss related to the problem, error, or
unauthorized transaction.

### Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
| | Address: | PO Box 7220 Tyler, TX 75711 |
| | Website: | www.bthbank.com |
| | Email: | support@bthbank.com |

GOODMAN_A-1-00000896

# Classic Checking-XXXXXXXX9852 (continued)

**Deposits (continued)**

| Date | Description | Amount |
|------|-------------|--------|
| | | |

**Electronic Credits**

| Date | Description | Amount |
|------|-------------|--------|
| | | |

**Electronic Debits**

| Date | Description | Amount |
|------|-------------|--------|
| | | |

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

GOODMAN_A-1-00000898

James E Goodman                XXXXXXXX9852          Statement Ending 07/19/2022                Page 5 of 6

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**
Date        Description                                                                    Amount



**Daily Balances**
Date                    Amount  Date                            Amount  Date                    Amount

GOODMAN_A-1-00000899

## Classic Checking-XXXXXXXX9852 (continued)

**Overdraft and Returned Item Fees**

|  | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees |  |  |
| Total Returned Item Fees |  |  |

GOODMAN_A-1-00000900

# BTH Bank

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Statement Ending 08/16/2022

James E Goodman                                   Page 1 of 6
Customer Number: XXXXXXXX9852

### Managing Your Accounts

| Dallas Banking Center | 214-363-2265 |
| Website | www.bthbank.com |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | | |



## Classic Checking-XXXXXXXX9852

### Account Summary

| Date | Description | Amount |
|---|---|---|

### Interest Summary

| Description | Amount |
|---|---|

### Deposits

| Date | Description | Amount |
|---|---|---|


Member FDIC

## How To Balance Your Account

Step 1  • Enter all checks, deposits, and other automated teller
          card (ATM) transactions in your register.
        • Record all automated deductions, debit card
          transactions and electronic bill payments.
        • Record and deduct service charges, check printing
          charges, and other bank fees.
        • If you have an interest bearing account, add any
          interest earned shown on this statement.
Step 2  • If applicable, sort check in numerical order and mark
          in your register each check or other transaction that is
          listed on this statement.
Step 3  • List any deposits or credits you have made that do not
          appear on this statement (See space provided below).
Step 4  • List any checks you have written, debit card
          transactions, electronic payments and other
          deductions that do not appear on this statement (see
          space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Step 4 Total |  | $ |

### Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. |  |
| Add total from Step 3. |  |
| Subtotal |  |
| Subtract total from Step 4. |  |
| This balance should equal your register balance. |  |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following.
Compare all your addition and subtraction above to your account
register. Make sure you remembered to subtract service charges
listed on this statement and add any interest earned to your register.
Amounts of deposits and withdrawals on this statement should
match your register entries. If you have questions or need
assistance, please contact customer service.

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement,
or if you think your statement or receipt is wrong, please telephone or write us as
soon as possible at the phone number designated below. We must hear from you no
later than 60 days after we sent you the FIRST statement on which the error or problem
appeared.

(1) Tell us your name and account number (if any).

(2) To better assist us in researching your request, please describe the error
    or the transfer you are unsure about and explain as clearly as you can
    why you believe there is an error or why you need more information.

(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more
than 10 business days to do this, we will credit your account the amount you think is
in error, so that you will have use of the money during the time it takes us to complete
our investigation.

If you would like to confirm that an automatic deposit to your account has been made
as scheduled, you may call us during normal business hours at the phone number
designated below.

### Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any
improper transactions on your account be reported to us as soon as reasonably
possible. If you fail to notify us of any suspected problems, errors, or unauthorized
transactions within the time periods specified in the Terms and Conditions of Your
Account, we are not liable to you for any loss related to the problem, error, or
unauthorized transaction.

### Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
|  | Address: | PO Box 7220 Tyler, TX 75711 |
|  | Website: | www.bthbank.com |
|  | Email: | support@bthbank.com |

James E Goodman                    XXXXXXXX9852            Statement Ending 08/16/2022            Page 3 of 6

## Classic Checking-XXXXXXXX9852 (continued)

**Deposits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

**Electronic Credits**

| Date | Description | Amount |
|------|-------------|--------|

**Electronic Debits**

| Date | Description | Amount |
|------|-------------|--------|

James E Goodman                XXXXXXXX9852        Statement Ending 08/16/2022                Page 4 of 6

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**
Date        Description                                                                          Amount



