IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | ADVERSARY PROCEEDING |
| Plaintiffs, | § | NO: 23-03072-mvl |
| | § | |
| v. | § | |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| STEVEN ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**BRIEF IN SUPPORT OF TRUSTEE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST 18920 NW 11TH, LLC**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE**

## <u>TABLE OF CONTENTS</u>

I.      SUMMARY ...................................................................................................................1

II.     JURISDICTION ...........................................................................................................2

III.    BACKGROUND FACTS .............................................................................................4

IV.     SUMMARY JUDGMENT ........................................................................................13

        A.      SUMMARY JUDGMENT STANDARDS .......................................................13

        B.      ISSUE 1: THERE WAS NO MANDATORY REDEMPTION RIGHT..................13

        C.      ISSUE 2: THE DEBTOR WAS INSOLVENT AT ALL MATERIAL TIMES......18

                1. Roberts Expert Opinion ...............................................................18
                2. Defendants' Admissions of Insolvency ...........................................20
                3. Objective Evidence of Insolvency ...................................................21

        D.      ISSUE 3: CONSTRUCTIVE FRAUDULENT TRANSFER .................................23

        E.      ISSUE 4: DENIAL OF AFFIRMATIVE DEFENSES AS A MATTER OF LAW ....27

        F.      ISSUE 5: RECOVERY OF TRANSFERS FROM 18920 ..................................29

V.      CONCLUSION............................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ...........................................................13

*BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994)...........................................................................25

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) .........................................................................13

*Floyd v. Amite Cty. School Dist.*, 581 F.3d 244, 247-48 (5th Cir. 2009).........................................13

*Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495–96 (5th Cir. 2002) ...........................................2

*In re Am. Housing Found.*, 544 Fed. App'x 516, 520 (5th Cir. 2013) ...........................................28

*In re Essential Fin. Educ. Inc.*, 629 B.R. 401, 420 (Bankr. N.D. Tex. 2021)...............................23

*In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002).................................................24, 27, 28

*Lain v. V3 Constr. Grp., Ltd. (In re Erickson Ret. Communities LLC)*,
475 B.R. 762, 763 (Bankr. N.D. Tex. 2012).....................................................................................2

*O'Cheskey v. Herring Nat'l Bank (In re Am. Hous. Found.)*,
520 B.R. 208, 222–23 (Bankr. N.D. Tex. 2014)................................................................................2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ............................13

*Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019) ......................................................18

*Reed v. PLT Constr. Co. (In re BFN Operations, LLC)*,
604 B.R. 268, 270 (Bankr. N.D. Tex. 2019)......................................................................................2

## <u>Statutes and Rules</u>

11 U.S.C. § 101(32)(A)....................................................................................................................18

11 U.S.C. § 544(b)(1) ......................................................................................................................23

11 U.S.C. § 548(a) ...........................................................................................................................23

11 U.S.C. § 548(c) ...........................................................................................................................27

11 U.S.C. § 548(d) ...........................................................................................................................25

11 U.S.C. § 550(a)(1)........................................................................................................................29

28 U.S.C. § 157(b)(2)(H)....................................................................................................................2

28 U.S.C. § 158(c)(1)................................................................................................3

FED. R. CIV. P. 56(a) ..............................................................................................13

TEX. BUS. & COMM. CODE ANN. § 24.003(a) ...............................................18

TEX. BUS. & COMM. CODE ANN. § 24.006(a) ...............................................24

TEX. BUS. & COMM. CODE ANN. § 24.009(d)(1)...........................................27

**BRIEF IN SUPPORT OF TRUSTEE'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST 18920 NW 11TH, LLC**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel, Trustee (the "Trustee"), the trustee of Goodman Networks,

Inc. (the "Debtor") and its bankruptcy estate (the "Estate"), and the plaintiff for the Estate and for

GNET ATC, LLC ("GNET") in this Adversary Proceeding, and files this *Brief In Support of the*

(the "Brief") *Trustee's Motion for Partial Summary Judgment Against 18920 NW 11th, LLC* (the

"Motion"), seeking partial summary judgment against 18920 NW 11th, LLC ("18920"),

respectfully stating as follows:

## I.    SUMMARY

1.      This Adversary Proceeding begins and ends with a simple question: did the

Debtor's Series A-1 Preferred Shares have a mandatory right of redemption?  The defendants in

this Adversary Proceeding, motivated by greed, apparently forgot to ask this simple question

before they caused the Debtor to pay out $13,474,075 for 18920's redemption demand.  There was

no such right.  Period.  That is all that matters, although one may also ask how sophisticated people,

who admitted that the Debtor was insolvent, could ever have thought that any stock of the Debtor

would have any value—$80 million at that—redemption right or otherwise.  Greed, plain and

simple.  Whatever machinations Zakharyayev and Frinzi engaged in to conceal this fundamental

fact, whether by way of a fictitious $50 million promissory note, agreement to sell the shares to

the Debtor, or "settlement agreement," the fact remains that the Debtor paid out almost $13.5

million when there was no right of redemption, when there was no loan by 18920, and when the

underlying shares that the Debtor allegedly agreed to repurchase had no value whatsoever.

2.      There was plenty of fraud by the 18920 parties.  There were plenty of breaches of

fiduciary duty by Goodman and Frinzi.  There was unbelievable gross negligence.  And there was

plenty of greed motivating everyone, while they helped themselves to the last bits of the Debtor's flesh, knowing that bankruptcy was just around the corner. What there was not, was the right of redemption that they built their whole house of cards on. There will be time for the fraud and other torts to be tried to a jury. For now, the Trustee seeks summary judgment avoiding the Debtor's transfer of cash and other assets as a textbook constructively fraudulent transfer: there was no right of redemption and therefore no value for the Debtor's transfers, and the Debtor was insolvent at the time. Such avoidance would be binding on all other parties to this Adversary Proceeding. The Trustee then seeks a monetary judgment against 18920, as the initial transferee, for $13,474,075, and for the avoidance of any non-cash transfers.

## II.    <u>JURISDICTION</u>

3.      Various of the Trustee's causes of action in this Adversary Proceeding and the subject of the Motion are fraudulent transfer claims under federal and state law. These causes of action are statutorily core proceedings. *See* 28 U.S.C. § 157(b)(2)(H). Nor are these *Stern* type claims that would not be Constitutionally core, as held by this Court. *See Lain v. V3 Constr. Grp., Ltd. (In re Erickson Ret. Communities LLC)*, 475 B.R. 762, 763 (Bankr. N.D. Tex. 2012). *Accord Reed v. PLT Constr. Co. (In re BFN Operations, LLC)*, 604 B.R. 268, 270 (Bankr. N.D. Tex. 2019); *accord O'Cheskey v. Herring Nat'l Bank (In re Am. Hous. Found.)*, 520 B.R. 208, 222–23 (Bankr. N.D. Tex. 2014) (Jones, J.). This is in line with Fifth Circuit precedent, albeit predating *Stern*, which held that section 544 and 548 claims are core proceedings because they are created by Congress and cannot be brought by a debtor outside of bankruptcy. *See Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495–96 (5th Cir. 2002). As such, they are not *Stern* claims.

