

```
 1

 2   IN THE UNITED STATES BANKRUPTCY COURT
     NORTHERN DISTRICT OF TEXAS
 3   DALLAS DIVISION
     ----------------------------------------X
 4   IN RE:                      Case No.:
                                 22-31641-mv1-7
 5   GOODMAN NETWORKS, INC.,     (Chapter 7)

 6                               DEBTOR,
     ----------------------------------------X
 7   SCOTT M. SEIDEL, TRUSTEE and GNET ATC, LLC,

 8                               PLAINTIFFS,

 9
                -against-        Adv. Proc. No.:
10                               23-03072-mv1

11   18920 N 11th LLC JAMES GOODMAN JAMES FRINZI
     STEVEN ZAKHARYAYEV EVELINA PINKASOVA PEOPLE
12   NQ INC JJC & PEOPLE LLC GDMN FAMILY
     INVESTMENTS 2, LLC,
13
                                 DEFENDANTS.
14   ----------------------------------------X
     IN THE UNITED STATES BANKRUPTCY COURT
15   NORTHERN DISTRICT OF TEXAS
     DALLAS DIVISION
16   ----------------------------------------X
     SCOTT M. SEIDEL, TRUSTEE and GNET ATC, LLC,
17
                                 PLAINTIFFS,
18

19              -against-        Adv. Proc. No.:
                                 23-03090-mv1
20
     HUDSON CLEAN ENERGY ENTERPRISES, LLC,
21
                                 DEFENDANTS.
22   ----------------------------------------X

23              DATE:  September 12, 2024

24              TIME:  2:00 P.M.

25   (Caption continued on next page.)
```

Trustee's
**BB**

APP0796

1

2              DEPOSITION of the Defendant, by

3    a Witness, ANTHONY RAO, ESQ., taken by the

4    respective parties, pursuant to a Notice

5    and to the Federal Rules of Civil

6    Procedure, held at the offices of Alston &

7    Bird, 90 Park Avenue, New York, New York

8    10016, before Barbara Vazquez, a Notary

9    Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4    MUNSCH HARDT KOPF & HARR, PC
         Attorneys for the Plaintiffs
 5       SCOTT M. SEIDEL, TRUSTEE and
         GNET ATC, LLC
 6       500 N Akard Street, Suite 3800
         Dallas, Texas 75201
 7       BY:  CONOR WHITE, ESQ.
         File #:  13229.16
 8       cwhite@munsch.com

 9

      JORDAN, LYNCH & CANCIENNE PLLC
10       Attorneys for the Defendants
         18920 N 11th LLC STEVEN ZAKHARYAYEV
11       EVELINA PINKASOVA
         1980 Post Oak Boulevard, Suite 2300
12       Houston, Texas 77056
         BY:  BRITTAINIE ZINSMEYER, ESQ.
13       File #: (None provided)
         bzinsmeyer@jlcfirm.com
14

15    WICK PHILLIPS
         Attorneys for the Defendant
16       JAMES FRINZI
         100 Throckmorton Street, Suite 1500
17       Fort Worth, Texas 76102
         BY:  PAUL T. ELKINS, ESQ.
18       File #: (None provided)
         paul.elkins@wickphillips.com
19

20    PULMAN, CAPPUCCIO & PULLEN, LLP
         Attorneys for the Defendants
21       JAMES GOODMAN PEOPLE NQ INC JJC &
         PEOPLE LLC GDMN FAMILY INVESTMENTS 2, LLC
22       2161 N.W. Military Highway, Suite 400
         San Antonio, Texas 78213
23       BY:  RANDALL A. PULMAN, ESQ.
         File #: (None provided)
24       rpulman@pulmanlaw.com

25          *          *          *
```



Anthony Rao, Esq.

```
 1

 2    A P P E A R A N C E S:

 3

 4    JORDAN, LYNCH & CANCIENNE PLLC
         Attorneys for the Defendants
 5       HUDSON CLEAN ENERGY ENTERPRISES, LLC
         1980 Post Oak Boulevard, Suite 2300
 6       Houston, Texas 77056
         BY:  MICHAEL CANCIENNE, ESQ.
 7       File #: (None provided)
         Mcancienne@jlcfirm.com
 8

 9    ALSTON & BIRD
         Attorneys for the Defendants
10       90 Park Avenue
         New York, New York 10016
11       BY:  ROBERT LONG, ESQ.
         File #: (None provided)
12       Mcancienne@jlcfirm.com

13
      ALSO PRESENT:
14    ANNA MACFARLANE, ESQ.
      LESLIE HYMAN, ESQ.
15    SIERRA SHEAR, ESQ.
      STEVEN ZAKHARYAYEV
16

17

18

19

20

21

22

23

24

25
```

APP0799

```
1

2    F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5    and between the counsel for the respective

6    parties herein that the sealing, filing and

7    certification of the within deposition be

8    waived; that the original of the deposition

9    may be signed and sworn to by the witness

10   before anyone authorized to administer an

11   oath, with the same effect as if signed

12   before a Judge of the Court; that an

13   unsigned copy of the deposition may be used

14   with the same force and effect as if signed

15   by the witness, 30 days after service of

16   the original & 1 copy of same upon counsel

17   for the witness.

18

19          IT IS FURTHER STIPULATED AND AGREED

20   that all objections except as to form, are

21   reserved to the time of trial.

22

23              *     *     *     *

24

25
```

APP0800

Anthony Rao, Esq.

```
 1                   ANTHONY RAO, ESQ.

 2   A N T H O N Y   R A O, called as a witness,

 3   having been first duly sworn by a Notary

 4   Public of the State of New York, was

 5   examined and testified as follows:

 6   EXAMINATION BY

 7   MR. WHITE:

 8        Q.    Please state your name for the

 9   record.

10        A.     Anthony Rao.

11        Q.     What is your address?

12        A.    6 Sprucewood Lane, Westport,

13   Connecticut 06880.

14             THE COURT REPORTER:  Are you

15         ordering a copy of the transcript?

16             MR. PULMAN:  Yes.

17             MR. CANCIENNE:  Yes.  I will.

18             MR. ELKINS:  I will order a

19         copy.  Yes.

20        Q.    Good afternoon, Mr. Rao.  My

21   name is Conor White.  I represent Scott

22   Seidell, Chapter 7 trustee in this case.

23             I believe she said for the

24   record, but can you just once again state

25   your name and address for the record,
```



```
 1                    ANTHONY RAO, ESQ.

 2    please.