GOODMAN_A-1-00000904

James E Goodman                XXXXXXXX9852          Statement Ending 08/16/2022                          Page 5 of 6

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

**Checks Cleared**

| Check Nbr | Date | Amount |
|-----------|------|--------|

* Indicates skipped check number

**Daily Balances**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|

**Overdraft and Returned Item Fees**

|  | Total for this period | Total year-to-date |
|--|----------------------|--------------------|
| Total Overdraft Fees |  |  |
| Total Returned Item Fees |  |  |

James E Goodman    XXXXXXXX9852    Statement Ending 08/16/2022    Page 6 of 6



GOODMAN_A-1-00000906

# BTH Bank

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Statement Ending 09/20/2022

*James E Goodman*                           Page 1 of 8
**Customer Number: XXXXXXXX9852**

### Managing Your Accounts

| | Dallas Banking Center | 214-363-2265 |
| | Website | www.bthbank.com |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | | |



## Classic Checking-XXXXXXXX9852

### Account Summary

| Date | Description | Amount |
|---|---|---|

### Interest Summary

| Description | Amount |
|---|---|

### Deposits

| Date | Description | Amount |
|---|---|---|


Member **FDIC**
EQUAL HOUSING LENDER

## How To Balance Your Account

Step 1   •  Enter all checks, deposits, and other automated teller
        card (ATM) transactions in your register.
        •  Record all automated deductions, debit card
        transactions and electronic bill payments.
        •  Record and deduct service charges, check printing
        charges, and other bank fees.
        •  If you have an interest bearing account, add any
        interest earned shown on this statement.
Step 2   •  If applicable, sort checks in numerical order and mark
        in your register each check or other transaction that is
        listed on this statement.
Step 3   •  List any deposits or credits you have made that do not
        appear on this statement (See space provided below).
Step 4   •  List any checks you have written, debit card
        transactions, electronic payments and other
        deductions that do not appear on this statement (see
        space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| | Step 4 Total | $ |

## Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. |  |
| Add total from Step 3. |  |
| Subtotal |  |
| Subtract total from Step 4. |  |
| This balance should equal your register balance. |  |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following.
Compare all your addition and subtraction above to your account
register. Make sure you remembered to subtract service charges
listed on this statement and add any interest earned to your register.
Amounts of deposits and withdrawals on this statement should
match your register entries. If you have questions or need
assistance, please contact customer service.

## IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement,
or if you think your statement or receipt is wrong, please telephone or write us as
soon as possible at the phone number designated below. We must hear from you no
later than 60 days after we sent you the FIRST statement on which the error or problem
appeared.

        (1) Tell us your name and account number (if any).

        (2) To better assist us in researching your request, please describe the error
            or the transfer you are unsure about and explain as clearly as you can
            why you believe there is an error or why you need more information.

        (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more
than 10 business days to do this, we will credit your account the amount you think is
in error, so that you will have use of the money during the time it takes us to complete
our investigation.

If you would like to confirm that an automatic deposit to your account has been made
as scheduled, you may call us during normal business hours at the phone number
designated below.

## Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any
improper transactions on your account be reported to us as soon as reasonably
possible. If you fail to notify us of any suspected problems, errors, or unauthorized
transactions within the time periods specified in the Terms and Conditions of Your
Account, we are not liable to you for any loss related to the problem, error, or
unauthorized transaction.

## Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
|  | Address: | PO Box 7220 Tyler, TX 75711 |
|  | Website: | www.bthbank.com |
|  | Email: | support@bthbank.com |

Appx.0414

GOODMAN_A-1-00000908

## Classic Checking-XXXXXXXX9852 (continued)

**Deposits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

**Electronic Credits**

| Date | Description | Amount |
|------|-------------|--------|

**Electronic Debits**

| Date | Description | Amount |
|------|-------------|--------|

GOODMAN_A-1-00000909

XXXXXXXX9852    Statement Ending 09/20/2022

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

GOODMAN_A-1-00000910

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|

GOODMAN_A-1-00000911

James E Goodman                    xXXXXXXX9852    Statement Ending 09/20/2022                    Page 6 of 8

## Classic Checking-XXXXXXXX9852 (continued)

**Other Debits**

| Date | Description | Amount |
|------|-------------|--------|
|      |             |        |

**Checks Cleared**

| Check Nbr | Date | Amount |
|-----------|------|--------|
|           |      |        |

* Indicates skipped check number

**Daily Balances**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
|      |        |      |        |      |        |