4.      There are two subsidiary issues to consider. First, the reason why the District Court agrees that the reference should be withdrawn for trial is because the Defendants have asserted

jury rights, which they have regardless of core jurisdiction. By definition, however, if an issue is susceptible to summary judgment, then there is no jury right as to that issue. Thus, this Court retains core jurisdiction to decide the issue as a matter of law, assuming that summary judgment is otherwise proper. Second, other of the Trustee's causes of action, such as for fraud, are undeniably not core issues. These issues cannot be decided by the Court regardless of jury rights. The Court can, however, and should, present a report and recommendation to the District Court on all such issues. *See* 28 U.S.C. § 157(c)(1). The questions of whether there was a redemption right, whether the Debtor was insolvent, and whether the Debtor received any reasonably equivalent value, are all relevant to the non-core causes of action. If, as the Trustee submits, there is no genuine issue of material fact regarding these issues, then the District Court may enter summary judgment on those issues irrespective of jury rights.

5.      The Trustee therefore requests as follows, if the Court is inclined to grant some or all of the Motion. The Court should decide, by final order, the avoidance and recovery causes of action, whether as part of the Motion or afterwards with respect to subsequent transferees. These are core issues that, once decided, should be binding on all parties to this Adversary Proceeding and their privies. From that, the remainder of this Adversary Proceeding can then be ascertained. The Court should also send the same ruling that it makes as proposed findings of fact and conclusions of law to the District Court with respect to all other causes of action, including for fraud, knowing participation in breach of fiduciary duty, and any other causes of action that the Trustee may assert. While those causes of action are not implicated by the Motion, to the extent that the underlying facts and issues are relevant to the other causes of action (as the Trustee certainly believes them to be), they should be decided by the District Court on summary judgment without need or benefit of being presented to the jury.

---

3

### III.   **BACKGROUND FACTS**

6.      The Trustee discusses the discrete facts applicable to each element of his causes of action the subject of the Motion in detail below—and why there is no genuine dispute regarding such facts.  Here, the Trustee presents the Court with an overview of the background facts, which may or may not in and of themselves be relevant, both to give the Court context and to the extent that the Court deems any relevant to the Motion.

7.      The Debtor was a Texas entity at all times.  James Frinzi ("Frinzi") was the Chief Executive Officer of the Debtor on March 9, 2022 and on each other day in March, 2022.  *Compare* Trustee's Amended Complaint at Docket No. 23, ¶ 20, *with* 18920 Answer at Docket No. 27, ¶ 20, and Goodman Defendants Answer at Docket No. 26, ¶ 20.  James Goodman ("Goodman") was a prior director of the Debtor, who allegedly resigned as director on February 1, 2022.  APP0154 (No. 6).

8.      Steven Zakharyayev ("Zakharyayev") and Evelina Pinkhasova ("Pinkhasova") were married at all times relevant to this action (and remain married).  *See* APP0341 (12:20-24). Pinkhasova owned 18920, of which she was the sole manager and officer.  *See* APP0341 (12:12-22); APP0342 (13:13-14:3).  Zakharyayev is a licensed attorney, licensed in New York, New Jersey, and Florida.  *See* APP0386 (57:16-18). Zakharyayev represented 18920 in the transactions the subject of the Motion.  *See* APP0578 (249:14-20).  Also, for each and every document signed by Pinkhasova or bearing her name that is discussed herein, Zakharyayev signed it for her.  *See* APP0632-33; APP0488; APP0530; APP0555; APP0615; APP0616.  In fact, she knew nothing of any of these transactions, or of 18920, or of the purchase of any shares, or of the receipt of millions of dollars.  *See e.g.* APP0891 (11:5-16); APP0894-895 (14:2-15:13).  Rather, she gave her husband

full power, authority, and agency to act for her and to sign her name to any and all documents. APP0891-892 (11:5-12:13).

9.      Years ago, the Debtor had issued so-called "Series A-1 Preferred Shares."  As of March 9, 2022: (i) GDMN Family Investments 2, LLC ("GDMN") held 2,574,326 of the Series A-1 Preferred Stock,  *see* APP0004; (ii) JJC & People, LLC ("JJC&P") held 750,837 of the Series A-1 Preferred Stock, *see* APP0018; and (iii) People NQ Inc. ("People," with GMDN and JJC&P, the "Sellers") held 707,755 of the Series A-1 Preferred Stock.  *See* APP0032.

10.     Each of the Sellers was owned and/or controlled by Goodman. *See id*. (all contracts signed by Goodman for the Sellers).  Goodman apparently believed that the shares held redemption rights, and that they were therefore potentially very valuable.[1]  *See* APP0155 (No. 10).  Goodman sought to monetize these shares, and he asked Frinzi to assist.  *See* APP0153 (No. 2).  Frinzi, in turn, informed Shalom Auerbach ("Auerbach") of the opportunity.  *Id*.  Auerbach, in turn, made Zakharyayev aware of the opportunity, which is how 18920 became involved due to Zakharyayev's control of 18920.  *See* APP0129 (No. 11).  Auerbach then introduced Zakharyayev to Frinzi, and Frinzi subsequently introduced Zakharyayev to Goodman to discuss the details of the potential transaction.  *See* APP0360 (31:14-24).

11.     Zakharyayev has experience in transactional work, real estate deals, creditor's rights, and real estate transactions, and was thus familiar with review of a company's books and records.  APP0629-630 (300:16-301:2); APP0631-632 (302:19-303:14); APP0633-634 (304:20-

---

[1]      His belief, good faith or not, is not relevant to the Motion.  Therefore, not wishing to interject a disputed question of fact, the Court should assume for purposes of the Motion that Goodman did indeed believe, in good faith, that the shares held a redemption right.  In fact, there was such a right under the Debtor's prior articles of incorporation, so Goodman's belief to that effect may not be absurd.  But even then there were metrics that would quantify the redemption, which would have led to zero dollars being payable for the redemption in light of the Debtor's insolvency.  And, what is truly baffling, is that Goodman believed there to be an *optional* redemption, which makes it all the more inconceivable that anyone would think that the insolvent Debtor would pay millions and millions of dollars on something that was optional, at best.  *See* APP0155 (No. 10).

305:18) APP0693 (264:2-12).   Despite this background 18920, either directly or through Zakharyayev, never reviewed the articles of incorporation or any other governing documents of the Debtor.   APP0540-541 (211:23-212:1).   Pinkhasova likewise never reviewed the Debtor's bylaws, articles of incorporation, or shareholders' agreement.   APP0899-900 (19:25-20:11). Zakharyayev undertook no due diligence to review the Debtor's corporate governance documents or the documents that would actively govern a shareholder's rights.   APP0540-541 (211:23-212:13); APP0589-590 (260:22-261:6).