 3         A.    Sure.  Anthony Rao, 6

 4    Sprucewood Lane, Westport, Connecticut

 5    06880.

 6         Q.    Mr. Rao, what is your

 7    educational background?

 8         A.    I am a lawyer.  So I have a JD.

 9         Q.    Where did you receive your JD?

10         A.    UC Davis.

11         Q.    How long have you been a

12    licensed attorney?

13         A.    1994.

14         Q.    In what states are you

15    currently licensed?

16         A.    California, New York, DC.  DC

17    is not a state.

18         Q.    Understood.  Any record of

19    disciplinary action?

20         A.    No.

21         Q.    Have you been deposed before?

22         A.    No.  I have taken many

23    depositions.

24         Q.    As she stated, if I start

25    speaking too quickly or if you don't
```

```
 1                    ANTHONY RAO, ESQ.

 2    understand the question, please feel free

 3    to ask me to slow down or clarify.

 4           If I ask you a question and you

 5    answer it, I'm going to assume that you

 6    understood what my question was asking.

 7    Please do not hesitate to ask for

 8    verification.

 9           Where do you currently work?

10      A.   Endeavor Managed Services.

11      Q.   Prior to working at Endeavor

12    Managed Services, where did you work?

13      A.   Goodman Investment Holdings for

14    about six months.

15      Q.   Prior to that, did you work at

16    a company by the name of Unified Field

17    Services?

18      A.   Yes.

19      Q.   Prior to that, at a company by

20    the name of Goodman Networks?

21      A.   Yes.

22      Q.   Approximately what time did you

23    begin working for Goodman Networks and stop

24    working for Goodman Networks?

25      A.   More or less February of 2013
```

APP0803



1                     ANTHONY RAO, ESQ.

2    and I retired/resigned August 2, 2021.

3         Q.    Did you begin working at

4    Unified Field Services, which I'll call

5    UFS, immediately after you resigned from

6    Goodman Networks?

7         A.    Shortly thereafter.  I would

8    say my first real official date was

9    probably mid-September, more or less.

10        Q.    Understood.  It's been a few

11   years.

12              What time did you stop working

13   for UFS?

14        A.    That's a good question.  I have

15   to go backwards.  I do not have a firm

16   recollection.  It wasn't very long.

17        Q.    If I represented to you that

18   the company ceased operating around

19   December of 2022, would that sound right?

20        A.    I was out before that.

21        Q.    When did you start working for

22   Goodman Investment Holdings?

23        A.    I was at Goodman Investment --

24   I stopped December 25, 2022.  So I was

25   probably at Investment Holdings for six

APP0804



Anthony Rao, Esq.

```
 1                    ANTHONY RAO, ESQ.
 2     bankruptcy.  You are really testing me, by
 3     the way.
 4          Q.    This is not a memory test.
 5          A.    That's okay.  I'll do my best.
 6          Q.    That actually brings me to one
 7     question I was going to ask.  Do you recall
 8     why Goodman Networks filed bankruptcy in
 9     the first instance?
10                MR. LONG:  Objection.
11                I instruct you not to answer on
12           the basis of attorney-client
13            privilege.
14          Q.    Mr. Rao, your role at Goodman
15     Networks, was it strictly in your capacity
16     as general counsel or did you also hold a
17     business position?
18          A.    No.  Just general counsel.
19     Corporate secretary when the board had
20     meetings.
21          Q.    Were you employed directly by
22     Goodman Networks or were you retained
23     pursuant to an outside counsel agreement?
24          A.    When I worked at Goodman
25     Networks, I was a W-2 employee, general
```

APP0805



Anthony Rao, Esq.

```
 1                    ANTHONY RAO, ESQ.

 2   counsel.

 3        Q.    Before we get into some of the

 4   documents that I'm going to show you, do

 5   you recall a man by the name or do you know

 6   a man by the name of Steven Zakharyayev?

 7        A.    No.

 8        Q.    Do you know a man by the name

 9   of Shalom Auerbach?

10        A.    No.

11        Q.    Do you know a James Frinzi?

12        A.    I know the name.  I don't know

13   the person or the face.

14        Q.    As we were discussing the bonds

15   and the shares earlier, do you have any

16   recollection at this moment of a purchase

17   of the Goodman Networks bonds and preferred

18   shares that you were maybe not fully

19   involved with but were implicated in with

20   James Goodman in the early part of 2022?

21             MR. LONG:  I don't know what

22        you are trying to get at and I'm

23        trying to avoid objecting to every

24        single one.  Can you rephrase that in

25        a way that asks about the time?
```

APP0806



1                    ANTHONY RAO, ESQ.

2   mentioned that it was unsigned?

3        A.    I do.

4        Q.    Can you flip to the back of

5   that sixth amended that I have given you?

6        A.    Yes.

7        Q.    Is that document signed?

8        A.    Yes.

9        Q.    The year on that is 2020; is

10  that correct?

11       A.    Of the sixth amended?

12       Q.    Yes.

13       A.    May 31, 2017.  This is the

14  indenture.

15       Q.    I'm going to hand you another

16  document that you have been asked about.

17  Ms. Zinsmeyer brought this up.  I'll just

18  give it to you now.

19            (Whereupon, the referred to

20        Restated Certificate of Formation was

21        marked as Plaintiffs' Exhibit 25 for

22        identification as of this date by the

23        Reporter.)

24       Q.    Do you have 25 in front of you?

25       A.    I do.

APP0807



```
 1                    ANTHONY RAO, ESQ.

 2         Q.    Do you recognize this document?

 3         A.    Yes.

 4         Q.    I had my dates mixed up.  This

 5    document was filed in 2020; is that

 6    correct?

 7         A.    It was filed -- it says:  Filed

 8    September 17, 2020.

 9         Q.    Let me reask this question:

10    Does this look like a true and correct

11    copy, to the best of your recollection, of

12    the Sixth Amended Restated Articles of

13    Incorporation?

14         A.    It does.

15         Q.    Now I want to go back to the

16    summary document that I initially handed to

17    you and then Ms. Zinsmeyer asked you about.

18         A.    Okay.

19         Q.    She pointed you to Paragraph 5

20    about the mandatory redemption right; is

21    that correct?