**Overdraft and Returned Item Fees**

|                           | Total for this period | Total year-to-date |
|---------------------------|-----------------------|--------------------|
| **Total Overdraft Fees**  |                       |                    |
| **Total Returned Item Fees** |                    |                    |

GOODMAN_A-1-00000913

James E Goodman                XXXXXXXX9852                Statement Ending 09/20/2022                Page 8 of 8

This page left intentionally blank

GOODMAN_A-1-00000914

# BTH Bank

P.O. Box 7220
Tyler, TX 75711

**RETURN SERVICE REQUESTED**

JAMES E GOODMAN
103 TOMAHAWK TRL
SAN ANTONIO TX 78232-3611

## Statement Ending 10/10/2022

James E Goodman                                    **Page 1 of 4**
**Customer Number: XXXXXXXX9852**

### Managing Your Accounts

| | Dallas Banking Center | 214-363-2265 |
|---|---|---|
| | Website | www.bthbank.com |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Classic Checking | | |

## Classic Checking-XXXXXXXX9852

### Account Summary

| Date | Description | Amount | Interest Summary Description | Amount |
|---|---|---|---|---|
| | | | | |

### Deposits

| Date | Description | Amount |
|---|---|---|
| | | |

### Electronic Debits

| Date | Description | Amount |
|---|---|---|
| | | |



Member **FDIC**
EQUAL HOUSING LENDER

## How To Balance Your Account

**Step 1** • Enter all checks, deposits, and other automated teller card (ATM) transactions in your register.
• Record all automated deductions, debit card transactions and electronic bill payments.
• Record and deduct service charges, check printing charges, and other bank fees.
• If you have an interest bearing account, add any interest earned shown on this statement.

**Step 2** • If applicable, sort checks in numerical order and mark in your register each check or other transaction that is listed on this statement.

**Step 3** • List any deposits or credits you have made that do not appear on this statement (See space provided below).

**Step 4** • List any checks you have written, debit card transactions, electronic payments and other deductions that do not appear on this statement (see space provided below).

| Date/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Step 3 Total | $ |

| Date/Description | Check # | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Step 4 Total | | $ |

### Balancing Your Register To This Statement

| Step 5 | |
|---|---|
| Enter the "current balance" shown on this statement. |  |
| Add total from Step 3. |  |
| Subtotal |  |
| Subtract total from Step 4. |  |
| This balance should equal your register balance. |  |
| If it does not agree, see steps below. | $ |

If your account does not balance, review the following. Compare all your addition and subtraction above to your account register. Make sure you remembered to subtract service charges listed on this statement and add any interest earned to your register. Amounts of deposits and withdrawals on this statement should match your register entries. If you have questions or need assistance, please contact customer service.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFER

If you need more information about an electronic transfer appearing on this statement, or if you think your statement or receipt is wrong, please telephone or write us as soon as possible at the phone number designated below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).

(2) To better assist us in researching your request, please describe the error or the transfer you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.

(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

If you would like to confirm that an automatic deposit to your account has been made as scheduled, you may call us during normal business hours at the phone number designated below.

### Reporting Other Problems

Please review your statement carefully. It is essential that any account errors or any improper transactions on your account be reported to us as soon as reasonably possible. If you fail to notify us of any suspected problems, errors, or unauthorized transactions within the time periods specified in the Terms and Conditions of Your Account, we are not liable to you for any loss related to the problem, error, or unauthorized transaction.

### Change Of Address

Please contact customer service to tell us about a change of address.

| Customer Service: | Telephone: | 800-947-0142 |
|---|---|---|
|  | Address: | PO Box 7220 |
|  |  | Tyler, TX 75711 |
|  | Website: | www.bthbank.com |
|  | Email: | support@bthbank.com |

GOODMAN_A-1-00000916

James E Goodman                    XXXXXXXX9852          Statement Ending 10/10/2022                    Page 3 of 4

## Classic Checking-XXXXXXXX9852 (continued)

**Electronic Debits (continued)**

| Date | Description | Amount |
|------|-------------|--------|



**Daily Balances**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|

**Overdraft and Returned Item Fees**

|  | Total for this period | Total year-to-date |
|--|-----------------------|--------------------|
| Total Overdraft Fees |  |  |
| Total Returned Item Fees |  |  |

James E Goodman                     XXXXXXXX9852     Statement Ending 10/10/2022                     Page 4 of 4

GOODMAN_A-1-00000918