12.     On January 21, 2022, Zakharyayev emailed Goodman stating he represented "the purchaser for the preferred shares."   APP0092.   Thereafter, Zakharyayev and Goodman's counsel negotiated the relevant transaction documents.   *See* Appendix at F (APP0045-55).   On March 9, 2022, each of GDMN, JJC&P, and People, as sellers, executed a *Share Purchase Agreement* with 18920, as buyer (collectively, the "Purchase Agreements").   *See* Appendix at A, B, and C.   Each agreement provided for the sale, by each of the sellers, to 18920, of their Series A-1 Preferred Stock; in the case of GDMN, for $4.05 per share; in the case of JJC&P, for $1.65 per share; and in the case of People, for $1.00 per share.   *See* APP0004; APP0018; and APP0032.

13.     None of 18920, Zakharyayev, or Pinkhasova had the money to pay these selling entities for these shares.   APP0346-347 (17:14-18:7).   Instead, Zakharyayev intended to do a "back-to-back transaction," where 18920 would agree to purchase the shares from these sellers and subsequently fund the purchase with cash received from the Debtor.   APP0348.   As 18920 testified at its corporation deposition:

Q.   And I think you said that, ultimately, it was decided to be a "back-to-back" transaction?

A. Correct.

Q. What do you mean by a "back-to-back" transaction?

A. Essentially enter into an A to B transaction, whereas Party B would be 18920, and enter into an agreement to purchase the shares from Mr. Goodman's entities. And then immediately flip the shares back to -- well, it really exercised the right of redemption to Goodman Networks.

Q. And then Goodman Networks would pay on the right of redemption, and that is where the money to pay the Goodman entities would come from?

A. Yes.

Q. Whose idea was that?

A. That's – that's something I [Zakharyayev] came up with.

APP0348 (19:1-20).

14.     This, however, is not what 18920 represented to the sellers, instead representing in the Purchase Agreements (§ 3.03) that it shall have "immediately available funds" to pay the purchase price on the "Closing Date," defined as the date on which the Purchase Agreements were executed (March 9, 2022).  *See* APP0007; APP0021; and APP0035.  18920 did not, in fact, have those funds on that date.  *See* APP0126 (No. 2).  Nor was this the only lie by 18920 and Pinkhasova (having her named signed by her husband).  18920 represented that it was an "accredited investor" under the Securities Act of 1933, but Zakharyayev confirmed at his deposition that Pinkhasova, the sole owner of 18920, did not have the requisite income or assets to so qualify.  *See* APP0646-647 (317:5-318:12).   But the more important lie by 18920 and Pinkhasova in the Purchase Agreements (§ 3.04(b)) was their representation that "[18920] is acquiring the Shares for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof."  *See* APP0007; APP0021; and APP0035.

15.     Of significant relevance to the Motion, in the Purchase Agreements (§ 3.04(g)) 18920 also represented that it was aware, having been informed so by the sellers, that the "[Debtor's] liabilities exceed the [Debtor's assets]."  APP0008; APP0022; and APP0036.

16.    On March 9, 2022, 18920 transmitted a notice to the Debtor "re: Redemption of Preferred Shares" (the "Redemption Notice"). APP0043. Though not signed, the Redemption Notice comes from:

> 18920 NW 11th LLC
> Evelina Pinkhasova

*Id*. By the Redemption Notice, 18920 demanded the redemption of the 4,032,918 in Series A-1 Preferred Stock which it represented that it owned. *Id*. The Redemption Demand does not indicate a value or price for the purported redemption right. *Id*.

17.    The Redemption Notice was sent from "Admin Northwest <18290nw@gmail.com>" to Frinzi, at his personal james@frinzi.net e-mail address, at 5:55 p.m. on March 9, 2022. APP0044. The e-mail is labeled "Series A-1 Demand" and states that attached is the "demand letter." *Id*. Frinzi responded at 12:33 a.m. on March 10, 2022: "Received, thank you." *Id*. In fact, and as will be relevant for the fraud portions of this Adversary Proceeding once it is ready for trial, 18920 did not own the shares it represented it owned in the Redemption Notice, since it had neither paid the Sellers for the shares and because the Sellers had not actually transferred the shares to 18920. It was very simply a lie.

18.    Of determinative relevance to the Motion, however, there was no redemption right. This is discussed and evidenced at length by the Trustee in Section IV.B. of this Brief below. Also of determinative relevance to the Motion, the Debtor was insolvent at the time of the Redemption Notice and at all times thereafter. This too is discussed and evidenced in at length below in Section IV.C. of this Brief.

19.    Even though the Redemption Notice does not reflect the redemption price, Zakharyayev testified that he calculated the value of the redemption at $80 million—and this for a company where he confirmed that the liabilities exceeded the assets! *See* APP0404-05;

APP0682 (353:5-23).    He communicated this amount to Frinzi, but could not remember at deposition how he arrived at this amount!  *Id*. The Debtor, of course, did not have the money to pay this, so Zakharyayev and Frinzi "negotiated" a "settlement" of the redemption demand, and since Zakharyayev and 18920 needed money because they owed the money to the Sellers, that "settlement" would of necessity require a cash payment by the Debtor.

20.    In an email dated March 9, 2022 at 9:48 p.m., just four hours after transmission of the Redemption Notice, Zakharyayev emailed Frinzi stating that "the parties have agreed to settle 18920 NW 11th LLC's demand for redemption and other rights to it via a promissory note in the amount of $50,000,000 at 8% interest per annum with a maturity date of one year from the effective date," (the "50 Million Promissory Note").  APP0191.  Frinzi responded to this email simply with "Confirmed."  *Id*.

21.    The $50 Million Promissory Note was ostensibly to resolve a redemption value of $80,000,000 for the Transaction Shares, a value that Frinzi and Zakharyayev estimated in their discussions.  *See* APP0404-05.  Even so, it appears that they no longer wanted the $50 Million Promissory Note linked to the Redemption Notice since, on March 10, 2022, Zakharyayev and Frinzi agreed that, "in exchange for the proposed note, 18290 NW shall transfer the shares to GNET.  GNET shall retain all rights arising from the shares including redemption rights." APP0190. (S).  Towards this end, on March 10, 2022, the Debtor and 18920 executed that certain *Share Purchase Agreement* (the "Repurchase Agreement"), whereby the Debtor agreed to purchase 4,032,918 Series A-1 Preferred Shares from 18920 for the price of $3.595 per share.  *See* Appendix at W (APP0312).  This equals $14,498,340.12—almost exactly the $14,500,000.00 cash payment that was subsequently "negotiated" between the parties.

22.     Half a day later, on March 10, 2022, Zakharyayev emailed Frinzi hashing out the terms of a proposed release of the $50 Million Promissory Note.  *See* APP0307.  These terms were expressly "to settle the obligations of the promissory note," and included a payment of $14,500,000.00 to 18920, as well as a transfer of certain trademarks and licensing agreements, as well as a 50% interest in an alleged $44 million payable by American Metals Recovery and Recycling, Inc. ("AMRR").  *Id*.  These terms were memorialized later on March 10, 2022 by that certain *Settlement Agreement* (the "Settlement Agreement") between 18920, signed by Pinkhasova, and the Debtor, signed by Frinzi.  *See* Appendix at X.  The Settlement Agreement required the Debtor to pay $14,500,000.00 to 18920.  *See* APP0326.