22         A.    Probably.

23         Q.    I think you are looking at

24    Exhibit 1.  I'm referring to this document

25    right here.  Pardon my reach.  Exhibit 6.
```

APP0808

1                    ANTHONY RAO, ESQ.

2            C E R T I F I C A T E

3

4    STATE OF NEW YORK      )
                            :  SS.:
5    COUNTY OF KINGS        )

6

7         I, BARBARA VAZQUEZ, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10         That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14         I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19         IN WITNESS WHEREOF, I have hereunto

20   set my hand this 11th day of October,

21   2024.

22

23   *Barbara Vazquez*

24   _____
                BARBARA VAZQUEZ

25

APP0809

888-893-3767
www.lexitaslegal.com

LEXITAS

```
1     ERRATA SHEET FOR: ANTHONY RAO, ESQ.
          ANTHONY RAO, ESQ., being duly sworn, deposes and
2         says: I have reviewed the transcript of my
          proceeding taken on 09/12/2024. The following
3         changes are necessary to correct my testimony.

4     _____

5      PAGE LINE      CHANGE                    REASON

6    -71-|--7--|change "of" to "into"-|-----typo--

7    -83-|24|add "the" before "Seyfarth"|clarification

8     18__|_21_ change "Goodman" to "Goodman Networks" __clarification

9    __51_|_13__ change "on" to "of"_____|_typo_____

10   __69_|_23__ change "GIA" to GNI"_____|_typo_____

11   __84_|_4__ change "Goodman" to "Goodman Networks"__clarification

12    112_|_21__ change "Veto" to "Vito"_____|typo_____

13   __112_|_24__ change "at Goodman transfers" to "transfers at Goodman Networks"