23.     The foregoing insults the Trustee's intelligence: clearly the goal was to get money out of the Debtor and into the pockets of Goodman, which is exactly what happened, with 18920 making a very nice profit for serving as the strawman.  Whatever iterations there were, the money paid by the Debtor was always on account of the Redemption Notice, which 18920 would use to monetize the preferred shares and be able to pay the Sellers.  *See* APP0348 (19:1-20) ("Goodman Networks would pay on the right of redemption, and that is where the money to pay the Goodman entities would come from").  All the rest is just artifice and shenanigan.  But this is summary judgment, and the Trustee will focus on the facts, including as 18920 will have the Court accept them.  The Trustee will therefore use 18920's own documents and facts to demonstrate that summary judgment is all the more appropriate.

24.     Thereafter, directly on account of the Settlement Agreement, the Debtor paid and transferred $13,474,075.00 to 18920 in March of 2022, as confirmed by 18920 at its corporate deposition:

Q. Okay. Let's just put it this way. Regard -- whatever the actual details, days, and amounts were, 18920 agrees that it received $13,474,075 in March of 2022 on account of the Settlement Agreement we looked at earlier?

A. Yes.

Q. Okay. Thank you. And 18920 agrees that those funds came from Goodman Networks, Inc.?

A. Yes.

APP0606 (277:2-13).

25.    The fact of this payment is further confirmed by 18920's Interrogatory responses in response to identifying each and every transfer from the Debtor or GNET:

18920 received some of, or partial payment relating to, the items provided for in the Settlement Agreement. Specifically, 18920 received approximately $13.3 million of the $14.5 million dollars from Goodman Networks via wire transfer to the 18920 Bank of America account.

APP0126 (No. 2).

26.    The fact of the monetary transfers is further confirmed by the Debtor's bank statements. *See* APP0827-880. In full candor and transparency, the Trustee informs the Court that, of the $13,474,075.00 in cash transfers, $3,976,000.00 came from GNET from its East West Bank account. APP0868. GNET was a wholly owned subsidiary of the Debtor. *See* Appendix at GG, ¶ 2. The alleged obligation to pay the redemption right, and any subsequent Settlement Agreement, was the obligation of the Debtor and not of GNET. *See* APP0326. What happened was that the Debtor functionally up streamed the funds from GNET to itself, and then sent the funds on as its own funds as opposed to GNET funds. This would be the logical and legal import of what happened, sufficient, the Trustee believes for summary judgment purposes. Certainly 18920 has admitted at its corporate deposition and in its interrogatories that the funds came from the Debtor, which should be all that matters.

---

27.     As of March 1, 2022, the Debtor was party to a Licensing Agreement with the Tiger Athletic Foundation (the "License").  *See* APP0326; APP0449 (120:18-21).  The Debtor also purported to hold, or the authority to transfer and assign, certain trademarks registered to its subsidiary, Multiband Field Services, Inc. (the "Trademarks").  *See* APP0537-538 (209:24-210:12); APP0126 (No. 2).  Pursuant to the Settlement Agreement, the Debtor agreed to transfer and assign all rights it held in the License and the Trademarks to 18920.  *See* APP0326.  And, in fact, the Debtor did transfer and assign both the License and the Trademarks to 18920.  *See* APP0447 (118:10-13); APP0449 (120:12-21); APP0450-451(121:25-122:2).

28.     The summary judgment evidence is therefore as follows, all of which occurred in less than twenty-four (24) hours.  18920 sent the unliquidated Redemption Notice to the Debtor, making a demand for payment of a non-existing redemption right.  Zakharyayev liquidated that demand at $80 million (although he does not remember how and by what metric!) and made that demand to Frinzi.  The Debtor could not pay the $80 million so, instead, the Debtor executed the $50 Million Promissory Note.  Importantly, the $50 Million Promissory Note is either as consideration for the redemption demand, or for the purported transfer of the Series A-1 Preferred Shares that 18920 had contracted to buy from the Sellers (but which it had yet to actually buy) to the Debtor: either way there is *zero* consideration because there was no redemption right and because stock in the insolvent Debtor was worthless.  Then, to settle that $50 Million Promissory Note, the Debtor transferred various items of value to 18920, including $13,474,075.00 in cash, the Trademarks, and the License.  Everything, however, is the fruit of the poisonous tree: if there was no redemption right, as there was not, then whatever that right metamorphized into, and whatever the Debtor paid on account of such transformed right, was still for nothing of value.  Period.

# IV.    SUMMARY JUDGMENT

## A.    SUMMARY JUDGMENT STANDARDS

29.    The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate only where "no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Floyd v. Amite Cty. School Dist.*, 581 F.3d 244, 247-48 (5th Cir. 2009).  Under Rule 56, the inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A party seeking summary judgment bears the initial burden of identifying portions of pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show that summary judgment should not be granted.  *See id.* at 324-25.  In meeting its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587.

## B.    ISSUE 1: THERE WAS NO MANDATORY REDEMPTION RIGHT

30.    First and foremost, and regardless of whether the Court grants any other portion of the Motion, the Court should decide that, as a matter of law, the Series-1 Preferred Stock held no redemption right.  There is no genuine issue of material fact regarding this issue.

31.    There is no dispute of fact that the Debtor's stock at issue in the transaction was the "Series A1 Preferred Stock," as confirmed in both the Redemption Demand and the Share Purchase

Agreements.  *See* APP0043.  At the time of the transaction, the Debtor was governed by the *Sixth Amended and Restated Certificate of Formation* (the "Sixth Amendment").  This was filed with the Texas Secretary of State, and a certified copy thereof is included in the Appendix.  *See* APP0779.  That this was the governing document is also confirmed by the testimony of Anthony Rao, the Debtor's former general counsel.  *See* Appendix at BB.

32.    This governing document does address the redemption of the Series A-1 Preferred Shares, but not by way of mandatory redemption.  *See* APP0787 at § 5.1.  Instead, it provides that "[a]t any time and from time, to time to the extent it may lawfully do so, the Corporation shall have the right at its option to redeem all or less than all of the outstanding shares of Series A-1 Preferred Stock . . . at a per share redemption price [ ] equal to the Stated Value per share together with all accrued but unpaid dividends thereon."  *Id*.  At best, therefore, the governing document provided for an *optional* redemption, but that of course was not what was demanded, honored or paid (and the thought of an optional redemption when the Debtor was so heavily insolvent is fantastical).  Zakharyayev, insofar as he undertook no due diligence regarding this $80 million transaction, never asked for or obtained a copy of this governing document, however, and was therefore not aware of this fact (at least according to him).  *See* APP0601(272:14-25).