14   ----|----|------------------- typo and clarification

15   ----|----|-------------------|--------------

16   ----|----|-------------------|--------------

17   ----|----|-------------------|--------------

18   ----|----|-------------------|--------------

19   ----|----|-------------------|--------------

20   ----|----|-------------------|--------------

21   ----|----|-------------------|--------------

22   ----|----|-------------------|--------------

23        Witness Signature:_____

24     Subscribed and sworn to, before me
       this ____ day of _____, 20 ____.

25   _____       _____
       (NOTARY PUBLIC)                 MY COMMISSION EXPIRES
```

APP0810

LEXITAS

Filing#:157232200  Document#:996645360002 Filed On 9/17/2020 received by Upload

---

**Form 414**
**(Revised 09/13)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**

**Restated Certificate of Formation With New Amendments**

This space reserved for office use.



## Entity Information

The name of the filing entity is:

Goodman Networks Incorporated

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☑ For-profit Corporation
☐ Nonprofit Corporation
☐ Cooperative Association
☐ Limited Liability Company

☐ Professional Corporation
☐ Professional Limited Liability Company
☐ Professional Association
☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  157232200

The date of formation of the filing entity is:  February 23, 2000

## Statement of Approval

Each new amendment has been made in accordance with the provisions of the Texas Business Organizations Code. The amendments to the certificate of formation and the restated certificate of formation have been approved in the manner required by the Code and by the governing documents of the entity.

## Required Statements

The restated certificate of formation, which is attached to this form, accurately states the text of the certificate of formation being restated and each amendment to the certificate of formation being restated that is in effect, and as further amended by the restated certificate of formation. The attached restated certificate of formation does not contain any other change in the certificate of formation being restated except for the information permitted to be omitted by the provisions of the Texas Business Organizations Code applicable to the filing entity.

Form 414

6

APP0811

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent in the restated certificate of formation has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:          9/17/2020
                _____

Goodman Networks Incorporated
_____
Name of entity (see Execution instructions)

_____
Signature of authorized individual (see instructions)

Anthony Rao
_____
Printed or typed name of authorized individual

[ **Print** ]  [ **Reset** ]

Attach the text of the amended and restated certificate of formation to the completed statement form. Identify the attachment as "Restated Certificate of Formation of [Name of Entity]."

APP0812

## SIXTH AMENDED AND RESTATED
## CERTIFICATE OF FORMATION

### ARTICLE ONE

The name of the corporation is Goodman Networks Incorporated (the "Corporation").

### ARTICLE TWO

The address of the registered office of the Corporation is 206 E. 9th Street, Suite 1300, Austin, Texas 78701, and the name of its registered agent at such address is Capitol Corporate Services, Inc.

### ARTICLE THREE

The purpose for which the Corporation is organized is to engage in any lawful business for which corporations may be organized under the Texas Business Organizations Code ("TBOC").

### ARTICLE FOUR

The total number of shares of stock that the Corporation shall have authority to issue is 73,250,000, consisting of 51,000,000 shares of Common Stock, par value $0.0001 per share (the "Common Stock") and 22,250,000 shares of Preferred Stock, par value $0.0001 per share (the "Preferred Stock").

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

## A.    COMMON STOCK

All shares of Common Stock shall have identical rights, powers, limitations and preferences. All of the Common Stock issued and outstanding as of the effective date of the filing of this Sixth Amended and Restated Certificate of Formation ("Certificate of Formation"), whether previously designated "Series A Common Stock" or "Series B Common Stock" shall be deemed equivalent shares of Common Stock upon the filing of this Certificate of Formation.

1.    General. The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights, powers and preferences of the holders of the Preferred Stock set forth herein.

2.    Voting Rights. Each holder of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held of record by such holder on all matters on which shareholders generally are entitled to vote; provided, that except as otherwise required by the TBOC, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Formation (including any resolutions relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Formation (including any resolutions relating to any series of Preferred Stock) or pursuant to the TBOC.

3.    Dividends and Distributions. Subject to the rights of the holders of Preferred Stock, holders of Common Stock shall be entitled to receive such dividends and other distributions in cash, securities or other property of the Corporation as may be declared thereon by the Board of Directors (the "Board") from

APP0813

time to time out of the assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in all such dividends and other distributions.

    4.    <u>Liquidation, Dissolution or Winding Up</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation and subject to the rights of the holders of shares of any series of Preferred Stock upon such liquidation, dissolution or winding up, if any, the holders of all outstanding shares of Common Stock shall be entitled to receive the remaining assets of the Corporation available therefor and shall share equally on a per share basis in all such distributions.

    5.    <u>Conversion Rights</u>.  The Common Stock shall not be convertible into, or exchangeable for, shares of any other class or classes of the Corporation's capital stock.

## B.    PREFERRED STOCK - GENERAL

The first series of Preferred Stock shall be designated "<u>Series A-1 Preferred Stock</u>" and shall consist of 13,125,000 shares.  The second series of Preferred Stock shall be designated "<u>Series A-2 Preferred Stock</u>" and shall consist of 2,500,000 shares.  The third series of Preferred Stock shall be designated "<u>Series A-3 Preferred Stock</u>" and shall consist of 625,000 shares.  The fourth series of Preferred Stock shall be designated "<u>Series A-4 Preferred Stock</u>" and shall consist of 6,000,000 shares.

Additional shares of Preferred Stock may be divided into and issued in one or more series, the powers, preferences, limitations and relative rights of which series may vary in any and all respects. The Board is hereby vested with the authority to establish additional series of Preferred Stock by fixing and determining all the powers, preferences, limitations and relative rights of the shares of any series so established, to the extent not provided for in this Certificate of Formation (including any resolutions relating to any series of Preferred Stock) or any amendment hereto, and with the authority to increase or decrease the number of shares within each such additional series; provided, however, that the Board may not decrease the number of shares within a series below the number of shares within such series that is then issued. The authority of the Board with respect to each such additional series shall include, but not be limited to, determination of the following:

(1)    the distinctive designation and number of shares of that series;

(2)    the rate of dividend (or the method of calculation thereof) payable with respect to shares of that series, the dates, terms and other conditions upon which such dividends shall be payable, and the relative rights of priority of such dividends to dividends payable on any other class or series of capital stock of the Corporation;

(3)    the nature of the dividend payable with respect to shares of that series as cumulative, noncumulative or partially cumulative, and if cumulative or partially cumulative, from which date or dates and under what circumstances;

(4)    whether shares of that series shall be subject to redemption, and, if made subject to redemption, the times, prices, rates, adjustments and other terms and conditions of such redemption (including the manner of selecting shares of that series for redemption if fewer than all shares of such series are to be redeemed);

(5)  the rights of the holders of shares of that series in the event of voluntary or involuntary liquidation, dissolution or winding up of the Corporation (which rights may be different if such action is voluntary than if it is involuntary), including the relative rights of priority in such event as to the rights of the holders of any other class or series of capital stock of the Corporation;

(6)  the terms, amounts and other conditions of any sinking or similar purchase or other fund provided for the purchase or redemption of shares of that series;