33.    The Trustee has therefore proven, without any doubt and as a matter of law, that the governing Sixth Amendment contained no mandatory redemption right.  In order to exclude the possibility that some other document or agreement of the Debtor might provide for any such redemption right (it could not, of course, since the Debtor's Articles are its Constitution and therefore supreme), the Trustee presents the Court with the following summary judgment evidence confirming that the defendants either agree that the Sixth Amendment controls or that they are otherwise unable to identify any other document giving rise to any redemption right.

34.     In Interrogatory No. 6, the Trustee asks 18920 to:

Identify each document or instrument, including any articles of incorporation, bylaws, shareholder agreement, resolution, or other governance document of the Debtor, which You assert or contend gave You any right or option of redemption with respect to the Transaction Shares or any securities of the Debtor as demanded in the Redemption Notice, including any of the Debtor's Series A-1 Preferred Stock, including by identifying the same in Your production to the Trustee in response to his Requests for Production served concurrently herewith.

APP0127 (No. 6).

35.     18920 responded to this Interrogatory as follows:

18920 would refer the Trustee to documents produced by 18920 beginning with bates numbers 18920-0000052, 18920-0000119, and 18920-0000170.

*Id.* Zakharyayev incorporated the same answer into his Interrogatory answer. *See* APP0138. As did Pinkhasova. *See* APP0146 (No. 7).

36.     Each of these three documents (18920-0000052, 18920-0000119, and 18920-0000170) is included in the Appendix as Exhibits H, I, and J. The first document, ending in 52, is a summary of corporate documents dated May 31, 2017, but is not a governing document itself and provides for no mandatory right of redemption. *See* APP0081. That document, again not governing, does state that "[t]he Preferred Shares are also subject to mandatory redemptions at their liquidation value on a quarterly basis, to the extent there is Excess Net Cash or Excess Cash Flow (each as defined in the Company's certificate of formation)." APP0082. Not only is this document not a governing document of anything, and setting aside it was from 2017, and also setting aside that the Debtor had filed a prior Chapter 11 proceeding with a prepackaged plan that any reasonable person should have known would change the treatment of preferred stock,[2] 18920 did not even attempt to use any "Excess Net Cash" or "Excess Cash Flow" as Zakharyayev divined

---

[2]     *See* Bankr. S.D. Tex.  17-31575 at docket no. 236.

that the shares had an $80 million value.  *See* APP0404-05.  This document is meaningless and provides for no right of redemption.

37.    The third document, ending in 170, is just the same document as the first.  *See* APP0085.  The second document, ending in 119, is an e-mail, which itself is not a governing document, but it does attach various other documents. *See* APP0089.  The only potentially relevant attachment is the Seventh Amended and Restated Shareholder Agreement, which is included in the Appendix as Exhibit K.  *See* Appendix at K (APP0094).  The Trustee does not concede that this is a legitimate or an admissible document because it is not signed, *see* APP0112-21, and because he has never seen a version thereof signed by the Debtor.  *See* Appendix at FF, ¶ 9.  Nor does he see how a shareholder agreement, as opposed to a governing document of a corporation, can provided for a mandatory redemption of stock.  However, the Court may review it solely for ensuring that there is no genuine dispute of material fact regarding the redemption right because, even if this document was signed, enforceable, or admissible, it too contains no redemption right at all.

38.    The Trustee likewise served the following Interrogatory on Goodman:

As of the execution of the Purchase Agreements, did You believe or understand that the Transaction Shares held any right or option of redemption and if so, explain why, including what You did to form such belief or understanding or who You discussed the issue with in forming such belief or understanding, and identify any document or communication you consulted, relied on, or reviewed in forming such belief or understanding. To the extent Your answer includes an attorney representing You, You may exclude such attorney's information and advice. To the extent that any attorney retained by the Debtor or GNET provided any information regarding Your belief or understanding, You are to detail the same in Your answer.

APP0155 (No. 10).

39.     Goodman answered as follows:

At the time of execution of the Purchase Agreement, I believed that there was an optional redemption right as provided in Article 5 of the Sixth Amended and Restated Certificate of Formation of Goodman Networks Incorporated.

*Id*.

40.     The Trustee also asked Goodman to "identify any document of the Debtor, whether articles of incorporation, bylaws, Chapter 11 plan, confirmation order, board resolution, shareholder agreement, or other document that You at that time believed or understood to be in effect and to provide for any optional or mandatory redemption of the Transaction Shares." APP0155 (No. 11).  Goodman answered with only "Sixth Amended and Restated Certificate of Formation of Goodman Networks Incorporated."  *Id*.  Going further, the Trustee asked Goodman whether he contended, at the time of the transaction or now during litigation, that "any document of the Debtor, whether articles of incorporation, bylaws, Chapter 11 plan, confirmation order, board resolution, shareholder agreement, or other document" provided for "any optional or mandatory redemption" of the Series 1 Preferred Stock, to which Goodman answered "Sixth Amended and Restated Certificate of Formation of Goodman Networks Incorporated."  APP0156 (Nos. 12 & 13).  The Trustee asked the same questions of the Goodman affiliated defendants, who provided the same answers: "Sixth Amended and Restated Certificate of Formation of Goodman Networks Incorporated."  APP0164-65 (Nos. 12, 13, and 14); APP0174-75 (Nos. 12, 13, and 14); APP0184-85 (Nos. 12, 13, and 14).  As conclusively demonstrated above, however, the Sixth Amendment did not contain any mandatory redemption of any stock, much less the Series A1 Preferred Stock.

41.     Therefore, not only is the Trustee's evidence conclusive, but each of the Defendants, by their interrogatory responses, has demonstrated that they cannot and have not

offered any contrary evidence or document to suggest that there was any mandatory redemption right. There is therefore no genuine dispute that, at the time of the Redemption Notice, the Repurchase Agreement, the $50 Million Promissory Note, the Settlement Agreement, and the transfer of cash and other assets, there was no redemption right for the Series A-1 Preferred Shares the subject of this Adversary Proceeding.

**C.     ISSUE 2: THE DEBTOR WAS INSOLVENT AT ALL MATERIAL TIMES**

42.     Under the Bankruptcy Code, "insolvent" is generally defined as a company's "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). Likewise, under TUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." TEX. BUS. & COMM. CODE ANN. § 24.003(a). The question, therefore, is whether the Debtor was insolvent as of March 11, 2022 when it made the cash transfers to 18920.

**1.     Roberts Experts Opinion**

43.     The Trustee offers as summary judgment evidence the expert report of Bill Roberts, which would also include his trial testimony, by which Mr. Roberts concludes that the Debtor was insolvent at that time and explains why. *See* Appendix at G. As the Fifth Circuit has confirmed, it is permissible to consider expert testimony on summary judgment, so long as the testimony "can be presented in admissible form at trial." *Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019). Mr. Roberts' report, converted into what would be his trial testimony in his declaration submitted with the Appendix, contains all of the information needed for his opinion to be admissible, including his qualifications, his methodology, his sources, and his detailed conclusions. *See id*. The deadline to submit a rebuttal expert was January 10, 2025. *See* Scheduling Order at Docket No. 92. No Defendant submitted, timely or otherwise, any rebuttal

report to Mr. Roberts or any expert report on solvency or insolvency at all.  *See* Appendix at FF, ¶ 14.