(7)  whether shares of that series shall be convertible into or exchangeable for shares of capital stock or other securities of the Corporation or of any other corporation or entity, and, if provision be made for conversion or exchange, the times, prices, rates, adjustments and other terms and conditions of such conversion or exchange;

(8)  the extent, if any, to which the holders of shares of that series shall be entitled (in addition to any voting rights provided by law) to vote as a class or otherwise with respect to the election of directors or otherwise;

(9)  the restrictions and conditions, if any, upon the issue or reissue of any additional Preferred Stock ranking on a parity with or prior to shares of that series as to dividends or upon liquidation, dissolution or winding up;

(10)  any other repurchase obligations of the Corporation, subject to any limitations of applicable law; and

(11)  notwithstanding their failure to be included in (1) through (10) above, any other designations, powers, preferences, limitations or relative rights of shares of that series.

Any of the designations, powers, preferences, limitations or relative rights (including the voting rights) of any series of Preferred Stock may be dependent on facts ascertainable outside this Certificate of Formation.

## C.    LEGACY PREFERRED STOCK

Unless otherwise indicated, references to "sections" or "subsections" in this Part C of this Article Four refer to sections and subsections of Part C of this Article Four below. The "Stated Value" of each share of Series A-1 Preferred Stock, Series A-2 Preferred Stock and Series A-3 Preferred Stock shall be $10.00, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other recapitalization with respect to the Preferred Stock or any series thereof.

The terms and provisions of the Series A-1 Preferred Stock, Series A-2 Preferred Stock and Series A-3 Preferred Stock (collectively, the "Legacy Preferred Stock") are as follows:

1.    Dividends.

1.1    Payment of PIK Dividends.  From and after the third anniversary of the effective date of the Debtors' Amended Joint Prepackaged Chapter 11 Plan of Reorganization, Case No. 17-31575 (the "Plan"), cumulative dividends at the rate per annum of seven percent (7%) of the Stated Value per issued and outstanding share of Legacy Preferred Stock shall accrue on such shares of Legacy Preferred Stock (the "PIK Dividends"). The PIK Dividends shall accrue from day to day and shall be payable, on a pari passu basis, quarterly on March 31, June 30, September 30 and December 31, at the option of the Board, in the form of (a) cash, and/or (b)(i), with respect to the Series A-1 Preferred Stock, a number of

3

additional shares of Series A-1 Preferred Stock, (ii) with respect to the Series A-2 Preferred Stock, a number of additional shares of Series A-2 Preferred Stock, and (iii) with respect to the Series A-3 Preferred Stock, a number of additional shares of Series A-3 Preferred Stock, in each case equal to the cash value of the PIK Dividend on such share that accrued during the preceding quarter, divided by the Stated Value of such share of Legacy Preferred Stock. No dividends shall be paid on shares of any series of Legacy Preferred Stock unless a corresponding dividend is paid on the shares of each other series of Legacy Preferred Stock. The payment of PIK Dividends each calendar quarter shall be mandatory to the extent permitted by applicable law. Unpaid cumulative PIK Dividends will compound quarterly. No fractional shares of Legacy Preferred Stock shall be issued as PIK Dividends. Whether or not fractional shares would be issuable as PIK Dividends shall be determined on the basis of the total number of shares of Series A-1 Preferred Stock, Series A-2 Preferred Stock or Series A-3 Preferred Stock to be issued as a PIK Dividend to any single holder of Series A-1 Preferred Stock, Series A-2 Preferred Stock or Series A-3 Preferred Stock, respectively, based on the total shares of Series A-1 Preferred Stock, Series A-2 Preferred Stock or Series A-3 Preferred Stock held by such holder immediately prior to the payment of such PIK Dividend. In lieu of issuing any fractional share as PIK Dividends, the Corporation will pay cash equal to the value of such fractional share.

1.2    Reservation of Shares. The Corporation shall at all times reserve and keep available out of its authorized but unissued Legacy Preferred Stock, for the purpose of issuing PIK Dividends pursuant to Subsection 1.1, such number of its duly authorized shares of Series A-1 Preferred Stock, Series A-2 Preferred Stock and Series A-3 Preferred Stock as shall from time to time be sufficient to issue PIK Dividends; and if at any time the number of authorized but unissued shares of Series A-1 Preferred Stock, Series A-2 Preferred Stock or Series A-3 Preferred Stock shall not be sufficient to issue in full all PIK Dividends pursuant to Subsection 1.1, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Series A-1 Preferred Stock, Series A-2 Preferred Stock or Series A-3 Preferred Stock, as applicable, to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to the Certificate of Formation.

2.    Liquidation, Dissolution or Winding Up.

2.1    Preferential Payments to Holders of Legacy Preferred Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Legacy Preferred Stock then outstanding shall be entitled to be paid, on a pari passu basis, out of the assets of the Corporation available for distribution to its shareholders after any payments to holders of shares of Preferred Stock with rights superior to Legacy Preferred Stock but before any payment shall be made to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to the Stated Value per share together with all accrued but unpaid dividends thereon. The amount payable per share of Legacy Preferred Stock in the event of any liquidation, dissolution or winding up of the Corporation is referred to herein as the "Liquidation Amount" per share. For the avoidance of doubt, the Liquidation Amount shall be determined in the same manner for all shares of Legacy Preferred Stock. If upon any such liquidation, dissolution or winding up of the Corporation, the assets of the Corporation available for distribution to its shareholders shall be insufficient to pay the holders of shares of Legacy Preferred Stock the full amount to which they shall be entitled under this Subsection 2.1, the holders of shares of Legacy Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.2    Payments to Holders of Common Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after the payment of all preferential amounts required to be paid to the holders of shares of Legacy Preferred Stock as contemplated by

4

APP0816

Subsection 2.1, the remaining assets of the Corporation available for distribution to its shareholders shall be distributed among the holders of other shares of Preferred Stock (to the extent of any remaining preferential amounts designed for such shares) and then to holders of shares of Common Stock, pro rata based on the number of shares of Common Stock held by each such holder.

3.    Voting Rights.

3.1    General. Except as otherwise provided herein or as otherwise required by law, the holders of Legacy Preferred Stock shall have no voting rights.

3.2    Legacy Preferred Stock Protective Provisions. As long as any shares of Legacy Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote of the holders of a majority of the then issued and outstanding shares of the Legacy Preferred Stock:

(a)    increase or decrease the number of authorized shares of Legacy Preferred Stock;

(b)    authorize or create any class of stock ranking as to dividends or distribution of assets upon a liquidation, dissolution or winding up pari passu or senior to the Series A-1 Preferred Stock, Series A-2 Preferred Stock or Series A-3 Preferred Stock;

(c)    amend this Certificate of Formation in a manner that amends or otherwise changes the rights of the holders of shares of Legacy Preferred Stock set forth herein (including without limitation the PIK Dividends); or

(d)    liquidate, dissolve or wind up the Corporation unless the holders of Legacy Preferred Stock shall be paid the full preferential amounts to which they are entitled pursuant to Subsection 2.1;

4.    Conversion.

4.1    Mandatory Conversion of Series A-2 Preferred Stock. Immediately following the Corporation's redemption of shares of Series A-1 Preferred Stock with an aggregate Stated Value (including any cash dividends paid in connection therewith) of $15,000,000 pursuant to Section 5, each outstanding share of Series A-2 Preferred Stock shall be converted into one (1) fully paid and nonassessable share of Series A-1 Preferred Stock, subject to any adjustments necessary to take into account any prior stock split, combination of shares, reorganization, or reclassification with respect to the Series A-1 Preferred Stock without a corresponding and equivalent stock split, combination of shares, reorganization, or reclassification with respect to the Series A-2 Preferred Stock.

4.2    Optional Conversion of Series A-3 Preferred Stock. After the Corporation's redemption of Series A-1 Preferred Stock with an aggregate Stated Value (including any cash dividends paid in connection therewith) of $15,000,000 pursuant to Section 5 (inclusive of the prior redemptions as contemplated by Section 4.1) with the written approval of the Board, in its sole discretion, each outstanding share of Series A-3 Preferred Stock shall be converted into one (1) fully paid and nonassessable share of Series A-1 Preferred Stock, subject to any adjustments necessary to take into account prior to any stock split, combination of shares, reorganization, or reclassification with respect to the Series A-1 Preferred Stock without a corresponding and equivalent stock split, combination of shares, reorganization, or reclassification with respect to the Series A-3 Preferred Stock.