44.     Mr. Roberts evaluated numerous of the Debtor's documents to assess the Debtor's solvency as of that time period, which included the subject period as it relates to the Motion. APP0062 (¶ 6).  In assessing the Debtor's and GNET's financial health, Mr. Roberts concluded that the Debtor and GNET were insolvent on both a balance sheet basis and a cash flow basis as of January 1, 2022.  APP0066 (¶ 14); APP0067 (¶ 18).  By January of 2022, the Debtor and GNET had little to no fixed assets, employees, or viable business lines.  APP0066 (¶¶ 15-16).  As of March 2022, the Debtor had liabilities of approximately $106,119,000.00 in excess of its assets. APP0077.  Likewise, GNET had liabilities of approximately $127,847,000.00 in excess of its assets.  *Id*.  Collectively, the Debtor and GNET had $233,966,000.00 in liabilities over and above whatever assets the Debtor and GNET may have owned at the time of the relevant transactions. *Id*.  Further, the Debtor had looming bond debt which would mature in June of 2022 further damaging its financial position and ultimately precipitating the Bankruptcy Case when those bondholders filed the Involuntary Petition.

45.     Altogether, while the defendants may attempt to dispute the total amount of debt that the Debtor and GNET had as of March 2022, even give or take several million dollars the Debtor and GNET are still deeply insolvent on a balance sheet basis.  APP0077.  Even if the Court were to consider the worthless $44 million note given by AMRR to GNET and value it at face value, the Debtor and GNET are still deeply insolvent.  Further, the Roberts Opinion details the fact that the Debtor and GNET also had no material expenditures during this time for employees meaning that it had no way of generating revenue to pay its debt.  APP0066 (¶ 16).

2.      **Defendants' Admissions of Insolvency**

46.      In each of the Purchase Agreements, 18920 represents that "[18920] is aware of, and Seller has fully disclosed to Buyer, the current financial and operational condition of the [Debtor], including, that the [Debtor's] liabilities exceed the [Debtor's] assets, and that the [Debtor] may be considered insolvent."  APP0008; APP0022; and APP0036.  Liabilities that exceed assets is, of course, precisely the definition of insolvency under both the Bankruptcy Code and TUFTA, as discussed above.  Admittedly, this acknowledgement and representation is not necessarily binding in court, but it is very strong evidence that, at the time of the transaction, each of the Defendants knew that the Debtor was insolvent.[3]

47.      Nor was this some boilerplate language or oversight.   The referenced representation appears in section 3.04(g) of the Purchase Agreements.  *See* APP0008; APP0022; and APP0036.  In negotiating the form of the documents with counsel for the Sellers, Zakharyayev wrote "3.04(g) – striked [*sic*]." APP0053.  Counsel for the Sellers responded: "[s]ection 3.04(g) should remain as is.  This is material information known by both parties and important to the transaction." APP0051.  Zakharyayev then responded by striking the following from the original version of the document: "without limitation, that the Company has no material assets, employees or operations." *Id*.  Asked to explain why, Zakharyayev wrote that he did not "think it's accurate" because "the company has sufficient assets to cover its secured bond debt." APP0050.  The Sellers then agreed to Zakharyayev's final changes to the referenced insolvency provision.  Not only, therefore, was this representation of insolvency discussed and understood, and negotiated, but it

---

[3]      Goodman knew it because he signed each of the Purchase Agreements.  Each of the selling entities knew it because Goodman signed for them, and his knowledge is therefore imputed to them.  Zakharyayev knew it because he signed each of the Purchase Agreements for 18920.  18920 knew it because Zakharyayev knew it and his knowledge is imputed to it.  Pinkhasova knew nothing about anything, but having given absolute license and agency to her husband to sign her name to anything he wanted to, she is bound by his knowledge as her agent.

also reveals Zakharyayev's view: that the Debtor may have had sufficient assets to cover its bond

debt is nowhere near the more than $100 million of trade debt that existed on top of the bond debt.

Indeed, ARRIS had already sued the Debtor by then for more than $30 million.  *See* APP0284.

48.    The import of these admissions should not be lost on the Court.  While their

prepetition admissions and representations may not be binding, 18920 signed contracts worth

millions of dollars acknowledging that the Debtor's liabilities exceeded its assets, and

Zakharyayev is a highly sophisticated attorney.  He may try to get out of these admissions now,

but at some point the things that a sophisticated, educated, and licensed adult does matter more

than subsequent words.

49.    Goodman, in his Interrogatory answers, agreed that "as of the date of the Purchase

Agreements and at all times thereafter, the liabilities and debts of the Debtor exceeded the value

of the Debtor's assets."  APP0157 (No. 18).  This admission is binding in this Adversary

Proceeding on Goodman and the Sellers, and may be used as evidence against other defendants.

**3.    <u>Objective Evidence of Insolvency</u>**

50.    The Trustee also presents undisputable, objective evidence of the Debtor's

insolvency, and of GNET.

51.    On the liabilities side, the Court can take into account only three (3) claims,

amongst many.  As of March 11, 2022 and thereafter, FedEx Supply Chain Logistics &

Electronics, Inc. ("<u>FedEx</u>") was owed at least $81,158,452.82.  *See* Appendix at DD.  As of the

same day, the Debtor owed ARRIS Solutions, Inc. ("<u>ARRIS</u>") $30,293,887.09.[4]  *See* APP0282.

As of the same day, the Debtor owed at least $18,619,192.10 on account of its outstanding, secured

---

[4]        This exhibit is ARRIS' joinder to the involuntary petition.  For purposes of admissibility, the Trustee points the Court to the *Affidavit of Mark Smith* at the end thereof, which sworn testimony transforms the joinder into an admissible testimony and an admissible exhibit.  *See* APP0281.

bonds.  *See* Appendix at EE.  Not only are these claims properly evidenced in the Trustee's

Appendix, and the Trustee cannot imagine how an defendant would factually dispute them, but the

Court entered an order allowing each of these claims (which the Court may and should take judicial

notice of).  *See* Bankruptcy Case Docket No. 526.  All of the defendants were already parties to

this Adversary Proceeding by that time and have actual notice and knowledge of that order, and at

a minimum inquiry notice.  Said order is therefore binding on them as it is the world with respect

to the allowance of these claims.  And, the Court granted the involuntary petition for the creditors,

which *ipso facto* allowed their claims.

52.    Thus, and taking into account just three largest creditors—there are of course many

more—the Debtor owed at least $130,071,532.01 immediately prior to making the cash and other

transfers to 18920 that are complained of.