4.3    No Other Conversion Rights. Except as set forth above, the Series A-1 Preferred Stock, Series A-2 Preferred Stock and Series A-3 Preferred Stock shall not be convertible into, or exchangeable for, shares of any other class or classes of the Corporation's capital stock.

4.4.   Procedural Requirements. All holders of record of shares of Series A-2 Preferred Stock or Series A-3 Preferred Stock, as the case may be, shall be sent written notice of the conversion of all such shares of Series A-2 Preferred Stock or Series A-3 Preferred Stock, as applicable, pursuant to this Section 4. Such notice need not be sent in advance of the conversion. Upon receipt of such notice, each holder of shares of Series A-2 Preferred Stock or Series A-3 Preferred Stock, as the case may be, in certificated form shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation and its transfer agent to indemnify the Corporation and its transfer agent against any claim that may be made against the Corporation or its transfer agent on account of the alleged loss, theft or destruction of such certificate) to the Corporation and its transfer agent at the place designated in such notice. If so required by the Corporation or its transfer agent, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation and its transfer agent, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the series of Legacy Preferred Stock converted pursuant to Subsections 4.1 or 4.2 will terminate at the time of conversion (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, or his, her or its nominee, to receive a certificate or certificates, or a notice of issuance of uncertificated shares, for the number of shares of Series A-1 Preferred Stock issuable on such conversion in accordance with the provisions hereof. Such converted Series A-2 Preferred Stock or Series A-3 Preferred Stock shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for shareholder action) as may be necessary to reduce the authorized number of shares of Series A-2 Preferred Stock or Series A-3 Preferred Stock accordingly.

4.5   Reservation of Stock. The Corporation shall at all times when the Series A-2 Preferred Stock and Series A-3 Preferred Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of the Series A-2 Preferred Stock and Series A-3 Preferred Stock, such number of its duly authorized shares of Series A-1 Preferred Stock as shall from time to time be sufficient to effect the conversion of all outstanding Series A-2 Preferred Stock and Series A-3 Preferred Stock; and if at any time the number of authorized but unissued shares of Series A-1 Preferred Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A-2 Preferred Stock and Series A-3 Preferred Stock, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Series A-1 Preferred Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to the Certificate of Formation.

5.   Redemption.

5.1   Optional Redemption. At any time and from time, to time to the extent it may lawfully do so, the Corporation shall have the right at its option to redeem all or less than all of the outstanding shares of Series A-1 Preferred Stock and Series A-3 Preferred Stock at a per share redemption price (the "Redemption Price") equal to the Stated Value per share together with all accrued but unpaid dividends thereon.

5.2   Priority of Redemptions. The Corporation shall redeem shares of Series A-1 Preferred Stock and Series A-3 Preferred Stock pursuant to this Section 5 in the following order:

APP0818

(a)    first, the Corporation shall redeem shares of Series A-1 Preferred Stock, pro rata from the holders thereof based on the number of shares of Series A-1 Preferred Stock held by them, until the Corporation has redeemed all shares of Series A-1 Preferred Stock; and

(b)    second, if determined by the Corporation's Board in its sole discretion, the Corporation shall redeem shares of Series A-3 Preferred Stock, pro rata from the holders thereof based on the number of shares of Series A-3 Preferred Stock held by them, until the Corporation has redeemed all shares of Series A-3 Preferred Stock.

5.3    Redemption Notice. The Corporation shall send written notice of any redemption pursuant to this Section 5 (each, a "Redemption Notice") to each holder of record of shares of Series A-1 Preferred Stock and/or Series A-3 Preferred Stock to be redeemed not less than seven (7) days prior to the effective date of such redemption ("Redemption Date"). Each Redemption Notice shall state:

(a)    the aggregate number of shares of Legacy Preferred Stock to be redeemed on the applicable Redemption Date and the number of shares of Legacy Preferred Stock held by the holder that the Corporation shall redeem on the Redemption Date;

(b)    the Redemption Date and the aggregate Redemption Price to be paid to the holder; and

(c)    for holders of shares in certificated form, that the holder is to surrender to the Corporation or its transfer agent, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Legacy Preferred Stock to be redeemed. In the event fewer than all of the shares of Legacy Preferred Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Legacy Preferred Stock shall promptly be issued to such holder.

5.4    Surrender of Certificates; Payment. On or before the applicable Redemption Date, each holder of shares of Series A-1 Preferred Stock and/or Series A-3 Preferred Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation and its transfer agent to indemnify the Corporation and its transfer agent against any claim that may be made against the Corporation or its transfer agent on account of the alleged loss, theft or destruction of such certificate) to the Corporation or its transfer agent, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof. In the event fewer than all of the shares of Series A-1 Preferred Stock or Series A-3 Preferred Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Series A-1 Preferred Stock or Series A-3 Preferred Stock shall promptly be issued to such holder.

5.5    Rights Subsequent to Redemption. If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Series A-1 Preferred Stock and/or Series A-3 Preferred Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Series A-1 Preferred Stock and/or Series A-3 Preferred Stock so called for redemption shall not have been surrendered, dividends with respect to such shares of Series A-1 Preferred Stock and/or Series A-3 Preferred Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall

forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.

 5.6    Redeemed or Otherwise Acquired Shares. Any shares of Legacy Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Legacy Preferred Stock following redemption.

 6.    Waiver. Any of the rights, powers, preferences and other terms of the Legacy Preferred Stock or any series thereof set forth herein may be waived on behalf of all holders of Legacy Preferred Stock or any series thereof by the affirmative written consent or vote of the holders of at least a majority of the shares of Legacy Preferred Stock or such series then outstanding.

 7.    Notices. Any notice required or permitted by the provisions of this Article Four to be given to a holder of shares of Legacy Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the TBOC, and shall be deemed sent upon such mailing or electronic transmission.

 8.    Business Day. If any payment required to be made by the Corporation falls on a day other than a business day, such payment shall be due and payable on the next succeeding business day.

## D.    SERIES A-4 PREFERRED STOCK

Unless otherwise indicated, references to "sections" or "subsections" in this Part D of this Article Four refer to sections and subsections of Part D of this Article Four below.

The terms and provisions of the Series A-4 Preferred Stock are as follows:

1.    Designation and Amount. The shares of such series of Preferred Stock shall be designated as "Series A-4 Preferred Stock" (the "*Series A-4 Preferred Stock*"). The number of authorized shares constituting the Series A-4 Preferred Stock shall be 6,000,000. That number from time to time may be increased or decreased (but not below the number of shares of Series A-4 Preferred Stock then outstanding) by resolution duly adopted by the Board, or any duly authorized committee thereof and by the filing of a certificate pursuant to the provisions of the TBOC stating that such increase or decrease, as applicable, has been so authorized.