53.    As far as assets, the Trustee includes in the Appendix each account statement for

each account where there Debtor and its wholly-owned subsidiaries held any funds as of March

11, 2022, and even *before* the transfers of complained of in this Adversary Proceeding.  *See*

APP0827-880.  On March 11, 2022, prior to the transfers, the Debtor and its subsidiaries

collectively held $22,770,604.44 on account.[5]    APP0834; APP0840; APP0843; APP0846;

APP0849; APP0854; APP0855; APP0857; APP0859; APP0860; APP0861; APP0863; APP0864;

APP0866; APP0868; APP0870; APP0872; APP0874; APP0880.  The Debtor held no other

material assets on that date, except an alleged $44 million promissory note payable by AMRR to

GNET and causes of action (and insurance for the same) related to said $44 million and to other

fraudulent transfers predating March 11, 2022.  *See* Appendix at FF, ¶¶ 15-17; GG at ¶ 5.  Even if

---

[5]     This number includes escrow and trust funds that the Debtor would not have had access to, but all
such funds are included to demonstrate that, even taking every penny into account, the Debtor was heavily insolvent.

the Court grants *full* face value to this note and all such causes of action—which would be absurd in light not only of the law but what is now known of these assets—their value is approximately $66 million. *See* Appendix at FF, ¶¶ 15-17.

54.     Thus, on a best case scenario, the Debtor had assets worth less than $90 million against debt of at least $130 million on a conservative basis: the Debtor was insolvent just as the expert opinion and the admissions of the defendants confirm.

D.     **ISSUE 3: CONSTRUCTIVE FRAUDULENT TRANSFER**

55.     Under the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the Debtor "that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation; and [ ] was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(i) & (ii).

56.     Pursuant to the Bankruptcy Code, the Trustee may also "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1). The predicate is that there be such a "golden creditor," meaning "an actual unsecured creditor holding an allowable unsecured claim as of the date of the petition that could avoid the challenged transfer." *In re Essential Fin. Educ. Inc.*, 629 B.R. 401, 420 (Bankr. N.D. Tex. 2021). There are many such unsecured creditors here, and the Trustee does not need to belabor the point. At a very minimum, FedEx was an unsecured creditor (and a massive one at that) as of March 11, 2022 whose claim is not only allowable under section 502 of the Bankruptcy Code, but was allowed. *See* Appendix at DD. *See also* Bankruptcy Case Docket No. 526 at p. 3

23

(allowing FedEx's claim, which the Trustee requests that the Court take judicial notice of).  The

Trustee therefore steps into the shoes of each such "golden creditor" and may use section 544 of

the Bankruptcy Code to avoid the whole of the challenged transfer for the benefit of the Estate.

57.     Under TUFTA, and with respect to present creditors, "[a] transfer made or

obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer

was made or the obligation was incurred if the debtor made the transfer or incurred the obligation

without receiving a reasonably equivalent value in exchange for the transfer or obligation and the

debtor was insolvent at that time." TEX. BUS. & COMM. CODE ANN. § 24.006(a).

58.     First, there is no question of fact that, on March 11, 2022, the Debtor transferred

$7,498,075.00 of its cash to 18920, and that it transferred an additional $2,000,000.00 of its cash

to 18920 on March 15, 2022.  APP0840; APP0880.  *See also* APP0126 (18920 rog. 2).  Thus, the

Debtor transferred $9,498,075.00 to 18920 within the meaning of both the Bankruptcy Code and

TUFTA.

59.     Second, for the facts and reasons presented above, and there being no genuine issue

of material fact regarding the same, the Debtor was insolvent when it transferred these

$9,498,075.00.

60.     Third, the Debtor did not receive reasonably equivalent value in return.  The value

of the transferred asset is determined from the Debtor's perspective.  *See In re Hannover Corp.*,

310 F.3d 796, 802 (5th Cir. 2002).  Reasonably equivalent value is a "two-part inquiry" which

includes an analysis of "(1) whether the debtor received value, and (2) whether that value was

reasonably equivalent to the transfer." *In re La. Pellets, Inc.*, 838 Fed App'x at 49.  "Although

*value* is defined in the Bankruptcy Code, *reasonably equivalent value* is not." *Id.* (emphasis in

original).  Under the Bankruptcy Code, "value means property, or satisfaction or securing of a

present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor." 11 U.S.C. § 548(d)(2)(A). Reasonably equivalent value is value that is comparable to the worth of the transferred property. *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994). Courts typically define reasonably equivalent value as whether "the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994)

61.     No great discussion of what reasonably equivalent value may be is needed here, for surely all parties and persons of logic can agree on the following: when the return consideration is *nothing*, then there is no reasonably equivalent value as a matter of law. This then turns on the question of whether there was a redemption right for the Series A-1 Preferred Shares, and why the Trustee opened his arguments with this issue.

62.     As there was no such right, the Redemption Notice demanded nothing. The Debtor owed nothing, nothing at all, on the Series A-1 Preferred Shares by way of mandatory redemption, whether to 18920 or to the selling entities. Yet it is from that foundational card that the remainder of the house of cards was built: whatever machinations and shenanigans—and the Trustee would add that these were rather amateur attempts at that—are all built on the Debtor trying to pay an non-existing obligation. Again, the Trustee believes that everything after the Redemption Notice was nonsensical and not operational, but given that this is summary judgment, the Court can take the Defendants' actions at their word.

63.     So, the story begins with the non-existing redemption demand. That leads to an alleged liability of the Debtor of $80 million, as Zakharyayev calculated and testified to (but conveniently could not remember how he calculated). Then, because the Debtor could not pay this non-owing amount, the *very next day* Zakharyayev and Frinzi reach a "settlement," whereby

the Debtor allegedly issues the $50 Million Promissory Note (which the Trustee has never even

seen a signed version of). Whether the note is for the Redemption Notice or for the Repurchase

Agreement[6] is irrelevant: both are equally without any value. Then, to settle that $50 Million

Promissory Note, the Debtor transfers cash, the License, and the Trademarks to 18920, as well as

one half of the alleged $44 million AMRR promissory note.

64. Each of these should be avoided as constructively fraudulent transfers under the

Bankruptcy Code, either because each individually had no value; *i.e.* there was no reasonably

equivalent value, or because each is the fruit of the poisonous, no-value tree. Avoidance of the

transfer License, the Trademarks, and the $44 million AMRR note is straight forward, as is the

avoidance of any obligation under the Repurchase Agreement, the Settlement Agreement, or the

$50 Million Promissory Note.

65. Avoidance of the cash transfers, however, is a little different, given the interplay of

GNET and of TUFTA.

66. Under the Bankruptcy Code, there is no question that the Debtor transferred

$9,498,075.00 of its funds. That should be the avoided transfer, at a minimum. As argued above,

and as conceded by 18920 in both its deposition and its interrogatory responses, all of the funds

transferred were the Debtor's, including the $3,976,000.00 transferred from the GNET account. If

the Court agrees that there is no genuine issue of material fact that the Debtor held an interest in

those funds, then the total rises to $13,474,075.00.