2.    Conversion. Subject to the terms and conditions of this Section 2, all shares of Series A-4 Preferred Stock shall, immediately after the filing of this Certificate of Formation and without the giving of notice to or election by the holders of shares of Series A-4 Preferred Stock, convert into such number of fully paid and nonassessable shares of Common Stock as is obtained by (i) multiplying the number of shares of Series A-4 Preferred Stock so converted by $4.83 and (ii) dividing the result by the conversion price of $2.11 per share or other price approved by the Board of Directors. After such conversion the holders of shares of Series A-4 Preferred Stock shall surrender their certificate or certificates for the shares (if any) so converted to the Corporation at its principal office (or such other office or agency of the Corporation as the Corporation may designate by notice in writing to the holders of the Series A-4 Preferred Stock) after filing of this Certificate of Formation at any time during the Corporation's usual business hours, together with a statement of the name or names (with address) to whom the shares of Common Stock shall be issued.

3. <u>Issuance of Certificates</u>. Promptly after the surrender of the certificate or certificates for the share or shares of Series A-4 Preferred Stock converted pursuant to <u>Section 2</u>, the Corporation shall issue, registered in such name or names as such holder may direct, the number of whole shares of Common Stock issuable upon the conversion of such share or shares of Series A-4 Preferred Stock. To the extent permitted by law, such conversion shall be deemed to have been effected immediately after the filing of this Certificate of Formation, and at such time the rights of the holder of such share or shares of Series A-4 Preferred Stock shall cease, and the person or persons in whose name or names the shares of Common Stock are to be registered on conversion shall upon such conversion shall be deemed to have become the holder or holders of record of such shares of Common Stock.

4. <u>Fractional Shares</u>. No fractional shares shall be issued upon conversion of Series A-4 Preferred Stock into Common Stock. If any fractional share of Series A Common Stock would, except for the provisions of the first sentence of this <u>Section 4</u>, be delivered upon such conversion, the Corporation, in lieu of delivering such fractional share, shall pay to the holder surrendering the Series A-4 Preferred Stock for conversion an amount in cash equal to the current market price of such fractional share as determined in good faith by the Board, and based upon the aggregate number of shares of Series A-4 Preferred Stock surrendered by any one holder.

5. <u>Voting Rights</u>. Except as may be otherwise provided in these terms of Series A-4 Preferred Stock or by law, the Series A-4 Preferred Stock shall vote together with Common Stock as a single class on all actions to be taken by the shareholders of the Corporation. Each share of Series A-4 Preferred Stock shall entitle the holder thereof to such number of votes per share on each such action as shall equal the number of votes to which a holder of the shares of Series A Common Stock (including fractions of a share) into which each share of Series A-4 Preferred Stock is then convertible is then entitled to cast.

6. <u>Rank</u>. The Series A-4 Preferred Stock shall rank senior to the Series A-1 Preferred Stock, the Series A-2 Preferred Stock, the Series A-3 Preferred Stock and the Common Stock with respect to the payment of dividends and the distribution of assets in the event of any dissolution, liquidation or winding up of the Corporation. Notwithstanding the foregoing, the Series A-1 Preferred Stock, the Series A-2 Preferred Stock and the Series A-3 Preferred Stock shall be entitled to payment of the PIK Dividends, so long as such payment is made in stock of the Corporation (and any cash in lieu of fractional shares of stock).

7. <u>Amendment</u>. The Corporation shall not amend this Part D of Article Four in a manner that would alter, change or repeal any of the preferences, powers or special rights given to the Series A-4 Preferred Stock without the prior written consent of the holders of a majority of the Series A-4 Preferred Stock.

8. <u>Other Rights</u>. The shares of Series A-4 Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof (including any rights granted to the Preferred Stock in the Certificate of Formation), other than as expressly set forth in this Part D of Article Four or as provided by applicable law and regulation.

9. <u>Waiver</u>. Notwithstanding any provision in this Part D of Article Four to the contrary, any provision contained in Part D of Article Four and any right of the holders of Series A-4 Preferred Stock granted in this Part D of Article Four may be waived as to all shares of Series A-4 Preferred Stock (and the holders thereof) upon the vote or written consent of the holders of a majority of the shares of Series A-4 Preferred Stock then outstanding.

10. <u>Severability</u>. If any term of the Series A-4 Preferred Stock set forth in this Part D of Article Four is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other

LEGAL02/39933000v2

APP0821

terms set forth herein which can be given effect without the invalid, unlawful or unenforceable term will, nevertheless, remain in full force and effect, and no term herein set forth will be deemed dependent upon any other such term unless so expressed herein.

## ARTICLE FIVE

5.1     Bylaws.  The shareholders (only) shall have the power to adopt, alter, amend, change or repeal the bylaws of the Corporation ("Bylaws").  The shareholders may adopt, amend or repeal the Bylaws only with the affirmative vote of the holders of outstanding stock having not less than a majority of the votes entitled to be cast on all matters on which shareholders generally are entitled to vote, voting together as a single class.

## ARTICLE SIX

6.1     Annual Meetings.  An annual meeting of shareholders for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting shall be held at such place, on such date, and at such time that is stated in or set in accordance with the Bylaws.  Advance notice of shareholder nominations for the election of directors of the Corporation and of business to be brought by shareholders before any meeting of shareholders of the Corporation will be given in the manner provided in the Bylaws.

6.2     Special Meetings. Special meetings of the shareholders may be called only by (i) the Board acting pursuant to a resolution adopted by a majority of the Board, (ii) by the Executive Chairman of the Board of Directors or Chief Executive Officer of the Corporation, or (iii) the holders of at least a majority of the votes entitled to be cast by the outstanding shares of the Common Stock and other stock voting with the Common Stock.  Any business transacted at any special meeting of shareholders shall be limited to matters relating to the purpose or purposes stated in the notice of meeting.

6.3     Action by Written Consent.   Any action required or permitted to be taken by shareholders at any annual or special meeting of shareholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than a majority of the votes entitled to be cast, or, if greater, not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted; provided, that from and after the closing of a Qualified Offering, any action required or permitted to be taken by the shareholders of the Corporation may be effected only at a duly called annual or special meeting of shareholders of the Corporation and may not be effected by any consent in writing by such shareholders.

## ARTICLE SEVEN

7.1     Limitation of Liability.  To the fullest extent permitted by the TBOC, a director of the Corporation shall not be liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director.  Without limiting the effect of the preceding sentence, if the TBOC is hereafter amended to authorize the further elimination or limitation of the liabilities of a director, then the liability of a director of the Corporation will be eliminated or limited to the fullest extent permitted by the TBOC, as so amended.

7.2     Indemnification.  The Corporation shall have the power to indemnify to the fullest extent permitted by the TBOC any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, any predecessor of the Corporation or any subsidiary or

affiliate of the Corporation, or serves or served as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, at the request of the Corporation, any predecessor to the Corporation or any subsidiary or any affiliate of the Corporation. The Corporation shall indemnify any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he is or was a director or officer of the Corporation or any predecessor of the Corporation, or serves or served as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, at the request of the Corporation, any predecessor to the Corporation or any subsidiary or any affiliate of the Corporation as and to the extent (and on the terms and subject to the conditions) set forth in the Bylaws or in any contract of indemnification entered into by the Corporation and any such person.

7.3    <u>Insurance</u>. The Corporation shall have power to purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, against any expense, liability or loss asserted against such person and incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the TBOC.

7.4    <u>Non-Exclusivity</u>. The rights and authority conferred in this <u>Article Seven</u> shall not be exclusive of any other right which any person may otherwise have or hereafter acquire and shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent of the Corporation and shall inure to the benefit of the heirs, executors and administrators of such a person.