67. Under TUFTA, however, the $7,498,075.00 and $3,976,000.00 that were

transferred were subject to the Bondholders' perfected, prepetition security interests, perfected by

---

[6] Even if the Court construes the Repurchase Agreement as return consideration, wherein 18920 agreed to sell all of its 4,032,918 Series A-1 Preferred Shares (which, of course, it still did not own) to the Debtor for $14,498,340.21, and that this is what the Debtor paid its funds towards, then there is still no return consideration because those shares were worthless! Stock in an insolvent company has no value, and the Debtor was insolvent.

way of account control agreements.  Thus, these funds were not "assets" under TUFTA subject to avoidance.  However, there was no account control agreement or other security interest or lien with respect to the $2,000,000.00 transferred by the Debtor from its funds at RBC Capital Markets, LLC.  *See* Appendix at FF, ¶ 18; GG ¶ 6.  Thus, those funds were "assets" under TUFTA and are therefore subject to avoidance and recovery.  This is relevant because the Court may award attorney's fees under TUFTA—and should aware such fees when there is an avoidance—whereas the Court cannot award such fees under the Bankruptcy Code.

68.    Therefore, with respect to monetary avoidance, the Trustee requests the avoidance of $13,474,075.00 in transfers to 18920 under the Bankruptcy Code or, alternatively, $9,498,075.00, and the Trustee requests the avoidance of $2 million transferred from the Debtor to 18920 under TUFTA.  With respect to nonmonetary avoidance, the Trustee requests the avoidance of the transfer of the License and the Trademarks.

**E.    ISSUE 4: DENIAL OF AFFIRMATIVE DEFENSES AS A MATTER OF LAW**

69.    Under the Bankruptcy Code, "a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c).  Likewise under TUFTA: "a good faith transferee or obligee is entitled, at the transferee's or obligee's election, to the extent of the value given the debtor for the transfer or obligation, to" retain an interest in the asset transferred or to a reduction in the amount of liability."  TEX. BUS. & COMM. CODE ANN. § 24.009(d)(1).

70.    Importantly, these are affirmative defenses.  *See, e.g., In re Hannover Corp.*, 310 F.3d 796, 799 (5th Cir. 2002).  Yet 18920, Zakharyayev, and Pinkhasova have not asserted these

affirmative defenses.    They have, however, asserted an affirmative defense that they acted "reasonably and in good faith at all times."    *See* Docket No. 27 at ¶ 5.    The Goodman defendants likewise did not plead these affirmative defenses, but pled that they received the transfers "in good faith" and that they received "payment on an antecedent debt."    *See* Docket No. 26 at ¶¶ 1-2.    The Court should therefore conclude that the defendants have failed to assert and preserve whatever affirmative defense to avoidance they may have had.    Alternatively, to the extent that any of these defendants can argue that they somehow asserted these affirmative defenses, the Trustee requests that the Court conclude that no defendant has any such affirmative defense as a matter of law.

71.    Most obviously, each of these affirmative defenses requires that the transferee gave value.    *See In re Hannover Corp.*, 310 F.3d at 799.    All that the selling entities gave up and all that 18920 ever gave up were the Series A-1 Preferred Shares.    As evidenced and proven above, these shares did not have any value, none at all, whether by way of any mandatory redemption, optional redemption, or simply as stock (as the Debtor was insolvent).

72.    Also, with respect to 18920, 18920 cannot demonstrate "good faith."    As the Fifth Circuit has confirmed, courts "look to whether the claimant was on notice of the debtor's insolvency or the fraudulent nature of the transaction."    *In re Am. Housing Found.*, 544 Fed. App'x 516, 520 (5th Cir. 2013).    First, the Court analyzes whether the transferee had information that put it on inquiry notice that the transferor was insolvent.    *Id.*    Second, the Court decides whether the transferee engaged in a "diligent investigation" of the transferor's potential insolvency.    *Id.*    There is with good faith a "duty of inquiry," although the outside bounds of this duty have not been defined.    *See In re Hannover Corp.*, 310 F.3d at 800.    Here, 18920 fails on all accounts.    18920 was told, and acknowledged knowledge, that the Debtor's liabilities exceeded its debts; *i.e.* that it was insolvent.    And, as for any due diligence, Zakharyayev—a licensed attorney—undertook no

due diligence regarding the existence of any redemption right, instead relying solely on a summary

of corporate documents (but not a review of the documents themselves) from 2017.  He never

requested the financials for the Debtor, GNET, or AMRR, never looked the Debtor or GNET up

on any SEC website, and never undertook any formal due diligence.  APP0407 (78:15-21);

APP0408 (79:11-21); APP0414 (85:13-18); APP0515-516 (186:16-187:5); .

**F.    ISSUE 5: RECOVERY OF TRANSFERS FROM 18920**

73.    Under the Bankruptcy Code, "to the extent that a transfer is avoided under section

544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of

the estate, the property transferred, or, if the court so orders, the value of such property, from—(1)

the initial transferee of such transfer or the entity for whose benefit such transfer was made."  11

U.S.C. § 550(a)(1).  There is no question that 18920 is the initial transferee—all funds and other

assets went to it.  The Trustee also requests that the Court award him his reasonable attorney's fees

and expenses incurred herein as against 18920, which can and should be liquidated post-judgment

under Rule 54(d)(2).

74.    The Trustee likewise requests the recovery of the License and the Trademarks.

Regarding the License, the Trustee understands that it has been terminated, so there may be nothing

to recover.  Regarding the Trademarks, the recovery should include a requirement that 18920

execute such document or instrument as may be appropriate under non-bankruptcy law to convey

the Trademarks to the Estate, but the Court's judgment should also be self-effectuating and

command any appropriate governmental entity to record the transfer to the Estate.

**V.    CONCLUSION**

75.    The Debtor paid to 18920 almost $13.5 million and transferred other valuable

consideration for a non-existing redemption right, at a time when the Debtor was insolvent.  These

facts are beyond reasonable contest.  Whatever good or bad faith, intentions, and motivations of 18920 were, they do not matter to these facts and to the Trustee's constructively fraudulent transfer causes of action.  There being no genuine issue of disputed fact, and the law being clear, nothing remains but for the Court to grant the Trustee summary judgment on these issues.

RESPECTFULLY SUBMITTED this 23d day of January, 2025.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Conor P. White, Esq.
Texas Bar No. 24125722
500 N. Akard Street, Ste. 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 23d day of January, 2025, true and correct copies of this document were served via the Court's CM/ECF system on the following counsel for the defendants:

Michael A Cancienne on behalf of Defendants 18920 NW 11th, LLC, Evelina Pinkhasova, and Steven Zakharyayev
mcancienne@jlcfirm.com

Randall A. Pulman on behalf of Defendants GDMN Family Investments 2, LLC, JJC & People LLC, People NQ Inc., and James Goodman
rpulman@pulmanlaw.com, jgonzales@pulmanlaw.com;mvilla@pulmanlaw.com


By: /s/  Davor Rukavina
Davor Rukavina, Esq.