7.5    <u>Vested Rights</u>.    Neither the repeal nor modification of this <u>Article Seven</u>, Certificate of Formation, the Bylaws, nor, to the fullest extent permitted by the TBOC, any applicable law, shall adversely affect any right or protection of any person granted pursuant hereto existing at, or arising out of or related to any event, act, omission, transaction or fact that occurred prior to the time of such repeal or modification (regardless of when any proceeding (or part thereof) relating to such event, act, omission, transaction or fact arises or is first threatened, commenced or completed).

## ARTICLE EIGHT

8.1    <u>Change in Vote Required</u>. Except as provided in this Certificate of Formation, pursuant to Sections 21.365 and 21.366 of the TBOC, any action of the Corporation which, under the provisions of the TBOC or any other applicable law, is required to be authorized or approved by the holders of any specified fraction which is in excess of one-half or any specified percentage which is in excess of fifty percent of the outstanding shares (or of any class or series thereof) of the Corporation shall, notwithstanding any law, be deemed effectively and properly authorized or approved if authorized or approved by the vote of the holders of at least a majority of the votes entitled to be cast in respect of the outstanding shares entitled to vote thereon (or, if the holders of any class or series of the Corporation's shares shall be entitled by the TBOC or any other applicable law to vote thereon separately as a class, by the vote of the holders of at least a majority of the votes entitled to be cast in respect of the outstanding shares of each such class or series). Without limiting the generality of the foregoing, the foregoing provisions of this <u>Article Eight</u> shall be applicable to any required shareholder authorization or approval of: (a) any amendment to this Certificate of Formation; (b) any plan of merger, share exchange, or

reorganization involving the Corporation; (c) any sale, lease, exchange, or other disposition of all, or substantially all, the property and assets of the Corporation; and (d) any voluntary dissolution of the Corporation. Notwithstanding anything to the contrary contained in this Certificate of Formation or the Bylaws, and notwithstanding that a lesser percentage or vote may be permitted from time to time by the TBOC, from and after the closing of a firm commitment underwritten public offering pursuant to an effective registration statement on Form S-1 (or successor form) under the Securities Act of 1933, as amended, covering the sale of Common Stock with aggregate gross proceeds to the Corporation (prior to underwriters' commissions and expenses) of not less than $50,000,000 (a "Qualified Offering"), no provision of this Certificate of Formation may be altered, amended, changed or repealed in any respect, nor may any provision of this Certificate of Formation or of the Bylaws inconsistent therewith be adopted, unless in addition to any other vote required by this Certificate of Formation or otherwise required by the TBOC, such alteration, amendment, repeal or adoption is approved at a meeting of the shareholders called for that purpose by the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the votes entitled to be cast in respect of the shares of capital stock entitled to vote thereon, voting together as a single class.

　　　　8.2　　No Additional Voting Rights. Nothing contained in this Article Eight is intended to require shareholder authorization or approval of any action of the Corporation whatsoever unless such approval is specifically required by the other provisions of this Certificate of Formation (including any resolutions relating to any series of Legacy Preferred Stock), the Bylaws, or by the TBOC or other applicable law.

## ARTICLE NINE

　　　　Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's shareholders, (iii) any action asserting a claim against the Corporation or any director, officer or other employee of the Corporation arising pursuant to any provision of the TBOC or this Certificate of Formation or Bylaws (as either may be amended from time to time) or (iv) any action asserting a claim against the Corporation or any director, officer or other employee of the Corporation governed by the internal affairs doctrine shall be the state and federal courts located in Dallas County, Texas. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article Nine.

## ARTICLE TEN

　　　　No holder of any shares of capital stock of the Corporation, whether now or hereafter authorized, shall, as such holder, have any preemptive or preferential right to receive, purchase, or subscribe to (i) any unissued or treasury shares of any class of stock (whether now or hereafter authorized) of the Corporation, (ii) any obligations, evidences of indebtedness, or other securities of the Corporation convertible into or exchangeable for, or carrying or accompanied by any rights to receive, purchase, or subscribe to, any such unissued or treasury shares, (iii) any right of subscription to, any right to receive, or any warrant or option for the purchase of, any of the foregoing securities, or (iv) any other securities that may be issued or sold by the Corporation, in each case except for such rights as are explicitly provided by contract, including the Shareholders Agreement.

LEGAL02/39933000v2

APP0824

## ARTICLE ELEVEN

No person entitled to vote at an election for directors may cumulate votes to which such person is entitled.

## ARTICLE TWELVE

Except as otherwise set forth herein, for purposes of this Certificate of Formation, the following terms shall have the meanings indicated:

(a)    "affiliate" shall mean a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another person.

(b)    "business day" shall mean any day other than a Saturday, Sunday or other day on which banks are required or permitted to close in the State of Texas.

(c)    "control," including the terms "controlling," "controlled by" and "under common control with," shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise.

(d)    "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

(e)    "group" shall be determined in accordance with Section 13(d)(3) of the Exchange Act and the rules and regulations promulgated thereunder.

(f)    "person" shall mean an individual, any general partnership, limited partnership, limited liability company, corporation, trust, business trust, joint-stock company, joint venture, unincorporated association, cooperative or association or any other legal entity or organization of whatever nature, and shall include any successor (by merger or otherwise) of such entity.

(g)    "Principal" means any member of the Goodman family who is, directly or indirectly, a shareholder of the Corporation.

(h)    "Related Parties" means: (i) any controlling stockholder, at least 51% owned (and controlled) subsidiary, or in the case of any individual, any immediate family member or descendant of any Principal and the heirs, executors and administrators and beneficiaries of the estate of such Principal or any such family member, or (ii) any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or persons beneficially holding at least a 51% (and controlling) interest of which consists of any one or more Principals and/or such other persons referred to in the immediately preceding clause (i).

(i)    "stock" shall mean, with respect to any corporation, capital stock and, with respect to any other entity, any equity interest.

## ARTICLE THIRTEEN

The names of the persons who are serving presently are directors of the Corporation are as follows:

| Name | Mailing Address |
|------|-----------------|
| James Goodman | 2801 Network Blvd., Ste. 300<br>Frisco, Texas 75034 |
| Mark Keiffer | 2801 Network Blvd., Ste. 300<br>Frisco, Texas 75034 |

Each director shall have one (1) vote on any matter submitted to the Board; provided that in the event of a tie vote on any matter submitted to the Board, the Executive Chairman of the Board of Directors shall have an additional casting vote to resolve the matter. If the Executive Chairman of the Board of Directors has recused himself or herself from consideration of any such matter or is otherwise absent in consideration of such matter, another member of the Board of Directors designated by the Executive Chairman of the Board of Directors to act in his or her capacity as chairman in the event of such a recusal or absence shall have the additional casting vote to resolve a tie vote in such matter.

The directors shall elect a member of the Board of Directors to serve as Executive Chairman of the Board. The Executive Chairman of the Board shall have such powers as are set forth in this Certificate of Formation and the Bylaws; provided that if there is a Majority Shareholder at the time of election of an Executive Chairman, the election of such Executive Chairman shall be subject to the approval of the Majority Shareholder. As used in this Article Thirteen, "Majority Shareholder" means a single shareholder of record of the Corporation that owns shares of capital stock of the Corporation that represent a majority of the votes entitled to be cast by outstanding shares of capital stock of the Corporation entitled to vote at a meeting of shareholders.

\* \* \*

LEGAL02/39933000v2

APP0826